# Exhibit A

## INDEX OF EXHIBIT A

Service of Process ............................................................................... 1 to 2

Summons ........................................................................................ 3 to 5

Complaint and Civil Case Information Sheet ................................................. 6 to 26

Defendants St. Joseph's Health, Inc. and Michael Lange, M.D.'s Answers and Crossclaims ................................................................................... 27 to 43

Order Extending Time for Service of an Affidavit of Merit ........................ 44 to 45

Order Denying Defendants St. Joseph's Health, Inc. and Michael Lange, M.D.'s Motion to Dismiss ................................................................................ 46

Stipulation of Dismissal with Prejudice as to Defendants St. Joseph's Health, Inc. and Michael Lange, M.D. .............................................................. 47 to 48

Gilead Sciences, Inc.'s Motion to Dismiss .............................................. 49 to 197

Defendants St. Joseph's Health, Inc. and Michael Lange, M.D.'s Opposition to Gilead Sciences, Inc.'s Motion to Dismiss .............................................. 198 to 200

Plaintiff's Opposition to Gilead Sciences, Inc.'s Motion to Dismiss ....... 201 to 226

Gilead Sciences, Inc.'s Reply in Support of the Motion to Dismiss ........ 227 to 246

 **CT Corporation**

**Service of Process Transmittal**
07/10/2020
CT Log Number 537925309

TO: David Meresman
Gilead Sciences, Inc.
333 Lakeside Dr
Foster City, CA 94404-1147

RE: **Process Served in New Jersey**

FOR: Gilead Sciences, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ANTHONY GAETANO, Pltf. vs. GILEAD SCIENCES, INC., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # PASL201120 |
| **NATURE OF ACTION:** | Medical Injury - Improper Care and Treatment |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, West Trenton, NJ |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/10/2020 at 14:51 |
| **JURISDICTION SERVED :** | New Jersey |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/10/2020, Expected Purge Date: 07/15/2020 |
| | Image SOP |
| | Email Notification, CHRIS GOLIS  chris.golis@gilead.com |
| | Email Notification, David Meresman  david.meresman@gilead.com |
| | Email Notification, Plato Mok  Plato.Mok@gilead.com |
| | Email Notification, David Meresman  david.meresman@gilead.com |
| | Email Notification, Keeley Wettan  keeley.wettan@gilead.com |
| | Email Notification, Diana Gama  diana.gama@gilead.com |
| | Email Notification, Jocelyn Delavega  jocelyn.delavega@gilead.com |
| | Email Notification, EILEEN BELTRAN  eileen.beltran1@gilead.com |
| | Email Notification, CARIN KWON  carin.kwon@gilead.com |
| | Email Notification, KATIE RICE  katharine.rice@gilead.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
07/10/2020
CT Log Number 537925309

**TO:** David Meresman
Gilead Sciences, Inc.
333 Lakeside Dr
Foster City, CA 94404-1147

**RE:** **Process Served in New Jersey**

**FOR:** Gilead Sciences, Inc.  (Domestic State: DE)

**SIGNED:** The Corporation Trust Company
**ADDRESS:** 1999 Bryan Street
Suite 900
Dallas, TX 75201

**For Questions:** 866-665-5799
SouthTeam2@wolterskluwer.com

Page 2 of  2 / AK

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Ari G. Bernstein, Esq. – Attorney ID 024841992
LANDEL, BERNSTEIN & KALOSIEH, LLP
279 Franklin Avenue
Wyckoff, New Jersey 07481
(201) 891-6955
*Attorneys for Plaintiff Anthony Gaetano*

---

| | |
|---|---|
| ANTHONY GAETANO,<br><br>                Plaintiff,<br><br>      v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>              Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: PASSAIC COUNTY<br><br>Docket No.: PAS L-2011-20<br><br><br>**CIVIL ACTION**<br><br>**SUMMONS** |

**From the State of New Jersey to:**

### GILEAD SCIENCES, INC.

The Plaintiff named above, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit. If you dispute this Complaint, you or your attorney must file a written Answer or Motion and Proof of Service with the Deputy Clerk of the Superior Court in the County listed above within 35 days from the date you received this Summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is annexed hereto.) A filing fee ($175 to file an Answer or $50 to file a Motion) made payable to the *Treasurer, State of New Jersey* and a completed Case Information Statement (available from the Deputy Clerk of the Superior Court) must accompany your Answer or Motion when it is filed. You must also send a copy of your Answer or Motion to the Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve a written Answer or Motion (with fee and completed Case Information Statement) if you want the Court to hear your defense.

If you do not file and serve a written Answer or Motion within 35 days, the Court may enter a Judgment against you for the relief Plaintiff demands, plus interest and costs of suit.  If Judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the Judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live.  A list of these offices is provided.  If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.   A list of these numbers is also provided.

Dated:  July 8, 2020

/s/ *Michelle M. Smith*
**MICHELLE M. SMITH**
*Superior Court Clerk*

**Name of Defendant to Be Served:**          **GILEAD SCIENCES, INC.**

**Address of Defendant for Service:**          **The Corporation Trust Company**
*as Registered Agent for Gilead Sciences, Inc.*

c/o 820 Bear Tavern Road
    West Trenton, New Jersey 08628

| | | | |
|---|---|---|---|
| **ATLANTIC COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Division, Direct Filing<br>Atlantic County Civil Court Building,<br>First Floor<br>1201 Bacharach Boulevard<br>Atlantic City, NJ 08401<br>(609) 345-6700<br>**LAWYER REFERRAL**<br>(609) 345-3444<br>**LEGAL SERVICES**<br>(609) 348-4200 | **CUMBERLAND COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Case Management Office<br>Cumberland County Courthouse<br>Broad & Fayette Streets<br>Bridgeton, NJ 08302<br>(856) 451-8000<br>**LAWYER REFERRAL**<br>(856) 692-6207<br>**LEGAL SERVICES**<br>(856) 451-0003 | **MERCER COUNTY:**<br>Deputy Clerk of the Superior Court<br>Local Filing Office<br>Mercer County Courthouse<br>175 South Broad Street<br>Trenton, NJ 08650<br>(609) 278-7986<br>**LAWYER REFERRAL**<br>(609) 585-6200<br>**LEGAL SERVICES**<br>(609) 695-6249 | **SALEM COUNTY:**<br>Deputy Clerk of the Superior Court<br>Salem County Courthouse<br>92 Market Street<br>Salem, NJ 08079<br>(856) 935-7510<br>**LAWYER REFERRAL**<br>(856) 935-5628<br>**LEGAL SERVICES**<br>(856) 451-0003 |
| **BERGEN COUNTY:**<br>Deputy Clerk of the Superior Court<br>Case Processing Section, Room 119<br>Bergen County Justice Center<br>10 Main Street<br>Hackensack, NJ 07601-0769<br>(201) 646-2000<br>**LAWYER REFERRAL**<br>(201) 488-0044<br>**LEGAL SERVICES**<br>(201) 487-2166 | **ESSEX COUNTY:**<br>Deputy Clerk of the Superior Court<br>Essex County Courts Building<br>50 West Market Street, Room 131<br>Newark, NJ 07102<br>(973) 693-5700<br>**LAWYER REFERRAL**<br>(973) 622-6207<br>**LEGAL SERVICES**<br>(973) 624-4500 | **MIDDLESEX COUNTY:**<br>Deputy Clerk of the Superior Court<br>Middlesex Administration Building,<br>3rd Floor<br>1 Kennedy Square<br>New Brunswick, NJ 08903-2633<br>(732) 981-3200<br>**LAWYER REFERRAL**<br>(732) 828-0053<br>**LEGAL SERVICES**<br>(732) 249-7600 | **SOMERSET COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Division Office<br>Somerset County New Courthouse,<br>3rd Floor<br>20 North Bridge Street<br>Somerville, NJ 08876-1262<br>(908) 231-7000<br>**LAWYER REFERRAL**<br>(908) 685-2323<br>**LEGAL SERVICES**<br>(908) 231-0840 |
| **BURLINGTON COUNTY:**<br>Deputy Clerk of the Superior Court<br>Central Processing Office<br>Attn: Judicial Intake<br>Burlington County Court Facility,<br>First Floor<br>49 Rancocas Road<br>Mount Holly, NJ 08060<br>(609) 518-2500<br>**LAWYER REFERRAL**<br>(609) 261-4862<br>**LEGAL SERVICES**<br>(609) 261-1088 | **GLOUCESTER COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Case Management Office<br>Attn: Intake<br>Gloucester County Courthouse<br>1 North Broad Street<br>Woodbury, NJ 08096<br>(856) 853-3200<br>**LAWYER REFERRAL**<br>(856) 848-4589<br>**LEGAL SERVICES**<br>(856) 848-5360 | **MONMOUTH COUNTY:**<br>Deputy Clerk of the Superior Court<br>Monmouth County Courthouse<br>71 Monument Park<br>Freehold, NJ 07728-2633<br>(732) 431-7872<br>**LAWYER REFERRAL**<br>(732) 431-5544<br>**LEGAL SERVICES**<br>(732) 866-0020 | **SUSSEX COUNTY:**<br>Deputy Clerk of the Superior Court<br>Sussex County Judicial Center<br>43-47 High Street<br>Newton, NJ 07860<br>(973) 579-0675<br>**LAWYER REFERRAL**<br>(973) 267-5882<br>**LEGAL SERVICES**<br>(973) 383-7400 |
| **CAMDEN COUNTY:**<br>Deputy Clerk of the Superior Court<br>Camden County Hall of Records,<br>First Floor<br>101 South Fifth Street<br>Camden, NJ 08103<br>(856) 225-5000<br>**LAWYER REFERRAL**<br>(856) 964-4520<br>**LEGAL SERVICES**<br>(856) 964-2010 | **HUDSON COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Records Dept.<br>Brennan Courthouse, First Floor<br>583 Newark Avenue<br>Jersey City, NJ 07306<br>(201) 795-6000<br>**LAWYER REFERRAL**<br>(201) 798-2727<br>**LEGAL SERVICES**<br>(201) 792-6363 | **MORRIS COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Division<br>Morris County Courthouse<br>Washington & Court Streets<br>P.O. Box 910<br>Morristown, NJ 07960-0910<br>(973) 285-6400<br>**LAWYER REFERRAL**<br>(973) 267-5882<br>**LEGAL SERVICES**<br>(973) 285-6911 | **UNION COUNTY:**<br>Deputy Clerk of the Superior Court<br>Union County Courthouse<br>2 Broad Street, First Floor<br>Elizabeth, NJ 07207-6073<br>(908) 659-4100<br>**LAWYER REFERRAL**<br>(908) 353-4715<br>**LEGAL SERVICES**<br>(908) 354-4340 |
| **CAPE MAY COUNTY:**<br>Deputy Clerk of the Superior Court<br>Cape May County Courthouse<br>9 North Main Street<br>Cape May Court House, NJ 08210<br>(609) 465-1000<br>**LAWYER REFERRAL**<br>(609) 463-0313<br>**LEGAL SERVICES**<br>(609) 465-3001 | **HUNTERDON COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Division<br>Hunterdon County Courthouse<br>65 Park Avenue<br>Flemington, NJ 08822<br>(908) 788-1589<br>**LAWYER REFERRAL**<br>(908) 735-2611<br>**LEGAL SERVICES**<br>(908) 782-7979 | **OCEAN COUNTY:**<br>Deputy Clerk of the Superior Court<br>Ocean County Courthouse<br>118 Washington Street<br>Room 119<br>Toms River, NJ 08754<br>(732) 244-2121<br>**LAWYER REFERRAL**<br>(732) 240-3666<br>**LEGAL SERVICES**<br>(732) 341-2727 | **WARREN COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Division Office<br>Warren County Courthouse<br>Second & Hardwick Streets<br>Belvidere, NJ 07823-1500<br>(908) 475-6161<br>**LAWYER REFERRAL**<br>(973) 267-5882<br>**LEGAL SERVICES**<br>(908) 475-2010 |
| | | **PASSAIC COUNTY:**<br>Deputy Clerk of the Superior Court<br>Civil Division<br>Passaic County Court House<br>77 Hamilton Street<br>Paterson, NJ 07505<br>(973) 247-8000<br>**LAWYER REFERRAL**<br>(973) 278-9223<br>**LEGAL SERVICES**<br>(973) 345-7171 | |

3

Ari G. Bernstein, Esq.
Attorney I.D. No.: 024841992
**LANDEL, BERNSTEIN & KALOSIEH, LLP**
279 Franklin Avenue
Wyckoff, New Jersey 07481
(201) 891-6955
*Attorneys for Plaintiff Anthony Gaetano*

| | |
|---|---|
| ANTHONY GAETANO,<br><br>            Plaintiff,<br><br>    v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>            Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: PASSAIC COUNTY<br><br>Docket No.:<br><br><u>**CIVIL ACTION**</u><br><br>**COMPLAINT** |

Plaintiff, ANTHONY GAETANO, residing at 70 Lincoln Avenue, Borough of Hawthorne, County of Passaic, State of New Jersey, by way of Complaint against Defendants, says:

<u>**THE PARTIES AND JURISDICTION**</u>

1.    Plaintiff, Anthony Gaetano (hereinafter, "Plaintiff"), is an individual who resides at 70 Lincoln Avenue, Borough of Hawthorne, County of Passaic, State of New Jersey.

2.    Upon information and belief, Defendant, Gilead Sciences Inc. (hereinafter, "Gilead"), is a California corporation that participates in the manufacture and sale of medicines mainly used to treat Human Immunodeficiency Virus-1 ("HIV") and has, at all times relevant herein, did substantial and continuous business in the State of New Jersey.

3.     Defendant Gilead is registered as a foreign profit corporation with the New Jersey Secretary of State and may be served through its President, Daniel O'Day, at its corporate headquarters located at 333 Lakeside Drive, Foster City, County of San Mateo, State of California 94404.

4.     Upon information and belief, Defendant, St. Joseph's Health, Inc. (hereinafter, "St. Joseph"), is a medical service provider and has at all times relevant herein did substantial and continuous business in the State of New Jersey. Defendant St. Joseph is registered as a nonprofit corporation with the New Jersey Secretary of State and can be served through its President, Kevin J. Slavin, at its headquarters located at 703 Main Street, City of Paterson, County of Passaic, State of New Jersey.

5.     Upon information and belief, Defendant, Dr. Michael Lange (hereinafter, "Dr. Lange"), at all times relevant herein, was a physician licensed to practice medicine in the State of New Jersey and an employee or agent of St. Joseph's in Paterson, New Jersey.

6.     Defendant, John Doe, (said name being fictitious) is an agent, servant and/or employee of St. Joseph and/or Dr. Lange, MD. Alternatively, John Doe is an independent contractor who also treated and/or cared for Plaintiff at all relevant times hereto. Plaintiff is presently unable to identify all potential Defendants whose negligence contributed to his damages. As soon as Plaintiff is able to identify other individuals and/or entities that contributed to his damages in the course of further investigation and/or discovery, Plaintiff reserves the right to amend this pleading pursuant to the Rules of the Court.

7.     Defendant, Jane Doe, (said name being fictitious) is an agent, servant and/or employee of St. Joseph and/or Dr. Lange, MD. Alternatively, Jane Doe is an independent contractor

who also treated and/or cared for Plaintiff at all relevant times hereto. Plaintiff is presently unable to identify all potential Defendants whose negligence contributed to his damages. As soon as Plaintiff is able to identify other individuals and/or entities that contributed to his damages in the course of further investigation and/or discovery, Plaintiff reserves the right to amend this pleading pursuant to the Rules of the Court.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

8.      On or about December 27, 2005, Plaintiff was prescribed Truvada by Dr. Lange, an antiretroviral manufactured by Gilead for the purpose of treating HIV.

9.      In 2014, Plaintiff began experiencing pain in his right shoulder and related body parts. The cause of this pain was unknown at the time.

10.     In 2015, this pain manifested itself into a bending/hooking of Plaintiff's right hand. The cause of this hooking was unknown at the time.

11.     On or about April 26, 2018, Plaintiff was diagnosed with chronic pain related to musculoskeletal disorders.

12.     On or about January 16, 2019, Plaintiff first discovered that Truvada was linked to adverse kidney and bone events through a television advertisement during the Jerry Springer show. It was on this date that Plaintiff first realized that his worsening medical condition may have been the result of Defendants' conduct.

13.     Plaintiff files this Complaint within two years from when he first discovered that Defendants' conduct caused his injuries.

## FIRST COUNT

### NEGLIGENCE
### (As to Defendants, St. Joseph's; Dr. Lange; John Doe; and Jane Doe)

14. On or about September 8, 2005, Plaintiff arrived at St. Joseph's Regional Medical Center located in Paterson, New Jersey to undergo health treatment.

15. Plaintiff communicated, and hospital records confirm, his past medical history that includes the following relevant diagnoses: HIV, Chronic Kidney Disease, and Type 2 Diabetes Mellitus.

16. On or about October 7, 2005, Plaintiff was diagnosed with the following additional relevant ailments: renal insufficiency, Anemia of Chronic Diseases ("AOCD") and dyselectrolytemia.

17. On or about December 27, 2005, Plaintiff was prescribed Truvada by Dr. Lange, an antiretroviral manufactured by Gilead for the purpose of treating HIV.

18. As directed by Dr. Lange, Plaintiff continued taking this drug (Truvada) daily until Dr. Lange prescribed Odefsey for Plaintiff in 2014. Plaintiff was not told why his medication was changed.

19. On or about May 9, 2006, Plaintiff began experiencing pain in his hands, elbow and left shoulder and reported same to Dr. Lange.

20. At all times relevant herein, Truvada's labelling included a warning to monitor patients who were at risk for adverse kidney events as clinically appropriate.

21.     During this period:

    a.  Plaintiff's diagnoses of Chronic Kidney Disease, Type 2 Diabetes, AOCD, renal insufficiency, and dyselectrolytemia made him at risk for adverse kidney events;

    b.  Defendants failed to adequately monitor the kidney health of Plaintiff as warned; and

    c.  Defendants failed to warn Plaintiff of potential kidney damage related to continued use of Truvada.

22.     At all times relevant herein, Truvada's labelling included a warning to monitor the bone health of patients who were at risk for adverse kidney events as clinically appropriate.

23.     During this period:

    a.  Plaintiff's diagnoses of Chronic Kidney Disease, Type 2 Diabetes, AOCD, renal insufficiency, and dyselectrolytemia made him at risk for adverse kidney events;

    b.  Defendants failed to adequately monitor the bone health of Plaintiff as warned; and

    c.  Defendants failed to warn Plaintiff of potential bone density damage related to continued use of Truvada.

24.     Defendants, their agents, servants and/or employees, negligently, carelessly and/or unskillfully cared for and treated Plaintiff during, but not limited to, the dates hereinabove set forth, as follows:

    a.  Negligent failure to follow the standard of care and skill of the average qualified member of the profession and practicing the specialties practiced by Defendants, and the employees, servants and agents of Defendants, taking into account advances in the profession;

    b.  Negligent failure to follow the standards of care and skill of an average hospital

    undertaking the care of patients such as Plaintiff, taking into account advances in the profession;

c.  Negligent failure to diagnose the conditions and medical problems of Plaintiff, and the subsequent complications;

d.  Negligent failure to treat or adequately treat the conditions and medical problems of Plaintiff, and the subsequent complications;

e.  Negligent failure to prescribe or administer or have administered, or prescribed or administered or have administered in the proper amounts, certain medications or medicines to Plaintiff that could have prevented Plaintiff's medical conditions and subsequent complications;

f.  Negligent failure to respond to certain symptoms of Plaintiff, or negligently failed to use diligence in any responses made, in the care and treatment of Plaintiff, and subsequent complications; and

g.  Negligently failed to diagnose and treat Plaintiff's musculoskeletal disorders.

25.    As a direct and proximate result of the negligence and carelessness of Defendants, their agents, servants and/or employees, as hereinabove set forth, Plaintiff has been caused to suffer and continues to suffer severe, painful and permanent injuries and emotional damages, caused him great pain and long suffering, and has left him with permanent disabilities that has incapacitated him and caused him great pain and suffering. Plaintiff has been and will be in the future, caused to expend great sums of money for medical, hospital and psychological care and treatment.

**WHEREFORE**, Plaintiff Anthony Gaetano demands Judgment against these Defendants on the First Count herein, jointly and severally, for all of his damages or, in the alternative, in the amount of their respective damages together with interest and costs of suit.

## SECOND COUNT

### STRICT PRODUCTS LIABILITY
### (As to Defendant Gilead)

26.   Plaintiff Anthony Gaetano repeats each and every allegation of the First Count herein and makes the same a part hereof.

27.   At all times relevant herein, this Defendant was and is responsible for the production and sale of Truvada (the "Product"), an anti-retroviral medication used to treat HIV with the active ingredient *tenofovir disoproxil fumarate* ("TDF"), a formulation of tenofovir meant to make delivery of tenofovir to HIV infected cells possible through ingestion.

28.   At all relevant times, Defendant designed, manufactured, tested, packaged, labeled, promoted, distributed and/or sold the Product, and Plaintiff Anthony Gaetano was a reasonably foreseeable or intended user or recipient of Defendant's Product. Defendant exercised significant control over the aforementioned design, manufacture, packaging, or labeling of the Product.

29.   Defendant also produced and sold Viread, an antiretroviral also containing the active ingredient TDF.

30.   The first TDF based drug, Viread, was approved for medical use by the FDA on October 26, 2001.

31.   The Product (a combination of TDF and an inactive ingredient) was approved by the FDA on August 2, 2004.

32.   Before the introduction of TDF based antiretroviral medications in 2001, Defendant knew that two of its substantially similar antiretroviral medications caused significant kidney

7

and bone damage.

33.  Before the introduction of TDF based antiretroviral medications into the market, Defendant's preclinical trials of TDF showed exposure to TDF caused bone toxicity through the softening of the bone (osteomalacia) and reduced bone mineral density.

34.  By 2004 and the introduction of the Product into the market, Defendant had years' worth of evidence that TDF medications were causing liver and bone damage.

35.  By this time, medical literature identified multiple cases of renal dysfunction and failure even in those with no preexisting kidney issues.

36.  By this time, Defendant's long-term clinical data also showed that TDF was damaging bones, with 48-week data showing decreases in bone mineral density, as well as significant increases in biochemical markers signaling bone turnover in patients taking Viread compared to other HIV drugs. These studies recognized that osteomalacia was caused by renal dysfunction.

37.  On March 14, 2002, the FDA sent Defendant Gilead a Warning Letter admonishing Defendant for its promotional activities that contained false and misleading statements in violation of the Federal Food, Drug, and Cosmetic Act. The FDA stated that Defendant unlawfully minimized Viread's risks, including with respect to kidney toxicity, known as nephrotoxicity, and overstated its efficacy.

38.  During a June 2003 sales force training, Defendant told representatives to respond to anticipated concerns about TDF's nephrotoxicity by downplaying the fact that the many patients taking TDF drugs had experienced adverse effects.

39.   In 2004, Defendant took out a print advertisement in the November 2004 edition of *The Advocate*, the oldest and largest LBGT magazine in the US that failed to warn of that the suffering of kidney and bone damage by TDF patients was not limited to at-risk patients.

40.   From October 2001 through May 20, 2007, Defendant's labelling of TDF medications in the US failed to warn doctors that all patients should be monitored for adverse kidney effects, only recommending patients who were at risk of adverse kidney events be monitored although Defendant knew through its studies that otherwise healthy individuals were experiencing adverse kidney events.

41.   From August 2004 through May 20, 2007, Defendant's labelling of the Product failed to include the same warning as described in Paragraph 40 of this Complaint.

42.   Defendant also failed to include any warning about the need to monitor bone defects by consumers of TDF medication until October 14, 2003, and after then only in patients who were at risk for renal and bone adverse effects, failing to warn doctors that patients should be universally monitored.

43.   Defendant failed to warn for universal monitoring of the kidneys although their label states that the dosing interval must be adjusted in those patients exhibiting high creatinine clearance (a biochemical marker indicating kidney damage).

44.   On May 21, 2007, Defendant's labels for some of their TDF medication began recommending an initial test of creatinine clearance and monitoring as clinically appropriate during therapy although Defendant knew universal monitoring should be done.

45.   This initial creatinine clearance test and monitoring was not placed on the Product's

9

warning labels until 2008.

46.  This label remained inadequate because creatinine clearance is an insensitive marker of kidney damage and is typically present when TDF induced injury is irreversible. Defendant should have warned doctors to check for serum phosphorus and/or urine glucose, more effective markers of kidney damage.

47.  Defendant only added additional recommendations to monitor other biochemical markers for kidney damage in Truvada in 2018.

48.  All these recommendations were further inadequate as they failed to instruct how often these biochemical markers should be checked. "Clinically appropriate" could mean that the patients are experiencing irreversible damage before they are properly monitored.

49.  All of these recommendations were also inadequate as they failed to disclose that kidney and bone damage could occur in those with no pre-existing bone and kidney conditions. All of these inadequacies were also present in patient package inserts for the Product.

50.  During this time, Defendant provided stronger monitoring recommendations and warnings to physicians and patients in the European Union.

51.  Unlike US warnings, that at its height only recommended the monitoring of a single kidney health marker for unspecific intervals, Defendant recommended to all EU doctors a consistent monitoring schedule of multiple kidney health markers. Defendant Gilead also recommended that these health markers be monitored every four weeks. Gilead also recommended that these health markers should be monitored even in those without pre-existing kidney or bone problems.

10

52.    Specifically, Defendant Gilead's 2005 labels for the Product in the EU recommended "careful monitoring of renal function (serum creatinine and serum phosphate) … before taking Truvada, every four weeks during the first year, and then every three months. In patients with a history of renal function or in patients who are at risk for renal dysfunction, consideration should be given to more frequent monitoring of renal function."

53.    In 2006, Defendant released a "Dear Doctor" letter to physicians in the EU stressing the importance of a frequent and consistent monitoring schedule of kidney function. No such warning was issued in the US.

54.    Defendant's labels for TDF based products in the EU also instruct physicians to increase monitoring when patients show an increase, but not clinically significant increase, in biochemical markers for kidney damage.

55.    During this time, Defendant published studies that used suspiciously convenient methodologies to understate the seriousness of renal events caused by TDF medications.

56.    According to a 2009 shareholder lawsuit, a former employee alleged that Defendant Gilead was trying to overcome the perception in the medical community that Viread would likely cause kidney damage.

57.    On March 26, 2010, the FDA issued a third Warning Letter to Defendant regarding Defendant's direct-to-consumer print advertising for the Product, stating that the advertisements were false and misleading because they unlawfully minimized the risks associated with the drug.

58.    Before the introduction of TDF medications in the market, Defendant also discovered a

safer composite of tenofovir known as tenofovir alafenamide fumarate ("TAF") that could be taken in doses up to 10 times smaller than TDF, substantially reducing the toxicity of the antiretroviral.

59.     In 2001, Defendant's 10-K highlighted the benefit of TAF as introducing the same amount of active ingredient into cells but with higher efficiency.

60.     In 2002, Defendant's researchers presented data on TAF at a conference on retroviruses. They explained that the goal with TAF was to deliver tenofovir to the cells in lower doses for greater results and fewer side effects.

61.     In the same year, Defendant stated in its 10-K that operations would suffer if Viread did not maintain or increase its market acceptance (and made similar statements in their 2003 and 2004 10-k filings).

62.     In 2004, despite the overwhelmingly positive results from clinical trials, Defendant abruptly discontinued the phasing in of TAF antiretroviral medications shortly after introducing the Product into the market.

63.     In 2004, Defendant Gilead stated that it chose to discontinue its TAF research because it was too similar to TDF, despite Defendant's research before and after that evidences TAF to be clearly superior to TDF.

64.     During the time between the introduction of TDF drugs onto the market and the first sale of TAF drugs, Defendant began a marketing campaign that sought to underplay the risks associated with TDF drugs, calling it a "miracle drug" with "no toxicities," and failing to recommend the monitoring of patients that prevented doctors from being able to detect kidney and bone damage in a timely manner.

12

65.    It was only in October 2010 that Defendant renewed its development of TAF as an antiretroviral medication.

66.    In 2010, Defendant constantly referred to TAF as a "new" development in antiretroviral medication.

67.    An October 2010 earnings call indicates that Defendant's Chief Scientific Officer knew TAF's superior safety over TDF and was positioning it as a replacement for the now-declining use of Viread and other TDF medications.

68.    In a statement to the Capital Markets Healthcare Conference on March 2, 2011, Defendant's President and Chief Operating Officer explicitly states that Defendant stopped research into TAF due to its fear that TAF would hurt the Product's competition against Epzicom for market dominance.

69.    Throughout the first half of the past decade, Defendant constantly touted TAF's benefits over TDF.

70.    Defendant completed research and had its TAF medication approved by the FDA (brand name "Genvoya") on November 5, 2015, which could have been conceivably approved in 2009 had Gilead not purposefully paused their research and development of TAF in 2004.

71.    The timing of the release of TAF drugs was meant to have doctors switch brand name TDF patients to TAF medications before generic TDF was introduced in 2020.

## **DESIGN DEFECT**

72.    Defendant knew or should have known that the Product created or caused unreasonable harm and dangerous side effects, including but not limited to kidney and bone density

damage, as well as other severe and permanent health consequences, and Defendant failed to warn of those risks.

73.    The Product's risks outweighed its utility; alternatively, a practical and feasible, safer, alternative design existed that would have reduced or prevented the harm caused to the Plaintiff.

74.    The Product prescribed to Plaintiff Anthony Gaetano was being used in a manner reasonably anticipated at the time it was prescribed to him.

75.    The Product's design is defective because TDF in high concentrations causes nephrotoxicity and loss of bone density, adversely affecting patient health.

## **FAILURE TO WARN**

76.    Defendant failed to warn of the above-listed risks. TDF in the Product has defects that create a high risk of unreasonable and dangerous injuries and side effects with severe, permanent adverse health consequences.

77.    During the entire history of the sale of TDF products, Defendant had the ability, through past and current regulations, to change the labeling of TDF products to warn of all of the associated risks and strengthen their recommendations to proper standards.

78.    The warnings, if any, provided to Plaintiff Anthony Gaetano and his healthcare providers in their capacities as learned intermediaries were improper because they did not reflect the full extent of the potential health complications associated with using the Product.

79.    Had Defendant adequately warned Plaintiff Anthony Gaetano and/or his healthcare providers of the risks associated with the Product, the healthcare providers acting as

14

reasonably prudent healthcare providers, would have elected not to use the Product to treat Plaintiff's HIV.

80.    As a direct and proximate result of The Product's design defect and/or Defendant's inadequate warning(s), Plaintiff Anthony Gaetano suffered serious bodily injuries, experienced significant mental and physical pain and suffering, and expended and will continue to expend large sums of money for medical care and treatment, and suffered economic loss and Plaintiff Anthony Gaetano is otherwise physically, emotionally and economically injured from the manufacturing defects.

**WHEREFORE**, Plaintiff Anthony Gaetano demands Judgment against this Defendant on the Second Count herein for all of his damages, together with interest and costs of suit.

LANDEL, BERNSTEIN & KALOSIEH, LLP
*Attorneys for Plaintiff Anthony Gaetano*

Dated:  July ___8___, 2020            By _____
                                              Ari G. Bernstein, Esq.

## DESIGNATION OF TRIAL COUNSEL

Ari G. Bernstein, Esq. of the law firm of Landel, Bernstein & Kalosieh, LLP hereby certifies that in accordance with R. 4:5-1(c) he is hereby designated as trial counsel for Plaintiff, Anthony Gaetano.

**LANDEL, BERNSTEIN & KALOSIEH, LLP**
*Attorneys for Plaintiff Anthony Gaetano*

Dated:  July ___ , 2020          By: _____
                                         Ari G. Bernstein, Esq.

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any Court and is not the subject of a pending arbitration proceeding. Further, all parties who should be joined in this action have been joined.

**LANDEL, BERNSTEIN & KALOSIEH, LLP**
*Attorneys for Plaintiff Anthony Gaetano*

Dated:  July ___ , 2020          By: _____
                                         Ari G. Bernstein, Esq.

## AFFIDAVIT OF MERIT

Pursuant to N.J.S.A. 2A:53A-27, Plaintiff will provide an Affidavit of Merit in compliance with New Jersey laws.

**LANDEL, BERNSTEIN & KALOSIEH, LLP**
*Attorneys for Plaintiff Anthony Gaetano*

Dated:  July ___ , 2020          By: _____
                                         Ari G. Bernstein, Esq.

## <u>DEMAND FOR DISCOVERY OF INSURANCE COVERAGE</u>

Pursuant to R. 4:10-2(b) demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Yes ( )        No ( )

If the answer is "yes" state the type of each policy for which coverage exists:

General Liability Yes ( ) No ( )

Commercial        Yes ( ) No ( )

Umbrella          Yes ( ) No ( )

Excess            Yes ( ) No ( )

Other             Yes ( ) No ( )

If the answer is "yes" attach a copy of each policy or, in the alternative, state under oath or certification the following:

a)  Policy Number;
b)  Name and address of insuror or issuer;
c)  inception and expiration dates;
d)  names and addresses of all persons insured thereunder;
e)  personal injury limits;
f)  property damage limits;
g)  medical payment limits;
h)  name and address of person who has custody and possession thereof; and
i)  where and when each policy or agreement can be inspected and copied.

## DEMAND FOR PRODUCTION OF DOCUMENTS

**PLEASE TAKE NOTICE**, that pursuant to Rule 4:18-1, we hereby request that you produce true and complete copies within thirty (30) days of service of this request, at the Law Offices of Landel, Bernstein & Kalosieh, LLP, 279 Franklin Avenue, Wyckoff, New Jersey 07481, or at such other location as is reasonable and convenient for the parties, for examination and for copying, the documents, records and/or tangible things listed below that are within your actual or constructive possession, custody or control.

## DOCUMENTS TO PRODUCE

1.     Any and all statements made prior to the date of filing of Plaintiff's Complaint, by any party to this lawsuit, their agents, representatives or employees, whether written or oral, made during Plaintiff's course of treatment.

2.     Any and all statements made prior to the date of filing of Plaintiff's Complaint, by any witness to the events described in any and all of the paragraphs of the cause of action.

3.     Any and all statements made prior to the date of filing of Plaintiff's Complaint, by any person other than witnesses or parties which relates or refer in any way to the cause of action.

4.     Any and all written reports rendered by Defendants' proposed expert witnesses, including, but not limited to any medical expert witnesses intended or not intended to be called at the time of trial.

5.     Any and all books, treaties, commentaries, reports, statutes, codes, ordinances, rules, regulations or other published documents referred to and utilized by or relied upon by any expert witness whom Defendants intend to call at trial.

6.     Any and all scientific materials including but not limited to medical studies, public journal articles, clinical trials, phased research and development reports and any other data-driven materials prepared or utilized by, referred to or relied upon by any expert witnesses whom Defendants intend to call at time of trial..

18

7.     A copy of any and all written reports or summaries of oral reports, as well as a copy of the curriculum vitae, of any and all experts that have been supplied to Defendants' attorneys, whose testimony will be offered at the time of trial in the above captioned matter.

8.     All liability expert reports. If oral, supply a complete summary of same.

9.     Copies of any statements obtained from any witnesses, any party to this action, any parties investigators, agents, servants or employees; If oral, supply a complete summary of same.

10.     Copies of any and all medical reports and bills from treating, consulting or examining physicians of Plaintiff.

11.     Copies of any and all diagnostic tests, reports, summaries and bills relating to Plaintiff.

12.     Copies of all interrogatories and responses thereto propounded or received by or from any other party with regard to this action.

13.     Provide a detailed summary and/or any supporting documents relating to or demonstrating any and all insurance policies which would cover any and all claims referred to in the Plaintiffs' complaint.

14.     Attach hereto copies of any and all documents demonstrating any and all benefits received of any kind and from any source to which Defendants were entitled as a result of the incident which is the subject of this lawsuit together with a summary or documents indicating benefits paid to date.

15.     A complete copy of each and every document which Defendants may rely upon at the time of trial.

16.     A complete copy of any and all expert reports in the possession of the Defendants regarding the subject matter of this lawsuit.

17.     All documents not produced pursuant to the above that the Defendants may refer to at the time of trial, mark for identification or offer into evidence during the trial of this matter.

18.   All documents referred to or identified in defendants' answers to interrogatories.

19.   A copy of the insurance declaration page for each and every insurance policy mentioned in Defendants' answers to interrogatories.

20.   A copy of each and every document or other item obtained by subpoena which reflects, relates or refers to any named party or any other item at issue in this action.

21.   A copy of each and every document or other item obtained with Plaintiff's authorization which reflects, relates or refers to any party named this action.

22.   Statements concerning the action or subject matter previously made by the Defendants pursuant to **Rule 4:10-2(c)**.

23.   The reports of any examining experts who have conducted an examination pursuant to **Rule 4:10-2** whether or not said expert is expected to testify as per **Rule 4:10-2**.

24.   Copies of all liability and/or damages expert reports in your possession of any person you may call at trial as an expert pursuant to **Rule 4:2(d)**.

25.   Copies of each and every document or other item reflecting Plaintiff's medical history and history of treatment, including but not limited to patient visit summaries, medical charts, diagnoses, body scans, laboratory test records and results and any other medical documents.

**LANDEL, BERNSTEIN & KALOSIEH, LLP**
*Attorneys for Plaintiff Anthony Gaetano*

Dated:  July __8__, 2020        By: _____
                                    Ari G. Bernstein, Esq.

20

# Civil Case Information Statement

## Case Details: PASSAIC | Civil Part Docket# L-002011-20

**Case Caption:** GAETANO ANTHONY  VS GILEAD SCIENCES, INC .

**Case Initiation Date:** 07/08/2020

**Attorney Name:** ARI GREENE BERNSTEIN

**Firm Name:** LANDEL BERNSTEIN & KALOSIEH, LLP

**Address:** 279 FRANKLIN AVE

WYCKOFF NJ 07481

**Phone:** 2018916955

**Name of Party:** PLAINTIFF : Gaetano, Anthony

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** MEDICAL MALPRACTICE

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** YES

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Anthony Gaetano? NO**

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Other(explain)   Doctor/Patient

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

| | |
|---|---|
| 07/08/2020 | /s/ ARI GREENE BERNSTEIN |
| Dated | Signed |

**FARKAS & DONOHUE, LLC**
Evelyn C. Farkas, Esq - 024851985
25 A Hanover Road, Suite 320
Florham Park, New Jersey 07932
(973) 443-9400
(973) 443-4330 Fax
Attorneys for Defendants, St. Joseph's Health, Inc. and Dr. Michael Lange
Our File No.: STJI-419

| | |
|---|---|
| ANTHONY GAETANO, | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION – PASSAIC COUNTY |
| | : DOCKET NO.  L-2011-20 |
| Plaintiff, | : |
| | : Civil Action |
| | : |
| vs. | : **ANSWER TO THE COMPLAINT,** |
| | : **CROSSCLAIMS, ANSWER TO** |
| GILEAD SCIENCES, INC., ST. JOSEPH'S: | **CROSSCLAIMS, DEMAND FOR** |
| HEALTH, INC., MICHAEL LANGE, | : **ANSWERS TO INTERROGATORIES** |
| JOHN DOES, et. al. | : **AND JURY DEMAND** |
| | : |
| Defendants. | : |

Defendants, Michael Lange, M.D. (specializing in Infectious Disease) and St. Joseph's

Health, Inc., by   and through their attorneys Farkas & Donohue, LLC, by way of Answer to the

Complaint say:

## THE PARTIES AND JURISDICTION

1.      These Defendants lack sufficient knowledge or information to form a belief as to

the truth of the allegations contained in paragraph one.

2.      These Defendants lack sufficient knowledge or information to form a belief as to

the truth of the allegations contained in paragraph two.

3.      These Defendants lack sufficient knowledge or information to form a belief as to

the truth of the allegations contained in paragraph three.

4.      These Defendants admit upon information defendant, St. Joseph's Health, Inc. is

a medical service provider registered as a nonprofit corporation with the New Jersey Secretary

1

of State. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph four.

5.      These Defendants admit Dr. Michael Lange specializes in Infectious Disease as contained in paragraph five. No knowledge as to remaining.

6.      These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph six.

7.      These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seven.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

8.      These Defendants will rely generally on medical records for nature and dates of treatment. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph eight.

9.      These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph nine.

10.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph ten.

11.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph eleven.

12.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph twelve.

13.     These Defendants deny the allegations contained in paragraph thirteen.

## **FIRST COUNT**

14.     These Defendants will rely generally on medical records for nature and dates of treatment. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph fourteen.

15.     These Defendants will rely generally on medical records for nature and dates of treatment. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph fifteen.

16.     These Defendants will rely generally on medical records for nature and dates of treatment. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph sixteen.

17.     These Defendants will rely generally on medical records for nature and dates of treatment. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph seventeen.

18.     These Defendants deny the allegations contained in paragraph eighteen.

19.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph nineteen.

20.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph twenty.

21.     These Defendants deny the allegations as to them. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph twenty-one.

22.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph twenty-two.

3

23. These Defendants deny the allegations as to them. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph twenty-three.

24. These Defendants deny the allegations as to them. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph twenty-four.

25. These Defendants deny the allegations as to them. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph twenty-five.

**WHEREFORE**, these Defendants demand judgment in their favor, dismissal of the Complaint with prejudice, costs, fees and such other and further relief as the Court deems just.

## SECOND COUNT

26. These Defendants repeat and reiterate their responses to each and every allegation contained in the previous portions of this Answer, inclusive, as if set forth at length herein.

27. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph twenty-seven.

28. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph twenty-eight.

29. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph twenty-nine.

30. These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty.

4

31.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-one.

32.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-two.

33.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-three.

34.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-four.

35.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-five.

36.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-six.

37.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-seven.

38.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-eight.

39.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph thirty-nine.

40.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty.

41.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-one.

42.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-two.

5

43.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-three.

44.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-four.

45.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-five.

46.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-six.

47.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-seven.

48.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-eight.

49.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph forty-nine.

50.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty.

51.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-one.

52.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-two.

53.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-three.

54.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-four.

55.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-five.

56.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-six.

57.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-seven.

58.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-eight.

59.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph fifty-nine.

60.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty.

61.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-one.

62.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-two.

63.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-three.

64.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-four.

65.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-five.

66.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-six.

67.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-seven.

68.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-eight.

69.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph sixty-nine.

70.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy.

71.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-one.

## DESIGN DEFECT

72.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-two.

73.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-three.

74.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-four.

75.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-five.

## FAILURE TO WARN

76.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-six.

77.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-seven.

78.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-eight.

79.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph seventy-nine.

80.     These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph eighty.

**WHEREFORE**, these Defendants demand judgment in their favor, dismissal of the Complaint with prejudice, costs, fees and such other and further relief as the Court deems just.

### FIFTH COUNT

1.     These Defendants repeat and reiterate their responses to each and every allegation contained in the previous portions of this Answer, inclusive, as if set forth at length herein.

2.     These Defendants deny the allegations contained in paragraph two of the Fifth Count.

**WHEREFORE**, these Defendants demand judgment in their favor, dismissal of the Complaint with prejudice, costs, fees and such other and further relief as the Court deems just.

### SIXTH COUNT

1.     These Defendants repeat and reiterate their responses to each and every allegation contained in the previous portions of this Answer, inclusive, as if set forth at length herein.

2.     These Defendants deny the allegations contained in paragraph two of the Sixth Count.

9

**WHEREFORE**, these Defendants demand judgment in their favor, dismissal of the Complaint with prejudice, costs, fees and such other and further relief as the Court deems just.

**SEVENTH COUNT**

1.      These Defendants repeat and reiterate their responses to each and every allegation contained in the previous portions of this Answer, inclusive, as if set forth at length herein.

2.      These Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph two of the Seventh Count.

3.      These Defendants deny the allegations contained in paragraph three of the Seventh Count.

**WHEREFORE**, these Defendants demand judgment in their favor, dismissal of the Complaint with prejudice, costs, fees and such other and further relief as the Court deems just

**FIRST SEPARATE DEFENSE**

No agency relationship existed between these Defendants and any other party to this proceeding as a result of which these Defendants have vicarious liability by reason of the act of any other party.

**SECOND SEPARATE DEFENSE**

These Defendants incorporate herein all defenses by the original Defendants and any co-Defendants presently or hereafter filed.

**THIRD SEPARATE DEFENSE**

Any injury or damage that the Plaintiffs may have sustained was due to the act or acts of a third person or persons over whom these Defendants had no control.

10

## FOURTH SEPARATE DEFENSE

These Defendants violated no duty to Plaintiffs or any other party during the time referred to in the Complaint.

## FIFTH SEPARATE DEFENSE

The injuries and damages alleged by Plaintiffs were not proximately caused by the acts or omissions of these Defendants.

## SIXTH SEPARATE DEFENSE

These Defendants are entitled to a credit for any expenses by insurance or other third parties which are claimed as damages by Plaintiffs, pursuant to N.J.S.A. 2A: 15-97.

## SEVENTH SEPARATE DEFENSE

Plaintiffs' claims against these Defendants are barred by its comparative negligence pursuant to N.J.S.A. 2A:15-5.1.

## EIGHTH SEPARATE DEFENSE

Plaintiffs instituted this proceeding knowing that they had no reasonable, factual or legal basis therefore and in willful and reckless disregard to such knowledge. Such action constitutes a misuse of the Court and its processes and an illegal and tortuously outrageous harassment of claims against these Defendants are barred and renders Plaintiffs liable for attorney's fees and costs of suit.

## NINTH SEPARATE DEFENSE

Plaintiffs fail to state a cause upon which relief can be granted.

## TENTH SEPARATE DEFENSE

Plaintiffs were comparatively negligent with negligence reduces or bars any recovery by the Plaintiff as set forth in N.J.S.A. 2A:15-5.1, et seq.

11

### ELEVENTH SEPARATE DEFENSE

Service of process upon claims against these Defendants was deficient.

### TWELFTH SEPARATE DEFENSE

Personal Jurisdiction over these Defendants is lacking.

### THIRTEENTH SEPARATE DEFENSE

There is no Jurisdiction over the subject matter of this action.

### FOURTEEN SEPARATE DEFENSE

As St. Joseph's Regional Hospital and Medical Center, Inc./ St. Joseph's Health Inc. is a non-profit hospital corporation, this Defendant plead limitation of liability and immunity as afforded to it pursuant to the provisions of N.J.S.A. 2a: 53a – 7&8.

### FIFTEENTH SEPARATE DEFENSE

Venue has not been laid in accordance with R. 4:3-2.

### DEMAND FOR STATEMENT OF DAMAGES

Pursuant to Rule 4:5-2, these Defendants demand that within five (5) days of service hereof, Plaintiffs serve upon the undersigned a written statement of the amount of damages claimed in each Count of the Complaint.

### DEMAND FOR ANSWERS TO INTERROGATORIES

These Defendants hereby demand that Plaintiffs furnish answers to Uniform Interrogatories set forth in the Appendix to the New Jersey Court Rules within the time set forth therein.

### DEMAND FOR AFFIDAVIT OF MERIT AND EXPERT REPORTS

Please take notice that pursuant to N.J.S.A. 2 A: 53:A- 27 and Rule 4:10 – 2(d) (1), these Defendants hereby demands that within sixty (60) days following the date of this Answer,

12

Plaintiffs furnish a written report of an expert stating the substance of the facts and opinion to which said expert to testify with regard to Plaintiffs' allegations directed toward these Defendants, otherwise these Defendants will seek relief as may be appropriate, including dismissal.

### CROSSCLAIM FOR INDEMNIFICATION AND/OR CONTRIBUTION

While denying any responsibility for liability to the Plaintiffs, these Defendants crossclaim against all Defendants, presently or hereafter named, for indemnification and/or contribution pursuant to the New Jersey Joint Tortfeasor Contribution Law, N.J.S.A. 2A: 52A-1 et seq.; the New Jersey Comparative Negligence Law, N.J.S.A. 2A: 15-5.1 et seq., and R. 4:7-5(b), for any sums which may be recovered by Plaintiffs against these Defendants on the basis that such liability as may be established, if any, is the responsibility of the other Defendant(s) joined herein.

**WHEREFORE**, these Defendants demand judgment of indemnity and/or contribution against all Defendants joined herein.

### ANSWER TO CROSSCLAIMS

These Defendants deny all allegations set forth in any crossclaims filed by any defendant or third party defendant presently or hereafter named herein.

### NOTICE OF ALLOCATION PURSUANT TO RULE 4:7-5(c)

Pursuant to R. 4:7-5(c); Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102 (2004); Young v. Latta, 123 N.J. 584 (1991) and Burt v. West Jersey Health Systems, 339 N.J. Super. 296 (App. Div. 2001), you are hereby notified that if any defendant settles or is dismissed prior to trial, these Defendants will seek an allocation by the fact finder for the percentage of fault attributable to the settling and/or dismissed defendant. In support of the allocation, we will rely

upon the examination and cross-examination of any expert witness who may testify at the time of trial.

## JURY DEMAND

These Defendants hereby demands a trial by jury on all issues.

## DESIGNATION OF TRIAL COUNSEL

Evelyn C. Farkas, Esq., is hereby designated as trial counsel, pursuant to Rule 4:25-4.

## CERTIFICATION

I hereby certify that the within Answer to the Complaint of Defendants, St. Joseph's Health, Inc. and Michael Lange, M.D., was served within the time period allowed by Rule 4:6 and extensions hereof. To the best of my knowledge, information and belief, the matter in controversy is not the subject of any other pending or contemplated proceeding and there are no other potentially liable parties that should be joined to this action.

I hereby certify that on August 3, 2020 a copy of the within Answer to the Complaint of these Defendants was forwarded for filing with the Deputy Clerk of Passaic County via regular mail and plaintiff's counsel: Ari Bernstein, Esq., Landel, Bernstein & Kalosieh, LLP, 279 Franklin Avenue, Wyckoff, New Jersey via e-mail.

**FARKAS & DONOHUE, LLC**
Attorneys for Defendants, St. Joseph's Health, Inc. and
Dr. Michael Lange

*Evelyn C. Farkas, Esq. /s/*

By: _____
        Evelyn C. Farkas, Esq.

Dated:  August 3, 2020

14

# FARKAS & DONOHUE, LLC

### -Counselors at Law-

25A Hanover Road, Suite 320
Florham Park, New Jersey 07932
(973) 443-9400
(973) 443-4330 Fax
Email: Office@FarkasandDonohue.com
www.FarkasandDonohue.com

EVELYN CADORIN FARKAS *
DAVID C. DONOHUE # *
ROBERT J. MORMILE **
BETH A. HARDY*
CHARLES E. MURRAY III +
NANCY CROSTA LANDALE*
EILEEN M. KAVANAGH + ◆
JENNIFER SALFI GIANETTI ◆
GUY M. MAGNUSSON ◆
CHRISTINE M. JONES +
G. WARREN BALDWIN II+
SEAN D. MCMURTRY##

* Certified By The Supreme
  Court of New Jersey as a
  Certified Civil Trial Attorney
** Admitted in NJ & PA
+ Admitted in NJ & NY
# Admitted in NJ & AZ
◆ Of Counsel

August 3, 2020

**Via E-File**

Clerk,
Passaic County Courthouse
Paterson, New Jersey

   Re: **Gaetano v. St. Joseph's Health, Inc., et. al.**
   ` **Docket No.: L-2011-20**
   **Our File No.: STJI-436**

Dear Sir/Madam:

  Enclosed herein for filing please find an Answer to Complaint on behalf of Defendants, St. Joseph's Health, Inc. and Dr. Michael Lange. Kindly charge our account number 140984 the appropriate filing fee.

  Thank you for your anticipated cooperation.

     Very truly yours,

     *Evelyn C. Farkas /s/*

     Evelyn C. Farkas

ECF:jc
Enclosure
cc: Ari Bernstein, Esq.

# Civil Case Information Statement

## Case Details: PASSAIC | Civil Part Docket# L-002011-20

**Case Caption:** GAETANO ANTHONY VS GILEAD SCIENCES, INC.

**Case Initiation Date:** 07/08/2020

**Attorney Name:** EVELYN CADORIN FARKAS

**Firm Name:** FARKAS & DONOHUE, LLC

**Address:** 25A HANOVER RD SUITE 320
FLORHAM PARK NJ 07932

**Phone:** 9734439400

**Name of Party:** DEFENDANT : ST. JOSEPH'S HEALTH,INC.

**Name of Defendant's Primary Insurance Company**

(if known): None

**Case Type:** MEDICAL MALPRACTICE

**Document Type:** Answer W/CrossClaim W/Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** YES

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: ANTHONY  GAETANO?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>08/03/2020</u>
Dated

<u>/s/ EVELYN CADORIN FARKAS</u>
Signed

Ari G. Bernstein, Esq.
Attorney I.D. No.: 024841992
LANDEL, BERNSTEIN & KALOSIEH, LLP
279 Franklin Avenue
Wyckoff, New Jersey 07481
(201) 891-6955
*Attorneys for Plaintiff Anthony Gaetano*

**FILED**

**OCT 15 2020**

**BRUNO MONGIARDO, J.S.C.**

---

ANTHONY GAETANO,

                    Plaintiff,

          v.

GILEAD SCIENCES, INC.; ST. JOSEPH'S
HEALTH, INC.; MICHAEL LANGE, M.D.;
JOHN DOES 1-10 (fictitious names
representing unknown individuals); and/or
JANE DOES 1-10 (fictitious names
representing unknown individuals),

                    Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: PASSAIC COUNTY

Docket No.: PAS L-2011-20

**CIVIL ACTION**

**CONSENT ORDER EXTENDING
THE PERIOD FOR SERVICE OF
AFFIDAVIT OF MERIT**

---

**THIS MATTER,** being initially brought before the Court by Landel, Bernstein &

Kalosieh, LLP, attorneys for Plaintiff, Anthony Gaetano, by way of Complaint, Ari G. Bernstein,

Esq. appearing; and Farkas & Donahue, LLC, answering as counsel for Defendants, St. Joseph's

Health, Inc. and Michael Lange, M.D., Evelyn C. Farkas, Esq., appearing; and the parties,

through their legal counsel, having discussed and informally conferred with the Court and the

parties having consented to this form of Order, and for good cause shown,

IT IS, on this __15__ day of __Oct__ 2020,

**ORDERED** as follows:

1.     Plaintiff is hereby granted an additional sixty (60) day period to serve upon
       Defendant, Michael Lange, M.D., an Affidavit of Merit pursuant to NJSA
       §2A:53A-27, to begin upon the expiration of the initial sixty (60) day period

which commenced upon the filing of an Answer by Defendants, St. Joseph's Health Inc. and Michael Lange, M.D. filed and dated August 3, 2020.

Hon. _____

**Bruno Mongiardo, J.S.C.**

Each of the undersigned counsel hereby consents to the form and entry of the within Consent Order Extending the Period for Service of Affidavit of Merit and each further represents that they have been duly authorized by their respective clients to do so.

**LANDEL, BERNSTEIN & KALOSIEH, LLP**
*Attorneys for Plaintiff Anthony Gaetano*

By: _____
Ari G. Bernstein, Esq.

Dated: 10|.|20

**FARKAS & DONOHUE, LLC**
*Attorneys for Defendants, St. Joseph's Health, Inc. and Michael Lange, M.D.*

By: _____
Evelyn C. Farkas, Esq.

Dated: 10/1/20

2

**FARKAS & DONOHUE, LLC**
Charles E. Murray, III, Esq. - 007031999
25 A Hanover Road, Suite 320
Florham Park, New Jersey 07932
973-443-9400
973-443-4330 – Fax
Attorneys for Defendants, St. Joseph's Health, Inc. and Dr. Michael Lange
Our File No.: STJI-436

**FILED**

DEC 21 2020

BRUNO MONGIARDO, J.S.C.

| | |
|---|---|
| ANTHONY GAETANO, | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION – PASSAIC COUNTY<br>: DOCKET NO. L-2011-20 |
| Plaintiff, | : |
| | : Civil Action |
| vs. | : |
| | : **PROPOSED ORDER** |
| GILEAD SCIENCES, INC., ST. JOSEPH'S :<br>HEALTH, INC., MICHAEL LANGE,<br>JOHN DOES, et. al. | : |
| Defendants. | : |

  **THIS MATTER** having been opened to the Court on motion by Farkas & Donohue,

LLC, attorneys for Defendants, St. Joseph's Health Inc. and Dr. Michael Lange, M.D., and the

Court having considered the papers and arguments of counsel, and for good cause having been

shown;

  **IT IS** on this ___ day of _____ 2020;

  **ORDERED** that plaintiff's complaint is hereby dismissed with prejudice against

Defendants, St. Joseph's Health Inc. and Dr. Michael Lange, M.D., pursuant to R. 4:23-4 for

failure to provide discovery; and it is further *Denied without prejudice*

  **ORDERED** that a copy of this Order be served upon all counsel of record via eCourts

within seven (7) days hereof.

*Unopposed*

_____
Bruno Mongiardo, J.S.C.

*Movant has failed to certify it is
not in default of its discovery obligations*

1

**FARKAS & DONOHUE, LLC**
Charles E. Murray, III, Esq. - 007031999
25 A Hanover Road, Suite 320
Florham Park, New Jersey 07932
973-443-9400
973-443-4330 – Fax
Attorneys for Defendants, St. Joseph's Health, Inc. and Dr. Michael Lange
Our File No.: STJI-436

| | |
|---|---|
| ANTHONY GAETANO, | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION – PASSAIC COUNTY<br>: DOCKET NO. L-2011-20 |
| Plaintiff, | : |
| | : Civil Action |
| | : |
| vs. | : **STIPULATION OF DISMISSAL** |
| | **WITH PREJUDICE AS TO** |
| GILEAD SCIENCES, INC., ST. JOSEPH'S : | **DEFENDANTS, ST. JOSEPH'S** |
| HEALTH, INC., MICHAEL LANGE, : | **HEALTH, INC., AND DR. MICHAEL** |
| JOHN DOES, et. al. : | **LANGE** |
| | : |
| Defendants. : | |

   **IT IS** hereby stipulated and agreed by and between Plaintiffs and Defendants, St. Joseph's

Health, Inc. and Dr. Michael Lange that any and all claims against Defendants, St. Joseph's

Health, Inc. and Dr. Michael Lange, including but not limited to Plaintiff's Complaint and any

and all crossclaims, be and are hereby dismissed with prejudice and without costs or fees against

any party.

**FARKAS & DONOHUE, LLC**
Attorneys for Defendants, St. Joseph's
Health, Inc., and Dr. Michael Lange

By: _____
       Charles E Murray, III, Esq.

Dated: 1/11/21

**LANDEL, BERNSTEIN & KALOSIEH, LLP**
Attorneys for Plaintiff, Anthony Gaetano

By: _____
       Ari G. Bernstein, Esq.

Dated: 1|11|21

1

# FARKAS & DONOHUE, LLC

**-Counselors at Law-**
25A Hanover Road, Suite 320
Florham Park, New Jersey 07932
(973) 443-9400
(973) 443-4330 Fax
Email: Office@FarkasandDonohue.com
www.FarkasandDonohue.com

**EVELYN CADORIN FARKAS \***
**DAVID C. DONOHUE # \***
**ROBERT J. MORMILE \*\***
**BETH A. HARDY\***
**CHARLES E. MURRAY III +**
**NANCY CROSTA LANDALE\***
**EILEEN M. KAVANAGH + ♦**
**JENNIFER SALFI GIANETTI ♦**
**GUY M. MAGNUSSON ♦**
**CHRISTINE M. JONES +**
**SEAN D. MCMURTRY##**

**\* Certified By The Supreme**
   **Court of New Jersey as a**
   **Certified Civil Trial Attorney**
**\*\* Admitted in NJ & PA**
 **+ Admitted in NJ & NY**
 **# Admitted in NJ & AZ**
 **♦ Of Counsel**

January 13, 2021

*Sent via Electronic Filing*
Clerk, Civil Division
Passaic County Courthouse
77 Hamilton Street
Paterson, NJ 07505

    Re:    **Gaetano v. St. Joseph's Health, Inc. et. al.**
            **Docket No.:   PAS-L-2011-20**
            **Our File No.: STJI-436**

Dear Sir or Madam:

      This office represents defendants, St. Joseph's Health, Inc. and Dr. Michael Lange, in the above matter. Enclosed herein for filing please find an executed Stipulation of Dismissal with prejudice as to Defendants, St. Joseph's Health, Inc. and Dr. Michael Lange. Kindly charge our account number 140984 the appropriate filing fee and file the same.

      Thank you for your courtesies in this regard.

                Respectfully submitted,

                */s/ Charles E. Murray, III, Esq.*

                Charles E. Murray, III, Esq.
                cmurray@farkasanddonohue.com

Enclosure
cc: all counsel of record (via electronic filing)

**SILLS CUMMIS & GROSS P.C.**
Beth S. Rose (NJ ID #028491987)
R. Michael Riecken (NJ ID #211402016)
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
brose@sillscummis.com
rriecken@sillscummis.com

**SIDLEY AUSTIN LLP**
Joshua E. Anderson (*pro hac vice* pending)
Alycia A. Degen (*pro hac vice* pending)
555 West Fifth Street, Suite 4000
Los Angles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Defendant*
*Gilead Sciences, Inc.*

| | |
|---|---|
| ANTHONY GAETANO,<br><br>                   Plaintiff,<br><br>                   v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>                   Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: PASSAIC COUNTY<br>CASE NO. PAS-L-002011-20<br><br>**CIVIL ACTION**<br><br>**DEFENDANT GILEAD SCIENCES, INC.'S NOTICE OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM** |

TO:   Ari G. Bernstein, Esq.
       Landel, Bernstein & Kalosieh, LLP
       279 Franklin Avenue
       Wyckoff, New Jersey  07481
       *Attorneys for Plaintiff*
       *Anthony Gaetano*

**PLEASE TAKE NOTICE** that on November 13, 2020, or as soon thereafter as counsel may be heard, the undersigned attorneys for Defendant Gilead Sciences, Inc. ("Gilead") shall move before the Honorable Joseph S. Conte, J.S.C., Superior Court of New Jersey, Law Division, Passaic County, 77 Hamilton St., Paterson, NJ 07505 for an Order dismissing Plaintiff's Complaint as to Gilead with prejudice for failure to state a claim pursuant to R. 4:6-2(e).

PLEASE TAKE FURTHER NOTICE that in support of its motion, Gilead will rely upon the accompanying Certification of Beth S. Rose and the Brief submitted herewith.

PLEASE TAKE FURTHER NOTICE that oral argument is requested if the motion is opposed and that a proposed form of order is attached.

PLEASE TAKE FURTHER NOTICE that no trial date is currently scheduled.

Respectfully submitted,

*s/ Beth S. Rose*
Beth S. Rose
R. Michael Riecken
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Phone: (973) 643-7000
Facsimile: (973) 643-6500
E-mail: brose@sillscummis.com
E-mail: rriecken@sillscummis.com
*Attorneys for Defendant*
*Gilead Sciences, Inc.*

Dated: October 16, 2020

2

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on this 16th day of October, 2020, I caused a true and correct copy of Defendant Gilead's Notice of Motion, Certification of Beth S. Rose, Brief, and proposed form of Order to be served on all counsel of record via the Court's e-filing system within the time period allowed by the Rules of the Court.


*s/ Beth S. Rose*
Beth S. Rose


Dated: October 16, 2020

**SILLS CUMMIS & GROSS P.C.**
Beth S. Rose (NJ ID #028491987)
R. Michael Riecken (NJ ID #211402016)
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
brose@sillscummis.com
rriecken@sillscummis.com

**SIDLEY AUSTIN LLP**
Joshua E. Anderson (*pro hac vice* pending)
Alycia A. Degen (*pro hac vice* pending)
555 West Fifth Street, Suite 4000
Los Angles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Defendant*
*Gilead Sciences, Inc.*

| | |
|---|---|
| ANTHONY GAETANO,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>　　　　　　Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: PASSAIC COUNTY<br>CASE NO. PAS-L-002011-20<br><br>**CIVIL ACTION**<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT GILEAD SCIENCES, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM WITH PREJUDICE** |

**THIS MATTER** having been brought by Sills Cummis & Gross P.C., counsel for

Defendant Gilead Sciences, Inc. ("Gilead"), for an Order dismissing Plaintiff's Complaint as to

Gilead with prejudice for failure to state a claim pursuant to Rule 4:6-2(e), on notice to all

counsel of record, and the Court having considered the submissions of the parties and having

heard the arguments of counsel, and for good cause shown:

IT IS on this _____ day of _____ 2020;

**ORDERED** that Defendant Gilead's motion to dismiss Plaintiff's Complaint with

prejudice as to Gilead pursuant to R. 4:6-2(e) is hereby **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint as to Gilead is hereby dismissed with prejudice.

_____
HONORABLE JOSEPH S. CONTE, J.S.C.

This motion was:

_____ Opposed

_____ Unopposed

2

**SILLS CUMMIS & GROSS P.C.**
Beth S. Rose (NJ ID #028491987)
R. Michael Riecken (NJ ID #211402016)
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
brose@sillscummis.com
rriecken@sillscummis.com

**SIDLEY AUSTIN LLP**
Joshua E. Anderson (*pro hac vice* pending)
Alycia A. Degen (*pro hac vice* pending)
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Defendant*
*Gilead Sciences, Inc.*

| | |
|---|---|
| ANTHONY GAETANO,<br><br>                    Plaintiff,<br><br>          v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: PASSAIC COUNTY<br>CASE NO. PAS-L-002011-20<br><br>**CIVIL ACTION**<br><br>**CERTIFICATION OF BETH S. ROSE IN SUPPORT OF DEFENDANT GILEAD SCIENCES, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM** |

BETH S. ROSE, of full age, hereby certifies as follows:

1.      I am an attorney-at-law in the State of New Jersey and am a Member of the law

firm of Sills Cummis & Gross P.C., counsel for Defendant Gilead Sciences, Inc. ("Gilead").  As

such, I am responsible for the handling of the within matter, and I am fully familiar with the facts

and circumstances set forth herein.  I submit this Certification in support of Gilead's Motion to Dismiss Plaintiff's Complaint with prejudice as to Gilead for failure to state a claim pursuant to Rule 4:6-2(e).

2.      Attached hereto as Exhibit A is a true and accurate copy of the unpublished decision captioned *Desai v. Sorin CRM USA, Inc.*, No. 12-2995, 2013 WL 163298 (D.N.J. Jan. 15, 2013).

3.      Attached hereto as Exhibit B is a true and accurate copy of the unpublished decision captioned *McGee v. Boehringer Ingelheim Pharms., Inc.,* No. 4:16-cv-2082, 2018 WL 1399237 (N.D. Ala. Mar. 20, 2018).

4.      Attached hereto as Exhibit C is a true and accurate copy of the unpublished decision captioned *Epstein v. Gilead Sciences, Inc.,* No. 19-81474, 2020 WL 4333011 (S.D. Fla. July 27, 2020).

5.      Attached hereto as Exhibit D is a true and accurate copy of the unpublished decision captioned *Evans v. Gilead Sciences, Inc.,* No. 20-cv-00123, 2020 WL 5189995 (D. Haw. Aug. 31, 2020).

6.      Attached hereto as Exhibit E is a true and accurate copy of the unpublished decision captioned *Robinson v. Eli Lilly & Co.,* 5:17-cv-338, 2018 WL 4039703 (E.D. Ky. Aug. 23, 2018).

7.      Attached hereto as Exhibit F is a true and accurate copy of the unpublished decision captioned *Drescher v. Bracco Diagnostics Inc.,* No. CV-19-00096, 2020 WL 1466296, (D. Ariz. Mar. 26, 2020).

8.      Attached hereto as Exhibit G is a true and accurate copy of the unpublished decision captioned *Boone v. Boehringer Ingelheim Pharms., Inc.,* SC 20200, 2020 WL 2121063, -- A.3d -- (Conn. May 4, 2020).

9.      Attached hereto as Exhibit H is a true and accurate copy of the unpublished decision captioned *Lyons v. Boehringer Ingelheim Pharms., Inc.,* No. 1:18-cv-04624, -- F.Supp. 3d --, 2020 WL 5835125 (N.D. Ga. Sept. 29, 2020).

10.      Attached hereto as Exhibit I is a true and accurate copy of the unpublished decision captioned *Patton v. Forest Labs., Inc.,* No. 17-cv-922, 2018 U.S. Dist. LEXIS 160368 (C.D. Cal. Sept. 19, 2018).

11.      Attached hereto as Exhibit J is a true and accurate copy of the unpublished decision captioned *Maze v. Bayer Healthcare Pharms., Inc.,* No. 4:18-cv-21, 2019 WL 1062387 (E.D. Tenn. Mar. 6, 2019).

12.      Attached hereto as Exhibit K is a true and accurate copy of the unpublished decision captioned *Rossito v. Hoffman-La Roche Inc.,* A-1237-13T1, 2016 WL 3943335 (App. Div. July 22, 2016).

I hereby certify that the foregoing statements made by me are true.  I am aware that is any of the foregoing statements made by me are willfully false, I am subject to punishment.


                                        *s/  Beth S. Rose*
                                        BETH S. ROSE

DATED: October 16, 2020

# Exhibit A

Desai v. Sorin CRM USA, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 163298

KeyCite Yellow Flag - Negative Treatment
Distinguished by MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC, D.N.J., February 20, 2020

2013 WL 163298
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Janardan J. DESAI, Pravina
Desai and Jayant Desai, Plaintiffs,
v.
SORIN CRM USA, INC. (f/k/a Ela
Medical Inc.), et al., Defendants.

Civ. No. 12–2995.
|
Jan. 15, 2013.

**Attorneys and Law Firms**

Gerald J. Martin, Biebelberg & Martin, Esqs., Millburn, NJ, for Plaintiffs.

Beth S. Rose, Sills Cummis & Gross P.C., Newark, NJ, for Defendants.

**OPINION**

WALLS, Senior District Judge.

*1 Defendant Biotronik moves to dismiss this matter and for judgment on the pleadings under Federal Rules of Civil Procedure 12(b)(6) and 12(c). Plaintiffs Janardan J. Desai, Pravina Desai, and Jayant Desai oppose the motion, and cross move for leave to file a second amended complaint under Federal Rule of Civil Procedure 15(a). Under Federal Rule of Civil Procedure 78, the Court grants the motion to dismiss and denies the motion to amend without oral argument.

**FACTUAL AND PROCEDURAL BACKGROUND**

This is an action brought the New Jersey Product Liability Act (the "PLA") involving an allegedly defective defibrillator lead distributed by Defendant Biotronik. Am. Compl., Second Count ¶ 5. Plaintiffs allege that Co–Defendant Sorin's

Implantable Cardiac Defibrillator ("ICD") device (Model number OATIO VR 6250, Serial Number 644YC328) was surgically implanted in Mr. Desai on or about April 9, 2008. *Id.,* Second Count ¶ 2. Plaintiffs contend that Biotronik's Lead (Serial No. 10287936), was an integral part of Sorin's ICD. *Id.*

Plaintiffs allege that Mr. Desai attended regular follow-up visits with his cardiologist. Opp. at 1. On or about July 4, 2012, Mr. Desai was home with his wife and son, Plaintiffs Pravina Desai and Jayant Desai, when he was allegedly "suddenly and violently overtaken by numerous painful convulsions." Am. Compl., First Count ¶ 3. He was transported by ambulance to the emergency room of Christ Hospital in Jersey City. *Id.,* First Count ¶ 4; Opp. at 1. Plaintiffs contend that diagnostic testing revealed that Mr. Desai had suffered in excess of twenty electrical shocks to the heart, causing ventricular tachycardia as a direct and proximate result of a defective "fractured" lead wire of the ICD. Am. Compl., First Count ¶ 4.

On April 4, 2012, Plaintiffs filed a Complaint in the Superior Court of New Jersey, Law Division, in Hudson County. On May 18, 2012, counsel for Co–Defendant Sorin filed a Notice of Removal to this Court. ECF No. 1. A Consent Order to permit Plaintiffs to amend their Complaint to add Biotronik as a defendant, and to extend Sorin's time to answer was granted by this Court on May 23, 2012.

On June 1, 2012, Plaintiffs filed an Amended Complaint which named Biotronik as a defendant. ECF No. 4. On July 5, 2012, Plaintiffs and Defendant Sorin executed a Stipulation of Dismissal Without Prejudice based on Defendant's representations that they did not manufacture, design, or sell the sensory lead wire at issue. ECF No. 5. On September 10, 2012, Defendant Biotronik filed an Answer and Affirmative Defenses to Plaintiffs' claims. ECF No. 11. On September 30, 2012, Biotronik filed a motion to dismiss Plaintiffs' Amended Complaint. ECF No. 13. Plaintiffs filed their opposition on October 22, 2012. ECF No. 16.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(c) provides, in pertinent part, that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The pleadings are considered closed after the complaint and answer are filed, along with any reply to

Desai v. Sorin CRM USA, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 163298

additional claims. *Arnold v. New Jersey,* 03–cv–3997, 2007 WL 1381757, at *2 (D.N.J. May 9, 2007) (citations omitted).

**\*2** "Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Bayer Chemicals Corp. v. Albermarle Corp.,* 171 Fed. Appx. 392, 397 (3d Cir. Mar.21, 2006) (quoting *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir.1988) (citations and quotations omitted)).

"The standard applied to a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings is similar to that applied to a Fed.R.Civ.P. 12(b)(6) motion to dismiss." *Haynes v. Metropolitan Life Ins. Co.,* 94 Fed. Appx. 956, 958 (3d Cir. Apr.20, 2004) (citation omitted). "In reviewing the grant of a Rule 12(c) motion, [the court] must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Bayer,* 171 Fed. Appx. at 397 (internal quotation marks and citation omitted). The court "need not accept as true legal conclusions or unwarranted factual inferences." *Bayer,* 171 Fed. Appx. at 397 (internal quotation marks and citation omitted). As with a Rule 12(b)(6) motion, in deciding a Rule 12(c) motion, the court typically does not consider matters outside the pleadings. *Mele v. Federal Reserve Bank of New York,* 359 F.3d 251, 257 (3d Cir.2004). The court may consider matters of public record, orders, and exhibits attached to the complaint. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994).

Similarly, in deciding a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 306 (3d Cir.2007). Under Federal Rule of Civil Procedure 8(a)(2), the complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." At the same time, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d

868 (2009). As a result, the complaint must contain more than "bare-bones allegations" or "threadbare recitals of the elements of a cause of action." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) (quoting *Iqbal,* 556 U.S. at 678). The plaintiff must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008).

**\*3** In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the allegations of the complaint, documents attached or specifically referenced in the complaint if the claims are based upon those documents and matters of public record. *Family Trust v. Queen,* 503 F.3d 319, 327 (3d Cir.2007); *Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Cir.2003).

Federal Rule of Civil Procedure 15(a)(2) allows a party to amend its pleading by leave of court when justice so requires. Leave to amend pleadings is to be freely given. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The decision to grant leave to amend rests within the discretion of the court. *Id.* Leave to amend may be denied on the basis of: (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposing party; and (4) futility of amendment. *Id.* "Only when these factors suggest that amendment would be 'unjust' should the court deny leave." *Arthur v. Maersk, Inc.,* 434 F.3d 196, 203 (3d Cir.2006) (internal citations omitted).

## DISCUSSION

### 1. Preemption under the Medical Device Amendments

#### a. Premarket Approval

The Medical Devices Amendments ("MDA"), 21 U.S.C. § 360c *et seq.* to the FDA, 21 U.S.C. § 301 *et seq.,* authorize the FDA to regulate the safety and effectiveness of medical devices. Under the MDA, medical devices are divided into three categories according to the risks that the devices present. Class III devices, which includes the device in this case, are those that are either too unproven to be rendered safe by general controls or that present a potential for unreasonable risk of illness or injury. 21 U.S.C. § 360(a)(1)(C). The MDA usually requires Class III devices to receive premarket approval before the FDA will allow them to be sold. The FDA will approve the devices for distribution only if it is satisfied

*Desai v. Sorin CRM USA, Inc., Not Reported in F.Supp.2d (2013)*

2013 WL 163298

that the device is reasonably safe and effective for its intended purpose. 21 U.S.C. § 360(e)(d)(2).

Defendant Biotronik argues that the Medical Device Amendments to the Federal Food, Drug & Cosmetics Act ("FDA") expressly preempt the type of claim being asserted by Plaintiffs. Mot. at 1, 3–8; 21 U.S.C. § 360c *et. seq.* Plaintiffs respond that Defendant's allegation that the devices implanted in Plaintiff were Class III medical devices subject to premarket approval was insufficiently supported. Opp. at 4–6. In the alternative, Plaintiffs allege that should the Court find that the lead wire and ICD device were subject to pre-market approval, all of Plaintiffs' claims would still not be preempted. *Id.* at 4–13.

This Court rejects Plaintiffs' contention that Defendant's "generic reference" to the FDA public database of premarket approvals is insufficient to establish which forms of the ICD device and lead wire received premarket approval. In *Desabio v. Howmedica Osteonics Corp.,* as example, the defendant cited to a web address for the FDA's premarket approval of the devices at issue in support of its motion to dismiss. 817 F.Supp.2d 197, 201 (W.D.N.Y.2011). The web address given to the court did not lead to any relevant information, but the court conducted its own independent search of the FDA's website, and confirmed that the devices did receive premarket approval. *Id.* The court took judicial notice of that fact based on its independent search. *Id.; see also Stengel v. Medtronic Inc.,* 676 F.3d 1159, 1167 (9th Cir.2010) ("Because the accuracy of FDA records cannot reasonably be questioned, the premarket approval status of [the device] is a fact subject to judicial notice."); *Cornwell v. Stryker Corp.,* No. 1:10–cv–00066–EJL, 2010 WL 4641112, at *3 (D.Idaho Nov.1, 2010) (confirmed premarket approval via independent search of FDA website); *Horne v. Novartis Pharms. Corp.,* 541 F.Supp.2d 768, 777 (W.D.N.C.2008) ("The Court may take judicial notice of and consider the public record of the FDA ...."); *Funk v. Stryker Corp.,* 673 F.Supp.2d 522, 530–31 (S.D.Tex.2009); *Ali v. Allergan USA, Inc.,* No. 1:12–cv–115, 2012 WL 3692396, at *1 (E.D.Va. Aug.23, 2012).

**\*4** Plaintiffs' reliance on *Kavalir v. Medtronic, Inc.* is misplaced. Case No. 07–cv–0835, 2008 WL 4087950 (N.D.Ill. Aug.27, 2008). In *Kavalir,* the plaintiff had four different ICDs with various lead wires implanted over a six year period. *Id.* at *1–*2. The court was worried that "none of the documents attached ... refer to the ... lead wires used to implant the ICDs in Plaintiff, the part Plaintiff contends caused her injuries." *Id.* at *4. The court also expressed the concern that the provided documents "did not make clear what specific form or forms" of the ICD leads had received premarket approval. *Id.* In contrast, Biotronik's lead wire is the only one at issue, and is specifically identified by the FDA's public records as having received its own premarket approval on January 27, 2006 under PMA Number P980023. This Court takes judicial notice of the FDA's website, and holds that it establishes premarket approval of the Biotronik lead.[1]

### b. Preemption

The Medical Devices Amendments contain an express preemption provision with two elements that must be satisfied for preemption to occur:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360(k)(a).

In *Riegel v. Medtronic,* the Supreme Court held that state laws are preempted by the MDA if: (1) the Federal Government has established "specific requirements applicable to a particular device," and (2) the plaintiff's claims are based on "state requirements" related to safety and effectiveness that are "different from, or in addition to," the federal requirements. 552 U.S. 312, 315, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (citing 21 U.S.C. § 360c). The Supreme Court reasoned that a state law demanding a manufacturer's devices "to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme." *Id.* at 325. Included in the meaning of "state requirements" are common law causes of action, such as negligence, strict liability, and breach of implied warranty. *Id.* at 324–25, 327–28.

Federal courts in various circuits have also held that, to avoid § 360k(a) preemption, a plaintiff must allege a violation with sufficient facts to render the alleged violation plausible under *Twombly* and *Iqbal. See, e.g., Bass v. Stryker Corp.,* 669 F.3d 501, 509 (5th Cir.2012); *Covert v. Stryker Corp.,* No. 1:08CV447, 2009 WL 2424559, at *14 (M.D.N.C. Aug.5,

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 5 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 63 of 248 PageID: 72
Desai v. Sorin CRM USA, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 163298

2009); *Parker v. Stryker Corp.,* 584 F.Supp.2d 1298, 1301 (D.Colo.2008); *Gross v. Stryker,* 858 F.Supp.2d 466, 495 (W.D.Pa.2012).* Conclusory allegations that the defendant violated FDA regulations in the manufacturing, labeling, or marketing of the premarket approved medical device are not sufficient to state a parallel state-law claim and avoid preemption. *Parker,* 584 F.Supp.2d at 1301. *See also Gelber v. Stryker Corp.,* 752 F.Supp.2d 328, 334 (S.D.N.Y.2010); *In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.,* 592 F.Supp.2d 1147, 1158 (D.Minn.2009), *aff'd,* 623 F.3d 1200 (8th Cir.2010) ("Plaintiffs cannot simply incant the magic words '[defendant] violated FDA regulations' in order to avoid preemption.").

**\*5** As in *Riegel,* Defendant Biotronik argues that Plaintiffs' statutory Product Liability Act claims are preempted. Mot. at 10. Plaintiffs contend that its claims are parallel state claims under the New Jersey Product Liability Act, and they intend to assert, and if necessary, to amend their Complaint to explicitly include a claim under the New Jersey PLA for Defendant's alleged deviation from the federal requirements for Class III lead wires. Opp. at 7.

As said, the Federal Government has established specific requirements applicable to Biotronik's lead wire. Plaintiffs' claims of, *inter alia,* negligence, defective design, and failure to warn stem from state common law. Plaintiffs would only be able to prevail on the New Jersey PLA claims if they proved that the lead wire, as designed, manufactured, and distributed, was defective and unreasonably dangerous. It follows that liability would necessitate a finding that the lead wire—designed, manufactured, and labeled in a way that the FDA deemed safe and effective—was both defective and unreasonably dangerous. Such a determination would necessarily constitute "a requirement 'different from, or in addition to,' " the standard required by federal authorities. *Martin v. Medtronic, Inc.,* 254 F.3d 573, 585 (5th Cir.2001) (citation omitted); *see also Horn v. Thoratec Corp.,* 376 F.3d 163, 176 (3d Cir.2004). This is the exact situation when the MDA requires preemption.

These claims in the amended complaint are consequently expressly preempted. "Generalized common law theories of liability ... are precisely the types of claims the MDA sought to preempt." *Williams v. Cyberonics, Inc.,* 388 Fed. Appx. 169, 171 (3d Cir. July 30, 2010) (citing *Riegel,* 552 U.S. at 325; *Horn,* 376 F.3d at 173). Many courts, both within and outside this district, have evaluated nearly identical claims, and deemed them expressly preempted.

*See, e.g., Horn,* 376 F.3d 163 (dismissing all state common law tort claims); *Banner v. Cyberonics, Inc.,* No. 08–0741, 2010 WL 455286 (D.N.J. Feb.4, 2010) (dismissing claims for defective manufacturing, defective design, and breach of implied warranties); *Funk v. Stryker Corp.,* 673 F.Supp.2d 522 (S.D.Tex.2009) (dismissing claims for, *inter alia,* strict liability and negligence), *aff'd,* 631 F.3d 777 (5th Cir.2011); *Covert,* 2009 WL 2424559 (dismissing claims for failure to warn, defective manufacturing, defective design, negligence and recklessness, and breach of implied warranties); *Horowitz v. Stryker Corp.,* 613 F.Supp.2d 271 (E.D.N.Y.2009) (dismissing claims for strict liability, negligence and recklessness, and breach of express and implied warranties); *Parker,* 584 F.Supp.2d 1298 (dismissing claims for failure to warn, manufacturing defect, design defect, breach of express and implied warranties, breach of implied warranty of fitness, breach of implied warranty of merchantability, and negligence and recklessness).

**\*6** With regard to Plaintiffs' proposed second amendment of the Complaint to explicitly include claims of an alleged deviation from the federal requirements for Class III lead wires, the amended claims remain fatally conclusory:

7. Based on information and belief the lead wire manufactured by Biotronik deviated from the ICD/ lead wire's federally approved design and manufacturing process and/or federal requirementS [*sic* ] including but not limited to 21 C.F.R. 820, 814(b), and 814.39 pertaining to manufacturing processes.

8. Based upon information and belief it is the deviations from the federally approved design and manufacturing processes that caused the lead wire to fracture causing the lead wire and/or ICD device to malfunction on or about April 9, 2008, which was the direct and proximate cause of my [*sic* ] injuries sustained therefrom. [*sic* ] on April 9, 2008.

9. Deviations from the federally approved design and manufacturing process for the lead wire and ICD device rendered the device/lead wire unreasonably fit, unsuitable and unsafe for its intended purpose, under the law of New Jersey.

Pls.' Cross Motion, Ex. 4 (Pls' Proposed Second Am. Compl.), Second Count ¶¶ 7–9. These allegations fail to assert the facts necessary, or indeed, any facts at all, to establish a claim that would parallel a violation of federal law, or even meet the federal pleading standard. Plaintiffs' claims, both in the amended complaint and proposed second

amended complaint, are devoid of any explanation as to how Biotronik allegedly violated federal regulations in its design or manufacture of the lead wire, or even what about the device is "defective" or "unreasonably dangerous." *Callaway v. Am. Med. Sys., Inc.,* No. 11–00193, 2011 WL 7724268, at *4 (W.D.La.2011).* Both complaints allege no specific wrongdoing on the part of Biotronik, other than to conclusory state that it is liable for all of Plaintiffs' damages. "[M]erely because a device does not work as intended is not proof that the device was not appropriately manufactured." *Banner,* 2010 WL 455286, at *4. *See also Clark v. Medtronic, Inc.,* 572 F.Supp.2d 1090, 1094 (D.Minn.2008) ("Plaintiff is ultimately wrong when he assumes that premarket approval guarantees the device is completely safe.").

Plaintiffs also consistently fail to allege any "cognizable link" between Biotronik's alleged federal violations and Mr. Desai's injury. *Horowitz,* 613 F.Supp.2d at 280; *Covert,* 2009 WL 2424559, at *15 (granting *Twombly* motion after concluding that the complaint failed to allege "any particular non-conclusory link between [the] alleged wrongdoing and [plaintiff's] particular injuries, let alone a causal one"). *See also Parker,* 584 F.Supp.2d at 1301–02 (noting that plaintiff's complaint was deficient in that it failed to provide any factual detail substantiating her claim that the device was defective as a direct result of defendants having manufactured it in violation of the premarket approval process). *Gross v. Stryker Corp.,* among other cases, held that broad references to federal regulations in pleadings are insufficient:

> **\*7** Allowing a plaintiff to plead non-specific regulations as a basis for a parallel claim is inconsistent with the Supreme Court's reasoning in *Riegel,* as well as the pleading requirements articulated in *Twombly, Iqbal,* and *Fowler.* This Court requires a greater level of specificity in pleading a parallel claim, rather than allowing claims premised on violations of general regulations to go forward merely because plaintiffs will supplement their pleadings at trial.

858 F.Supp.2d 466, 495–96 (W.D.Pa.2012) (internal citations omitted). Plaintiffs themselves even admit in their opposition that they cannot, at this point in time, specify how Biotronik's lead wire deviated from FDA approved design and manufacturing processes. Opp. at 13–16 ("Plaintiffs do not currently have access to the specific federal requirements for the leads manufactured by Biotronik. Plaintiffs will promptly seek to obtain this information from Defendants through discovery.").

Plaintiffs contend that they should be permitted to allege unspecified deviations from FDA manufacturing requirements at this stage, and "fill in the blanks" later as to how Biotronik deviated from those requirements. But a plaintiff must successfully plead a claim before obtaining discovery, and not the other way around. Such a premature request for discovery is inapposite to Rules 8 and 1 1(b) of the Federal Rules of Civil Procedure. *See Kinetic Co. v. Medtronic, Inc.,* No. 08–CV–6062, 2011 U.S. Dist. LEXIS 42398, at *13, 2011 WL 1485601 (D.Minn. Apr. 19, 2011) (stating that "[a] plaintiff is permitted to take discovery to find evidence to support a properly pleaded claim for relief; a plaintiff is not permitted to take discovery to fish for claims of which it is not aware."); *Timmons v. Linvatec Corp.,* 263 F.R.D. 582, 585 (C.D.Cal.2010) ("A plaintiff who fails to meet the pleading requirements of Rule 8 is not entitled to conduct discovery with the hope that it might permit her to state a claim."); *Horowitz,* 613 F.Supp.2d at 280 ("[M]ere promises of future allegations are not sufficient [to state a cause of action]."); *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.,* 623 F.3d 1200, 1207 (8th Cir.2010) ("The district court did not abuse its discretion in denying Plaintiffs' motion to reconsider the dismissal order and grant their belated request for discovery to see if they could find such a requirement.").

Judge Hayden of this District recently addressed this very issue. In *Hayes v. Howmedica Osteonics Corp.,* plaintiff argued that the pleading requirements of Federal Rules of Civil Procedure 8 and 11 should be relaxed for claims involving a premarket approved device. No. 08–6104, 2009 WL 6841859 (D.N.J. Dec.15, 2009). In a bench opinion, Judge Hayden held that *'Twombly,* and in this Circuit, *Phillips* and *Fowler,* do not distinguish between and among different types of cases. It would be wrong for this Court to rule that this plaintiff because of her particular injury and theory of harm has a right to support [her claim] through discovery as opposed [to] allegations in the complaint...." *Id.* at 7.

**\*8** Furthermore, the cases cited by Plaintiffs in support are inapposite. In *Cornett v. Johnson & Johnson,* while plaintiffs were permitted to proceed with a manufacturing defect claim based on alleged deviations, the factual underpinnings of their defect claim were pled with specificity. 414 N.J.Super. 365, 998 A.2d 543 (App.Div.2010), *aff'd as modified,* 211 N.J. 362 (2012). The *Cornett* plaintiffs, as example, pointed to an FDA warning letter highlighting the device's polymer coating. 414 N.J.Super. at 398, 998 A.2d 543. In *Walker v. Medtronic, Inc.,* the plaintiff similarly stated that she wished to pursue a theory

Desai v. Sorin CRM USA, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 163298

of recovery based on a violation of the terms of the device's premarket approval. The court noted that "[plaintiff] details several discovery matters yet to be resolved." No. 2:07–00317, *2008 WL 4186854, at \*3 (S.D.W.Va. Sept.9, 2008).* The court concluded that the complaint did not "adequately allege the type of claim which might survive *Riegel." Id.* In *Braden v. Tornier, Inc.,* Plaintiffs fail to note that the court did not allow the case to go forward on the basis of its current, inadequately pled complaint, but granted leave to amend, highlighting that plaintiffs had not previously amended their complaint. No. C09–5529RJB, *2009 WL 3188075, at \*5 (W.D.Wash., Sept.30, 2009).* Although courts have acknowledged that plaintiffs might have limited access to crucial information, this Court's research suggests that no courts have let cases enter discovery based on the type of generalized allegations that are present here. *Cf. Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 598 (8th Cir.2009).

### c. Derivative Claims

Plaintiffs Pravina Desai and Jayant Desai assert claims against Defendant Biotronik for emotional distress. Am. Compl., Third Count ¶ 3. These derivative claims are preempted since the underlying claims cannot stand. *Kemp v. Medtronic,* 231 F.3d 216, 237 (6th Cir.2000) ("In light of the foregoing analysis finding that Elizabeth Kemp's claims are preempted by § 360(k) of the MDA, Clifford Kemp's derivative spousal claim is similarly preempted."); *Talbott v. C.R. Bard, Inc.,* 865 F.Supp. 37, 52 (D.Mass.1994), *aff'd,* 63 F.3d 25 (1st Cir.1995) (holding that a claim for negligent infliction of emotion distress are preempted); *see also Riegel,* 522 U.S. at 321 (affirming dismissal of loss of consortium claim because "it was derivative of the pre-empted claims"); *Wolicki–Gables v. Arrow Int'l, Inc.,* 641 F.Supp.2d 1270, 1288, 1290–91 (M.D.Fla.2009), *aff'd,* 624 F.3d 1296 (11th Cir.2011).

### 2. Second Amendment of the Complaint

An amendment is considered futile if it advances a claim or defense that is legally insufficient on its face. Courts may properly deny a motion to amend when the amendment would

not withstand a motion to dismiss. *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 125 (3d Cir.1983).

With respect to futility, "[it is] clear that an amendment would be futile when 'the complaint, as amended, would fail to state a claim upon which relief could be granted.' " *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir.2002) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997)); *see also Harrison Beverage Co. v. Dribeck Imps., Inc.,* 133 F.R.D. 463, 468 (D.N.J.1990) (reasoning that an amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face" (citations and footnotes omitted)). As such, "[i]n assessing futility, the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Burlington,* 114 F.3d at 1434 (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996) (further citation omitted)). The Court therefore must accept all factual allegations as true "as well as the reasonable inferences that can be drawn from them." *Brown v. Philip Morris, Inc.,* 250 F.3d 789, 796 (3d Cir.2001).

*\*9* Here, in light of Plaintiffs' admission that they cannot meet the necessary pleading hurdle without discovery, any amendment would be futile, and the motion to amend is denied.

## CONCLUSION

The Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted and Defendant Biotronik is entitled to the dismissal of the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' motion to amend is also denied on grounds of futility.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 163298

### Footnotes

1  Defendant Biotronik has also submitted a hard copy of the FDA's letter granting premarket approval with its Reply papers. *See* Reply, Ex. C.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 9 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 67 of 248 PageID: 76
McGee v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1399237

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by In re Zofran (Ondansetron) Products Liability Litigation, D.Mass., February 5, 2019

2018 WL 1399237
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Southern Division.

Phillip MCGEE, Sr., Plaintiff,

v.

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC., Defendant.

CIVIL ACTION NO. 4:16-CV-2082-KOB
|
Signed 03/20/2018

**Attorneys and Law Firms**

B. Kristian W. Rasmussen, Richard Allen Wright, Cory Watson Crowder & DeGaris, Birmingham, AL, Rolf T. Fiebiger, Johnson Becker PLLC, St. Paul, MN, for Plaintiff.

Elizabeth C. Curtin, Sidley Austin LLP, Chicago, IL, F.M. Haston, III, Ellen S. Presley, Bradley Arant Boult Cummings LLP, Birmingham, AL, Heidi L. Levine, Sidley Austin LLP, New York, NY, for Defendant.

**MEMORANDUM OPINION**

KARON OWEN BOWDRE, CHIEF UNITED STATES DISTRICT JUDGE

*1 Plaintiff Phillip McGee brings this products-liability suit against Boehringer Ingelheim Pharmaceuticals, Inc.; he alleges that "Jardiance," a prescription drug manufactured and sold by Boehringer, caused him to go into diabetic ketoacidosis ("DKA"). Mr. McGee, a Type-II diabetic, asserts, essentially, that Boehringer failed to adequately warn him that Jardiance presented a known risk of DKA.

The matter comes before the court on Boehringer's motion to dismiss Mr. McGee's First Amended Complaint under Fed. R. Civ. P. 12(b)(6). (Doc. 24). Boehringer contends that federal law preempts Mr. McGee's claims and that the complaint fails to provide a sufficient factual basis to state a claim for relief.

For the reasons discussed below, the court will GRANT Boehringer's motion to dismiss.

First, the court will GRANT Boehringer's motion to the extent Mr. McGee attempts to raise a claim that Boehringer should have told the FDA about Jardiance's DKA risk during the drug's approval process. Federal laws and regulations preempt such a claim, and the court will DISMISS any such claim WITH PREJUDICE.

Second, the court will GRANT Boehringer's motion to dismiss as to Mr. McGee's claim that Boehringer should have updated Jardiance's label to warn about DKA *after* the FDA approved Jardiance and *before* Mr. McGee's injuries. In the complaint, Mr. McGee fails to allege whether the body of relevant newly-available information increased during this specific time period. The court will therefore DISMISS Mr. McGee's failure-to-warn claims for this time period WITHOUT PREJUDICE.

Finally, Boehringer raises several other arguments in favor of dismissal. It argues that the learned intermediary doctrine bars Mr. McGee's failure-to-warn claims and that the complaint merely contains legal conclusions without factual underpinnings. Because the court will dismiss Mr. McGee's complaint without prejudice on the preemption issue, the court need not address these arguments at this time. As to these arguments, Boehringer's motion to dismiss is MOOT.

**STANDARD OF REVIEW**

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)). A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley, 355 U.S. at 47). It does, however, "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal 556 U.S. 662, 678 (2009). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions"

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 10 of 114 Trans ID: LCV20201846220

Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 68 of 248 PageID: 77

McGee v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1399237

without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

**\*2** The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## FACTS

Boehringer sells Jardiance as a prescription drug designed to treat Type-II diabetes. Jardiance belongs to a class of drugs known as "SGLT-2 inhibitors" that, working properly, lowers patients' blood-glucose levels. The FDA approved Jardiance for use in treating Type-II diabetes on August 1, 2014. At that time, the FDA-approved label for Jardiance did not include warnings about DKA, a medical condition that rarely occurs in Type-II diabetics.

The FDA has a publicly-available database known as the Adverse Event Reporting System ("FAERS"). Beginning in March 2013, FAERS recorded "adverse events" in which Type-II diabetics on SGLT-2 inhibitors were hospitalized after going into DKA.

Mr. McGee is one such Type-II diabetic. In January 2015,[1] a doctor prescribed Jardiance to Mr. McGee as a treatment for his diabetes. On January 17, Mr. McGee went into DKA. Mr. McGee remained hospitalized until January 21. Mr. McGee had taken Jardiance from the time his doctor prescribed it until his hospitalization. Mr. McGee asserts that he would not have taken Jardiance if Boehringer had disclosed the risk of DKA when taking the drug.

On May 15, 2015, several months after Mr. McGee's injury, the FDA issued a general warning that SGLT-2 inhibitors like Jardiance carried a risk of DKA. To support that warning, the FDA cited cumulative FAERS data between March 2013 and June 2014.

And, on December 4, 2015, the FDA issued an additional warning about DKA and SGLT-2 inhibitors, citing cumulative FAERS data between March 2013 and May 2015. Mr. McGee alleges that the data included 73 hospitalizations

related to SGLT-2 inhibitors and DKA, with "more than 50 additional adverse events collected after June 6, 2014."

At the same time the FDA issued the additional warning based on the cumulative data in December 2015, it updated the label for Jardiance and other SGLT-2 inhibitors to include a warning "about the risks of too much acid in the blood." (Doc. 19 ¶ 40). The warning told patients to stop taking the drug and to seek medical attention if they displayed any DKA symptoms. In addition, the FDA required SGLT-2 inhibitor manufacturers to conduct a study to analyze reports of DKA patients treated with SGLT-2 inhibitors over a five-year period.

In this lawsuit, Mr. McGee contends that Boehringer should have been aware that Jardiance posed a DKA risk based on the FAERS data collected between March 2013 and June 2014. (Doc. 19 ¶¶ 54-55). Furthermore, Mr. McGee contends, Boehringer also had access to the additional data collected after June 2014. Mr. McGee thus asserts that Boehringer should have amended Jardiance's label through the FDA's "Changes Being Effected" process, which permits manufacturers like Boehringer to add warnings to FDA-approved labels when the manufacturer has newly-available information to support the warning.

**\*3** Mr. McGee breaks his allegations into three counts. In Count I, Mr. McGee alleges that Boehringer violated the Alabama Extended Manufacturer's Liability Doctrine. In the AEMLD claim, Mr. McGee focuses on Boehringer's failure to warn him and his physician about the risk of DKA, alleging that Boehringer "negligently and recklessly labeled, distributed, and promoted" Jardiance. (Doc. 19 at ¶ 82). In Count II, Mr. McGee in essence asserts that Boehringer negligently breached its duty of care by selling an SGLT-2 inhibitor with a known risk of DKA and by failing to warn that Jardiance could send a Type-II diabetic into DKA.[2] In Count III, Mr. McGee accuses Boehringer of gross negligence on the same failure-to-warn premises.

Mr. McGee asks for compensatory damages, medical expenses, damages for his pain and suffering, damages because he has an increased future risk of complications, punitive damages, interest, and attorneys' fees and costs.

## DISCUSSION

PAS-L-002011-20 10/16/2020 3:16:53 PM Pg 11 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC Document 1-1 Filed 01/29/21 Page 69 of 248 PageID: 78
McGee v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1399237

Boehringer asserts that Mr. McGee cannot prevail because federal laws and regulations preempt his claims. Specifically, Boehringer says that it could not have issued a label any different than the label approved by the FDA for Jardiance and that, if it had done so, it would have violated federal law; that is, Boehringer could not have possibly complied with both federal law and Mr. McGee's expectations under state law at the same time. The Supremacy Clause of the Constitution preempts "state laws that require a private party to violate federal law." *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2470 (2013) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).

This case pits Mr. McGee's claims that Boehringer had a state-law duty to add a DKA warning to Jardiance's label against Boehringer's federal obligation to get FDA approval for changes to Jardiance's label.

At the federal level, the FDA regulates the manufacture, use, and sale of drugs. *Bartlett*, 133 S. Ct. at 2470-71. Before the FDA permits a manufacturer to sell a new drug, the manufacturer must submit a new drug application and demonstrate that its drug is safe and effective. *See* 21 U.S.C. § 355(b)(1)(A), (d).

Alongside that application, the manufacturer must submit proposed labeling for the new drug. *Bartlett*, 133 S. Ct. at 2471. The FDA must approve the label's exact text before the manufacturer can sell the new drug. *Wyeth v. Levine*, 555 U.S. 555, 568 (2009). Approved labeling includes, for example, a "Warnings and Precautions" section that describes potential hazards and risks as well as steps that patients should take if bad reactions occur. *See* 21 C.F.R. § 201.57(c)(6)(i). Similarly, an "Adverse Reactions" section describes "the overall adverse reaction profile of the drug based on the entire safety database." *Id.* § 201.57(c)(7). Although the FDA approves the label, "the manufacturer bears responsibility for the content of its label at all times." *Wyeth*, 555 U.S. at 570-71.

Generally, once the FDA approves the new drug, the manufacturer may only change the label after the FDA approves a supplemental application. *Wyeth*, 555 U.S. at 568. However, the manufacturer may use the "Changes Being Effected" ("CBE") process to add or strengthen warnings and precautions before the FDA approves the supplemental application. *Id.*; *see also* 21 C.F.R. § 314.70(c)(6)(iii)(A).

A manufacturer may only use the CBE process if it has "newly acquired information," such as reports of adverse events or

new analyses of old data. 21 C.F.R. §§ 314.70(c)(6)(iii), 314.3(b). In addition, the newly acquired information must show "reasonable evidence of a causal association" between the serious hazard and the drug. *See, e.g.,* 21 C.F.R § 201.57(c)(6)(i).

**\*4** The FDA's drug-labelling regulations do not preempt a state duty when a plaintiff can show that the manufacturer had or should have had newly-acquired information that it could and should have used to modify its label to comply with state-law expectations. *Wyeth*, 555 U.S. at 573. In these circumstances, the pharmaceutical company "could independently do under federal law what state law requires of it." *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (observing that manufacturers of generic drugs have different federal obligations than manufacturers of new drugs such that the preemption analyses for those manufacturers differ); *Wyeth*, 555 U.S. at 573.

So, if a plaintiff can allege the existence of newly-acquired information that supports a labeling change under the CBE regulation, and if the manufacturer subsequently fails to show by "clear evidence" that the FDA would not have approved a change to the label, then a failure-to-warn claim will survive the manufacturer's preemption defense. *Wyeth*, 555 U.S. at 573.

Further, to reject a preemption defense at the motion to dismiss stage, the court need only conclude that allegations contained in the complaint—taken as true and all inferences drawn in the plaintiff's favor—evade preemption as a matter of law. *See Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). Here, the court recognizes that Boehringer theoretically could have complied with both its federal obligations and Mr. McGee's alleged state obligations so long as the state obligations are limited to the actions that Boehringer could and should have taken *after* Jardiance's approval and *before* Mr. McGee's injury. *See Wyeth*, 555 U.S. at 573. But Mr. McGee lumps together claims and facts from before, during, and after this brief time period. Without clarification, the court cannot tell when Mr. McGee alleges Boehringer had what information.

To the extent Mr. McGee asserts that Boehringer should have alerted the FDA about Jardiance's DKA risk *before* Jardiance's approval, the claim is preempted because the claim is essentially one of failure to communicate with the FDA. Federal law preempts state-law claims based on a defendant's failure to communicate with the FDA. *See*

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 12 of 114 Trans ID: LCV20201846220

Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 70 of 248 PageID: 79

McGee v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1399237

*Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 348-51 (2001). As the Supreme Court observed, the FDA "has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud" and "fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the [FDA] neither wants nor needs[.]" *Id.*; *see also PLIVA, Inc.*, 564 U.S. at 619. And common sense dictates that any information Boehringer obtained after January 17, 2015, when Mr. McGee suffered DKA, is irrelevant to Mr. McGee's claims because Boehringer could not have used that information to change its label and prevent Mr. McGee's injury from occurring.

In theory, Mr. McGee may be able to allege a non-preempted claim that Boehringer should have used the CBE process to modify Jardiance's label after its approval and before his injury. *See Wyeth*, 555 U.S. at 573 ("The CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved *Phenergan's* label does not establish that it would have prohibited such a change."). But, the complaint makes no allegations about the data as it existed during the relevant time period before he had DKA. Rather, Mr. McGee broadly alleges that the FAERS database contained data about many DKA incidents that occurred between March 2013 (before Jardiance's approval) and May 2015 (after his injury). And although Mr. McGee alleges that the body of data available to Boehringer regarding DKA incidents and SGLT-2 inhibitors increased from March 2013 through May 2015, he does not allege, for example, that the FAERS database collected any *new* DKA incidents after August 1, 2014—the date the FDA approved Jardiance—and before January 17, 2015—the date Mr. McGee suffered his injury. (*See* doc. 19 ¶¶ 38-39).

**\*5** In his response to Boehringer's motion to dismiss, Mr. McGee claims that "two-thirds of the very data FDA used to require a label change and nearly two and a half times the reports that led to FDA issuing its May 15, 2015 warning were available to [Boehringer] after Jardiance['s] approval and before [Mr. McGee's] harm." (Doc. 28 at 5-6). But that allegation is not in the complaint, so the court cannot consider it to save the complaint. *Cf. GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1258 n.26 (11th Cir. 2012) ("[A] plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). And Mr. McGee still fails to specify whether any *new* DKA adverse events occurred

after Jardiance's approval and before Mr. McGee's harm. As it stands, the complaint at best contains ambiguity about the newly-available data that Boehringer had or should have had after Jardiance's approval and before Mr. McGee's injury.

As a final issue, the court cannot ignore that Mr. McGee's complaint is rife with shotgun allegations. The complaint buries itself in contentions like those in paragraph 75, which unhelpfully observes that Boehringer "has engaged in the business of designing, researching, manufacturing, marketing, supplying, promoting, packaging, selling, testing, and/or distribution of" Jardiance, or paragraph 76, which purports to add that Boehringer "researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released" Jardiance. (*See, e.g.*, doc. 19 ¶¶ 75-76).

Even more problematic is Count II of the complaint, which generally alleges negligence based on Boehringer's failure to warn. But, in Count II, Mr. McGee attempts to bring other negligence claims for conduct beyond Boehringer's failure to warn about Jardiance's risk of DKA. In paragraph 104, Mr. McGee alleges that Boehringer

> breached its duty of reasonable care and failed to exercise ordinary care in the research, development, *marketing*, supplying, promotion, *marketing*, advertisement, packaging, *sale*, testing, quality assurance, quality control, *sale*, and distribution [of Jardiance].

(Doc. 19 ¶ 104) (emphases added). Mr. McGee believes that his negligence claims "includ[e]" and are "not limited to" the allegations presented in paragraph 104. (Doc. 28 at 26). Paragraph 104, however, contains nothing but a useless set of legal conclusions.

Worse, the complaint spews these legal conclusions with few supporting facts that would assist Boehringer in understanding what Mr. McGee claims the company did wrong. This type of "shotgun" pleading fails to plead a cognizable cause of action. *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."). If Mr. McGee chooses to file an amended complaint, he must eliminate the unnecessary and unhelpful "shotgun" assertions and claims. *Fed. R. Civ. P. 8(a)(2)*.

McGee v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1399237

**CONCLUSION**

The court will GRANT Boehringer's motion to dismiss. Any claim that Mr. McGee brings asserting that Boehringer should have told the FDA about Jardiance's DKA risk during the drug's approval process is DISMISSED WITH PREJUDICE. As to the time period between the FDA's approval of Jardiance and before Mr. McGee's DKA incident, the court DISMISSES WITHOUT PREJUDICE Mr. McGee's failure to warn claims in Counts I, II, and III. The remaining grounds that Boehringer asserts for dismissal are MOOT.

Mr. McGee may file an amended complaint by April 4, 2018. If he chooses to file an amended complaint, Mr. McGee must, in addition to clarifying his allegations about the type and quantity of newly-available information, clean up the complaint by eliminating his "shotgun" claims and assertions.

*6 The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 20th day of March, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1399237

Footnotes

1   The complaint says Mr. McGee began taking Jardiance "in or about January March [sic] 2015." The court has read this apparent typographical error to mean "January 2015" because that is the most plausible date given the context of the complaint, which indicates Mr. McGee suffered the alleged injuries in January 2015 after taking Jardiance.

2   Mr. McGee's claim in Count II also includes "shotgun" claims that Boehringer breached a duty of care in everything from designing Jardiance to testing and delivering it. (*See* Doc. 19 ¶ 104). As discussed below, the court finds all of those "shotgun" claims insufficiently pled.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 15 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 73 of 248 PageID: 82
Epstein v. Gilead Sciences, Inc., Slip Copy (2020)

2020 WL 4333011

2020 WL 4333011
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Philip B. EPSTEIN, Plaintiff,

v.

GILEAD SCIENCES, INC., Defendant.

CASE NO. 19-81474-CIV-SINGHAL
|
Signed 07/27/2020

**Attorneys and Law Firms**

Debra Daumit Klingsberg, George William Kramer, Law
Offices of Kramer & Klingsberg, Delray Beach, FL, for
Plaintiff.

Alycia Degen, Pro Hac Vice, Debra Elaine Pole, Joshua E.
Anderson, Pro Hac Vice, Sidley Austin LLP, Los Angeles,
CA, Barbara Bolton Litten, Gunster Yoakley & Stewart, P.A.,
West Palm Beach, FL, for Defendant.

## ORDER

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

**\*1  THIS CAUSE** is before the Court on the Defendant
Gilead Sciences, Inc.'s Motion to Dismiss Complaint (DE
[29] ), filed April 1, 2020. Plaintiff responded ("Response")
(DE [35] ) to the Motion to Dismiss Complaint (DE [29] )
on June 15, 2020, and Defendant has submitted a reply
memorandum ("Reply") (DE [38] ). Accordingly, the matter
is now ripe for review.

## I. BACKGROUND

Defendant Gilead Sciences, Inc. ("Gilead") develops and
markets HIV treatment medications, including Atripla and
Viread, which contain the prodrug tenofovir disoproxil
fumarate ("TDF"). Plaintiff Philip B. Epstein's ("Plaintiff")
doctors prescribed Atripla, and then Viread, to Plaintiff for
a period of about three years, after which his physicians
changed his antiretroviral regimen to one that did not contain
tenofovir. See (Compl. (DE [1] ), ¶ 3). Plaintiff alleges that
Atripla and Viread contained a form of TDF that is toxic
to kidneys and bones in the prescribed amounts and, as a
result of taking Atripla and Viread, he sustained "kidney

and bone damage and other associated injuries." Id. ¶ 23.
Plaintiff alleges Gilead knew TDF posed a safety risk to
patients' kidneys and bones but misrepresented the safety
of Atripla and Viread when promoting the medications to
doctors. Plaintiff further alleges that Atripla and Viread
"were defective, unreasonably dangerous and unsafe for
their intended purpose because they include TDF." Id. ¶
53. Plaintiff argues Gilead should have altered the drugs by
replacing TDF with tenofovir alafenamide ("TAF"), which
is allegedly superior. Plaintiff asserts claims against Gilead
for (1) Strict Products Liability – Design Defect (Count I),
(2) Strict Products Liability – Failure to Warn (Count II), (3)
Negligence (Count III), (4) Fraud (Count IV), (5) Violation
of the Florida Deceptive and Unfair Trade Practices Act
("FDUTPA") (Count V), (6) Breach of Express Warranty
(Count VI), and (7) Breach of Implied Warranty (Count VII).

The Food and Drug Administration (the "FDA") regulates
the manufacture, sale, and labeling of prescription drugs sold
in the United States through a structured statutory scheme.
Before a person can introduce a new drug into the market,
they must file, and the FDA must approve, a New Drug
Application for the drug. See 21 U.S.C. § 355(a). On October
26, 2001, the FDA approved Viread, which contains the
active ingredient TDF, for the treatment of HIV-1 infection.
On July 12, 2006, FDA approved Atripla, a combination of
TDF, emtricitabine, and efavirenz, for the treatment of HIV-1
infection, either on its own or in combination with other
antiretroviral agents.

In the instant Motion to Dismiss Complaint (DE [29] ), Gilead
argues all of Plaintiff's claims are preempted by federal law.
Gilead further argues that Plaintiff has not alleged his claims
for Fraud (Count IV) and supposed violations of FDUTPA
(Count V) with the specificity required by Federal Rule of
Civil Procedure 9(b). Gilead contends Plaintiff's FDUTPA
claim (Count V) fails because it does not apply to claims for
personal injury. Finally, Gilead contends Plaintiff's Breach of
Express and Implied Warranty claims (Counts VI and VII) are
insufficient and fail as shotgun pleadings.

**\*2**  In opposition, Plaintiff argues its claims are not
preempted by federal law because no federal law prevented
Gilead from designing its TDF Drugs to be safer before
FDA approval and because Gilead could unilaterally change
their label to make it stronger to comply with state law.
Plaintiff contends he has satisfied the privity requirements of
his Breach of Express and Implied Warranty claims (Counts
VI and VII) and has met the heightened pleading standard

required to maintain his Fraud claim (Count IV). In his Response (DE 35) , Plaintiff voluntarily dismisses his claim for violation of FDUTPA (Count V), however, Plaintiff argues he has sufficiently pled his remaining claims.

## II. LEGAL STANDARD

At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). Although Rule 8(a) does not require "detailed factual allegations", it does require "more than labels and conclusions ... a formulaic recitation of the cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." Id. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." Wilchombev v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009) (quoting St. George v. Pinellas Cty., 285 F.3d 1334, 1337 (11th Cir. 2002)). Courts must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007). However, pleadings that "are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 556 U.S. at 679.

## III. DISCUSSION

The Supremacy Clause of the U.S. Constitution provides that the Constitution and the laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under this principle, "any state law that interferes with, or is contrary to, federal law is preempted." Estrada v. Becker, 917 F.3d 1298, 1302 (11th Cir. 2019) (citation and internal quotations omitted). Congress may preempt state law through: (1) express preemption, (2) field preemption, and (3) conflict preemption. Id. at 1303. Impossibility preemption, a type of conflict preemption that is relevant here, occurs "when it is impossible for a private party to comply with

both state and federal requirements." Merck Sharp & Dohme Corp. v. Albrecht, 139 S. Ct. 1668, 1672 (2019) (citation and internal quotations omitted). In that case, a court must find that the record demonstrates an "inevitable collision" between the state and federal schemes; "dissimilarity of the standards" is not enough. Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143 (1963).

### A. Counts I, II, and III

Plaintiff's Complaint is premised on the allegations that: (1) Gilead should have designed Atripla and Viread with TAF instead of TDF, and thus, never should have sold Atripla and Viread; and/or (2) Gilead failed to adequately warn Plaintiff or his doctors about the bone and kidney risks associated with Atripla and Viread. Gilead argues these claims are preempted, because Gilead could not have marketed or sold medications containing this design change without first seeking and obtaining FDA approval. See 21 C.F.R. § 314.70(b)(2)(i) (defining "changes in the qualitative or quantitative formulation of the drug product" as "major changes" that "requir[e] supplement submission and approval prior to distribution of the product"). This Court agrees, it would have been impossible for Gilead to comply with both its state duties to change the products' labels and its federal duties not to make such changes without first obtaining FDA approval. See Mut. Pharm. Co., Inc. v. Bartlett, 570 U.S. 472, 475 (2013). Additionally, Plaintiff contends that TAF should have been used instead of TDF; however, the FDA approved Gilead's formula and any changes would have required further approval.

### B. Counts IV and V

**\*3** Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") contains a "heightened pleading standard," a plaintiff "alleging fraud or mistake ... must state with particularity the circumstances constituting fraud or mistake." ADA v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010) (internal quotations omitted). "[P]ursuant to Rule 9(b), a plaintiff must allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud.' " Id. (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380–81 (11th Cir. 1997)). Here, Plaintiff fails to allege any facts differentiating what specific misrepresentations or omissions Plaintiff was himself exposed to; the identity of any his doctors, let alone what

specific misrepresentations or omissions they were each allegedly exposed to; when or where exposure to any alleged misrepresentations or omissions occurred; or the manner in which Plaintiff and his doctors "justifiably relied" on such alleged misrepresentations and omissions. Instead, Plaintiff merely asserts his claims are based on his doctors' justifiable reliance on Gilead's representations and omissions regarding the state of development and toxicities associated with TAF and TDF. (Compl. (DE [1] ), ¶¶ 222, 226). Thus, Plaintiff has not met his burden to plead his Fraud claims or his FDUTPA claims with the particularity Rule 9(b) requires. Moreover, as to his FDUTPA claim, Plaintiff in his Response (DE [35] ), "voluntarily agrees to dismiss."

### C. Count VI and VII

Defendant argues Plaintiff cannot state a breach of warranty claim (Counts VI and VII) because: (i) Plaintiff does not stand in privity to Gilead; and (ii) these claims do not satisfy Rule 8(a). The Eleventh Circuit held there is "no clear rule about whether privity is required in every Florida express warranty claim." *Godelia v. Doe*, 881 F.3d 1309, 1321 (11th Cir. 2018); *compare T.W.M. v. Am. Med. Sys.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995) (stating that privity is required for all express warranty claims), *with Smith v. Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1342–43 (S.D. Fla. 2009) (recognizing that privity may not be required for all express warranty claims). Federal Rule of Civil Procedure 8(a), however, requires that a pleading contain a "short and plain statement of the claim" showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). A "shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Shotgun pleadings make it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. College*, 77 F.3d 364, 366 (11th Cir. 1996). Therefore,

"shotgun pleadings are routinely condemned by the Eleventh Circuit." *Real Estate Mortg. Network, Inc. v. Cadrecha*, 2011 WL 2881928, at *2 (M.D. Fla. July 19, 2011) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991)); *see also Davis v. Coca–Cola Bottling Co.*, 516 F.3d 955, 979 n.54 (11th Cir. 2008) ("[S]ince 1985 we have explicitly condemned shotgun pleadings upward of fifty times."); *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.9 (11th Cir. 2002) ("This court has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."). Plaintiff's breach of warranty claims merely "incorporate[ ] by reference each and every allegation made above." *See e.g.*, (Compl. (DE [1] ), ¶¶ 253, 259). The Complaint (DE [1] ) does not plead the specific factual predicate for each claim or link particular facts to the individual causes of action. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Defendant Gilead Sciences, Inc.'s Motion to Dismiss Complaint (DE [29] ) is **GRANTED**. This cause shall stand **DISMISSED WITHOUT PREJUDICE**. Plaintiff's claims against Gilead for Fraud (Count IV), Breach of Express Warranty (Count VI), and Breach of Implied Warranty (Count VII) are **DISMISSED WITHOUT PREJUDICE**. Further, Plaintiff's claims against Gilead for Strict Products Liability – Design Defect (Count I), Strict Products Liability – Failure to Warn (Count II), Negligence (Count III), and Violation of the Florida Deceptive and Unfair Trade Practices Act (Count V) are **DISMISSED WITH PREJUDICE**. The Clerk of Court is directed to **CLOSE** this case and **DENY AS MOOT** any pending motions. Plaintiff may move to amend the complaint by **August 7, 2020**.

**\*4 DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 27th day of July 2020.

### All Citations

Slip Copy, 2020 WL 4333011

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

Evans v. Gilead Sciences, Inc., Slip Copy (2020)

2020 WL 5189995

2020 WL 5189995
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Brian EVANS, Plaintiff,

v.

GILEAD SCIENCES, INC., Defendant.

Case No. 20-cv-00123-DKW-KJM
|
Signed 08/31/2020

**Attorneys and Law Firms**

Brian Evans, Kihei, HI, pro se.

Alycia A. Degen, Pro Hac Vice, Joshua E. Anderson, Pro Hac Vice, Sidley Austin LLP, Los Angeles, CA, Stefan M. Reinke, Lyons Brandt Cook & Hiramatsu, Honolulu, HI, for Defendant.

**ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS; AND (2) DISMISSING THE FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND**

Derrick K. Watson, United States District Judge

**\*1** This product liability case involves *pro se* Plaintiff Brian Evans' use of Truvada®, an FDA-approved prescription drug designed and manufactured by Defendant Gilead Sciences, Inc., for the prevention and treatment of HIV. Gilead has moved to dismiss the complaint for failure to state a claim, Dkt. No. 20, arguing that the claims are preempted by the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, and that Evans has failed to adequately allege facts to support the elements of his claims for failure-to-warn, fraud, and breach of express and implied warranty.

First, Evans' design defect claims are preempted under the FDCA because it was impossible for Gilead to comply with both Hawaii tort law and the FDCA's design approval requirements. Federal regulations, however, permitted Gilead to unilaterally change its Truvada labeling and, thus, Evans' failure-to-warn claims are not preempted. Second, Evans has failed to sufficiently allege that the inadequacy of the Truvada labeling proximately caused his injuries. Third, Evans has not pled his fraud claim with "particularity" as required by

Federal Rule of Civil Procedure 9(b). Lastly, Evans' warranty claims are dismissed as vague and conclusory. Accordingly, Gilead's motion to dismiss Evans' first amended complaint, Dkt. No. 20, is GRANTED. Evans is granted leave to amend all but his federally preempted design defect claims.

**FACTUAL & PROCEDURAL BACKGROUND**

The following facts are drawn from the allegations in the first amended complaint, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**A. Truvada® for PrEP**

At all times relevant, Defendant Gilead Sciences, Inc. (Gilead) manufactured and marketed the brand-name prescription drug Truvada. *See* Dkt. No. 8 at 1, 3.[1] Truvada contains two active ingredients, one of which is relevant here: Tenofovir disoproxil fumarate (TDF). *Id.* at 4.[2] TDF was approved by the Food and Drug Administration (FDA) in October 2001. Dkt. No. 8 at 4.

**\*2** On August 2, 2004, the FDA approved Truvada for the treatment of HIV infection in adults.[3] On July 16, 2012, the FDA approved Truvada for use by HIV-negative adults as a Pre-Exposure Prophylaxis (PrEP) taken daily to reduce the risk of becoming infected with HIV.[4]

**B. Alleged Risks Associated With TDF in Truvada**

Plaintiff Brian Evans was prescribed Truvada in October 2018. Dkt. No. 8 at 4. Evans alleges that as a result of taking Truvada, he "has now suffered irreversible damages to his bones." *Id.* at 5. Evans also alleges that he now suffers from, and has been diagnosed with, diffuse arthralgia (*i.e.*, joint pain) and is unable to work. *Id.* at 2, 7.[5]

Evans asserts that, as early as 1997, studies had associated TDF with bone and kidney damage. *See* Dkt. No. 8 at 7–8. In one study, patients who had taken Truvada demonstrated accelerated losses of bone density, resulting in "Osteoporosis [and] other joint and bone conditions." *Id.* at 2–3. By 2001, Gilead allegedly knew that Truvada had to be taken by consumers in high doses to be effective, and thus, patients

taking Truvada were at a higher risk for bone and kidney damage. *Id.* at 2, 4, 7.

The Truvada labeling in effect at the time Evans was prescribed Truvada (October 2018) was approved by the FDA on May 15, 2018. Dkt. No. 20-2.[6] The FDA-approved patient labeling states, in relevant part, "**Bone problems** can happen in some people who take TRUVADA. Bone problems include bone pain, or softening or thinning of bones, which may lead to fractures. Your healthcare provider may need to do tests to check your bones." *Id.* at 37 (emphasis in original).

The Truvada labeling also provides information for physicians prescribing Truvada. On the first page, under "WARNINGS AND PRECAUTIONS," the label notes, *inter alia*, "[d]ecreases in bone mineral density (BMD): Consider assessment of BMD in patients with a history of pathologic fracture or other risk factors for osteoporosis or bone loss." *Id.* at 1. Under "DRUG INTERACTIONS," it explains that "Coadministration of TRUVADA with certain HIV-1 protease inhibitors or certain drugs to treat HCV increases tenofovir concentrations. Monitor for evidence of tenofovir toxicity." *Id.* at 1. In a separate section, entitled "Bone Loss and Mineralization Defects," it states:

> In clinical trials in HIV-1 infected adults and in a clinical trial of HIV-1 uninfected individuals, TDF (a component of TRUVADA) was associated with slightly greater decreases in bone mineral density (BMD)[.]

**\*3**

....

> Assessment of BMD should be considered for adult and pediatric patients who have a history of pathologic bone fracture or other risk factors for osteoporosis or bone loss.

....

Cases of osteomalacia associated with proximal renal tubulopathy, manifested as bone pain or pain in extremities and which may contribute to fractures, have been reported in association with TDF use [see Adverse Reactions (6.1) ]. Arthralgia and muscle pain or weakness have also been reported in cases of proximal renal tubulopathy. Hypophosphatemia and osteomalacia secondary to proximal renal tubulopathy should be considered in patients at risk of renal dysfunction who present with persistent or worsening bone or muscle

symptoms while receiving TDF-containing products [see Warnings and Precautions (5.3) ].

Dkt. No. 20-2 at 7–8 (brackets in original); *see also id.* at 8 (noting that "ADVERSE REACTIONS" include "Bone Loss and Mineralization Defects"); *id.* at 12 ("In clinical trials of HIV-1 unfected individuals, decreases in BMD were observed.").

The "PATIENT COUNSELING INFORMATION" in the label further instructs physicians to "[a]dvise the patient to read the FDA-approved patient labeling (Medication Guide)," *id.* at 32, "[i]nform patients that decreases in bone mineral density have been observed with the use of TDF or TRUVADA," and "[c]onsider bone monitoring in patients and uninfected individuals who have a history of pathologic bone fracture or at risk for osteopenia [see Warnings and Precautions (5.5) ]," *id.* at 33 (brackets in original).

Evans alleges the warnings "partially disclosed material facts" and were "contrary to those [Gilead] gave with respect to the exact same drugs in [Europe]." Dkt. No. 8 at 8.

### C. TAF is Allegedly "Safer" Than TDF
In April 2001, scientists published research for a different chemical known as tenofovir alafenamide fumarate (TAF). Dkt. No. 8 at 4. TAF, as compared to TDF, was allegedly shown to be substantially more effective against HIV with far less toxicity. *Id.* at 5. Evans alleges Gilead began clinical trials for TAF but kept the results secret until it announced in October 2004 (shortly after Truvada was first FDA-approved) that Gilead was abandoning its research on TAF. *Id.* According to Evans, Gilead "purposefully withheld" TAF, knowing that it was "safer" than TDF, so that the company could "make more money" by continuing to sell Truvada until the Truvada patents expired and the medication could be purchased from generic prescription drug manufacturers. *See id.* at 5, 7; *id.* at 2. In 2010, Gilead began publishing the results of its earlier studies on TAF. *See id.* at 5. Between November 2015 and February 2018, the FDA approved at least four TAF-containing medications manufactured by Gilead. *See id.* at 5.[7]

**\*4** As noted, in October 2018, Evans was prescribed Truvada. *Id.* at 4.[8]

### D. Evans' Claims
Although the complaint lacks focus and Evans' claims concerning Truvada are difficult to deconstruct, heeding the

obligation to construe his complaint liberally, Evans' theory of liability is twofold. First, Evans alleges Gilead failed to adequately disclose on its prescriber and patient labeling for Truvada that: (a) the drug "could cause damage to the kidneys and to the bones of those who ingest it," including "the problems that [Evans] is now suffering" (*i.e.*, diffuse arthralgia); and (b) doctors should "monitor all TDF patients, on a frequent, specific schedule, for the adverse effects of TDF-associated bone and kidney toxicity." *See id.* at 2, 6–7. Evans also alleges Gilead failed to issue any such "warnings until 2018, despite knowing of these effects since 2001." *Id.* at 6. Second, Evans asserts "Gilead purposefully withheld the TAF design, which it knew was safer than TDF, to make more money." *Id.* at 7; *see also id.* at 6, ¶ 2. Evans' complaint asserts the following product liability claims sounding in negligence and strict liability: (1) "Strict Products Liability – Failure to Warn"; (2) "Negligence and Gross Negligence – Design Defect and Failure to Warn"; (3) "Fraud"; and (4) "Breach of Express and Implied Warranty." *Id.* at 1, 8.

### E. Procedural History

Because Evans filed this lawsuit *pro se*, seeking to proceed *in forma pauperis*, the Court conducted its mandatory, *sua sponte* screening of the complaint pursuant to 28 U.S.C. § 1915(a) and dismissed the complaint with leave to amend for failure to state a claim upon which relief may be granted. Dkt. No. 7 at 6; 28 U.S.C. § 1915(e)(2)(B); *Denton v. Hernandez*, 504 U.S. 25, 32 (1992). Evans filed an amended complaint, Dkt. No. 8, which the Court held "may proceed such that Gilead may be served," but noted that "Gilead ... may still challenge Evans' claims through any means procedurally permitted by the Federal Rules." Dkt. No. 9 at 5.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Gilead has moved to dismiss all claims. Dkt. No. 20.

## STANDARD OF REVIEW

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' " but it does require that "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient fact[s] ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 570).

**\*5** A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In making this assessment, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw "any reasonable inferences" in favor of the plaintiff. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008). In other words, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). That said, the plausibility standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

A court, therefore, judges the sufficiency of a complaint under a two-pronged approach: (1) disregard all "legal conclusions" and "conclusory statements"; and (2) determine whether the remaining "well-pleaded factual allegations," accepted as true, "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678–81. Dismissal is then warranted "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886 (9th Cir. 2018) (quoting *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017)).

## DISCUSSION

Gilead asserts various grounds to dismiss each of Evans' claims. Dkt. No 20-1 at 7–9; Dkt. No. 33 at 2–3. Evans' opposition consists almost solely of allegations copied from an antitrust class action complaint filed against Gilead, Dkt. No. 31,[9] which is irrelevant to Evans' product liability claims and the arguments Gilead raises for dismissal. Notwithstanding Evans' failure to meaningfully respond to Gilead's arguments, that alone is insufficient grounds to conclude that the *complaint* fails to state a claim, as Gilead

Evans v. Gilead Sciences, Inc., Slip Copy (2020)

2020 WL 5189995

must still satisfy its burden as the movant.[10] Therefore, the Court will address Gilead's arguments in turn.

### I. Federal Preemption Under the FDCA

The threshold issue raised by Gilead is federal preemption. Gilead argues that Evans' complaint must be dismissed in its entirety because his claims are "all based on his design defect and failure to warn theories" and these two claims are "preempted by federal law." Dkt. No. 20-1 at 20; Dkt. No. 33 at 3. For the reasons that follow, the Court agrees with respect to Evans' design defect claims only.

#### A. Applicable Preemption Principles

"A fundamental principle of the Constitution"—namely, the Supremacy Clause—"is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. art. VI, cl. 2). "In all pre-emption cases, ... [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations and internal quotation marks omitted). The U.S. Supreme Court "has sometimes used different labels to describe the different ways in which federal statutes may displace state laws—speaking, for example, of express, field, and conflict preemption." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019). Gilead relies solely on conflict preemption. *See* Dkt. No. 20-1 at 23.

**\*6** Conflict preemption exists in two forms: impossibility preemption and obstacle preemption. *See Crosby*, 530 U.S. at 373; *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013). Gilead argues "it was impossible for Gilead to comply simultaneously with both a purported state law duty" and the requirements imposed by federal law. *See* Dkt. No. 20-1 at 23–31. As such, the requirements for "impossibility preemption" govern.

"Impossibility pre-emption is a demanding defense." *Wyeth*, 555 U.S. at 573. The party invoking this preemption defense must show that it is " 'impossible for [that] private party to comply with both state and federal requirements.' " *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).[11] "[T]he mere possibility of impossibility [i]s not enough." *PLIVA*, 564 U.S. at 624 n.8 (citations and internal quotation marks omitted); *Wyeth*, 555 U.S. at 571; *Rice v. Norman*

*Williams Co.*, 458 U.S. 654, 659 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute").

Therefore, the defining "question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *PLIVA*, 564 U.S. at 620 (citing *Wyeth*, 555 U.S. at 573); *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 445 (2005) ("The proper inquiry calls for an examination of the elements of the common-law duty at issue; it does not call for speculation as to whether a jury verdict will prompt the manufacturer to take any particular action." (internal citations omitted)).

#### B. Hawaii Tort Law and the FDCA

With the above principles in mind, the Court must compare state tort duties with federal labeling and design requirements imposed on brand-name drug manufacturers to determine whether it was "impossible" for Gilead to comply with state and federal law. *See PLIVA*, 564 U.S. at 611. Hawaii law applies in this case.[12] The federal law at issue is the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq., and its implementing regulations through which the FDA regulates the approval and labeling of brand-name prescription drugs.

##### 1. Duties Under Hawaii Law

Under Hawaii common law, "where a seller or lessor ... sells or leases a defective product which is dangerous to the user or consumer, and injury results from its use or consumption, the seller or lessor will be held strictly liable in tort for the injury." *Tabieros v. Clark Equip. Co.*, 944 P.2d 1279, 1310 (Haw. 1997) (quoting *Ontai v. Straub Clinic & Hosp.*, 659 P.2d 734, 739 (Haw. 1983)). "A product may be defective" by virtue of its manufacturing, design, or "insufficient warning." *Id.* at 1296 (citation omitted). "A plaintiff may establish a defect for purposes of either strict liability or negligence under three approaches: (1) the 'consumer expectation' test; (2) the 'risk-utility' test; and (3) the 'latent danger' test." *Acoba v. General Tire, Inc.*, 986 P.2d 288, 304 (Haw. 1999) (quoting *Tabieros*, 944 P.2d at 1310).[13]

##### 2. FDCA Requirements

PAS-L-002120-20    10/16/2020 3:16:53 PM    Pg 23 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC    Document 1-1    Filed 01/29/21    Page 81 of 248 PageID: 90
Evans v. Gilead Sciences, Inc., Slip Copy (2020)

2020 WL 5189995

**\*7** Federal law, in this case, is more robust than state law. Under the FDCA, drug manufacturers must obtain approval from the FDA before bringing a new drug to market. 21 U.S.C. § 355(a). "It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers," like Gilead, "are meaningfully different than those that apply to generic drug manufacturers." *PLIVA*, 564 U.S. at 626. "A brand-name manufacturer ... is responsible for the accuracy and adequacy of its label." *See, e.g., PLIVA*, 564 U.S. at 613 (citing 21 U.S.C. §§ 355(b)(1), (d)). "It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." *Wyeth*, 555 U.S. at 571 (citations omitted). "A manufacturer seeking generic drug approval, on the other hand, is responsible for ensuring that its warning label is the same as the brand name's." *See, e.g., PLIVA*, 564 U.S. at 613 (citing 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G); 21 C.F.R. §§ 314.94(a)(8), 314.127(a)(7)).

"In the case of a new brand-name drug, FDA approval can be secured only by submitting a new-drug application (NDA)." *Bartlett*, 570 U.S. at 476 (noting that the "process of submitting an NDA is both onerous and lengthy"). The FDA may approve the drug "only if it determines that the drug in question is 'safe for use' under 'the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof.' " *Id.* (quoting 21 U.S.C. § 355(d)). FDA approval of a new drug also includes approval of the "exact text" on the final label. *Wyeth*, 555 U.S. at 568; 21 C.F.R. § 314.105(b).

After approval, the FDA's "changes being effected" (CBE) regulation permits brand-name drug manufacturers to revise their labels "to reflect newly acquired information" if the change is designed to "add or strengthen a contraindication, warning, precaution, or adverse reaction for which [there is] evidence of a causal association" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." *See, e.g.,* 21 C.F.R. § 314.70(c)(6)(iii)(A), (C); *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019); *PLIVA*, 564 U.S. at 614–15, 624. Brand-name drug manufacturers "may make the labeling change upon filing [a] supplemental application with the FDA; [they] need not wait for FDA approval." *Wyeth*, 555 U.S. at 568 (citing 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C)); *Albrecht*, 139 S. Ct. at 1673, 1679; *PLIVA*, 564 U.S. at 624 ("They need only simultaneously file a supplemental application with the FDA."). "[T]he FDA retains authority to reject" these unilateral labeling changes made pursuant to the CBE regulation. *Wyeth*, 555 U.S. at 571. But the possibility of rejection does not preempt state law. For a brand-name manufacturer to establish that "it was impossible" to comply with both federal and state labeling requirements, it must produce "clear evidence that the FDA would not have approved a change to [the] label." *Id.*; *Albrecht*, 139 S. Ct. at 1672 (holding that "this question of pre-emption is one for a judge to decide, not a jury"). "[T]he mere fact that the FDA approved [the brand-name drug]'s label does not establish that it would have prohibited such a change." *Wyeth*, 555 U.S. at 573.

The FDCA is different for generic drug manufacturers. Since Congress passed what is commonly known as the "Hatch-Waxman Act" in 1984, now "a generic drug" may simply be approved if "the generic drug is identical to the already-approved brand-name drug" in terms of active ingredients, route of administration, dosage form, strength, and labeling. *See Bartlett*, 570 U.S. at 477; *PLIVA*, 564 U.S. at 612; 21 U.S.C. §§ 355(j)(2)(A)(ii)–(v), (8)(B). Moreover, unlike brand-name drug manufacturers, the FDCA "prohibits generic drug manufacturers from independently changing their drugs' labels." *Bartlett*, 570 U.S. at 475, 477 (citing 21 C.F.R. §§ 314.94(a)(8)(iii), 314.150(b)(10) (approval for a generic drug may be withdrawn if the generic drug's label "is no longer consistent with that for [the brand-name] drug")).

**\*8** Nonetheless, generic and brand-name drug manufacturers are similar in one important aspect: "Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.' " *Bartlett*, 570 U.S. at 477 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

The trilogy of preemption cases the Supreme Court has decided involving drug manufacturers illustrates how the "different federal statutes and regulations" applicable to generic and brand-name drug manufacturers "lead to different pre-emption results." *See PLIVA*, 564 U.S. at 626.

First, in *Wyeth v. Levine*, a failure-to-warn lawsuit was brought against a brand-name drug manufacturer like Gilead. 555 U.S. at 558. Because it is possible for a brand-name drug manufacturer to comply with labeling requirements under both state and federal law, the Court held that the lawsuit was not preempted. *Id.* at 571–73. Specifically, the Court reasoned that the CBE regulation, 21 C.F.R. § 314.70(c)(6)

(iii), permitted a brand-name drug manufacturer, like Wyeth, "to unilaterally strengthen its warning" without prior FDA approval and Wyeth had not offered any evidence "that the FDA would not have approved a change" to the drug label in question. *Id.* at 572–73.

Second, in *PLIVA, Inc. v. Mensing*, the Court held that state failure-to-warn claims brought against generic drug manufacturers were preempted by the FDCA because "it was impossible" for the defendants "to comply with both their state-law duty" to strengthen the warning on the label and "their federal-law duty to keep the label the same" as the corresponding brand-name drug labels. *PLIVA*, 564 U.S. at 610, 618–19. "[T]he CBE process was not open to the [generic manufacturers]," *id.* at 615, and, thus, "federal law would permit the [generic manufacturers] to comply with the state labeling requirements if, and only if, the FDA and the brand-name manufacturer changed the brand-name label to do so." *Id.* at 620, 624. The Court rejected the argument that preemption turned on whether the manufacturers "asked the FDA for help in changing the corresponding brand-name label." *Id.* at 619. Because the generic manufacturers could not "independently" change their drug labels "without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency," the failure-to-warn claims were preempted. *Id.* at 624.

Third, *Mutual Pharm. Co. v. Bartlett* involved a state-law "design-defect claim" brought against a generic drug manufacturer. 570 U.S. at 475. The Court held that such "state-law design-defect claims" are preempted. *See id.* at 476, 487. The Court explained that it "was not possible" for the manufacturer to "redesign" its generic drug because (a) the FDCA requires a generic drug to be chemically identical to its brand-name counterpart; and (b) the drug in question was "chemically incapable of being redesigned" due to its "simple composition," consisting of only one molecule. *Id.* at 483–84. Moreover, it was not possible to, alternatively, strengthen the drug's warning label to avoid liability because "[a]s *PLIVA* made clear, federal law prevents generic drug manufacturers from changing their labels." *Id.* at 484, 486. Although the lower court had reasoned that a generic manufacturer "could escape the impossibility of complying with both its federal- and state-law duties by 'choos[ing] not to make [the generic drug] at all,' " *id.* at 488 (citation omitted), the Court rejected this " 'stop-selling' rationale," holding "the prospect that a regulated actor could avoid liability under both state and federal law by simply leaving the market did not" save the

plaintiff's claims from preemption under the FDCA. *Id.* at 489–90; *see also id.* at 487 n.3 ("[O]ur pre-emption cases presume that a manufacturer's ability to stop selling does not turn impossibility into possibility.").

### 3. Analysis: Preemption as to Evans' Claims

*\*9* Liberally construed, the Court interprets the complaint to raise both pre- and post-approval design defect claims and post-approval failure to warn claims.[14] Applying the standard for impossibility preemption to these claims, the Court concludes that only Evans' design defect claims are preempted under the FDCA because it was impossible for Gilead to comply with both Hawaii tort law and the FDCA's design approval requirements.

### a. Evans' Design Defect Claims are Preempted

First, to the extent Evans asserts a pre-approval design defect claim—*i.e.*, prior to Truvada receiving FDA approval, Gilead should have produced an HIV treatment or PrEP drug containing TAF, rather than TDF—this claim is preempted. Specifically, Evans alleges "Gilead abandoned its TAF (tenofovir) design in 2004" and "purposefully withheld the TAF design, which it knew was safer than TDF, to make more money." *See* Dkt. No. 8 at 7; *see id.* 6, ¶ 2 (alleging Gilead produced "a medication that it knew caused bone issues to those who took the medication, knowing it had a safer medication that would have prevented [Evans'] irreversible injuries").

The problem with Evans' theory is that it was impossible for Gilead to "independently" distribute a TAF-containing drug. *See Mensing*, 564 U.S. at 620. Doing so would have required prior FDA approval of the new drug. 21 U.S.C. § 355(a), (d); *Bartlett*, 570 U.S. at 476. Unlike the CBE process that permits "unilateral," *post-approval label* changes to be made immediately without prior FDA approval, *Wyeth*, 555 U.S. at 568; *Albrecht*, 139 S. Ct. at 1679, there is not a process under the FDCA's regime that permits a drug manufacturer to simply submit *a new drug application* and immediately begin distributing that drug until and unless the FDA rejects the application. "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy

PAS-L-002011-20    10/16/2020 3:16:53 PM    Pg 25 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC    Document 1-1    Filed 01/29/21    Page 83 of 248 PageID: 92
Evans v. Gilead Sciences, Inc., Slip Copy (2020)

2020 WL 5189995

those state duties for pre-emption purposes." *PLIVA*, 564 U.S. at 623–24.

Other courts have reached a different conclusion based on two principal reasons, neither of which square with Supreme Court precedent.[15] First, courts have reasoned that nothing requires a brand-name manufacturer "to use the allegedly defective design in the first place." *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 824 (N.D. Cal. 2019) (quoting *Trahan v. Sandoz, Inc.*, No. 3:13-cv-350-J-34MCR, 2015 WL 2365502, at *6 n.5 (M.D. Fla. Mar. 26, 2015)). But that theory is essentially a "never-start selling rationale" akin to the "stop-selling rationale" rejected in *Bartlett*, 570 U.S. at 488–89. *See Yates v. Ortho-Mcneil-Janssen Pharms., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) (holding that pre-approval drug design defect claims were preempted).[16] "[A] manufacturer's ability to stop selling does not turn impossibility into possibility." *See, e.g., Bartlett*, 570 U.S. at 487 n.3; *id.* at 489 n.5 ("[T]he mere fact that a manufacturer may avoid liability by leaving the market does not defeat a claim of impossibility."). Second, some courts have held that pre-approval design defect claims are not preempted because a drug manufacturer could have *possibly* "develop[ed] and submit[ed] for approval drugs that contained TAF rather than TDF" at an earlier date. *See Holley*, 379 F. Supp. 3d at 824 (quoting *Sullivan*, 2015 WL 4879112, at *6). *PLIVA*, however, rejected a similar rationale. *See PLIVA*, 564 U.S. at 619–21. Merely "requesting FDA assistance" or "ask[ing] the FDA for help" in complying with state law "would have satisfied [Gilead's] federal duty, [but] it would not have satisfied [Gilead]'s state tort-law duty" to provide an allegedly safer drug composition. *Id.* at 619. "The only action [Gilead] could independently take—asking for the FDA's help [by submitting a TAF-containing drug application]— is not a matter of state-law concern." *See PLIVA*, 564 U.S. at 624. In short, pre-approval design defect claims against brand-name drug manufacturers are preempted by the FDCA. *See, e.g., Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185–86 (S.D.N.Y. 2016) (concluding that pre-approval design defect claim against brand-name drug manufacturer was preempted, despite plaintiffs' arguments that "defendants had a pre-approval duty to submit a differently designed drug for FDA approval" or, alternatively, "should never have sold the FDA-approved formulation of Eliquis"); *Mahnke v. Bayer Corp.*, No. 219CV07271, 2019 WL 8621437, at *5 (C.D. Cal. Dec. 10, 2019); *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1364 (N.D. Ga. 2016) ("This original design theory of liability makes little sense in the face of the Supreme Court's precedents."). Accordingly, Evans' pre-

approval design defect claims, if any, are preempted under the FDCA.

**\*10**  Second, there is no question that any post-approval design defect claim is preempted by the FDCA. "Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.' " *Bartlett*, 570 U.S. at 477 (quoting 21 C.F.R. § 314.70(b)(2)(i)). Post-approval changes to a drug's composition are divided into three categories: "major," "moderate," and "minor" changes. *See* 21 C.F.R. § 314.70(b)–(d). Major changes require FDA "approval prior to distribution of the product made using the change," while moderate and minor changes do not. *See id.* (providing examples of changes within each category). Because changes in the "the qualitative or quantitative formulation of the drug product, including inactive ingredients" and "drug substance" are major changes, *id.* § 314.70(b)(2)(i), (iii), clearly substituting TAF for TDF as one of the active ingredients in Truvada constitutes a "major change" requiring prior FDA approval. *See, e.g., Yates*, 808 F.3d at 298 (holding that post-approval design defect claim against brand-name drug manufacturers was "clearly preempted" because "federal law prohibited defendants from decreasing the dosage of estrogen post-approval"); *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 14 (1st Cir. 2018) ("[C]hanging the product bottle so as to dispense a different amount of prescription eye solution is a 'major change' under 21 C.F.R. § 314.70(b)," meaning that "plaintiffs' attempt to use state law to require such a change is preempted."); *Drescher v. Bracco Diagnostics Inc.*, 2020 WL 699878, at *8 (D. Ariz. Jan. 31, 2020) (post-approval design-defect claim against brand-name manufacturer preempted because the design change advocated for "would constitute a major change under the regulations" requiring "prior FDA approval"); *Paulsen v. Abbott Labs.*, 368 F. Supp. 3d 1152, 1173 (N.D. Ill. 2019) ("[A]ny claims by Plaintiff that TAP should have changed the formulation of Lupron is preempted by FDA regulations that prohibit a change in the formulation of a drug once it has been approved."); *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 322 (D. Conn. 2016) (post-approval design defect claim preempted because "[i]f Defendants had unilaterally changed the active ingredient of Motrin from ibuprofen to dexibuprofen to satisfy their state law duty, they would have violated federal law"). Accordingly, insofar as Evans asserts that Gilead should have changed the

formulation of Truvada after it was approved by the FDA, this claim is preempted by the FDCA.

In sum, Evans' design defect claims are dismissed with prejudice as preempted by the FDCA. Because any amendment to the complaint will not change the law, leave to amend these claims would be a "futile exercise" and is, therefore, denied. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020).

**b. Evans' Failure-to-Warn Claims are Not Preempted**

As noted, Evans only asserts post-approval failure-to-warn claims. *See supra* n.14. Gilead contends that Evans "has not alleged any 'newly acquired information' " that would permit Gilead to utilize the CBE process to make a post-approval change to its Truvada labeling and, thus, Evans "cannot state a non-preempted claim based on a purported post-approval failure to warn." *See* Dkt. No. 20-1 at 30; *supra* Section I.B.2. Gilead misapprehends both its burden in establishing its preemption defense and the procedural posture of this case. *Wyeth*, 555 U.S. at 569.

First, Evans is not required to plead the existence of "newly acquired information."[17] "FDCA preemption, like all federal preemption, is an affirmative defense." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 (9th Cir. 2018) (quoting *Lusnak*, 883 F.3d at 1194 n.6). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Id.* (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)); *Lusnak*, 883 F.3d at 1194 n.6 ("Ordinarily, affirmative defenses such as preemption may not be raised on a motion to dismiss except when the defense raises no disputed issues of fact."). As such, whether "newly acquired information" existed prior to when Evans was prescribed Truvada, is an issue for post-discovery motion practice. *See Wyeth*, 555 U.S. at 569, 571.

*11 Second, even if there was little or no "newly acquired information" relevant to Evans' claims, that did not make it *impossible* for Gilead to change its Truvada label. The FDA's CBE regulation permits a brand-name drug manufacturer, like Gilead, to file a supplemental application and then immediately "change a label to 'reflect newly acquired information' if the changes 'add or strengthen a ... warning' for which there is 'evidence of a causal association,' without

prior approval from the FDA." *See, e.g., Albrecht*, 139 S. Ct. at 1679 (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)); *Wyeth*, 555 U.S. at 568 ("[I]t may make the labeling change upon filing [a] supplemental application with the FDA; it need not wait for FDA approval."). Thus, Gilead could have filed a supplemental application and immediately changed its Truvada label. *See Wyeth*, 555 U.S. at 571 ("Wyeth had a duty to provide a warning that adequately described that risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval."). As the Supreme Court recently emphasized:

> Of course, the FDA reviews CBE submissions and can reject label changes even after the manufacturer has made them. *See* §§ 314.70(c)(6), (7).... But in the interim, the CBE regulation permits changes, so a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both.

*Albrecht*, 139 S. Ct. at 1679; *Wyeth*, 555 U.S. at 571 ("[A]bsent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements."); *PLIVA*, 564 U.S. at 624 n.8. As explained, state law failure-to-warn claims are only preempted by the FDCA and related labeling regulations when the drug manufacturer produces " 'clear evidence' that the FDA would not have approved the warning [change] that state law requires." *Albrecht*, 139 S. Ct. at 1676 (quoting *Wyeth*, 555 U.S. at 571). In 2019, the Supreme Court held that " 'clear evidence' is evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." *Id.* at 1672; *id.* at 1678.

Gilead has not offered such evidence. Gilead has not shown that it filed a supplemental application, changed its Truvada labeling to include a warning for the injuries Evans allegedly suffered, and that the FDA later rejected that change. The notion that perhaps there was not sufficient "newly acquired information" or "evidence of a causal association" between Truvada and the risk of injuries alleged here, 21 C.F.R. § 314.70(c)(6)(iii)(A), are merely two of any number of reasons for the FDA to reject the label changes after Gilead had made them. But federal law did not preclude Gilead from making a label change in the interim.

2020 WL 5189995

Accordingly, Evans' failure-to-warn claims are not preempted by the FDCA and its labeling regulations.

## II. Failure-to-Warn Claims: Merits

Beyond preemption, Gilead contends that Evans' failure-to-warn claims fail for two reasons: "(1) the Truvada® labeling contained the warnings that [Evans] incorrectly alleges were lacking; and (2) [Evans] fails to adequately allege the causation required to sustain such a claim." Dkt. No. 20-1 at 11. Only the latter is true.

First, the Truvada labeling did not contain the specific warnings relevant to this case. A manufacturer has a duty to "give appropriate warning of any known dangers which the user of its product would not ordinarily discover." *Acoba*, 986 P.2d at 305 (quoting *Ontai*, 659 P.2d at 743); *Tabieros*, 944 P.2d at 1297–98. "[I]n a strict products liability action, the issue of whether the seller knew or reasonably should have known of the dangers inherent in his or her product ... has absolutely no bearing on the elements of a strict products liability claim." *Tabieros*, 944 P.2d at 1298 n.11 (quoting *Johnson v. Raybestos-Manhattan, Inc.*, 740 P.2d 548, 549 (Haw. 1987)). "When a product warning has been provided by a manufacturer, the adequacy of that warning is generally a question of fact for the jury." *Acoba*, 986 P.2d at 302 (collecting cases). "In rare instances, however, warnings may be found adequate as a matter of law." *Id.* (citing *Temple v. Velcro USA, Inc.*, 196 Cal. Rptr. 531, 533 (Cal. Ct. App. 1983)). For example, a warning may be deemed adequate as a matter of law where it is "very clear, understandable and completely unambiguous" and "forcefully [brings] home the intended message." *Temple*, 196 Cal. Rptr. at 533.

**\*12** Here, Evans alleges that Truvada's prescriber and patient labeling did not disclose that: (a) the drug "could cause damage to the kidneys and to the bones of those who ingest it," including "the problems that [Evans] is now suffering" (*i.e.*, diffuse arthralgia); and (b) doctors should "monitor all TDF patients, on a frequent, specific schedule, for the adverse effects of TDF-associated bone and kidney toxicity." *See* Dkt. No. 8 at 2, 6–7.

Although the Truvada labeling provided at the relevant time warned of "[b]one problems," including "bone pain, or softening or thinning of bones, which may lead to fractures"; "[d]ecreases in bone mineral density (BMD)"; and "Bone Loss and Mineralization Defects," see Dkt. No. 20-2 at 1, 7–8, 12, 37, the particular injury at issue here is "diffuse arthralgia." Dkt. No. 8 at 2, 7. In that regard, the most the

label says is that "in association with TDF use ... [a]rthralgia and muscle pain or weakness have also been reported in cases of proximal renal tubulopathy." *Id.* at 8. The label mentions "arthralgia" but only as a risk in patients with a specific condition—"proximal renal tubulopathy"—and that specific and important fact is conspicuously omitted in Gilead's brief and replaced with an ellipsis. Dkt. No. 20-1 at 7. The complaint does not indicate Evans has "proximal renal tubulopathy." As a result, the Court cannot say, as a matter of law, that the label warns patients like Evans of the risk of arthralgia in terms that are "completely unambiguous" and "forcefully [bring] home the intended message." *Temple*, 196 Cal. Rptr. at 533.

The warning for doctors to monitor TDF patients' "bone mineral density" suffers from the same defect. *See* Dkt. No. 20-2 at 1 ("Monitor for evidence of tenofovir toxicity."); *id.* at 33 ("Consider bone monitoring in patients and uninfected individuals *who have a history of pathologic bone fracture or at risk for osteopenia*" (emphasis added)). The label recommends monitoring patients with a history of particular conditions, none of which are known to be germane to Evans. Therefore, a reasonable jury could conclude that these warnings were inadequate. As such, the adequacy of the label in this case is a question for the jury.

Gilead, however, also argues that Evans has failed to allege that any failure to warn was the proximate cause of Evans' injuries. Specifically, Gilead contends that to do so Evans "must allege that his doctor would have acted differently (*e.g.*, not prescribed Truvada®) had Gilead provided supposedly adequate warnings." Dkt. No. 20-1 at 14. Although Hawaii courts have not directly addressed this specific issue, the Court predicts that the Hawaii Supreme Court would adopt a similar rule.[18]

"[I]n order for a manufacturer to be liable for failing to provide an appropriate warning, it must not only be subject to a legal duty to warn, but the breach of that duty (*i.e.*, the failure to give an adequate warning) must have been the legal cause of the plaintiff's injuries." *Tabieros*, 944 P.2d at 1313. "Proof of defect [*i.e.*, manufacture, design, or failure to warn] *and causation* may be provided by expert testimony or *by circumstantial evidence*." *Acoba*, 986 P.2d at 304 (emphasis added); *see Tabieros*, 944 P.2d at 1296–97. Hawaii adheres to the "learned intermediary" rule in the "the prescription drug arena." *See Craft v. Peebles*, 893 P.2d 138, 155 (Haw. 1995). "The learned intermediary rule ... assumes that it is reasonable for a manufacturer to rely on

the prescribing physician to forward to the patient, who is the ultimate user of the drug products, any warnings regarding their possible side effects." *Id.* (citation omitted). As such, the "the adequacy of [a manufacturer's] warning is measured by the effect on the *physician*, ... to whom it owed a duty to warn, and not by its effects on [the patient]." *Id.* at 156 (citation omitted; emphasis in original). It follows then, as other jurisdictions have concluded, that "[w]hen a plaintiff brings an insufficient warning claim against a drug company, the learned intermediary doctrine requires a showing that the prescribing physician, not the patient, would have taken 'a different course of action' if better warnings had been issued." *See, e.g., Luttrell v. Novartis Pharms. Corp.*, 555 F. App'x 710, 710 (9th Cir. 2014) (citations omitted; applying Washington law); *Motus v. Pfizer, Inc.*, 358 F.3d 659, 661 (9th Cir. 2002) (applying California law); *Tapia v. Davol, Inc.*, 116 F. Supp. 3d 1149, 1158 (S.D. Cal. 2015) (applying California law); *see also Holley*, 379 F. Supp. 3d at 830 ("[T]he relevant question is whether the plaintiff's physician would have 'prescribed the drug in the same manner.' ") (quoting *Alston v. Caraco Pharm., Inc.*, 670 F. Supp. 2d 279, 285 (S.D.N.Y. 2009)).

**\*13** Here, Evans has not adequately alleged causation because he has not asserted that stronger warnings would have led his physician to either prescribe a medication other than Truvada, prescribe the drug in a different manner, or prescribe nothing at all. Evans merely alleges that Gilead "[i]ntentionally omitting the warnings from their labeling caused [Evans] to be diagnosed with Diffuse Arthralgia, secondary to use of Truvada," and that Gilead's "negligence caused [Evans] the harm he now suffers." Dkt. No. 8 at 2, 8; *see also id.* at 7 ("The action or inaction has caused [Evans] with Diffuse Arthralgia."). These "labels and conclusions ... will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Evans must allege that had the Truvada label contained a stronger warning of the risk of diffuse arthralgia, this would have altered his prescribing physician's "course of action" in some meaningful way. Because Evans has not done so, his failure-to-warn claim is dismissed, albeit with leave to amend.

## III. Fraud

Evans alleges that he "is suing for," among other things, "Fraud." Dkt. No. 8 at 8. Gilead contends this claim must be dismissed because it does not meet the pleading requirements under Federal Rule of Civil Procedure 9(b) for claims sounding in fraud. Dkt. No. 20-1 at 16. The Court agrees. Evans is far from satisfying the "particularity" pleading

requirements of Rule 9(b). *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (*en banc*).

To establish a fraud claim, a plaintiff must allege the following elements: "(1) false representations were made by [the defendant], (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them." *Shoppe v. Gucci Am.*, 14 P.3d 1049, 1067 (Haw. 2000) (quoting *TSA Int'l Ltd. v. Shimizu Corp.*, 990 P.2d 713, 725 (Haw. 1999)). Rule 9(b), in turn, states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P.9(b); *see Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("Rule 9(b)'s particularity requirement applies to state-law causes of action."). To satisfy Rule 9(b), "the pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (citations and internal quotation marks omitted). In other words, Evans "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom*, 486 F.3d at 553 (citation omitted).

The missing pieces here are *who* stated *what* to *whom* and *when* and *where* was the statement made, as well as some allegation as to what makes the statement(s) false or misleading. Nor is there any allegation in the complaint that Evans and his physician(s) relied on any such misrepresentation. *See Craft*, 893 P.2d at 156. Rather, Evans has simply stated in conclusory terms that Gilead was "defrauding those taking this medication, including [Evans], for their own financial benefit." Dkt. No. 8 at 5. This presumably relates to Evans' contention that Gilead "purposefully withheld the TAF design," Dkt. No. 3, 7, but that decision, even accepted as true, does not constitute an actionable claim for fraud.

Accordingly, Evans' fraud claim is dismissed with leave to amend.

## IV. Breach of Express and Implied Warranty

That leaves Evans' claim for "Breach of Express and Implied Warranty." Dkt. No. 8 at 8.[19] These claims are also dismissed as insufficiently pled because the complaint merely "tenders

'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

**\*14** Under Hawaii law, three categories of warranties are prescribed by statute: express; implied warranty of fitness for a particular purpose; and implied warranty of merchantability. *See* Haw. Rev. Stat. §§ 490:2-313, -314, -315.

Express warranties are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See* Haw. Rev. Stat. § 490:2-313(1). "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* § 490:2-313(2). Thus, to state a breach of express warranty claim, Evans must allege that: "(1) [Gilead] made an affirmation of fact or promise regarding the product, (2) that statement became part of the basis of the bargain, and (3) the product failed to perform according to the statement." *Nielsen v. Am. Honda Motor Co.*, 989 P.2d 264, 274–75 (Haw. Ct. App. 1999); *Torres v. Northwest Eng'g Co.*, 949 P.2d 1004, 1015 (Haw. Ct. App. 1997).

Here, the defect in Evans' express warranty claim is that he has failed to allege that Gilead made a specific "affirmation or promise" regarding Truvada or that Gilead provided a "description of [Truvada]" that failed to live up to its billing. Therefore, Evans' express warranty claim is dismissed with leave to amend.

Implied warranties come in two forms, but Evans has not specified which theory he is pursuing. "The implied warranty of merchantability is perhaps the broadest warranty in the Uniform Commercial Code." *Ontai*, 659 P.2d at 744. "This warranty is implied by operation of law into every sale of goods by a merchant seller." *Id.* "Merchantability, as provided

in Hawaii's statute, means, *inter alia*, that the goods 'are fit for the ordinary purpose for which such goods are used.' " *Id.* (quoting Haw. Rev. Stat. § 490:2-314(2)(c)). Thus, to state a claim for breach of the implied warranty of merchantability, Evans must allege "(1) the seller is a merchant of such goods, and (2) the product was defective or unfit for the ordinary purpose for which it is used."[20] *Nielsen*, 989 P.2d at 274; *see also* *Larsen v. Pacesetter Sys., Inc.*, 837 P.2d 1273, 1284–85 (Haw. 1992) ("[T]o bring an action in implied warranty for personal injury[,] a plaintiff is required to show product unmerchantability sufficient to avoid summary judgment on the issue of defectiveness in a tort strict products liability suit.").

**\*15** By contrast, "the implied warranty of fitness for a particular purpose is narrower and more specific." *Ontai*, 659 P.2d at 744. When the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose." Haw. Rev. Stat. § 490:2-315. "[T]he buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." *Ontai*, 659 P.2d at 744 (quoting Haw. Rev. Stat. § 490:2-315 cmt. 1). Therefore, to adequately allege a claim for breach of the implied warranty of fitness, Evans must allege that: "(1) [Evans] desired a product for a particular purpose, (2) [Gilead] had reason to know about this purpose, and (3) the product sold to [Evans] failed to meet that purpose." *Nielsen*, 989 P.2d at 274.

Because Evans does not allege which implied warranty claim(s) he is pursuing (*i.e.*, merchantability, and/or fitness), Gilead (and the Court) are left to guess. That is not "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (ellipsis in original) (quoting *Conley*, 355 U.S. at 47). Moreover, Evans does not contend Truvada failed to perform as an HIV treatment or PrEP medication for HIV. For these reasons, Evans' "implied warranty" claim is dismissed. Evans, however, is granted leave to amend.[21]

**CONCLUSION**

Evans v. Gilead Sciences, Inc., Slip Copy (2020)

2020 WL 5189995

For the reasons set forth herein, Defendant's Motion to Dismiss the First Amended Complaint, Dkt. No. 20, is GRANTED, and the First Amended Complaint is DISMISSED.

Plaintiff may have until **September 21, 2020** to file an amended complaint, to the extent allowed herein and consistent with a litigant's ethical obligations under Fed.R.Civ.P. 11(b). **The Court cautions Evans that failure to file an amended complaint by September 21, 2020, may result in the automatic dismissal of this action.**

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 5189995

Footnotes

1   See FDA, Truvada, Drugs@FDA: FDA Approved Drugs, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=021752 (last visited August 28, 2020). Because a court may take judicial notice of any undisputed facts in "records and reports of administrative bodies" in ruling on a Rule 12(b)(6) motion to dismiss, Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999, 1001 (9th Cir. 2018) (quoting United States v. Ritchie, 342 F.3d 903, 907–09 (9th Cir. 2003)), the Court will consider relevant records and reports issued by the Food and Drug Administration, including the FDA-approved Truvada labeling.

2   See U.S. Food & Drug Admin. (FDA), Truvada for PrEP Fact Sheet: Ensuring Safe and Proper Use 1 (2012) [hereinafter "Truvada Fact Sheet"], https://www.fda.gov/media/83586/download (last visited August 14, 2020); see also FDA, Truvada, Drugs@FDA: FDA Approved Drugs, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=021752.

3   U.S. Food & Drug Admin., Drug Approval Package: Truvada (August 2, 2004), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021752s000_TruvadaTOC.cfm (last visited August 14, 2004); Letter from Dep't of Health & Human Services to Gilead Sciences, Inc., https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021752s000_Truvada_Approv.pdf.

4   See Truvada Fact Sheet, supra note 2, at 1.

5   Evans attaches a letter from his treating physician, stating in part, that Evans did not have "multi-joint pain prior to taking the medication." Dkt. No. 8-1.

6   Truvada's labeling has been revised on sixteen different occasions since the drug was initially approved. See FDA, Truvada, Drugs@FDA: FDA Approved Drugs, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=021752.

7   The four specific drugs are Genvoya, Odefsey, Descovy, and Biktarvy. FDA, Genvoya Approval Package, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000TOC.cfm; FDA, Odefsey Approval Package, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208351Orig1s000TOC.cfm; FDA, Descovy Approval Package, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208215Orig1_toc.cfm; FDA, Biktarvy Approval Package, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2018/210251Orig1s000TOC.cfm. The approval dates, history, letters, labels, and reviews for each drug are available on the FDA's website and can be accessed through a search using the drug's name. See FDA, Drugs@FDA: FDA-Approved Drugs, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

8   Evans also alleges that he was prescribed Truvada by his "healthcare provider, contrary to their obligation to do so, ... without any testing or bloodwork"; namely, a "negative HIV antibody test." Dkt. No. 8 at 1, 7. Evans does not allege any facts that would indicate that Gilead was somehow responsible for that decision, and Evans has not named his prescribing physician as a Defendant in this lawsuit.

9   See Complaint at ¶¶ 1–15, Staley v. Gilead Sciences, Inc., No. 3:19-cv-02573 (N.D. Cal. May 14, 2019), ECF No. 1.

10  See, e.g., V.V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas, LLC, 946 F.3d 542, 547 (9th Cir. 2019) (plaintiff "explicitly did not oppose" dismissal); Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416 n.3 (4th Cir. 2014) ("Even though Appellants did not challenge the motions to dismiss, we note that the district court nevertheless has an obligation to review the motions to ensure that dismissal is proper."); Issa v. Comp USA, 354 F.3d 1174, 1178 (10th Cir. 2003) (holding that "even if a plaintiff does not file a response to a motion to dismiss ... the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim").

11   The party asserting the defense bears the "burden [of] establishing [its] pre-emption defense." *See, e.g., Wyeth,* 555 U.S. at 569; *Lusnak v. Bank of Am., N.A.,* 883 F.3d 1185, 1191 (9th Cir. 2018); *Wolfe v. BNSF Ry. Co.,* 749 F.3d 859, 863 (9th Cir. 2014).

12   Hawaii law applies based on the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elect. Mfg. Co.,* 313 U.S. 487, 496–97 (1941); *Senne v. Kan. City Royals Baseball Corp.,* 934 F.3d 918, 928 (9th Cir. 2019); *see Mikelson v. United Servs. Auto. Ass'n,* 111 P.3d 601, 607 (Haw. 2005). Gilead relies primarily on Hawaii product liability law and thus appears to agree. *See, e.g.,* Dkt. No. 20-1 at 12.

13   To establish a design defect under the "consumer expectation" test, "it is enough that the plaintiff demonstrates that because of its manufacture or design, the product does not meet the reasonable expectations of the ordinary consumer or user as to its safety." *Tabieros,* 944 P.2d at 1311 (quoting *Ontai,* 659 P.2d at 739). Under the "risk-utility test," "a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." *Id.* (quoting *Ontai,* 659 P.2d at 739–40); *see id.* at 1310 (noting that relevant factors may include "the gravity of the danger posed by the design, the likelihood that such danger would cause injuries, the mechanical feasibility of a safer alternative design at the time that the product was manufactured, the financial cost of an improved design, and the adverse consequences, if any, to the product and the consumer that would result from an alternative design."). The third theory—the "latent danger" test—provides that "the product is defective in design, even if faultlessly made, if the use of the product in a manner [that] is intended or reasonably foreseeable ... involves a substantial danger that would not be readily recognized by the ordinary user of the product *and the manufacturer fails to give adequate warnings of the danger*." *Tabieros,* 944 P.2d at 1310 (emphasis in original); *Masaki v. General Motors Corp.,* 780 P.2d 566, 579 (Haw. 1989).

14   Evans does not allege that he suffered any injuries by virtue of inadequate warnings in the *original* FDA approved labeling for Truvada. In any event, the various Truvada labels provided before Evans was prescribed the drug in October 2018 are irrelevant to his failure-to-warn claims because the Truvada labeling had changed by October 2018. Dkt. No. 8 at 4; *See* FDA, *Truvada,* Drugs@FDA: FDA Approved Drugs, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=021752.

15   *See Holley v. Gilead Scis., Inc.,* 379 F. Supp. 3d 809, 823–25 (N.D. Cal. 2019) (citing *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.,* No. MDL 2592, 2017 WL 3188456, at *6 (E.D. La. July 21, 2017); *Young v. Bristol-Myers Squibb Co.,* No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320, at *7-8 (N.D. Miss. Feb. 22, 2017); *Guidry v. Janssen Pharms., Inc.,* 206 F. Supp. 3d 1187, 1206–09 (E.D. La. 2016); *Sullivan v. Aventis, Inc.,* No. 14-CV-2939-NSR, 2015 WL 4879112, at *6 (S.D.N.Y. Aug. 13, 2015); *Estate of Cassel v. Alza Corp.,* No. 12-CV-771-WMC, 2014 WL 856023, at *2–6 (W.D. Wis. Mar. 5, 2014)).

16   It appears the Sixth Circuit is the only Court of Appeals that has addressed whether pre-approval design-defect claims against a brand-name manufacturer are preempted. *See Holley,* 379 F. Supp. 3d at 822.

17   The FDA regulations define "newly acquired information" as "data, analyses, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to [the] FDA." 21 C.F.R. § 314.3(b); *see Wyeth,* 555 U.S. at 569 ("The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments"). Given that the "process of submitting an NDA is both onerous and lengthy," typically "span[ning] thousands of pages and is based on clinical trials conducted over several years," *Bartlett,* 570 U.S. at 476 (citation omitted), requiring a plaintiff to allege "new clinical studies, reports of adverse events, or new analyses" would give new meaning to the phrase "short and plain" under Rule 8(a)(2).

18   *See PSM Holding Corp. v. Nat'l Farm Fin. Corp.,* 884 F.3d 812, 820 (9th Cir. 2018) ("[A] federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.").

19   To the extent Evans asserts a claim for "Negligence and Gross Negligence – Design Defect and Failure to Warn," Dkt. No. 8 at 8, such claims are necessarily dismissed because, as explained above, Evans' design defect claims are preempted by the FDCA, and he has not adequately alleged causation as to his failure-to-warn claim.

20   The Court notes that any defect based on Truvada's drug composition is necessarily preempted by the FDCA. *See supra* Section I.B.3.a.

21   To assist Evans, the Court will mail Evans a copy of a form complaint for use in a civil *pro se* proceeding, such as this one. Should Evans choose to use the form, he should answer **all of the questions** clearly and concisely. Evans should

**Evans v. Gilead Sciences, Inc., Slip Copy (2020)**

2020 WL 5189995

set out each claim under a separate label or heading. Under each claim, Evans must write short, plain statements telling the Court the following: (1) the specific basis for this Court's jurisdiction; (2) the legal right(s) he believes were violated; (3) the name of the defendant(s) who violated those right(s); (4) exactly what each defendant did or failed to do and the underlying facts that provide support; (5) *how the action or inaction of a defendant is connected to the violation* of Evans' right(s); (6) what specific injury he suffered because of a defendant's conduct; and (7) what relief he seeks. Should Evans choose to file an amended complaint, he may not incorporate any part of his present complaint, Dkt. No. 1, in the amended complaint. Rather, all allegations must be re-typed or re-written in their entirety. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (*en banc*); LR 10.4.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit E

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 34 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 92 of 248 PageID: 101
Robinson on Behalf of T.R. v. Eli Lilly and Company, Not Reported in Fed. Supp. (2018)

2018 WL 4039703

2018 WL 4039703
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division.
at Lexington.

Timothy ROBINSON, ON BEHALF
OF T.R., a minor child, Plaintiff,

v.

ELI LILLY AND COMPANY, Defendant.

CIVIL ACTION NO. 5:17-CV-338-KKC
|
Signed 08/23/2018

### Attorneys and Law Firms

Alex C. Davis, Jasper D. Ward, IV, Jones Ward PLC, Louisville, KY, for Plaintiff.

Andrew E. Kantra, Pepper Hamilton LLP, Philadelphia, PA, Carol Dan Browning, Stites & Harbison, PLLC, Louisville, KY, for Defendant.

### OPINION AND ORDER

Karen K. Caldwell, United States District Judge

*1 This matter is before the Court pursuant to Defendant Eli Lilly's Motion to Dismiss for Failure to State a Claim (DE 10). For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**. The Court dismisses Robinson's claims[1] alleging design defects, manufacturing defects, breach of warranties, fraudulent concealment, and negligent misrepresentation. Robinson's failure to warn claims, arising in both strict liability and negligence, may proceed.

### I. INTRODUCTION

In late 2000, during her first trimester of pregnancy, Gina Robinson took Prozac as prescribed by a physician, (DE 1-2 at 6). She later gave birth to T.R., who was born with cardiac birth defects, which required corrective surgery at the age of nine.

T.R.'s father, Timothy Robinson claims that at the time of Gina Robinson's pregnancy, the manufacturer and distributor of Prozac, Eli Lilly and Company, knew through animal studies, post-marketing reports and other sources, that Prozac was associated with a significant risk of cardiac defects in babies whose mothers ingested Prozac during pregnancy. *Id.* at 8. Robinson claims that despite this knowledge, Eli Lilly aggressively and actively promoted Prozac "as being a safe alternative for pregnant women," and never informed doctors of the serious risks. *Id.*, at 10. Robinson's complaint asserts multiple claims against Eli Lilly, including strict liability for failure to warn, negligence, breach of warranties, fraudulent concealment and negligent misrepresentation. Eli Lilly has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 10). Specifically, Eli Lilly argues that each of Robinson's claims are either preempted, fail to meet the pleading requirements, or are not viable claims under Kentucky law. The Court considers the arguments below.

### II. ANALYSIS

#### A. Rule 12(b)(6)

In determining whether a plaintiff's complaint can withstand a motion to dismiss, the Court will assume the veracity of well-pleaded factual allegations and then determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937 (2009). A complaint should be dismissed pursuant to Rule 12(b)(6) if there is no law to support the claims, if the alleged facts are insufficient to state a claim, or if an insurmountable bar to relief exists on the face of the complaint. *See Browning v. Pennerton*, 633 F.Supp.2d 415, 429 (E.D. Ky. Jun. 22, 2009) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir. 1978) ).

"To survive a motion to dismiss, the complaint "must contain either direct or inferential allegations" establishing each material element required for recovery under some actionable legal theory." *Moore v. Zydus Pharmaceuticals (USA), Inc.*, 277 F.Supp.3d 873, 877 (E.D. Ky. 2017) (quoting *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) ). "Even under Rule 12(b)(6), a complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient." *Bishop*, 520 F.3d at 519.

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 35 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 93 of 248 PageID: 102
Robinson on Behalf of T.R. v. Eli Lilly and Company, Not Reported in Fed. Supp. (2018)

2018 WL 4039703

## 1. Strict Liability in Tort - Failure to Warn

**\*2** Robinson's first cause of action is styled as a failure to warn claim sounding in strict liability. (DE 1-2 at 20). To plead a failure to warn claim in a prescription drug case, the plaintiff must "allege facts for the Court to infer that (1) the manufacturer failed to provide her prescribing physician with adequate warnings about risks of which it knew or should have known and (2) the inadequate warnings proximately caused her injuries." *Estate of DeMoss v. Eli Lilly and Co.*, 234 F.Supp.3d 873, 880 (W.D. Ky. 2017). This test reflects that in 2004, Kentucky adopted the learned intermediary rule, an exception to the general rule that a drug manufacturer's duty to warn of any risks inherent in the product runs to the ultimate consumer. See *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 770 (Ky. 2004). But "even though the manufacturer's duty to warn runs only to the learned intermediary, that warning must still be adequate." *Id.* at 764.

At this stage, Robinson has sufficiently alleged that the warnings provided by Eli Lilly were inadequate, and that they caused the relevant injury. In his complaint, Robinson adequately set out the specific means by which Eli Lilly knew or should have known of *Prozac's* alleged connection to cardiac birth defects. (DE 1-2 at 7) (citing animal studies, post-marketing reports, and other sources, including scholarly articles). Robinson alleges Eli Lilly failed to warn physicians or consumers of the risk of cardiac birth defects through labeling or any other means. *See, e.g.*, (DE 1-2 at 6-9). Robinson further claims that if Ms. Robinson's prescribing physicians or health care providers had known of this risk, she would have never started—or subsequently discontinued —her use of Prozac, and T.R. would not have suffered injury. (DE 1-2 at 12). At this stage of the litigation, the Court finds that Robinson has stated a claim upon which relief may be granted. Therefore, Eli Lilly's motion to dismiss will be denied as to Robinson's first cause of action.

## 2. Negligence

Robinson also alleges that Eli Lilly was negligent in manufacturing, researching and designing Prozac. To prevail on a negligence claim under Kentucky law, a plaintiff must establish that:(l) the defendant owed a duty of care to the plaintiff; (2) the defendant breached its duty; and (3) there was consequent injury to the plaintiff, *See Mullins v.*

*Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992).

In his complaint, Robinson states that Eli Lilly was, among other things, negligent in manufacturing, researching, and designing Prozac; and that Eli Lilly failed to adequately test and warn of the risks and dangers of Prozac both before and after its sale. (DE 1-2 at 21). To the extent Robinson's negligence claim is based on a design defect, the claim is preempted by federal law as discussed in a subsequent section of this Opinion. To the extent Robinson alleges a negligent manufacturing claim, the claim must be dismissed. Robinson makes no factual allegations as to how Eli Lilly might have breached the duty of care in manufacturing Prozac or deviated from Prozac's intended design. See *Greene v. B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784, 788 (6th Cir. 2005) ("Under Kentucky law, a manufacturing defect exists in a product when it leaves the hands of the manufacturer in a defective condition because it was not manufactured or assembled in accordance with its specifications").

As previously discussed, Robinson has sufficiently claimed that Lilly failed to warn of potential risks regarding the usage of Prozac during pregnancy. This does not, however, prevent Robinson from asserting his strict liability claim. See *generally Estate of DeMoss*, 234 F.Supp.3d at 881 (W.D. Ky. 2017) ("Under Kentucky law, a plaintiff can advance both a strict-liability claim and a negligence claim against the manufacturer of a product for injury suffered by that product") (internal citation omitted).

## 3. Breach of Warranty

**\*3** The third and fourth causes of action are breach of warranty claims: express and implied. (DE 1-2 at 22). Neither claim survives the motion to dismiss.

To begin, the Court questions whether an express warranty claim can be premised on an omission, such as Eli Lilly's failure to warn of a particular risk. See *Stray horn v. Wyeth Pharmaceuticals, Inc.*, 737 F.3d 378, 395 (6th Cir. 2013) (finding no merit to express-warranty claims under Tennessee law where plaintiff attacked adequacy of drug label, rather than a false affirmation); *see also House v. Bristol-Myers Squibb Company*, No, 3:15-CGV-00894-JHM, 2017 WL 55876 (W.D. Ky. Jan, 4, 2017) (finding plaintiff could not base express warranty on an omission, such as failure of

PAS-L-002011-20  10/16/2020 3:16:53 PM  Pg 36 of 114 Trans ID: LCV20201846220

Case 2:21-cv-01418-KM-JBC  Document 1-1  Filed 01/29/21  Page 94 of 248 PageID: 103

Robinson on Behalf of T.R. v. Eli Lilly and Company, Not Reported in Fed. Supp. (2018)

2018 WL 4039703

prescribing information to contain adequate information, under Kentucky law).

Regardless, claims for breach of warranty under Kentucky law may proceed only where there is privity between the parties. See *Waterfill v. National Molding Corp.*, 215 Fed.Appx. 402, 405 (6th Cir. 2007); *see also Naiser v. Unilever U.S., Inc.*, 975 F.Supp.2d 727, 738 (W. D, Ky. 2013). Contractual privity must be uninterrupted and direct from the seller to "his buyer." See *Compex Intern. Co., Ltd. V. Taylor*, 209 S.W.3d 462, 465 (2006) (citing KRS 355.2318). Here, Robinson doesn't allege any kind of contractual privity between Lily and the consumer. As such, the claim for implied breach of warranty is dismissed. See *Munn v. Pr Hosp. Products Group, Inc.*, 750 F.Supp.244, 248 (W.D. Ky. 1990) (dismissing an implied warranty claim because the doctor, and not the patient, purchased surgically implanted nails).

Robinson argues an exception to privity exists for his express warranty claim. (DE 14 at 8). A line of cases in the United States District Court for the Western District of Kentucky has recognized that Kentucky law allows an exception to the privity requirement when a manufacturer makes express warranties directly to the intended consumer of the product. *See e.g., Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F.Supp.3d 730, 746-49 (W.D. Ky. 2014); *see also Huff v. Howmedica Osteonics*, No. 5:14-CV-00134-TBR, 2014 WL 4918807 (W.D. Ky. Sept. 30, 2014). But unlike in *Bosch* and *Huff*, the complaint in this case does not specify the warranties allegedly made by Eli Lilly. *See e.g., Bosch*, 13 F.Supp.3d at 746-49 (noting that the complaint identified the types and sources of communication, when plaintiff received the communications, and the specific assertions contained within); *see also Huff*, No. 5:14-CV-00134-TBR, 2014 WL 4918807 (noting that the Defendant did not dispute making express warranties to Plaintiff through the media about the effectiveness and safety of the product).

In the section of his complaint alleging breach of an express warranty, Robinson cites a litany of entities to which Eli Lilly supposedly made express warranties, but fails to point to even one specific communication directed to the consumer of the product—and certainly not one in which Lilly represented that Prozac was safe for, or intended to be used during, pregnancy. *See* (DE 1-2 at 22-23). Elsewhere in his complaint, Robinson alleges that Eli Lilly misrepresented to the public that Prozac was safe to take during pregnancy.[2] But Robinson again fails to provide the Court with any level of detail, leaving the Court to speculate as to when, where, how, and

by whom the statements were made. Such speculation is not sufficient to describe an express warranty, much less one that specifically ran to the ultimate consumer, and therefore Robinson cannot avail himself of the privity exception. Accordingly, Robinson's express warranty claim is dismissed without prejudice.

*4. Fraudulent Concealment*

**\*4** Robinson alleges that Eli Lilly fraudulently concealed from others its knowledge concerning the risk of taking Prozac while pregnant, including concealment from Ms. Robinson, her prescribing physicians, and the FDA. (DE 1-2 at 23). To the extent that Robinson asserts a claim of fraud on the FDA, it is preempted and dismissed. See *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012 (2001); *see also Garcia v. Wyeth-Ayerst Labs*, 385 F.3d 961, 966 (6th Cir. 2004) ("*Buckman* teaches that state tort remedies requiring proof of fraud committed against the FDA are foreclosed since federal law preempts such claims").

The remaining portion of Robinson's claim does not meet the applicable pleading requirement. The Sixth Circuit has explained that a claim based in fraud, including fraud by omission, is subject to a heightened pleading requirement under the Federal Rules of Civil Procedure:

> Rule 9(b) is designed, not only to put defendants on notice of alleged misconduct, but also to prevent fishing expeditions ... and to narrow potentially wide-ranging discovery to relevant matters. To maintain its fraud-by-omission claim under this standard, [plaintiff] must specify the who, what, when, where and how of the alleged omission. Specifically, it must plead: (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendants] obtained as a consequence of the alleged fraud.

*Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 255-56 (6th Cir. 2012); *see also House v. Bristol-Myers Squibb Company*, No. 3:15-CGV-00894-JHM, 2017 WL 55876 (W.D. Ky. Jan. 4, 2017) (dismissing Kentucky fraudulent concealment claim against drug manufacturers where plaintiff failed to allege sufficient facts under Rule 9(b) ).

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 37 of 114 Trans ID: LCV20201846220

Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 95 of 248 PageID: 104

Robinson on Behalf of T.R. v. Eli Lilly and Company, Not Reported in Fed. Supp. (2018)

2018 WL 4039703

In this case, Robinson alleges that Eli Lilly, "[a]t all times relevant hereto ... conducted a sales and marketing campaign to promote the sale of Prozac and willfully deceive" a generically broad cast of characters, including "Ms. Robinson and her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general." (DE 1-2 at 23-24). Robinson alleges that the timeframe of Eli Lilly's fraudulent concealment is "from the time Prozac was first tested ... up to the present," an expansive period that presumably begins prior to Ms. Robinson's alleged purchase and use of Prozac in 2000. (DE 1-2 at 23). The extent of Robinson's specificity is that the concealment was done through "false, fraudulent and misleading advertising, marketing messages, publications and all such public statements" issued by Eli Lilly. *Id.* at 24, Notably, Robinson does not cite the Court to a single document or statement during the—at minimum—eighteen-year period in which he alleges omissions occurred that makes plausible what he claims. Robinson discusses the alleged practices "only at a high level of generality," and the Court simply cannot find that such discussion meets the heightened pleading requirements. *Republic Bank*, 683 F.3d at 256. As such, Robinson's claim for fraudulent concealment is dismissed without prejudice.

*5. Negligent Misrepresentation*

Robinson's sixth cause of action alleges that Eli Lilly made negligent misrepresentations regarding Prozac and its use during pregnancy. (DE 1-2 at 26). The Sixth Circuit has indicated that, under Kentucky law, negligent misrepresentation claims are also subject to Rule 9(b)'s heightened pleading requirements. *See Republic Bank*, 683 F.3d at 247. Rule 9(b) "requires a plaintiff: (1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." *Id.*

**\*5** Robinson's negligent misrepresentation claim alleges the same broad time frame as his fraudulent concealment claim (DE 1-2 at 26); both claims involve the same sweeping cast of characters allegedly targeted by Eli Lilly (DE 1-2 at 27); and Robinson's negligent misrepresentation claim, similar to his fraudulent concealment claim, alleges misrepresentations at only a high level of generality. (DE 1-2 at 27) ("These misrepresentations were made directly by Defendant, by sales representatives, detail persons and other authorized agents of said Defendant, and in publications and in other written

materials...."). Again, Robinson's complaint fails to identify any specific statement by Eli Lilly that makes plausible the allegation that a misrepresentation was contained therein. For the same reasons as his fraudulent concealment claim, Robinson's negligent. misrepresentation claim does not meet the heightened pleading requirements, and must be dismissed without prejudice.

**B. Preemption**

Eli Lilly argues that Robinson's design defect and failure to warn claims, sounding in strict liability and negligence, are preempted by federal law—specifically through regulations enforced by the Food and Drug Administration ("FDA"). Eli Lilly asserts that both claims are preempted by the impossibility doctrine. (DE 10 at 3).

It is a fundamental principle of the Constitution that Congress has the power to preempt state law. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288 (2000). Congress can preempt state law either expressly or impliedly:

> Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Where a court deems express preemption inapplicable, it may still find implied preemption when federal and state laws conflict. So-called "conflict preemption" takes two forms: (i) impossibility preemption, where it is impossible for a private party to comply with both state and federal law, and (ii) obstacle preemption, where the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (internal citations omitted). Generally, plaintiffs who are injured by brand-name prescription drugs retain state-law tort remedies against the manufacturer, "provided it is not impossible for the drug manufacturer to comply with both state and federal law." *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 294 (6th Cir. 2015). The Supreme Court has stated that, "[t]he question for impossibility is whether the private party could independently do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620, 131 S.Ct. 2567 (2011). Neither party currently contests that Eli Lilly is a brand-name manufacturer for purposes of FDA regulations.

Robinson on Behalf of T.R. v. Eli Lilly and Company, Not Reported in Fed. Supp. (2018)

2018 WL 4039703

*1. Failure to Warn Claims*

At this point in the litigation, Robinson's failure to warn claims are not preempted. Previously, the Supreme Court has indicated that manufacturers of brand-name pharmaceuticals bear the responsibility for the contents of a drug's label at all times—the manufacturer is charged with both crafting an adequate label and ensuring that its label is adequate as long as the drug remains on the market. *See Wyeth v. Levine*, 555 U.S. 555, 570-71, 129 S.Ct. 1187 (2009). The Sixth Circuit has previously explained *Wyeth*:

> In a 2009 opinion authored by Justice Stevens, the Supreme Court held that failure-to-warn claims against branded-drug manufacturers were not preempted by federal law, because 1) it is not impossible for [a branded-drug manufacturer] to comply with its state and federal law obligations and 2) state common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the FDCA. In finding no impossibility preemption, the Court found that because the changes being effected (CBE) process allowed branded-drug manufacturers to strengthen warnings without prior approval of the FDA, compliance with both federal and state duties was not impossible. The Court did not find it significant that the FDA had authority to reject unilateral labeling changes made pursuant to the CBE process, finding it difficult to accept that the FDA would not have permitted a change to a stronger warning. Without clear evidence that the FDA would not have approved a change, the Court was unwilling to find impossibility.

**\*6** *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 582 (6th Cir. 2013) (internal citations and quotations omitted). Here, Robinson claims that Eli Lilly should have strengthened Prozac's label to include a more adequate warning regarding the risks associated with using the drug while pregnant. The Court has already concluded that Robinson has provided sufficient allegations to state a claim for failure to warn. At this early stage of litigation, the Court is faced with no "clear evidence" that the FDA would have denied such a change to Prozac's labeling, and the Court finds that Robinson's failure to warn claims are not preempted. *See e.g., Wyeth* 555 U.S. 555, 570-71, 129 S.Ct. 1187.

*2. Design Defect Claims*

In Robinson's second cause of action, he claims Eli Lilly breached a duty in that it negligently and carelessly manufactured, designed, formulated, produced and prepared Prozac. (DE 1-2 at 21). Eli Lilly alleges that these "design defect" claims are preempted by federal law and should be dismissed. The Court agrees.

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), drug manufacturers must gain approval from the FDA before introducing a new drug into interstate commerce. 21 U.S.C. § 355(a). And in contrast to the manufacturer's unilateral ability to strengthen a drug's label discussed above, once a drug is approved, "the manufacturer is prohibited from making any major changes to the qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application." *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472, 477 133 S.Ct. 2466 (2013) (quoting 21 C.F.R. § 314.70(b)(2)(i) ).

Here, Robinson's complaint does not cite a single change to Prozac's design that was required by Kentucky law—at most, Robinson alleges that it is the chemical make-up of Prozac that created the risk suffered by T.R. See (DE 1-2 at 7) (citing the dangers of fluoxetine and Prozac's effect on serotonin levels, "the primary human substance affected by Prozac"). Even assuming Kentucky law required a change regarding the make-up of Prozac, the federal law discussed above makes it clear that Eli Lilly could not have independently made such fundamental changes to Prozac's formula. Thus, Robinson's design defect claims are preempted. *See PLIVA, Inc.*, 564 U.S. 604, 624, 131 S.Ct. 2567 ("[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes"); *see also Yates*, 808 F.3d at 297-299 (finding a state law claim that manufacturer should have changed dosage level of an active ingredient after FDA approval to be "clearly preempted").

To the extent that Robinson attempts to ground his claim in a pre-approval duty, the claim is still preempted. *See Yates*, 808 F.3d at 300 ("Defendants could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [the drug], and certainly prior to [Plaintiff's] use of the drug"); *see also Fleming v. Janssen Pharmaceuticals, Inc.*, 186 F.Supp.3d 826 (W.D. Tn. 2016) (finding design defect claims premised on Defendant's duty to design drug differently prior to FDA

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 39 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 97 of 248 PageID: 106
Robinson on Behalf of T.R. v. Eli Lilly and Company, Not Reported in Fed. Supp. (2018)

2018 WL 4039703

approval to be preempted). Accordingly, Eli Lilly's motion to dismiss is granted as to Robinson's design defect claims.

### C. Request For Leave to Amend

In his response to Eli Lilly's motion to dismiss, Robinson has also included a request for leave to amend his complaint if the Court were to find that portions were "improperly pled or insufficient in some respect." (DE 14 at 13). The Court does not consider this an appropriate motion to amend. *See DeMoss*, 234 F.Supp.3d at 885. If Robinson wants the Court to consider such a request, he should submit a properly supported motion, with a copy of the amended complaint attached, no later than twenty-one (21) days from the entry of the Memorandum Opinion and Order. Thereafter, Eli Lilly may file its response, and the Court will address the merits of Robinson's motion.

### III. CONCLUSION

**\*7** Accordingly, and being otherwise sufficiently advised, the Court **HEREBY ORDERS** that:

(1) Defendant Eli Lilly's Motion to Dismiss (DE 10) is **DENIED** as to Robinson's failure to warn claim arising in strict liability;

(2) Defendant Eli Lilly's Motion to Dismiss (DE 10) is **DENIED** as to Robinson's failure to warn claim arising in negligence;

(3) Defendant Eli Lilly's Motion to Dismiss (DE 10) is **GRANTED** as to all other claims; and

(4) Plaintiff Robinson shall submit its motion and amended complaint no later than twenty-one (21) days from the entry of this Memorandum Opinion and Order.

It is so **ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4039703

**Footnotes**

1    The Court notes that these claims are brought by Timothy Robinson, on behalf of T.R., his minor child.

2    Robinson alleges that Eli Lilly "touted Prozac as being a safe alternative for pregnant women," and "misrepresented and continue[s] to misrepresent to the public ... that the drug is safe to take during pregnancy." (DE 1-2 at 10-11).

**End of Document**                                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit F

2020 WL 1466296
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Candice DRESCHER, Plaintiff,

v.

BRACCO DIAGNOSTICS
INCORPORATED, et al., Defendants.

No. CV-19-00096-TUC-RM (LCK)
|
Signed 03/26/2020

**Attorneys and Law Firms**

C. Brooks Cutter, Pro Hac Vice, Margot P. Cutter, Pro Hac Vice, Cutter Law PC, Sacramento, CA, Curt William Clausen, Clausen & Williamson PLLC, Phoenix, AZ, for Plaintiff.

Donn Christopher Alexander, Jones Skelton & Hochuli PLC, Phoenix, AZ, Paul Scott Penticuff, Pro Hac Vice, Thomas N. Sterchi, Pro Hac Vice, Baker Sterchi Cowden & Rice LLC, Kansas City, MO, for Defendant Bracco Diagnostics Incorporated.

Alison Rebecca Christian, Stephen M. Dichter, Christian Dichter & Sluga PC, Phoenix, AZ, Brad Michael Welsh, Pro Hac Vice, Jamie Kendall, Pro Hac Vice, Kendall Law Firm PC, Bryn Mawr, PA, Brian W. Shaffer, Pro Hac Vice, Morgan Lewis & Bockius LLP, Philadelphia, PA, Christina Marie Vitale, Morgan Lewis & Bockius LLP, Houston, TX, for Defendants Guerbet LLC, Liebel-Flarsheim Company LLC.

Alexix Gustavo Terriquez, Patrick Xavier Fowler, Snell & Wilmer LLP, Phoenix, AZ, Devin Kyle Ross, Pro Hac Vice, Robert Thomas Adams, Pro Hac Vice, Shook Hardy & Bacon LLP, Kansas City, MO, for Defendants Mallinckrodt Incorporated, Mallinckrodt LLC.

**ORDER**

Honorable Rosemary Márquez, United States District Judge

**\*1** On January 31, 2020, Magistrate Judge Lynette C. Kimmins issued a Report and Recommendation (Doc. 57) recommending that this Court grant Defendants' Motions to Dismiss (Docs. 46, 47, 48) and grant Plaintiff leave to amend the operative Complaint. The Report and Recommendation

("R&R") further recommended denying Defendants' first round of Motions to Dismiss (Docs. 15, 16, 20) as moot because they were based on the original Complaint, which was superseded by the First Amended Complaint (Doc. 35). Plaintiff filed an Objection (Doc. 58) and Defendants responded (Doc. 59). For the following reasons, the Court will grant the Motions to Dismiss and adopt Judge Kimmins' Report and Recommendation.

**I. Background**

Plaintiff filed her original Complaint on February 25, 2019. (Doc. 1.) Each group of Defendants filed a Motion to Dismiss the Complaint. (Docs. 15, 16, 20.) Defendants also moved to transfer the case to a judge with related cases, but the request was denied. (Docs. 33, 53.) Plaintiff filed her Amended Complaint (FAC) on July 29, 2019. (Doc. 35.) Defendants then filed the Motions to Dismiss which are the subject of Judge Kimmins' Report and Recommendation. (Docs. 46, 47, 48.)

The Amended Complaint alleges that Plaintiff was injected with the linear gadolinium-based contrast agent (GBCA) "OptiMARK," which is produced and sold by Defendants Guerbet and Mallinckrodt, prior to a January 19, 2013 magnetic resonance imaging (MRI) procedure.[1] (Doc. 35 ¶ 2.) Plaintiff further alleges that she was injected with linear GBCA MultiHance, which is produced and sold by Defendant Bracco, prior to MRIs on August 11, 2015 and November 8, 2016. (Id.) At the time of the GBCA injections, Plaintiff had normal kidney function. (Id. ¶ 43.) Plaintiff alleges that a urine test in May 2017 revealed that her body had retained high levels of gadolinium, a toxic heavy metal, in her organs, bone, and skin and that it had crossed the blood-brain barrier and deposited in her brain. (Id. ¶ 4.) The retention of gadolinium caused numerous symptoms, including joint pain, fatigue, cognitive problems, loss of mobility, muscle weakness, chronic pain, fibrosis, and skin changes. (Id.) Plaintiff claims that her doctors have diagnosed and treated her for "gadolinium toxicity." (Id.)

Beginning in 2007, the Food and Drug Administration (FDA) required all GBCA labels to add a "black box" warning that GBCAs increased the risk of Nephrogenic Systemic Fibrosis (NSF), a disease that causes fibrosis of skin and organs, for patients with reduced renal function. (Id. ¶¶ 74,77.) The Amended Complaint cites numerous studies documenting gadolinium retention in patients with normal kidney function. (Id. ¶¶ 47, 70, 86, 88.) It also cites patient reports of adverse

events (AERs) after gadolinium exposure despite normal kidney function, between 2007 and 2016. (*Id.* ¶¶ 47, 70, 85.) In December 2017, the FDA mandated a new warning for all GBCAs for MRIs that gadolinium may be retained in patients' bodies, including the brain, for months to years after receiving the drug. (*Id.* ¶ 111.) The FDA required GBCA manufacturers to issue a patient medication guide and to conduct further studies to assess the safety of GBCAs. (*Id.*)

**\*2** Plaintiff alleges that Defendants knew or should have known of the adverse consequences of gadolinium retention in people, like her, with normal kidney function. (*Id.* ¶ 50.) Plaintiff alleges that the Defendant manufacturers falsely promised the gadolinium would leave her body without harming her. (*Id.* ¶¶ 2, 6, 9.) Plaintiff further alleges that Defendants should have sold macrocyclic GBCAs, which are less likely to be retained in the body, instead of linear GBCAs. (*Id.* ¶¶ 84, 89, 95.) Plaintiff alleges that Defendants limited the warnings regarding gadolinium retention to the subset of patients with abnormal kidney function. (*Id.* ¶ 114.) Plaintiff alleges that Defendants are liable based on: (1) strict product liability: inadequate warning; (2) strict product liability: defective design; and (3) negligence due to inadequate warning and defective design.

In response to Plaintiff's FAC, Defendants filed Motions to Dismiss, arguing that the FAC should be dismissed for the following reasons: untimely service; preemption; failure to plead causation; failure to plead foreseeable risk; punitive damages are barred; and the allegations fail to state a claim and violate Fed. R. Civ. P. 8. (Docs. 46, 47, 48.)

## II. Standard of Review

A district judge must "make a de novo determination of those portions" of a magistrate judge's "report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) ("If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error."); *Prior v. Ryan*, CV 10-225-TUC-RCC, 2012 WL 1344286, at \*1 (D. Ariz. Apr. 18, 2012) (reviewing for clear error unobjected-to portions of Report and Recommendation).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is only appropriate if the complaint's factual allegations, together with all reasonable inferences drawn in the plaintiff's favor, fail to state a plausible claim for relief. *Id.* at 678; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (all factual allegations in the complaint must be accepted as true). However, allegations that "contradict matters properly subject to judicial notice or by exhibit" need not be accepted as true. *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (courts need not accept as true allegations that "contradict matters properly subject to judicial notice or by exhibit" or that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") "[A] court may disregard allegations of the complaint that are contradicted by attached exhibits." *Castle v. Eurofresh, Inc.*, No. CV09-8114-PCT-MHMDKD, 2010 WL 797138, at \*3 (D. Ariz. Mar. 8, 2010). "[W]here scientific studies are cited and thus incorporated into the complaint, and where those studies simply do not support the allegations, the Court may find that the deficiencies ... go to the very heart of the plausibility standard under *Iqbal*." *Sabol v. Bayer Healthcare Pharm., Inc.*, No. 18 CIV. 11169 (VM), 2020 WL 705170, at \*12 (S.D.N.Y. Feb. 12, 2020).

While a complaint need not plead "detailed factual allegations," the factual allegations it does include "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Twombly*, 550 U.S. at 570). The allegations must "raise a reasonable expectation that discovery will reveal [material] evidence" and thus "allow the court to draw the reasonable inference that the defendant is liable" for the alleged misconduct. *Id.* at 46. The plausibility standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A formulaic recitation of the elements of a cause of action is not enough to establish a claim, and legal conclusions are not entitled to an assumption of truth. *Id.* at 679.

**\*3** In resolving a Rule 12(b)(6) Motion to Dismiss for failure to state a claim, "the Court's task is to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sabol*, 2020 WL 705170, at \*6 (internal citations and quotations omitted). Within the context of the facts stated in the complaint or documents attached to or incorporated into the complaint by reference, the Court must "draw reasonable

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 43 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 101 of 248 PageID: 110
Drescher v. Bracco Diagnostics Incorporated, Slip Copy (2020)

2020 WL 1466296

inferences and resolve any doubts in favor of the non-moving party." *Id.*

### III. Report and Recommendation

The Report and Recommendation recommends dismissing Plaintiff's FAC with leave to amend. The R&R addresses each of Defendants' arguments for dismissal as if raised by all Defendants. *See Silverton v. Dep't of Treasury of U. S. of Am.*, 644 F.2d 1341, 1345 (9th Cir. 1981) ("A District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related."); *Bornstein v. Trans Union LLC*, No. CV-18-04773-PHX-JJT, 2019 WL 2372020, at *2 (D. Ariz. June 5, 2019) (applying dismissal argument of one defendant to all defendants because claims were identical).

The R&R first addresses Defendants' argument that the FAC should be dismissed for failure to timely serve. The Magistrate Judge found that because Plaintiffs served Defendants shortly after the deadline, because Plaintiff's claim would be barred by the statute of limitations if dismissed, and because Defendants did not show prejudice resulting from the two-week delay in service, dismissal based on improper service is not warranted. (Doc. 57 at 4.)

Next, the R&R addresses Defendants' argument that Plaintiff's inadequate warning claim and design defect claim, sounding in strict liability and negligence, are preempted by the FDA's regulatory scheme. (*Id.* at 5.) The R&R finds that Plaintiff's inadequate warning claim is preempted because it did not state a plausible claim that the Defendant manufacturers could have changed their labels under the Changes Being Affected, or "CBE," regulation, 21 C.F.R. § 314.70(c)(6)(iii). (*Id.* at 10.) The R&R further finds that Plaintiff's design defect claim is preempted because Plaintiff's proposed change to Defendants' linear GBCA product would constitute a major change under applicable state regulations and would therefore require obtaining prior FDA approval, and a label alteration to ameliorate the purported risk was also not possible without FDA approval. (*Id.* at 14.)

The R&R goes on to address Defendants' argument that Plaintiff failed to plead that Defendants knew, or should have known, that their linear GBCA products posed an unreasonable danger to patients with normal kidney function and finds that Plaintiff's attached exhibits demonstrate that

"the FDA concluded, more than a year after Plaintiff last was exposed to gadolinium, that no GBCAs were unreasonably dangerous and there was no known adverse health effect from gadolinium retention." (*Id.* at 17.) Therefore, the R&R rejected as conclusory Plaintiff's allegation that there was a known risk of harm that Defendants could and should have foreseen prior to 2016. (*Id.*)

Finally, the R&R addresses Plaintiff's request for punitive damages. (*Id.*) Defendants contend that punitive damages are barred by Arizona state law. (*Id.*) The R&R finds that Plaintiff is barred from seeking punitive damages because she did not plead that Defendants' products were non-compliant with their FDA-approved manufacturing or labeling. (*Id.* at 18.)

**\*4** Because the R&R found that Plaintiff's claims should be dismissed in their entirety based upon preemption and failure to plead foreseeability, the R&R does not address Defendants' other arguments for dismissal. (*Id.*) The R&R recommends granting Plaintiff leave to amend the complaint only if she possesses additional factual allegations that allow her to state at least one claim for relief. (*Id.*) The R&R finds that, at a minimum, Plaintiff must include allegations of: (1) reasonable evidence of a causal association of harm (relevant to preemption and causation necessary to state a claim for failure to warn or design defect); (2) a foreseeable risk of harm to patients with normal kidney function from Defendants' linear GBCA products (necessary to state a claim for failure to warn or design defect); and (3) Defendants' ability under federal law to redesign GBCA products to comply with state law (necessary to state a claim for design defect). (*Id.* at 19.)

### IV. Objection 1: The Magistrate Judge failed to properly apply the Motion to Dismiss Standard.

Plaintiff objects that the magistrate judge failed to properly apply the Motion to Dismiss standard by failing to draw all reasonable inferences in Plaintiff's favor. (Doc. 58 at 2-4, Doc. 57 at 7-9.) Plaintiff contends that the R&R failed to draw "important inferences" in Plaintiff's favor but does not specify what those inferences should have been. (*Id.* at 4.) Defendants respond that the R&R applied the appropriate legal standard by rejecting Plaintiff's conclusory allegations that are contradicted by the FDA statements and findings set forth in the exhibits attached to the complaint. (Doc. 59 at 3.)

On de novo review, the Court finds that the magistrate judge correctly applied the legal standard for motions to dismiss. Citing *Sprewell*, 255 F.3d at 988, the R&R finds

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 44 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 102 of 248 PageID: 111
**Drescher v. Bracco Diagnostics Incorporated, Slip Copy (2020)**

2020 WL 1466296

that "Plaintiff's conclusory allegations of causation ... are contradicted by the supporting facts and studies included in the Amended Complaint and its attachments" and that there was no "reasonable evidence of a causal association of harm for patients with normal renal function." (Doc. 57 at 9, 17.) Drawing all reasonable inferences in Plaintiff's favor, the Court finds no basis in the record to reach a different conclusion. The information provided by Plaintiff as attachments to the FAC does not provide a basis for a reasonable inference that there exists a causal connection between GBCAs and risk of harm to patients with normal kidney function. Rather, the information provided by Plaintiff shows that the FDA found, after inquiry and studies, that it could not establish a causal association between adverse health effects reported by patients with normal kidney function and gadolinium retention. (*See* Doc. 35, Exs. C; D at 6, 22; E at 6; F at 5, 19; H at 3.) Furthermore, Plaintiff's factual allegations, supported by the information in the attached exhibits, do not raise a right to relief beyond a speculative level or state a facially plausible claim. *Twombly*, 550 U.S. at 545, 570. The magistrate judge, in recommending granting the Motions to Dismiss based upon the factual allegations in and exhibits attached to the FAC, correctly applied the legal standard for motions to dismiss. *See Sprewell* 266 F.3d at 988 (courts need not accept as true allegations that "contradict matters properly subject to judicial notice or by exhibit" or that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences.")

### V. Objection 2: The Magistrate Judge erred in finding that the FDA found no causal association between GBCAs and adverse health effects.

Plaintiff objects to the magistrate judge's finding that the FDA found no causal association between GBCAs and adverse health effects in patients with normal kidney function. (*Id.* at 4-6, Doc. 57 at 9-10, 17.) Plaintiff contends that the FDA requirement that there be "reasonable evidence of a causal association between the drug and the adverse event" in order to include an adverse event in a drug warning, in conjunction with the fact that the FDA ordered "actions to alert health care professionals and patients about gadolinium retention after an MRI using a GBCA," provides evidence of a causal relationship between the use of Defendants' linear GBCA product and gadolinium retention in patients with normal kidney function. (*Id.* at 5-6.) Defendants respond that the FDA has expressly confirmed that there is no established causal association between GBCAs and adverse health effects in patients with normal renal function. (Doc. 59 at 4.) Defendants point to the FDA's warnings in 2017 and 2018 in

which the FDA concluded that no causal association had been established. (*Id.* at 5.)

**\*5**  The Court finds that Plaintiff's objection misconstrues the R&R's findings and the standard under which a warning of a causal relationship between GBCAs and adverse health effects in patients with normal kidney function would be required. First, Plaintiff's objection ignores the R&R's specific findings regarding the FDA's explicit findings that gadolinium retention has not been directly linked to adverse health effects in patients with normal kidney function. (Doc. 57 at 9-10.) The R&R cites to the FDA's label change in 2018, which stated that "adverse events involving multiple organ systems have been reported in patients with normal renal function without an established causal link to gadolinium retention." (*Id.* at 9.) Prior to that, the FDA issued a warning in 2017 stating that a causal association between reports of adverse events involving multiple organ systems in patients with normal kidney function and gadolinium retention "could not be established." (*Id.* at 16.) Plaintiff's objection does not address these findings or explain how her argument that reasonable evidence of a causal association between the drug and the adverse event exists is valid considering the FDA's explicit findings to the contrary. In other words, Plaintiff's argument that there is reasonable evidence of a causal association between adverse health effects in people with normal kidney function and gadolinium retention is plainly contradicted by the FDA warnings.

Plaintiff further argues that "it is incorrect to believe that the FDA ruled out linear GBCAs as a cause for the adverse events reported by patients." (Doc. 58 at 5.) However, the R&R does not make this finding nor does the FDA mandate warnings for a causal association that has not been ruled out. Rather, the FDA guidance requires "reasonable evidence of a causal association between the drug and the adverse event." (*Id.*) Plaintiff argues that the language in the 2018 label change meets this standard but neglects to address the FDA's finding that no causal link was established, and instead asks the Court to draw an inference that is both unsupported and explicitly contradicted by the record before it. (*See* Doc. 57 at 9-10, 16-17.) Accordingly, the Court finds that the magistrate judge did not err in finding that the FDA found no causal association between GBCAs and adverse health effects in patients with normal renal function.

### VI. Objection 3: The Magistrate Judge erred in finding that Plaintiff's Design Defect claim fails under Restatement (Third) of Torts § 6(c).

2020 WL 1466296

Plaintiff objects to the magistrate judge's finding that her design defect claims fail under Restatement (Third) of Torts § 6(c) because Defendants would have had to change their design. (*Id.* at 6-7, Doc. 57 at 13-14.) Plaintiff objects that the design defect claims were properly pled because Defendants should have sold the safer macrocyclic GBCA product instead of the linear GBCA products, which have defective designs. (*Id.* at 6.) Plaintiff further contends that she has alleged sufficient facts to support a claim consistent with Restatement (Third) of Torts § 6(c). (*Id.*)

Plaintiff's objection does not address the magistrate judge's analysis regarding preemption of the design defect claims. (Doc. 57 at 11-14.) Plaintiff does not argue and cites to no authority supporting the contention that the magistrate judge incorrectly applied the preemption framework to Plaintiff's design defect claim pursuant to *Mutual Pharm Co., Inc. v. Bartlett*, 570 U.S. 472 (2013). The R&R finds that Plaintiff's design defect claims are preempted by federal law because Defendants were unable to alter the formulation of the linear GBCA drug after its approval by the FDA. (Doc. 57 at 13); *see* 21 C.F.R. § 314.70(b)(2)(i) ("Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the qualitative or quantitative formulation of the drug product, including active ingredients[.]"). Plaintiff alleges that Defendants should have sold macrocyclic GBCAs, which are less likely to be retained in the body, instead of linear GBCAs. However, the active ingredients and chemical structures in each of these drugs are different and therefore such a change would require FDA approval. (Doc. 17 at 13-14.)

Furthermore, the Supreme Court expressly rejected Plaintiff's argument that Defendants should have simply replaced the linear GBCA products with macrocyclic GBCA products in *Bartlett*, 570 U.S. 488 ("We reject this 'stop-selling' rationale as incompatible with our preemption jurisprudence. Our pre-emption cases presume that an actor seeking to satisfy both his federal and state-law obligations is not required to cease acting altogether in order to avoid liability"); *see also Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 295 (6th Cir. 2015) (explaining that the *Bartlett* court "explicitly rejected the lower court's conclusion that the defendant could have complied with both state and federal law by simply exiting the market[.]").

**\*6** As for Plaintiff's argument regarding the magistrate judge's application of the Restatement (Third) of Torts § 6(c), the R&R finds that § 6(c) applies to Plaintiff's design defect

claims but that Defendants' duties with respect to product design apply only to foreseeable risks of harm under that section. (Doc. 57 at 13, 15.)

§ 6(c) states:

> A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

The commentary to the Restatement provides that "[d]uties concerning the design and marketing of prescription drugs and medical devices arise only with respect to risks of harm that are reasonably foreseeable at the time of sale." The R&R addresses Plaintiff's claims of foreseeability and finds that they are conclusory and are contradicted by factual allegations in the Amended Complaint or its exhibits. (Doc. 57 at 15-16.) The Court finds that the record before it provides no basis for a reasonable inference that the alleged risks posed by the linear GBCA agents to patients with normal kidney function were foreseeable. Because the linear GBCA products posed no reasonably foreseeable risks of harm to patients with normal kidney function, § 6(c) does not provide a basis for Plaintiff's design defect claim. Even if Plaintiff could show that the risks of harm were reasonably foreseeable and that § 6(c) did apply, the Court would find that Plaintiff's design defect claims fail due to preemption. (*See* Doc. 57 at 11-14.)

The Court has reviewed Judge Lynette C. Kimmins's Report and Recommendation, the parties' briefs, and the record. The Court finds no error in Judge Lynette C. Kimmins's Report and Recommendation.

Accordingly,

**IT IS ORDERED** that the Report and Recommendation (Doc. 57) is **accepted and adopted in full**.

**IT IS FURTHER ORDERED** that Plaintiff's Objections (Doc. 58) are **overruled**.

**IT IS FURTHER ORDERED** that Defendants' Motions to Dismiss (Docs. 46, 47, 48) are **granted**. Plaintiff is granted leave to amend the Amended Complaint (Doc. 35)

consistent with the parameters set forth in the Report and Recommendation.

**All Citations**

Slip Copy, 2020 WL 1466296

Footnotes

1    Gadolinium is a heavy metal that functions as a contrast agent. Contrast agents are injected into the body before an MRI procedure to enhance the imaging. *Sabol v. Bayer Healthcare Pharm., Inc.*, No. 18 CIV. 11169 (VM), 2020 WL 705170, at *1 (S.D.N.Y. Feb. 12, 2020).

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit G

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

2020 WL 2121063
Supreme Court of Connecticut.

Geralynn BOONE, Executrix
(Estate of Mary Boone)
v.
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC., et al.

(SC 20200)
|
Argued December 19, 2019
|
Officially released May 4, 2020[*]

**Synopsis**
**Background:** Executrix of consumer's estate brought action against manufacturer of oral anticoagulant medication, alleging that medication wrongfully caused consumer's death and asserting claims for manufacturer's alleged failure to give adequate warnings to guard against the risk of bleeding caused by medication, manufacturer's alleged failure to test the benefits of establishing therapeutic range for the medication, and manufacturer's allegedly defective design due to the absence of reversal agent. The Superior Court, Judicial District of Hartford, Ingrid L. Moll, J., granted manufacturer's summary judgment motion on design defect claim, entered jury verdict in favor of manufacturer, and denied executrix's motion to set aside verdict, 2018 WL 5807932. Executrix appealed, and the Supreme Court transferred the appeal.

**Holdings:** The Supreme Court, Kahn, J., held that:

[1] doctrine of induced error barred appellate review of executrix's claim that trial court improperly excluded opening statements and evidence relating to spoliation;

[2] proffered portion of video recorded deposition of manufacturer's senior vice president for clinical development was not proper rebuttal evidence;

[3] design defect claim, relating to reversal agent, was preempted by federal law; and

[4] trial court did not abuse its discretion by issuing curative instruction to jury after counsel for executrix improperly suggested during closing argument that manufacturer could be held liable for preempted failure to test claim.

Affirmed.

West Headnotes (22)

**[1]    Appeal and Error** 🔑 **Evidence and Trial**

Executrix of consumer's estate abandoned on appeal claims that trial court's rulings with respect to spoliation violated basic notions of fundamental fairness, due process, and the right to counsel in product liability action against manufacturer of oral anticoagulant medication, where executrix's brief contained no analysis applying the constitutional principles to the facts of the case. Conn. Const. art. 1, § 8.

**[2]    Trial** 🔑 **Course and Conduct of Trial in General**

A trial court possesses inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial.

**[3]    Appeal and Error** 🔑 **Evidence and Witnesses in General**

The Supreme Court reviews a trial court's rulings on evidentiary matters for an abuse of discretion.

**[4]    Pretrial Procedure** 🔑 **Failure to Disclose; Sanctions**

The imposition of sanctions for discovery misconduct is vested in the sound discretion of the trial court.

**[5]    Appeal and Error** 🔑 **Evidence and Witnesses in General**

Boone v. Boehringer Ingelheim Pharmaceuticals, Inc., --- A.3d ---- (2020)

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

**Appeal and Error** ⚷ **Evidence and Witnesses in General**

In reviewing a trial court's ruling on an evidentiary matter for abuse of discretion, the Supreme Court must make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion; thus, the Supreme Court's review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did.

**[6]**   **Appeal and Error** ⚷ **Invited, induced, or encouraged error**

The induced error principle bars appellate review of induced nonconstitutional error and induced constitutional error.

**[7]**   **Appeal and Error** ⚷ **Estoppel and Waiver; Invited Error**

**Appeal and Error** ⚷ **Invited, induced, or encouraged error**

The invited error doctrine rests on principles of fairness, both to the trial court and to the opposing party; whether called induced error, encouraged error, waiver, or abandonment, the result, that the claim is unreviewable on appeal, is the same.

**[8]**   **Appeal and Error** ⚷ **Arguments and conduct of counsel**

**Appeal and Error** ⚷ **Evidence and witnesses in general**

Doctrine of induced error barred appellate review of claim of executrix of consumer's estate that trial court improperly excluded opening statements and evidence relating to spoliation in trial on products liability claims against manufacturer of oral anticoagulant medication; executrix represented to trial court that adverse inference instruction would obviate the need for spoliation evidence, executrix agreed not to introduce such evidence if trial court agreed

at outset of trial to give requested instruction, and trial court afforded executrix broad latitude to introduce evidence describing work of manufacturer's scientist whose documents were destroyed.

**[9]**   **Trial** ⚷ **Limiting scope or time of argument**

A trial court acts well within its broad discretion when it restricts the scope of an argument to prevent comment on facts that are not properly in evidence.

**[10]**   **Trial** ⚷ **Comments on failure to produce evidence or call witness**

**Trial** ⚷ **Failure of party to testify or to call witness or produce evidence**

Evidence relating to spoliation was not proper material for closing arguments by counsel for executrix of consumer's estate in trial on products liability claims against manufacturer of oral anticoagulant medication, where trial court ruled at the outset of trial, as part of its decision to grant executrix's request for adverse inference instruction, that spoliation evidence would not be admitted or presented to the jury.

**[11]**   **Trial** ⚷ **In general; grounds for admission**

Proffered portion of video recorded deposition of anticoagulant medication manufacturer's senior vice president for clinical development did not contradict testimony presented by manufacturer's expert witnesses during manufacturer's case-in-chief, and thus was not proper rebuttal evidence on case of executrix of consumer's estate in products liability trial; isolated colloquy from deposition established only that gastrointestinal bleed could lead indirectly to death, senior vice president did not discuss situation in which person's gastrointestinal bleed had resolved prior to death, and experts addressed more precise question of whether consumer's death was caused by other medical conditions, and not the gastrointestinal bleed, which had resolved more than two weeks before her death. Conn. Practice Book § 15-5(3).

**[12]    Trial** 🗝 Discretion of court

The admission of rebuttal evidence lies within the sound discretion of the trial court. Conn. Practice Book § 15-5(3).

**[13]    Appeal and Error** 🗝 Order of proof

The issue on appeal is not whether any one of the members of the Supreme Court, sitting as the trial court, would have permitted the disputed rebuttal testimony to be introduced; the question is rather whether the trial court abused its discretion in not allowing the rebuttal testimony. Conn. Practice Book § 15-5(3).

**[14]    Trial** 🗝 In general; grounds for admission

"Rebuttal evidence" is that which refutes the evidence already presented rather than that which merely bolsters one's case.

**[15]    Witnesses** 🗝 Right to Contradict Testimony in General

There is no requirement that a rebuttal witness must respond to every alternate theory offered by the defendant; a general contradiction of the testimony given by the defendant is considered permissible rebuttal testimony.

**[16]    Appeal and Error** 🗝 Summary Judgment

The scope of appellate review of a summary judgment order depends upon the proper characterization of the rulings made by the trial court.

**[17]    Appeal and Error** 🗝 Plenary, free, or independent review

**Appeal and Error** 🗝 Review for correctness or error

When a trial court draws conclusions of law, the Supreme Court's review of a summary judgment order is plenary, and the Supreme Court must

decide whether the trial court's conclusions are legally and logically correct and find support in the facts that appear in the record.

**[18]    States** 🗝 Conflicting or conforming laws or regulations

The dictates of the supremacy clause of the United States Constitution require state law to yield to the extent that it conflicts with federal law. U.S. Const. art. 6, cl. 2.

**[19]    States** 🗝 Conflicting or conforming laws or regulations

A conflict between state and federal law is implicit where, for example, it is impossible for a private party to comply with both state and federal requirements. U.S. Const. art. 6, cl. 2.

1 Cases that cite this headnote

**[20]    States** 🗝 Preemption in general

There is a strong presumption against federal preemption of state and local legislation. U.S. Const. art. 6, cl. 2.

**[21]    Products Liability** 🗝 Design

**Products Liability** 🗝 Drugs in general

**States** 🗝 Product safety; food and drug laws

Manufacturer of oral anticoagulant medication could not have satisfied its alleged state law duty to consumer to develop and market reversal agent for medication without marketing unapproved drug in violation of federal law, and thus, design defect claim, relating to reversal agent, was preempted by federal law, where reversal agent was not approved by Food and Drug Administration (FDA) until after consumer's gastrointestinal bleed, which was allegedly prolonged because reversal agent was not available. U.S. Const. art. 6, cl. 2.

**[22]    Trial** 🗝 Particular statements or remarks

Trial court did not abuse its discretion by issuing curative instruction to jury after counsel for executrix of consumer's estate improperly suggested during closing argument that manufacturer of oral anticoagulant medication could be held liable for failing to seek approval of certain dose of medication proposed by Food and Drug Administration (FDA), a claim that trial court determined was preempted under federal law; manufacturer did not open the door to executrix's use of the exhibit during closing arguments, instruction only precluded jury from considering single exhibit to support claim that it had determined was preempted under federal law, and instruction was brief, contained no explicit reprimand, and was conveyed using reasonably measured language. U.S. Const. art. 6, cl. 2.

**Attorneys and Law Firms**

Brenden P. Leydon, with whom were Neal L. Moskow and Kelly A. Koehler, pro hac vice, and, on the brief, Richard I. Nemeroff, pro hac vice, for the appellant (plaintiff).

Paul W. Schmidt, pro hac vice, with whom were Patrick M. Fahey, Gregory Halperin and Michael X. Imbroscio, pro hac vice, and, on the brief, Phyllis A. Jones, pro hac vice, for the appellees (defendants).

Robinson, C. J., and Palmer, McDonald, D'Auria, Mullins, Kahn and Vertefeuille, Js.

**Opinion**

KAHN, J.

*1  The plaintiff, Geralynn Boone, the executrix of the estate of Mary Boone (decedent), brought the present action against the defendants, Boehringer Ingelheim Pharmaceuticals, Inc., and Boehringer Ingelheim International, GmbH, alleging, inter alia, that an oral anticoagulant medication, Pradaxa, wrongfully caused the decedent's death. A jury returned a verdict in favor of the defendants, from which the plaintiff now appeals.[1] The plaintiff claims that the trial court improperly (1) precluded evidence and arguments related to spoliation, (2) prevented the plaintiff from using an excerpt from a particular deposition on rebuttal, (3) granted the

defendants' motion for summary judgment on a design defect claim relating to the absence of a reversal agent, and (4) issued a curative instruction to the jury after closing arguments. We disagree with each of these claims and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to the present appeal. After experiencing intermittent heart palpitations in 2003, the decedent was diagnosed with nonvalvular atrial fibrillation. That condition may cause the formation of blood clots and, as a result, substantially increased the decedent's risk of suffering an ischemic stroke. In order to reduce that risk, Jeffrey Fierstein, a cardiologist, prescribed an anticoagulant named warfarin to the decedent. The use of warfarin requires dietary restrictions, frequent blood testing, and dose titration to keep the concentration of medication present in the bloodstream within an accepted therapeutic range. Like all anticoagulants, warfarin increases the risk of uncontrolled bleeding.[2]

In October, 2010, the defendants received approval from the United States Food and Drug Administration (FDA) to begin selling dabigatran etexilate, an anticoagulant marketed under the brand name Pradaxa. Unlike warfarin, Pradaxa requires no dietary restrictions and was approved for use without blood monitoring or dose titration. In November, 2010, Fierstein met with the decedent and recommended switching from warfarin to Pradaxa. Fierstein testified at trial that the decedent had been tolerating warfarin well and that he had recommended the switch "out of convenience." The decedent agreed and, for some time, took Pradaxa without any significant side effects.

*2  On March 5, 2014, the decedent suffered a severe gastrointestinal bleed and was admitted to a hospital. The decedent underwent kidney dialysis to remove Pradaxa from her blood and was administered multiple blood transfusions. Although the bleeding stopped three days later, the decedent's kidneys began to fail. On March 25, 2014, the decedent died. The death certificate lists "[a]cute [k]idney [i]njury," "chronic kidney [d]is-ease," "[r]etroperitoneal [f]ibrosis," and "occult neoplasia" as causes of death.[3] The death certificate also lists "[d]abigatran [i]nduced [c]oagulopathy" and "gastrointestinal bleed" as "significant" conditions contributing to the decedent's death. (Emphasis omitted.) No autopsy was performed.

The plaintiff subsequently commenced the present action, alleging, inter alia, that (1) the defendants negligently failed

to give adequate warnings, directions, and instructions to guard against the risk of bleeding caused by Pradaxa, (2) the defendants negligently failed to test, study, and investigate the benefits of establishing a therapeutic range for Pradaxa, and (3) Pradaxa was defectively designed due to the absence of a reversal agent. On January 24, 2018, the trial court granted the defendants' motion for summary judgment on the claim relating to the absence of a reversal agent, concluding, among other things, that it was preempted by federal law.[4]

The plaintiff filed a pretrial motion asking the trial court to instruct the jury that the defendants had improperly failed to maintain certain relevant materials for the purpose of discovery. Specifically, the plaintiff claimed that the defendants had lost or destroyed files of one of its former employees, Dr. Thorsten Lehr, while litigating previous federal actions relating to Pradaxa. The trial court, applying the test set forth in *Beers v. Bayliner Marine Corp.*, 236 Conn. 769, 777–79, 675 A.2d 829 (1996), concluded that a spoliation instruction was warranted and, over the defendants' objection, provided such an instruction to the jury at the end of the trial. See footnote 6 of this opinion.

The jury returned a verdict, finding that, although the defendants had negligently failed to give adequate warnings, directions, and instructions to guard against the risk of bleeding caused by Pradaxa, the plaintiff had failed to prove that the defendants' wrongful conduct caused the decedent's death. The trial court subsequently rendered judgment in favor of the defendants, from which the plaintiff appealed. Additional facts and procedural history will be set forth as necessary.

I

[1] The plaintiff first claims that the trial court improperly precluded certain evidence and arguments related to the issue of spoliation.[5] Specifically, the plaintiff posits that the absence of such information deprived the jury of the context necessary to decide whether to draw an adverse inference against the defendants, as permitted by the trial court's spoliation instruction. In response, the defendants argue that the trial court's limitations in this regard were proper.[6] For the reasons that follow, we decline to conclude that the trial court abused its discretion by precluding evidence and arguments relating to the issue of spoliation in the present case.

*3 The following additional facts and procedural history are relevant to our consideration of this claim. In 2012, certain federal litigation relating to Pradaxa was centralized in the Southern District of Illinois pursuant to 28 U.S.C. § 1407, and a federal district court judge, David R. Herndon, was appointed to preside. *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, 883 F. Supp. 2d 1355, 1355–56 (J.P.M.L. 2012). Various discovery disputes in that consolidated federal litigation led to motions seeking sanctions against the defendants. See *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, Docket No. 3:12-MD-02385 (DRH), 2013 WL 6486921, *1 (S.D. Ill. December 9, 2013).

As a result of those disputes, on September 18, 2013, Judge Herndon issued a mandatory injunction requiring the defendants to conduct "an immediate search for any yet undisclosed materials ...." (Internal quotation marks omitted.) Id., at *3–5. During a subsequent deposition, the plaintiffs in that proceeding discovered that Lehr was a potentially relevant source of additional information and, as a result, requested production of his custodial file. Id., at *9. Approximately one month after that deposition, the defendants informed Judge Herndon that Lehr had not been identified as a custodian and that, as a result, some of his documents and files had been destroyed. Id.

In reviewing a subsequent motion for sanctions, Judge Herndon found that Lehr "was a prominent scientist ... that played a vital role in researching Pradaxa," that the defendants were familiar with his work, and that the evidence on record in that case would "lead a reasonable person to infer a motive for the defendant[s] to abstain from placing a litigation hold on [Lehr's] materials ...." Id., at *12. On the basis of these findings, the court concluded that the defendants had failed to maintain Lehr's files "in bad faith."[7] Id., at *18. This conduct, together with certain other discovery violations, led Judge Herndon to impose immediate sanctions on the defendants, including a substantial monetary fine and an order compelling the attendance of various corporate employees at depositions in the United States. Id., at *20. In a separate ruling, Judge Herndon also specifically put the defendants on notice that additional sanctions, including an adverse inference instruction, would be considered at the close of discovery and would "apply to any actions pending before [that] court at [that] time ...." *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, United States District Court, Docket No. 3:12-MD-02385 (DRH), MDL No. 2385, CMO 50-1 (S.D. Ill. December

18, 2013), available at https://www.ilsd.uscourts.gov/ Documents/mdl2385/cmo50-1.pdf (last visited May 1, 2020). The defendants challenged Judge Herndon's order by filing a petition for a writ of mandamus in the United States Court of Appeals for the Seventh Circuit. *In re Petition of Boehringer Ingelheim Pharmaceuticals, Inc.*, 745 F.3d 216, 216–17 (7th Cir. 2014). In that proceeding, the Seventh Circuit concluded that the order compelling the deposition of corporate employees in the United States was improper. *Id.*, at 219–20. In reaching this conclusion, the Seventh Circuit expressly declined to revisit the factual findings underlying the District Court's finding of bad faith and its imposition of other sanctions. *Id.*, at 218. Following Judge Herndon's decision, the consolidated federal litigation settled. See *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, United States District Court, Docket No. 3:12-MD-02385 (DRH) (S.D. Ill. May 1, 2015), available at https://www.ilsd.uscourts.gov/documents/mdl2385/MinuteOrder656.pdf (last visited May 1, 2020).

**\*4**  Notwithstanding the resolution of the consolidated federal litigation, several cases related to Pradaxa remained pending in this state. Those cases were placed onto a single, consolidated docket governed by a series of case management orders. See *In re Connecticut Pradaxa Litigation*, judicial district of Hartford, Complex Litigation Docket, Docket No. HHD-CV-13-5036974S. The trial court in the present case noted that, under one such order dated July 23, 2015, "all discovery propounded and completed in the [consolidated federal litigation was] deemed propounded and responded to for purposes of [Connecticut's consolidated Pradaxa litigation] docket ...." That order, which the parties agreed to be bound by, required the defendants to provide the plaintiff with all evidence produced during the course of the consolidated federal litigation, and provided that all discovery requests and responses in that proceeding "shall be deem[ed] served in this court for purposes of the parties' respective rights and obligations with regard thereto."

On January 5, 2018, the plaintiff filed a pretrial request to charge, requesting a spoliation charge relating to, among other things, the defendants' failure to maintain Lehr's files.[8] Relying principally on Judge Herndon's finding of bad faith, the plaintiff requested an instruction indicating that the elements of spoliation had been met as a matter of law. The defendants objected, and the trial court heard oral argument on January 29, 2018. During oral argument, the plaintiff argued that the presentation of evidence relating to spoliation would be "time-consuming" and "extraordinarily

difficult" to put in context.[9] The plaintiff indicated that such an endeavor would be an unnecessary "sideshow" that would waste both time and judicial resources. On several occasions, the plaintiff represented that she would not seek to introduce such evidence, if the court were to conclude, at the outset of the trial, that she was entitled to the requested instruction.[10]

The court then asked the plaintiff the following specific question: "[I]f the court granted the requested charge and you didn't put on any evidence of Judge Herndon's order, et cetera, how would the jury be equipped to determine whether to draw an adverse inference? As ... you know, it's not mandatory." In response, the plaintiff stated that the instruction itself would inform the jury of her claim that the defendants had "intentionally ... or recklessly lost or destroyed" documents, including files from Lehr, that were relevant "to the issues of the benefits of assessing and adjusting Pradaxa dosing based on blood concentrations ...." The plaintiff asserted that, armed with such an instruction and testimony from various witnesses discussing Lehr, the jury "would be able to put [the spoliation issue] in context."[11]

**\*5**  On February 18, 2018, in a comprehensive, written decision,[12] the trial court granted the plaintiff's request for a spoliation charge, finding that, in light of the proceedings before Judge Herndon, the plaintiff had satisfied the elements of spoliation set forth in *Beers* as a matter of law and was entitled to a jury instruction to that effect.[13] In so doing, the court noted: "The parties agreed to be bound by, and not duplicate, the discovery process that had occurred in the [consolidated federal litigation]. It necessarily follows that an offending party who failed to identify a custodian of potentially relevant evidence and who failed to preserve such evidence in the underlying proceeding should also be bound by any judicial findings by the underlying court relating to such discovery failures. The contention that Judge Herndon's discovery related findings should be ignored altogether smacks of unfairness under the very unusual circumstances of the discovery process in [Connecticut's consolidated Pradaxa litigation] docket." The court then concluded that the "relitigation of the spoliation issues relating to ... Lehr ... would ... offend principles of judicial economy, would create a trial within a trial, would risk one or more trial counsel being called as witnesses, and would create possible, if not inevitable, confusion with the jury, who would be presented with testimony and other evidence (e.g., court orders, among other things) relating to the [consolidated federal litigation]." See footnote 6 of this opinion.

The following day, the trial court granted a motion in limine filed by the defendants seeking to exclude " 'evidence, testimony, or argument regarding alleged spoliation issues' " relating to Lehr.[14] The trial court based its decision on the plaintiff's previous representations that such issues would not need to be presented to the jury if the court granted, as it did, her request for a spoliation charge.

On February 23, 2018, the plaintiff filed a motion asking the court to issue the instruction on spoliation at the commencement of trial. In that motion, the plaintiff also sought permission to "inform the jury during opening, at trial, and during closing argument of [the defendants'] unlawful destruction of critically important evidence ...." On that same day, the defendants objected, and the trial court heard oral argument. The court ruled that references to spoliation during opening statements risked unfair prejudice to the defendants and, accordingly, exercised its discretion to proscribe such references. See Practice Book § 15-6. The trial court also made clear that, although the plaintiff was free to discuss Lehr's importance to the case generally, information relating to the "destruction" of documents could not be communicated to the jury during the evidentiary portion of the trial in the absence of a witness with personal knowledge of that event.[15] The trial court noted that the sanction the plaintiff had procured was powerful. The court was particularly concerned about the use by the plaintiff's counsel of the terms "sanction" or "bad faith" because, "although [it] found as a matter of law that Judge Herndon's findings satisfies *Beers*, he made findings that go beyond *Beers* and so he made a bad faith finding that is not necessary under *Beers*." (Internal quotation marks omitted.) Finally, the trial court expressly reserved decision on whether arguments relating to spoliation would be permitted in closing, noting that it had not yet determined whether it would give the adverse inference instruction when evidence relating to Lehr was admitted during trial, or after closing arguments.

*6 Lehr's involvement in the development of Pradaxa featured prominently at trial. In his opening statement, the plaintiff's counsel told the jury that the defendants had an interest in suppressing scientific information showing a "therapeutic range" for Pradaxa because frequent blood testing would place that product at a competitive disadvantage. The plaintiff's counsel noted, in particular, that the defendants had pressured one of their own scientists, Paul Reilly, to remove such information from a manuscript relating to dabigatran etexilate exposure. The plaintiff's counsel

indicated that certain corporate documents had identified Lehr as the "father" of that same manuscript and that Reilly had simply continued Lehr's work.[16] The plaintiff's counsel then urged the jury to "pay close attention to the paper and how it developed."[17]

One of the plaintiff's expert witnesses, a pharmacologist named Laura Plunkett, opined during her testimony that blood monitoring should have been required for Pradaxa because, like warfarin, Pradaxa has a particular therapeutic range that balances the various risks posed by clots and bleeds. She based her opinion, in part, on information contained in Reilly's exposure response paper. Plunkett then testified that she had reviewed various communications about the exposure response paper and that, in her opinion, important scientific information demonstrating a specific therapeutic range had been suppressed by the defendants in order to avoid the need for blood monitoring.[18] Finally, Plunkett testified, over the defendants' objection, that she had looked for the first draft of the exposure response paper and had been unable to find that document.[19]

Our review of the record indicates that, over the course of the nearly three weeks of trial that followed, there was only one particular instance in which the plaintiff proffered, and the trial court excluded, testimony directly relating to the destruction of Lehr's files. On that occasion, the plaintiff sought to introduce an excerpt from a deposition of Andreas Barner, the defendants' chairman of corporate management, relating generally to his awareness of the defendants' failure to preserve Lehr's computer. The plaintiff argued that this excerpt would provide "bread crumbs" to assist the jury in determining whether to draw an adverse inference against the defendants. The trial court, however, precluded admission of that excerpt, concluding that the information fell "squarely within" its previous rulings related to spoliation and the adverse inference instruction.

*7 On the final day of the plaintiff's case-in-chief, the defendants filed a motion seeking reconsideration of the court's previous decision to charge the jury on the issue of spoliation. In that motion, the defendants argued, inter alia, that the plaintiff's factual basis for requesting a spoliation charge had been undercut at trial. See footnote 19 of this opinion. The plaintiff objected, arguing that the evidence presented to the jury did not undermine the requested charge. The plaintiff further claimed that, even if evidence of spoliation was lacking, precluding the charge on that ground

would be improper in light of the fact that the trial court had excluded evidence of spoliation during trial. The plaintiff noted that the trial court's "carefully tailored spoliation charge is an appropriate sanction for [the defendants'] wrongful conduct." The trial court denied the defendants' motion.[20]

The defendants subsequently called Reilly as a witness during their case-in-chief. During that testimony, Reilly described the defendants' efforts to evaluate blood concentration data, stating that the exposure response paper had "gone through ... multiple iterations" and that Lehr had "initiated ... dose titration modeling to see whether ... he could identify a target range of dabigatran and a target dose adjustment." Reilly testified that, despite their best efforts, the defendants had not been able to identify a particular therapeutic range for Pradaxa and, had such a range been established, it would have been communicated to physicians. Reilly then indicated that the FDA and the scientific community had reached the same consensus.

On cross-examination, the plaintiff's counsel questioned Reilly about a specific e-mail in which Andreas Clemens, the head of the department of medical affairs for dabigatran etexilate, referred to Lehr as the "father" of the exposure response paper. (Internal quotation marks omitted.) That correspondence, which was admitted into evidence as a full exhibit, indicates that Reilly "took [that paper] over and changed it significantly." In response, Reilly testified that he was personally unaware of any drafts of the exposure response paper prior to his own and that Clemens had been "sadly misinformed." See also footnotes 15 and 19 of this opinion.

Following the close of evidence, the plaintiff again requested permission to inform the jury during closing argument of the defendants' spoliation and the impact it had on the present case. Without such information, the plaintiff argued, the jury would lack the context necessary to draw the adverse inference invited by the court's instruction. The plaintiff, however, did not proffer the substance of the new or additional information relating to spoliation that she wanted to use in closing argument. Rather, she again referenced Lehr's general importance to the development of Pradaxa and his involvement with the exposure response paper. The trial court ruled that the issue of spoliation would not be "fodder for closing argument" but expressly noted that the parties were free to "mention what [had] already come into evidence ...."

The plaintiff's closing argument, in fact, discussed the evidence relating to Lehr at length. Specifically, the plaintiff's counsel repeated the argument that the defendants had sought to suppress information relating to a therapeutic range for Pradaxa because blood monitoring would put their product at a competitive disadvantage. The plaintiff's counsel emphasized that the authors of the exposure response paper had explored the concept of blood monitoring, that Clemens' e-mail implied the existence of an early draft manuscript authored by Lehr, and that such a manuscript had never been discovered.[21] Finally, the plaintiff's counsel asked the jury to pay "close attention" to the trial court's instructions relating to Lehr and to "be the judge" of whether such facts were important.

*8 The trial court ultimately issued the following instruction to the jury relating to spoliation: "The plaintiff claims that certain evidence was not available to her because [the defendants] destroyed or failed to preserve it, at a time when it had a legal duty to preserve it. Specifically, [the defendants] destroyed or failed to preserve the desktop computer, laptop computer, Blackberry phone, and paper files of ... Lehr, about whom there was some evidence during the trial, who was a scientist and employee of [the defendants and] who did research concerning Pradaxa until he left the company in September, 2012. The plaintiff contends such evidence is relevant to her claim concerning the benefits of assessing blood plasma concentrations. I instruct you that ... Lehr's desktop computer, laptop computer, Blackberry phone, and paper files were not preserved at a time when [the defendants were] on notice of a legal duty to preserve them and that the failure to retain such files was intentional, in the sense that it was not inadvertent. Our law allows you to draw an adverse inference that the destroyed evidence would have been unfavorable to [the defendants]. You may therefore draw an inference that the evidence that was destroyed or not preserved would be unfavorable to [the defendants], but you are not required to do so. Understand that this is not a claim for which you would award damages; rather, it permits an adverse inference to be drawn as you consider all the evidence relating to the plaintiff's claims. If you choose to draw such an inference, you may not use the inference to supply the place of evidence of material facts or to shift the burden of proof from the plaintiff to [the defendants] on the plaintiff's claims, but it may turn the scale when the evidence is closely balanced. By giving you this instruction, the court does not mean to place emphasis on this issue versus any other aspect of the evidence that you may consider, and the court takes no

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

view as to whether such an inference should be drawn, as that decision is for you, the jury, to decide.''[22]

Following the jury's verdict in favor of the defendants, the plaintiff filed a motion to set aside the verdict, claiming, among other things, that the trial court had ''improperly prevented [her] from informing the jury of [the defendants'] acts of spoliation and the court's sanction regarding the same.'' The plaintiff argued that the issue of spoliation was itself relevant and probative to the defendants' reckless disregard for consumer safety. She renewed her claim that the trial court's restrictions on opening statements, the admission of evidence, and closing arguments prevented her from providing the jury with the context necessary to decide whether to draw an adverse inference against the defendants. The trial court found this claim to be ''wholly without merit'' because the plaintiff, in seeking an instruction, expressly represented that evidence relating to spoliation would not need to be presented at trial. Relying in part on the induced error doctrine, the trial court denied the motion, concluding that the plaintiff had found ''purported error in the very approach for which she successfully advocated.''

 [2]  [3]  [4]  [5]  We begin by noting the standard of review and the general principles of law applicable to the plaintiff's claim. ''The trial court possesses inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial.'' (Internal quotation marks omitted.) *Downs* v. *Trias*, 306 Conn. 81, 102, 49 A.3d 180 (2012). We review the relevant rulings of the trial court in the present case for an abuse of that discretion. See, e.g., *McBurney* v. *Paquin*, 302 Conn. 359, 378, 28 A.3d 272 (2011) (''[t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion'' (internal quotation marks omitted)); *Naughton* v. *Hager*, 29 Conn. App. 181, 188, 614 A.2d 852, (''[t]he trial court is vested with broad discretion over the latitude of the statements of counsel during argument''), cert. denied, 224 Conn. 920, 618 A.2d 527 (1992).[23] In applying that standard, ''[w]e [must] make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion.... [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did.'' (Internal quotation marks omitted.) *Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 119, 124 A.3d 501 (2015).

*9  [6]  [7]  We agree with the trial court's assessment that the present case implicates the doctrine of induced error. ''[T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the [allegedly] erroneous ruling.... It is well established that a party who induces an error cannot be heard to later complain about that error.... This principle bars appellate review of induced nonconstitutional error and induced constitutional error.... The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party.... [W]hether we call it induced error, encouraged error, waiver, or abandonment, the result —that the ... claim is unreviewable—is the same.'' (Internal quotation marks omitted.) *Independent Party of CT—State Central* v. *Merrill*, 330 Conn. 681, 724, 200 A.3d 1118 (2019); see also *State* v. *Fay*, 326 Conn. 742, 765 n.22, 167 A.3d 897 (2017) (''a finding of induced error is supportable when a party's claim on appeal will result in an inappropriate ambush of the trial court''). With these standards in mind, we turn to the trial court's rulings in the present case.

 [8]  Our review of the record leads us to conclude that the doctrine of induced error precludes the plaintiff from claiming that the trial court improperly excluded opening statements and evidence relating to spoliation. In response to the plaintiff's pretrial request for an adverse inference instruction, the court specifically asked the plaintiff how the jury would be able decide whether to draw such an inference without any evidence relating to the underlying conduct. The plaintiff not only represented to the trial court that the requested instruction would obviate the need for such evidence; see footnote 10 of this opinion; but also indicated that the instruction itself, together with evidence generally relating to Lehr's involvement in the development of Pradaxa, would adequately equip the jury with the information it would need to draw an adverse inference against the defendants.

The trial court afforded the plaintiff broad latitude to introduce evidence and testimony describing the nature of Lehr's work, his research regarding the possible existence of a therapeutic range, and the scope of his involvement in the exposure response paper. The plaintiff used the testimony proffered by Plunkett and Reilly, in particular, to develop a detailed theory that Lehr had authored an early version of the exposure response paper that the defendants had never produced. The trial court's instruction clearly stated that the defendants had failed to preserve Lehr's files despite having a legal duty to do so, and that the jury could choose to infer that

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

the information in those files would have been adverse to the defendants. Having encouraged the trial court to structure the proceeding in this precise manner, the plaintiff cannot now prevail on the ground that opening statements and evidence informing the jury about the defendants' destruction of Lehr's files was, in fact, *necessary* to put the requested instruction in an appropriate context. Cf. *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 236–37, 116 A.3d 297 (2015) ("Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him.... To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.)).

Reaching the opposite conclusion would substantially undercut the grounds on which the trial court concluded that the plaintiff's requested instruction was appropriate in the first instance, including improving judicial economy, avoiding a trial within a trial, and preventing confusion of the jurors. The trial court's decision to exclude the deposition testimony relating to Barner's knowledge regarding the destruction of Lehr's computer demonstrates this point. If the plaintiff had been permitted to lay a trail of "bread crumbs" for the jury using that testimony, the defendants would have been entitled to marshal any admissible evidence showing that this same trail should not be followed. Presenting such a dispute to the jury would necessitate the very "sideshow" that the plaintiff had purposefully forgone in requesting a spoliation instruction before the outset of trial.[24]

**\*10** **[9]** **[10]** Our conclusion that the trial court did not abuse its discretion by declining to admit evidence that could have initially been presented at a sanctions hearing also resolves, in large measure, the plaintiff's claims relating to the restrictions that the court imposed on closing arguments. As this court has previously noted, a trial court acts well within its broad discretion when it restricts the scope of an argument "to prevent comment on facts that are not properly in evidence ...." (Internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 713, 900 A.2d 498 (2006); cf. *State* v. *Weatherspoon*, 332 Conn. 531, 551, 212 A.3d 208 (2019) ("[w]hile the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence" (internal quotation marks omitted)); *State* v. *Lopez*, 280 Conn. 779, 803, 911 A.2d 1099 (2007) ("Counsel may comment [on] facts properly in evidence and [on] reasonable inferences to be drawn from them.... Counsel may not, however, comment on or suggest an inference from

facts not in evidence." (Internal quotation marks omitted.)).[25] Because the trial court ruled at the outset that evidence relating to the conduct underlying Judge Herndon's finding of bad faith would not be admitted or presented to the jury, we agree with the trial court's assessment that such evidence was not proper "fodder" for arguments by counsel.

We note that the plaintiff was not compelled to seek the benefit of the findings made by Judge Herndon or to request an adverse inference instruction as a matter of law. The plaintiff could have, for example, asked the trial court to independently review the evidence relating to the destruction of Lehr's files and, as is typically the case, argued that any evidence ultimately admitted at trial supported a corresponding instruction.[26] See *Paylan* v. *St. Mary's Hospital Corp.*, 118 Conn. App. 258, 264, 983 A.2d 56 (2009) (discussing whether plaintiff adduced sufficient evidence at trial to warrant spoliation instruction under *Beers*). The plaintiff could have also chosen to pursue still other sanctions available for discovery misconduct under our rules of practice. See Practice Book § 13-14. The plaintiff, as a matter of strategy, chose a different path.[27] Accordingly, we decline to conclude that the trial court abused its discretion by precluding evidence and arguments relating to spoliation in the present case.[28]

II

**\*11** **[11]** The plaintiff next claims that the trial court improperly excluded certain portions of a video recorded deposition of Christopher Corsico, the defendants' Senior Vice President for Clinical Development, from her case on rebuttal. The defendants respond by arguing, inter alia, that the trial court's ruling was correct because the proffered testimony did not contradict testimony presented by their expert witnesses. We agree with the defendants.

The following additional facts are relevant to our discussion of this claim. During their case-in-chief, the defendants called two expert witnesses, Stanley Schneller, a cardiologist, and Michelle Anderson, a gastroenterologist, to testify on the issue of causation. Schneller testified that the decedent's gastrointestinal bleed had resolved three days after she arrived at the hospital and that a "multiplicity of other coexisting medical problem[s]" had caused her death. Specifically, Schneller testified that "acute kidney injury, chronic kidney disease, retroperitoneal fibrosis, and occult

PAS-L-002011-20    10/16/2020 3:16:53 PM    Pg 58 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC    Document 1-1    Filed 01/29/21    Page 116 of 248 PageID: 125

Boone v. Boehringer Ingelheim Pharmaceuticals, Inc., --- A.3d ---- (2020)
2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

neoplasia'' directly caused the decedent's death, and that those conditions were unrelated to her use of Pradaxa or her gastrointestinal bleed. See footnote 3 of this opinion. Anderson's testimony supported the same conclusion.

After the defendants rested, the plaintiff sought to introduce, as rebuttal, a brief segment from Corsico's February, 2014 video recorded deposition. During that deposition, Corsico was asked: ''[D]o you understand that there can be a series or a cascade of events that can ultimately lead to one's demise that may be precipitated by a gastrointestinal bleed?'' Corsico answered in the affirmative. The defendants' counsel objected, arguing that the admission of that testimony as rebuttal would be improper because it did not conflict with testimony from either Schneller or Anderson. In response, the plaintiff's counsel argued that Corsico's testimony undercut Schneller and Anderson's conclusion that, because the decedent's gastrointestinal bleed had stopped, it did not cause her death.

The trial court ultimately sustained the defendants' counsel's objection, aptly noting: ''I just don't see how ... Corsico's testimony ... rebuts testimony by either ... Schneller or ... Anderson because ... Corsico, in this [question and answer], was not specifically asked about a [gastrointestinal] bleed that had ended; nor were [either] Schneller [or] Anderson asked [whether it is] possible that a [gastrointestinal] bleed can lead to a cascade of events that ultimately led to one's death.''

**[12]  [13]  [14]  [15]**  ''It is well settled that the admission of rebuttal evidence lies within the sound discretion of the trial court.'' *Gomeau* v. *Gomeau*, 242 Conn. 202, 208, 698 A.2d 818 (1997); see also Practice Book § 15-5 (3). ''The issue on appeal is not whether any one of us, sitting as the trial court, would have permitted the disputed testimony to be introduced. The question is rather whether the trial court ... abused its discretion in not allowing the rebuttal testimony ....'' (Internal quotation marks omitted.) *Id., at 209, 698 A.2d 818.* ''[R]ebuttal evidence is that which refutes the evidence [already] presented ... rather than that which merely bolsters one's case.'' (Internal quotation marks omitted.) *State* v. *Wood*, 208 Conn. 125, 139, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988). ''There is no requirement that a rebuttal witness must respond to every alternate theory offered by the defendant ... a general contradiction of the testimony given by the defendant is considered permissible rebuttal testimony.''[29] *State* v. *Gray*, 221 Conn. 713, 728, 607 A.2d 391, cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); see also 1

K. Broun, McCormick on Evidence (7th Ed. 2013) § 4, p. 16 (''the plaintiff ... is confined to testimony refuting the defense evidence, unless the trial judge in her discretion permits him to depart from the regular scope of rebuttal'').

**\*12**  We agree with the trial court's conclusion that the proffered question and answer from Corsico's deposition was not proper rebuttal because Corsico was not discussing a situation in which a person's gastrointestinal bleed had resolved prior to his or her death. The isolated colloquy from Corsico's deposition establishes only a single, generic proposition: that a gastrointestinal bleed can lead indirectly to death. Such a broad statement does not generally contradict Schneller's and Anderson's more precise testimony that, in this particular case, the decedent's death was caused by other medical conditions and not the gastrointestinal bleed, which had resolved more than two weeks before her death.[30] In essence, the experts were asked different hypothetical questions, the answers to which were not necessarily contradictory.[31] As a result, we conclude that the trial court did not abuse its discretion by excluding Corsico's testimony from the plaintiff's case on rebuttal.

### III

The plaintiff's third claim is that the trial court improperly granted the defendants' motion for summary judgment on a design defect claim related to the defendants' failure to develop and market a reversal agent for Pradaxa, pursuant to the impossibility preemption doctrine. In response, the defendants assert that the trial court's preemption analysis was correct because marketing a reversal agent would have required independent approval by the FDA. We agree with the defendants.

The following additional facts and procedural history are relevant to our consideration of this claim. The FDA approved Pradaxa in 2010. Five years later, after the decedent's death, the defendants obtained approval from the FDA to sell idarucizumab, a chemical reversal agent for Pradaxa marketed under the brand name Praxbind. Because Praxbind was not available at the time of the decedent's gastrointestinal bleed, kidney dialysis was required to remove dabigatran etexilate, the active ingredient in Pradaxa, from her bloodstream. As a result, the decedent's gastrointestinal bleed took three days to stop.

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

In the present case, the plaintiff sought to advance a claim that the defendants could have brought Praxbind to market earlier and that, because they did not do so, the decedent's gastrointestinal bleed was prolonged. The plaintiff claimed, in particular, that the defendants had defectively designed Pradaxa by failing to seek concurrent approval for a reversal agent. The defendants subsequently filed a motion for summary judgment, arguing that, because the FDA had not approved Praxbind before the decedent's death, the plaintiff was foreclosed from pursuing a design defect claim predicated on its absence. Specifically, the defendants argued that the reasoning set forth in *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 133 S. Ct. 2466, 186 L. Ed. 2d 607 (2013), and *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 131 S. Ct. 2567, 180 L. Ed. 2d 580 (2011), clearly established that such claims are preempted by federal law. The trial court reached the same conclusion and, accordingly, granted the defendants' motion for summary judgment on that claim.[32]

**\*13** **[16]** **[17]** ''The standard of review on summary judgment is well established. Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.... The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court.... When ... the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record.'' (Internal quotation marks omitted.) *NetScout Systems, Inc. v. Gartner, Inc.*, 334 Conn. 396, 408, 223 A.3d 37 (2020); see also *Byrne v. Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 447, 102 A.3d 32 (2014) (''[w]hether state causes of action are preempted by federal statutes and regulations is a question of law over which our review is plenary'').

**[18]** **[19]** **[20]** The supremacy clause of the United States constitution provides that federal law ''shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'' U.S. Const., art. VI, cl. 2. The dictates of that provision require state law to yield to the extent that it conflicts with federal law. See, e.g., *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995). Such a conflict is implicit where, for example, it is ''impossible for a private party to comply with both state and federal requirements ....'' (Internal quotation marks omitted.) Id. There is, however, ''a strong presumption against federal

preemption of state and local legislation.'' (Internal quotation marks omitted.) *Murphy v. Darien*, 332 Conn. 244, 249, 210 A.3d 56 (2019), cert. denied sub nom. *Metro North Commuter Railroad Co. v. Murphy*, ––– U.S. ––––, 140 S. Ct. 847, 205 L. Ed. 2d 468 (2020).

We begin our analysis of whether such a conflict exists in the present case with a brief review of three decisions from the United States Supreme Court examining the question of impossibility preemption in the pharmaceutical context. The plaintiff in *Wyeth v. Levine*, 555 U.S. 555, 558, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009), brought an action in a state court alleging, among other things, that she would have benefited from certain additional warnings in the label for a particular brand-name drug. After extensively reviewing federal law relating to drug labeling, the United States Supreme Court concluded that the plaintiff's state law claim was not preempted because a particular federal regulation, in fact, would have permitted the defendant to unilaterally add such additional warnings to the drug's label, while remaining in compliance with federal law. Id., at 568–72, 129 S. Ct. 1187, citing 21 C.F.R. § 314.70 (c) (6) (iii) (2008).[33]

**\*14** The plaintiffs in *PLIVA, Inc. v. Mensing*, supra, 564 U.S. at 608–609, 131 S.Ct. 2567, also alleged the absence of adequate warning labels. The defendants in that action argued on appeal that, as manufacturers of generic drugs, they could not make unilateral changes to the labels of generic drugs. Id., at 610, 131 S.Ct. 2567. The United States Supreme Court agreed, concluding that the plaintiffs' claim was preempted because FDA regulations required manufacturers of generic drugs to simply mirror the labeling of their brand-name counterparts.[34] Id., at 614, 624, 131 S.Ct. 2567. In reaching that conclusion, the court specifically rejected the plaintiffs' argument that proving impossibility would require the defendants to affirmatively demonstrate that the FDA would have rejected stronger warnings if they had been proposed. Id., at 620, 131 S.Ct. 2567. The relevant inquiry, the court held, was whether the defendants ''could *independently* do under federal law what state law requires ....'' (Emphasis added.) Id.[35]

The United States Supreme Court extended this reasoning to a state design defect claim two years later in *Mutual Pharmaceutical Co. v. Bartlett*, supra, 570 U.S. 472, 133 S.Ct. 2466. The plaintiff in that case took a generic drug, sulindac, and suffered a severe adverse reaction that was not mentioned in the drug's warning label. Id., at 477–78,

133 S. Ct. 2466.[36] The plaintiff subsequently brought an action, alleging that *sulindac* was "'unreasonably dangerous'" under state law and obtained a verdict in her favor. *Id.*, at 479, 486, 133 S. Ct. 2466. On appeal, the United States Supreme Court noted that, to satisfy the obligation imposed by state tort law, the defendant would have had to either (1) alter sulindac's composition or (2) strengthen the warning label. *Id.*, at 483–84, 133 S. Ct. 2466. The court found that the defendant was legally foreclosed from redesigning *sulindac* as a generic manufacturer and that, in any event, such alterations were physically impossible in light of *sulindac's* simplistic composition. *Id.* The court, citing its decision in *Mensing*, also concluded that the defendant, as a generic manufacturer, was prohibited by federal law from strengthening the warnings in sulindac's label. *Id.*, at 486, 133 S. Ct. 2466. As a result, the court concluded that the plaintiff's state tort claim was preempted. *Id.*, at 486–87, 133 S. Ct. 2466.

**\*15** **[21]** Our review of these decisions compels us to conclude in the present case that the trial court properly granted the defendants' motion for summary judgment as to the plaintiff's design defect claim. In order to cure the design defect alleged by the plaintiff, the defendants would have had to bring Praxbind to market before the decedent's *gastrointestinal bleed* in 2014. Because there is no dispute that Praxbind was not approved by the FDA until 2015, the defendants could not have satisfied their alleged state law duty to the decedent without marketing an unapproved drug in violation of federal law. In light of that conflict, the trial court correctly concluded that the plaintiff's design defect claim based on the absence of a reversal agent for Pradaxa was preempted. See *PLIVA, Inc. v. Mensing*, supra, 564 U.S. at 623–24, 131 S.Ct. 2567 ("when a party cannot satisfy its state duties without the [f]ederal [g]overnment's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for [preemption] purposes").

The plaintiff claims that the test for preemption set forth in *Mensing* and *Bartlett* is inapplicable to present case because those cases do not involve brand-name drugs. We disagree. Although the different levels of control afforded to brand-name and generic manufacturers by federal labeling regulations informed the court's *analysis* in those cases, the nature of the underlying test remained consistent: whether the defendant "could *independently* do under federal law what state law requires ...." (Emphasis added.) *Id.*, at 620, 131

S.Ct. 2567. Because the claim relating to the development and marketing of Praxbind in the present case does not relate to labeling, the plaintiff's attempt to rely on the distinctions between generic and brand-name manufacturers discussed in *Mensing* and *Bartlett* is unavailing. See *Yates v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 808 F.3d 281, 296–97 (6th Cir. 2015) ("contrary to [the plaintiff's] contention that the impossibility preemption in *Mensing* and *Bartlett* is limited to generic drugs, we view *Levine, Mensing*, and *Bartlett* as together stating the same test for impossibility preemption").

The plaintiff's remaining arguments against preemption do not warrant a different result. First, the plaintiff's assertion that it was *technologically* feasible to develop Praxbind before the decedent's death is insufficient to preclude preemption. Although such practical considerations may sometimes *limit* the options available to a manufacturer; see *Mutual Pharmaceutical Co. v. Bartlett*, supra, 570 U.S. at 484, 133 S.Ct. 2466; that fact is inapposite to the question of whether marketing Praxbind in 2014 would have required the FDA's "special permission and assistance ...."[37] *PLIVA, Inc. v. Mensing*, supra, 564 U.S. at 623–64, 131 S.Ct. 2567. For similar reasons, we are also unpersuaded that the FDA's subsequent approval of Praxbind in 2015 is dispositive. The possibility that the FDA would have looked favorably on an earlier application does nothing to alter the fact that, at the time of the decedent's death, the defendants were prevented from unilaterally marketing Praxbind under federal law. See footnote 35 of this opinion. Indeed, the United States Supreme Court found that the plaintiff's failure to warn claim in *Bartlett* was preempted notwithstanding the fact that, shortly after her injuries, the FDA agreed with her assessment that sulindac's label should include a stronger warning. See footnote 36 of this opinion.

For the foregoing reasons, we agree with the trial court's assessment that the plaintiff's design defect claim relating to Praxbind was preempted by federal law.[38] As a result, we conclude that trial court properly granted the defendants' motion for summary judgment on that claim.

IV

**\*16** **[22]** The plaintiff's final claim is that the trial court committed reversible error by issuing a curative instruction to the jury after closing arguments. Specifically, the plaintiff claims that the trial court abused its discretion by instructing

the jury that it could not hold the defendants liable for failing to conduct tests described in a particular exhibit. In response, the defendants contend that the trial court's instruction was merited because the plaintiff improperly used that exhibit to advance a preempted failure to test claim in closing argument. We review this claim for an abuse of discretion. See, e.g., *State* v. *Northrop*, 213 Conn. 405, 422 n.13, 568 A.2d 439 (1990). Applying that standard to the arguments and record before us, we find no reversible error.

The following additional facts and procedural history are relevant to our analysis of this claim. Before the commencement of trial, the court granted in part a motion in limine filed by the defendants seeking to "exclude evidence, testimony, or argument regarding [a] 110 [milligram] dose" of Pradaxa. In that ruling, the trial court acknowledged that such evidence might be relevant to the plaintiff's claim that the defendants had failed to adequately warn physicians about the risk of bleeding associated with the 150 milligram dose prescribed to the decedent and, accordingly, deferred ruling on the admissibility of the evidence for that purpose until trial. The court also concluded, however, that such evidence could not be used to prove that the defendants negligently failed "to test, study, investigate, or pursue the various action items identified by the FDA in order to secure approval of the 110 [milligram] dose in the United States" because such a failure to test claim would be preempted by federal law.[39] During trial, the court consistently applied this dichotomy when ruling on objections relating to evidence discussing a 110 milligram dose.

The defendants' counsel gave the following closing argument on the plaintiff's failure to test claim:[40] "The failure to test, you've literally not been given the nature of a test that should be done. Instead what you've been told is we did do a lot of study of this issue, we went as far we could, we went further than others did, and we came to the view that we couldn't go farther, a view that the FDA echoed. A failure to test, no." Notwithstanding the trial court's previous ruling, the plaintiff's counsel responded by drawing the jury's attention to a document, admitted into evidence as exhibit 23, discussing in particular detail a "potential path forward" for the 110 milligram dose previously proposed by the FDA. The trial court concluded that the plaintiff's counsel's argument had improperly suggested to the jury that the defendants could be

held liable for failing to pursue a 110 milligram dose and, as a result, gave the following curative instruction: "[M]embers of the jury, sometimes in closing arguments things are said by one or more lawyers that needs correction by the court. It's not uncommon for that to happen.... [I]t was suggested that you look at exhibit 23 during your deliberations. I am instructing you that you may not hold [the defendants] liable for a failure to conduct the testing outlined in exhibit 23."

**\*17** The plaintiff's principal argument is that her use of exhibit 23 was proper because the defendants had "opened the door" to it during their own closing argument. We disagree. This defendants' closing argument only broadly discussed the plaintiff's failure to test claim. See footnote 40 of this opinion. The "potential path forward" described in exhibit 23, by contrast, discusses the prospect of FDA approval for a 110 milligram dose. As a result, the defendants did not open the door to the plaintiff's use of that exhibit in closing.

The plaintiff also argues that the trial court instructed the jury to "disregard" a full exhibit and that doing so infringed on her right to use that evidence in support of her claims. The trial court's instruction, however, only precluded the jury from considering a single exhibit to support a particular claim that it had determined was preempted under federal law. Such a restriction was not improper. Finally, the plaintiff claims that she was unfairly prejudiced because the trial court had singled out her argument before the jury as doing "something wrong ...." Again, we disagree. The trial court's instruction was brief, contained no explicit reprimand, and was conveyed using reasonably measured language. In fact, the court described such instructions as "not uncommon ...." Under these circumstances, we decline to conclude that the trial court abused its discretion by issuing the challenged curative instruction to the jury.

The judgment is affirmed.

In this opinion the other justices concurred.

**All Citations**

--- A.3d ----, 2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

Footnotes

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

*    May 4, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

1    The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

2    Stanley Schneller, a cardiologist, testified at trial that, ''below [the accepted therapeutic] range [patients] don't get any benefit, it's as if they're not taking the drug, and above that range [patients] get no further benefit in terms of stroke prevention.'' Thus, Schneller testified, the ''targeted range is designed to give [patients] stroke protection without undue bleeding risk.'' Fierstein testified that the decedent was inside of the accepted therapeutic range ''at least 75 percent of the time'' she was taking warfarin.

3    According to testimony offered at trial, retroperitoneal fibrosis is a medical condition that can cause kidney damage by obstructing the flow of urine. This condition was not related to the decedent's use of Pradaxa. The phrase ''occult neoplasia'' denoted an undiagnosed cancer.

4    The judgment file incorrectly notes that the defendants' various motions for summary judgment were denied in their entirety. This appears to have been a scrivener's error.

5    The plaintiff also makes the conclusory assertion that the trial court's rulings with respect to spoliation ''would seem to violate basic notions of fundamental fairness, due process, and the right to counsel.'' The plaintiff's brief, however, contains no analysis applying those constitutional principles to the facts of the present case. As a result, we deem those claims, insofar as they were raised, to have been abandoned. See, e.g., Connecticut Light & Power Co. v. Gilmore, 289 Conn. 88, 124, 956 A.2d 1145 (2008) (''We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief.... Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly.'' (Internal quotation marks omitted.)).

6    The defendants argue that the trial court's decision to give a spoliation instruction was, itself, improper. Because the defendants prevailed at trial, we decline to address that claim of error in the present appeal. See Practice Book § 61-1; see also Seymour v. Seymour, 262 Conn. 107, 110, 809 A.2d 1114 (2002) (''[o]rdinarily, a party that prevails in the trial court is not aggrieved''). We note, however, that other trial courts overseeing Pradaxa trials in this state have adopted divergent approaches to this issue. See Bedsole v. Boehringer Ingelheim Pharmaceuticals, Inc., Superior Court, judicial district of Hartford, Docket No. CV-16-6070289-S (September 14, 2018) (68 Conn. L. Rptr. 206, 2018 WL 8489469) (declining to provide adverse inference instruction); Gallam v. Boehringer Ingelheim Pharmaceuticals, Inc., Superior Court, judicial district of Hartford, Docket No. CV-16-6067874-S, 2018 WL 8582397 (April 13, 2018) (following trial court's approach in present case, but also giving spoliation instruction during presentation of evidence); see also In re Petition of Boehringer Ingelheim Pharmaceuticals, Inc., 745 F.3d 216, 220 (7th Cir. 2014) (noting wide range of sanctions available to District Court).

7    Prior to 2015, there was a split in the federal courts regarding the factual findings necessary to support an imposition of sanctions, such as an adverse inference instruction, for the spoliation of electronically stored information; some courts imposed sanctions upon a finding of gross negligence, whereas others required intentional destruction. Compare Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 99–101 (2d Cir. 2002) (gross negligence standard), with Bracey v. Grondin, 712 F.3d 1012, 1020 (7th Cir. 2013) (bad faith standard). The Federal Rules of Civil Procedure were ultimately amended in 2015 to require a finding of bad faith. See Fed. R. Civ. P. 37 (e) (2) (permitting court to impose sanctions ''only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation'').

8    The plaintiff also requested instructions relating to the destruction of certain text messages and corporate e-mails. Those aspects of the plaintiff's request to charge are not at issue in the present appeal.

9    The plaintiff noted, in particular, that such evidence would likely require calling one of the defendants' attorneys, Eric Hudson, as a witness.

10    During oral argument, the plaintiff implied at least three times that the introduction of such evidence could be avoided. On one occasion, the plaintiff stated that, ''if the court doesn't grant this motion, then [she] intend[s] to put on evidence that there was a prior proceeding in which [the defendants] were obligated to preserve this information and they failed to do so.'' On another occasion, the court asked the plaintiff the following question: ''So, your position is that if the court were to grant the request for a spoliation charge, you would not intend to put on any evidence of Judge Herndon's order?'' The plaintiff responded by stating: ''That's correct.'' Finally, the plaintiff concluded her argument: ''We believe that the motion should be granted for the reasons we've articulated, but if the court denies it, we'd ask that it be denied with direction that we be permitted to put on the evidence as we've discussed here today.''

11   During a supplemental oral argument before the trial court, the plaintiff repeated her belief that the jury could be provided with an adequate context through evidence regarding Lehr's involvement in the research underlying Pradaxa and, specifically, the concept of a therapeutic range.

12   The trial court's written decision summarized the proceedings related to spoliation sanctions before Judge Herndon, including the relevant factual findings and conclusions.

13   As noted subsequently in this opinion, the ultimate question of whether to draw an adverse inference was reserved for the jury. See, e.g., *Paylan* v. *St. Mary's Hospital Corp.*, 118 Conn. App. 258, 264, 983 A.2d 56 (2009); see also Connecticut Civil Jury Instructions (2012) § 2.3-4, available at https://jud.ct.gov/JI/Civil/Civil.pdf (last visited May 1, 2020).

14   In her written objection to the defendant's motion in limine, the plaintiff reiterated her position that she would seek to introduce evidence relating to spoliation only in the event the trial court declined to give the requested instruction. The plaintiff argued, specifically, that, ''in the event that the spoliation issues addressed by Judge Herndon's orders are to be relitigated in this case, then [the] plaintiff believes that the court should admit as full exhibits [the various court orders] reflecting Judge Herndon's identification of the discovery orders, [the] bad faith conduct in breaching [the] same, and the consequences of that conduct.''

15   Although conceding that the scheduled witnesses lacked such personal knowledge, the plaintiff did indicate to the trial court that a particular corporate e-mail had identified Lehr as the ''father'' of a manuscript relating to dabigatran etexilate exposure, and that expert witnesses who had reviewed the materials produced by the defendants could testify that they had been unable to locate any version of that manuscript authored by Lehr. As discussed subsequently in this opinion, testimony to this effect was, in fact, ultimately presented to the jury.

16   The published version of that paper, which was admitted into evidence as a full exhibit, lists both Reilly and Lehr as authors, and indicates that both Reilly and Lehr ''contributed equally.''

17   The plaintiff's opening statement was accompanied by various slides that were shown to the jury. One such slide provided: ''We do not have the first version of the Pradaxa paper.''

18   In one e-mail, Reilly wrote that ''I am aware that the conclusions that appear to emerge from this paper are not the ones currently wished for by marketing (that dose adjustment will optimize therapy) ....'' In a separate string of e-mails discussing specific upper and lower blood concentration measurements, Reilly noted that he has ''been facing heavy resistance internally on this paper about the concept of a therapeutic range, at least stating it outright.'' In certain other communications discussing the need for blood monitoring with Pradaxa in specific populations, Andreas Clemens, the head of the department of medical affairs for dabigatran etexilate, wrote: ''This needs [to be] a TelCon and we should NOT interact via e-mail on this.'' All of this correspondence was admitted into evidence and placed before the jury for consideration.

19   The defendants sought to undercut this testimony on recross-examination by introducing a version of the exposure response paper that *Reilly* had characterized in an e-mail as the ''first draft.'' Plunkett later testified that she had specifically attempted to locate an earlier version of that paper from *Lehr* in light of an e-mail that identified Lehr as the ''father'' of the manuscript.

20   During oral argument on the defendants' motion for reconsideration, the plaintiff stated: ''[W]e wanted the record to be clear that [the] plaintiff has understood the court's instruction regarding the spoliation charge was that the plaintiff would not be offering evidence during the course of its case as to issues of spoliation or suppression of documents.... [T]o the extent that the court entertains the motion to [reconsider], we [do] not want to waive the right to put on such evidence by resting ....''

21   In response, the defendants posited during their closing argument that Reilly's testimony, together with various documents and correspondence, had disproved the existence of such a draft.

22   The plaintiff does not claim in the present appeal that the content of the trial court's ultimate instruction deviated in any material respect from her request.

23   The plaintiff argues that, in light of the trial court's decision to instruct the jury on spoliation, its decision to ''preclude counsel from commenting [on that issue] in any manner'' should be reviewed de novo. We disagree for two reasons. First, as set forth previously in this opinion, the plaintiff was permitted to introduce evidence regarding Lehr's research and his involvement with the exposure response paper. Second, to the extent that the plaintiff assails the scope of the remedy ultimately fashioned, we note that the imposition of sanctions for discovery misconduct is also vested in the sound discretion of the trial court. See, e.g., *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 70, 176 A.3d 1167 (2018); *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 28, 60 A.3d 222 (2013).

24   The trial court's exclusion of Barner's deposition testimony, like its pretrial ruling on the defendants' motion in limine, placed the plaintiff on notice that the trial court intended to hold her to the representations she had made in requesting

an adverse inference instruction. If the plaintiff believed that the instruction she had requested could not properly be considered in the absence of Barner's testimony, she could have withdrawn her request for the charge and sought to introduce evidence to prove the elements of spoliation under *Beers*. The plaintiff did not do so. See footnote 26 of this opinion.

25    We note that this well established legal principle also undercuts the plaintiff's claim that the trial court's restriction on closing arguments was unforeseeable.

26    The plaintiff also did not seek to revert to such a procedure after the trial court granted the defendants' motion in limine and denied her motion for permission to "inform" the jury of the issues relating to spoliation. Both of those rulings, which were made before the commencement of trial, clearly indicated that the court intended to severely restrict, if not entirely preclude, evidence and arguments relating to the defendants' destruction of Lehr's files.

27    The plaintiff raises two ancillary arguments warranting brief attention. First, the plaintiff argues that the trial court's decision to instruct the jury that an adverse inference was permissible as a matter of law merely relieved her of the burden of proving spoliation. That ruling, the plaintiff argues, should have done nothing to prevent her from informing the jury of the defendants' unlawful destruction of evidence. This argument ignores the fact that presenting such evidence to the jury would necessitate the very same "trial within a trial" that the court's decision to give an adverse inference instruction was, itself, expressly designed to avoid. Second, the plaintiff argues that the restrictions imposed by the trial court run contrary to a "strong public policy ... of seeking to deter spoliation by product liability defendants." We find this argument unpersuasive because the trial court, in fact, granted the plaintiff's requested form of relief for spoliation in the present case.

28    This conclusion is a relatively narrow one. This case does not require this court to determine whether a spoliation instruction was required, or whether the instruction ultimately provided to the jury was proper. See footnote 6 of this opinion. Simply put, we only conclude that, in light of the representations made to the trial court in seeking an instruction in the present case, the plaintiff cannot prevail on her claim that the trial court improperly precluded evidence and arguments related to spoliation.

29    The plaintiff argues that the trial court's ruling was based on the erroneous legal conclusion that rebuttal evidence must *directly* contradict testimony presented by the defendants. Our independent review of the record, however, has located no support for the contention that such a standard was applied in the present case.

30    The plaintiff does not argue that she was prohibited from calling additional expert witnesses to rebut the testimony from Schneller and Anderson on either the decedent's unrelated medical conditions or the results of the decedent's gastrointestinal bleed.

31    The plaintiff asserts that Corsico's recognition that a gastrointestinal bleed can lead to a fatal cascade was relevant and, indeed, crucial to proving her case. Specifically, the plaintiff argues that such testimony (1) would have helped to bolster her own evidence on causation, (2) would have precluded the defendants from making certain arguments in closing, and (3) was clearly important in light of the jury's ultimate verdict. None of these arguments, however, relates to whether the trial court erred by declining to admit Corsico's testimony *as rebuttal*. See, e.g., *Di Maio v. Panico*, 115 Conn. 295, 298, 161 A. 238 (1932) ("The rule upon this subject is a familiar one. When, by the pleadings, the burden of proving any matter in issue is thrown upon the plaintiff, he must, in the first instance, introduce all the evidence upon which he relies to establish his claim. He cannot, as said by Lord Ellenborough, go into half his case, and reserve the remainder." (Internal quotation marks omitted.)). Finally, the plaintiff argues that the trial court should have admitted Corsico's testimony because presentation of that evidence would not have taken much time. Although the trial court may well have been entitled to weigh that fact in reaching its decision; see *Gomeau v. Gomeau*, supra, 242 Conn. at 211, 698 A.2d 818; we decline to find an abuse of discretion on that basis alone.

32    The trial court also concluded that the defendants were entitled to summary judgment on this claim because Praxbind was a "different product as a matter of law and not a design element of Pradaxa." Because we conclude that the trial court properly granted the defendants' motion for summary judgment on federal preemption grounds, we need not consider this aspect of the trial court's ruling.

33    The court noted that the FDA retained authority to retrospectively reject such unilateral changes to the warnings, but the court declined to find impossibility preemption on that ground in the absence of "clear evidence" that the FDA would have done so. *Wyeth v. Levine*, supra, 555 U.S. at 571, 129 S.Ct. 1187. The plaintiff in the present case asserts that a recent United States Supreme Court case explaining that particular standard, *Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S. Ct. 1668, 203 L. Ed. 2d 822 (2019), stands for the broad proposition that impossibility preemption "only applies when a defendant can affirmatively show that it attempted to get the FDA to allow the safer alternative proposed by the plaintiff and the FDA affirmatively and officially rejected it." (Footnote omitted.) We disagree. The clear evidence

2020 WL 2121063, Prod.Liab.Rep. (CCH) P 20,887

standard in *Wyeth* applies only when a defendant seeks to prove that compliance with a state law obligation remains impossible *notwithstanding its ability to act unilaterally under federal law.* See *Gibbons* v. *Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) (describing "clear evidence" standard). The brand-name drug manufacturers in *Albrecht* and *Wyeth*, for example, could have satisfied their state law obligation to provide a label with an adequate warning by unilaterally making label amendments. See 21 C.F.R. § 314.70 (c) (6) (iii). No similar federal law would have permitted the defendants in the present case to market Praxbind unilaterally, and, as a result, *Albrecht* is inapposite.

34    The court reasoned: "To be sure, whether a private party can act sufficiently independently under federal law to do what state law requires may sometimes be difficult to determine. But this is not such a case. Before the [defendants] could satisfy state law, the FDA—a federal agency—had to undertake special effort permitting them to do so. To decide these cases, it is enough to hold that when a party cannot satisfy its state duties without the [f]ederal [g]overnment's *special permission and assistance,* which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for [preemption] purposes." (Emphasis added.) *PLIVA, Inc.* v. *Mensing,* supra, 564 U.S. at 623–24, 131 S.Ct. 2567.

35    Accepting the plaintiffs' argument, the court concluded, "would render conflict [preemption] largely meaningless because it would make most conflicts between state and federal law illusory. We can often imagine that a third party or the [f]ederal [g]overnment *might* do something that makes it lawful for a private party to accomplish under federal law what state law requires of it.... If these conjectures suffice to prevent federal and state law from conflicting for [s]upremacy [c]lause purposes, it is unclear when, outside of express [preemption], the [s]upremacy [c]lause would have any force." (Emphasis in original.) *PLIVA, Inc.* v. *Mensing,* supra, 564 U.S. at 620, 131 S.Ct. 2567; cf. footnote 33 of this opinion.

36    As a result of a comprehensive review commenced in 2005, the year after the plaintiff in *Bartlett* was prescribed sulindac, the FDA recommended the inclusion of such a warning in sulindac's label. See *Mutual Pharmaceutical Co.* v. *Bartlett,* supra, 570 U.S. at 478–79, 133 S.Ct. 2466.

37    We likewise reject the plaintiff's arguments relating to evidentiary admissibility and general foreseeability because they do not inform this analysis.

38    We note that courts in other jurisdictions considering related cases have reached the same conclusion. See *Ridings* v. *Maurice,* Docket No. 15-00020-CV-W (JTM), 2019 WL 4888910, *6 (W.D. Mo. August 12, 2019) (holding that plaintiffs' design defect claims were preempted "insofar as they are premised on the failure of Boehringer to develop, seek and obtain approval for and/ or market a reversal agent for Pradaxa sooner than it did" and noting that issue of feasibility was "immaterial"); *Chambers* v. *Boehringer Ingelheim Pharmaceuticals, Inc.,* Docket No. 4:15-CV-00068 (CDL), 2018 WL 849081, *13 (M.D. Ga. January 2, 2018) ("Regardless of when Boehringer started the process, Praxbind approval still required the FDA's 'special permission and assistance.' Boehringer could not unilaterally offer Praxbind to physicians. Therefore, initiating the process that *may* have led to Praxbind's approval does not enable Boehringer to comply with both federal and state law. Further, Boehringer was not required to cease production of Pradaxa until Praxbind was approved to comply with federal and state law.... Therefore, [the] [p]laintiff's design defect claim is also preempted. (Citation omitted; emphasis in original.)). But see *In re Xarelto (Rivaroxaban) Products Liability Litigation,* Docket No. 2592 (EEF), 2017 WL 1395312, *3 (E.D. La. April 13, 2017).

39    The plaintiff contends, in a conclusory fashion, that the trial court's legal conclusion on preemption was incorrect and that, as a result, the trial court improperly excluded evidence regarding certain correspondence between the defendants and the FDA discussing a 110 milligram dose of Pradaxa. Specifically, the plaintiff argues that, because the information contained within those documents shows that the defendants could have continued to pursue FDA approval of that lower dose, the trial court incorrectly concluded that the plaintiff's related, failure to test claim was preempted. For the reasons discussed previously in this opinion, this argument lacks merit. See footnote 35 of this opinion. To the extent that the plaintiff's brief implies evidentiary error on different grounds, we find those claims to have been inadequately briefed. See, e.g., *Connecticut Light & Power Co.* v. *Gilmore,* 289 Conn. 88, 124, 956 A.2d 1145 (2008).

40    The trial court aptly summarized the failure to test claims ultimately presented to the jury in its instructions as follows: "The plaintiff claims that [the defendants] failed to adequately test, study, and investigate Pradaxa's safety issues, specifically, that [the defendants]: (1) failed to study, test, and investigate plasma concentrations so as to maximize stroke prevention and minimize risk of bleeding relating to Pradaxa, and (2) failed to study, test, and investigate Pradaxa's relationship to gastrointestinal issues and gastrointestinal bleeding."

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit H

2020 WL 5835125

2020 WL 5835125
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Kimberly A. LYONS Individually,
as Next of Kin, and as Personal
Representative of the Estate of Cora
V. Underwood, Deceased, Plaintiff,

v.

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC., Defendant.

CIVIL ACTION FILE NO.: 1:18-CV-04624-WMR
|
Signed 09/29/2020

**Attorneys and Law Firms**

Charles Andrew Childers, Childers, Schlueter & Smith,
LLC, Atlanta, GA, Neal L. Moskow, Ury & Moskow LLC,
Fairfield, CT, for Plaintiff.

Ben J. Scott, Eric E. Hudson, Butler Snow O'Mara Stevens
& Cannada, Memphis, TN, Christopher Sean Berdy, Butler
Snow, LLP, Birmingham, AL, John James DeBoy, Shankar
Duraiswamy, Paul W. Schmidt, Covington & Burling, LLP,
Washington, DC, Mark A. Dreher, Orlando R. Richmond,
Sr., Pro Hac Vice, Butler Snow LLP, Ridgeland, MS, David
R. Helmick, Neal J. Callahan, Waldrep, Mullin & Callahan,
LLC, Columbus, GA, E. Righton Johnson Lewis, Butler
Snow LLP, Atlanta, GA, for Defendant.

**ORDER**

WILLIAM M. RAY, II, UNITED STATES DISTRICT
JUDGE

 **\*1** This matter now comes before the Court on Defendant's
Motion for Summary Judgment [Doc. 75], Defendant's
Motion to Exclude Certain Opinions of Laura Plunkett
[Doc. 76], Defendant's Motion to Exclude the Testimony of
Winston H. Gandy, M.D. [Doc. 77], Defendant's Motion to
Exclude Certain Opinions of Robert Gosselin [Doc. 78], and
Defendant's Motion to Exclude Certain Opinions of Glenn
Chertow, M.D. [Doc. 79]. The Court heard oral arguments on

June 1, 2020. After consideration of the parties' arguments,
the applicable law, and all appropriate matters of record, the
Court hereby **GRANTS** Defendant's Motion for Summary
Judgment [Doc. 75] and **DENIES** Defendant's Motions to
Exclude [Docs. 76, 77, 78, 79] as **MOOT**.

**I. FACTUAL BACKGROUND**
Plaintiff Kimberly A. Lyons, individually as next of kin
and as personal representative of the estate of Cora V.
Underwood, brings this civil action against Boehringer
Ingelheim Pharmaceuticals, Inc. ("Defendant") asserting
claims for damages arising out of Ms. Underwood's use of
Defendant's drug, Pradaxa. Plaintiff alleges failure to warn,
design defect, negligence, negligent misrepresentation and/or
fraud, fraudulent concealment, punitive damages, pre-death
injury and pain and suffering, and wrongful death.

 **A. Pradaxa's Regulatory History and FDA-Approved
Warnings**
Pradaxa (dabigatran) is a prescription medicine approved by
the U.S. Food and Drug Administration ("FDA") in October
2010 to reduce the risk of stroke and systemic embolism
in patients with non-valvular atrial fibrillation. [*See* Doc. 75-3
at p. 1].[1] Pradaxa is manufactured, marketed, and distributed
in the United States by Defendant. [Doc. 1 at p.3 ¶ 6].
Anticoagulants like Pradaxa impede the blood's ability to clot
and can prevent injuries such as strokes. [Doc. 75-19 at p. 2].
For this reason, anticoagulants also present the inherent risk
of serious bleeding. [*Id.*]

The FDA approved a 150 mg dose of Pradaxa for all
patient groups, but it rejected a lower 110 mg dose that was
approved in other countries. [Doc. 75-2 at p. 14 ¶ 50]. When
the FDA approved Pradaxa, it did not require that plasma
concentrations of the medicine be monitored by physicians.
[Doc. 75-12 at p. 44; Doc. 75-13 at p. 5 ("Follow-up of
anticoagulant activity is generally not needed"); Doc. 75-14].
Since Pradaxa was first approved by the FDA in October
2010, the medicine's label has consistently warned that
Pradaxa "can cause serious and, sometimes, fatal bleeding."
[Doc. 75-3; Doc. 75-31; Doc. 75-33, Doc. 75-47].

In this case, Plaintiff alleges that Defendant failed to
adequately warn physicians of the impact of Pradaxa plasma
concentrations (the level of Pradaxa in a patient's blood,
also referred to as "exposure") on bleeding risk and, based
on that impact, instruct physicians to monitor Pradaxa
plasma concentrations to confirm that patients do not have

2020 WL 5835125

concentrations that are excessive or outside a therapeutic range. [Doc. 1]. Additionally, Plaintiff alleges that Defendant failed to adequately warn that various patient characteristics —such as weight, age, gastrointestinal impairment, renal impairment, and usage of other medications—may increase bleeding risk due to their effect on Pradaxa plasma concentration levels. [*Id.*]

1. The FDA's Pre-Approval Understanding of Exposure Response Relationships and Its Rejection of Plasma Concentration Monitoring

**\*2** Defendant's pre-approval submissions to the FDA included detailed analyses of plasma concentration data. These submissions described the relationship between plasma levels, stroke risk, and bleed risk (also known as exposure-response analyses). [*See, e.g.*, Doc. 75-30 at p. 55 ("There was a strong relationship between dabigatran [Pradaxa] concentration and an increased probability of having a major bleed"); Doc. 75-11 at p. 34 ("The increase of trough total dabigatran [Pradaxa] concentration was associated with increased probability of having major bleeds") ]. These analyses also showed that as plasma concentrations increased, the risk of stroke decreased, but that this effect was more pronounced at lower plasma concentrations as opposed to higher plasma concentrations. [*See, e.g.*, Doc. 75-30 at p. 157 ("Increasing plasma dabigatran [Pradaxa] concentrations lowers the stroke risk, although at concentrations above 50 ng/mL this effect is modest") and p. 54 (noting that "the slope of the [stroke] curves decreases with increasing dabigatran plasma concentrations" and that "[t]here is relatively little difference in stroke risk across a wide range of higher dabigatran trough concentrations") ].

Defendant's pre-approval submissions to the FDA also described the effect of specific patient characteristics—such as age, gastrointestinal impairment, renal impairment, and accompanying use of P-gp inhibitors—on Pradaxa plasma concentrations and bleeding risk. [Doc. 75-11 at pp. 26-31, 71-78]. Prior to approving Pradaxa, the FDA reviewed Defendant's submissions, undertook its own independent analyses, and authored numerous memoranda detailing its multi-disciplinary review of the medicine's safety and efficacy. [*See, e.g.*, Doc. 75-12; Doc. 75-13; Doc. 75-28; Doc. 75-29; Doc. 95-13]. Like Defendant's pre-approval analyses, the FDA's independent pre-approval analyses found that increasing plasma concentrations were associated with an increased risk of bleeding. [Doc. 75-12 at pp. 18-20, 34].

The FDA's analyses also found, like Defendant's analyses, that increasing plasma concentrations were associated with a lower risk of stroke, though the FDA recognized that this effect was less pronounced at higher concentrations. [*Id.* at pp. 19-20, 58; Doc 75-37 at p. 133 ("[A]t the low concentrations the [stroke] risk] curve is steeper than at higher concentrations where it seems to flatten out a little bit more") ]. In addition, the FDA's pre-approval memoranda addressed the impact of patient characteristics like age, renal function, and concomitant medications on Pradaxa's safety. [*See, e.g.*, Doc. 75-12 at pp. 11-12, 25-27; Doc. 75-13 at p. 5; Doc. 75-29 at p. 7].

As part of its drug approval process, the FDA convened an Advisory Committee of independent experts to review Pradaxa's safety, recommended dosage, and efficacy. [Doc. 75-24; Doc. 75-29; Doc. 75-37]. At that meeting, both the FDA and Defendant presented their analyses of the relationship between plasma concentration and patient outcomes (i.e., risk of strokes and bleeds). [Doc. 75-37]. When one meeting participant raised the possibility of monitoring plasma levels, the FDA Pharmacometrics Reviewer, Dr. Kevin Krudys, responded that the FDA saw no need for such monitoring given Pradaxa's favorable safety-efficacy profile across all subgroups. [Doc. 75-37 at pp. 164-65].

On September 27, 2010, Defendant sent the FDA proposed labeling for Pradaxa and attached Pradaxa Proposed Prescribing Information. [Doc. 75-15; Doc. 75-16]. Defendant's proposed label included recommendations regarding use of the lower 110 mg dose for patients who present a high bleeding risk. [Doc. 75-16 at pp. 4, 10]. It also included language regarding the aPTT test, a blood test that approximates Pradaxa plasma concentrations and anticoagulant activity, stating that an "aPTT test maybe useful to assist in determining an excess of anticoagulant activity" and that "[a]n aPTT greater than 80 sec is associated with a higher risk of bleeding." [*Id.* at p. 5]. In response to Defendant's proposed label recommendations, however, the FDA rejected these proposed warnings. [Doc. 75-17; Doc. 75-18; *see also* Doc. 75-39] (FDA directing Defendant to "please delete all dabigatran 110 [mg] information" from the proposed label).

**\*3** On October 19, 2010, the FDA approved Pradaxa at a dose of 150 mg, without any requirement for monitoring plasma concentrations, adjusting doses, or treatment based on such measurements. [Doc. 75-14; Doc. 75-3; *see also*

Doc. 75-40 (expert testimony acknowledging that the FDA concluded that routine plasma concentration monitoring is not required for Pradaxa) ]. At the time of approval, the FDA approved Pradaxa's "launch label" which included the warning that "PRADAXA can cause serious and, sometimes, fatal bleeding." [Doc. 75-3 at p. 2]. Although the FDA-approved launch label did not contain any recommendation to monitor plasma concentrations, the label warned of the bleeding risk factors, including patient characteristics, that must be considered when prescribing Pradaxa. [*Id.* at pp. 3-4].

### 2. Post-Approval Discussions on Plasma Monitoring

Following Pradaxa's approval, Defendant continued to analyze the relationship between Pradaxa plasma concentrations and stroke and bleed risk. In 2012, a number of computer simulation analyses were performed "to explore whether exposure measurement using trough plasma concentration might further improve Pradaxa's "positive benefit-risk balance." [Doc. 75-44 at p. 6]. In reviewing this data, Defendant's experts concluded that the simulations had limitations and were unable to accurately predict the dose-response difference between the 110mg and 150mg dose benefit-risk factors seen in a "RE-LY" trial. [Doc. 75-26 at p. 21; Doc. 95-9 at pp. 6-8; Doc. 95-10 at pp. 7-8]. Subsequently, Defendant provided an explanation and analysis of the dose titration simulations to the European Medicines Agency (EMA) as well as to the FDA. [Doc. 75-42; Doc. 75-43]. The EMA "endorsed" Defendant's conclusion that the simulations had "limitations" that rendered them unable to predict actual patient outcomes or the dose-response difference between the 110 mg and 150 mg doses of Pradaxa (dabigatran), and Defendant shared the EMA's conclusion with the FDA. [Doc. 75-26, particularly at p. 22].

Additionally, in February 2014, Defendant's scientist Dr. Paul Reilly, along with other scientists involved in the RE-LY trial, published a research paper (hereinafter "the Reilly Paper") on the effect of Pradaxa (dabigatran) plasma concentrations and patient characteristics on the frequency of ischemic stroke and major bleeding in atrial fibrillation patients. [Doc. 75-25]. The Reilly paper showed that plasma concentrations increased with age and that bleed risk increased as plasma concentrations increased. The Reilly paper also showed that the risk of stroke decreased as plasma concentrations increased, although this effect was less pronounced at the higher concentration levels. [*Id.* at pp. 4-327]. In the Reilly paper, the scientists considered whether

the exposure-response analysis could suggest a therapeutic range and what that range might be, but ultimately, they reached the conclusion that "[t]here is no single plasma concentration range that provides optimal benefit-risk for all patients." [Doc. 75-25 at p. 9]. This conclusion was consistent with the FDA's pre-approval statements that the exposure-response analyses did not suggest a need for monitoring plasma concentrations and adjusting dosage. [Doc. 75-37 at p. 165 ("we didn't see a need for ... monitoring the concentration because we saw in a study, favorable results in all subgroups") ].

### 3. The FDA's Continued Rejection of Plasma Monitoring and Plaintiff's Other Warning Criticisms

In the decade since Pradaxa's approval, the FDA has approved Pradaxa's U.S. labeling on nineteen separate occasions. None of those labels recommend plasma monitoring. [*See e.g.*, Doc. 75-3; Doc. 75-31; Doc. 75-33, Doc. 75-47; *see also* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.proces s & applno=022512]. During this time, the FDA has issued numerous statements reaffirming Pradaxa's safety and efficacy when used as directed by the U.S. label, without any requirement for plasma monitoring or dose adjustment. [*See* Doc. 75-19 at p. 4 ("We are constantly examining patient safety data and conducting other surveillance activities after products are on the market to ensure that the labels reflect current knowledge with regard to benefits and risks.... Based on this evaluation [of new reports], FDA has not changed its recommendations regarding the use of Pradaxa; it provides an important health benefit when used as directed"); Doc. 75-20 at p. 2 ("As a result of our latest findings [regarding bleed risk in older patient populations], we still consider Pradaxa to have a favorable benefit to risk profile and have made no changes to the current label or recommendations for use"); Doc. 75-21 at p. 3 (article by three FDA authors on post-marketing reports of bleeding, concluding that "[w]e believe that dabigatran provides an important health benefit when used as directed"); Doc. 75-22 at p. 3 (FDA update of risk of serious bleeding, stating that "FDA has not changed its recommendations regarding Pradaxa. Pradaxa provides an important health benefit when used as directed. Healthcare professionals who prescribe Pradaxa should carefully follow the dosing recommendations in the drug label ... to reduce the risk of bleeding") ].

**\*4** In October 2015, after receiving a large number of reports of bleeding among Pradaxa users, the FDA published an

article comparing the various anticoagulant drugs that are used in treating atrial fibrillation. [Doc. 75-19]. In the article, the FDA noted that, when compared to patients who were new users of warfarin, new users of Pradaxa had lower risks of clot-related stroke, bleeding in the brain, and death, but an increased risk of major gastrointestinal bleeding, which was consistent with observations from the large clinical trial used to approve Pradaxa. [*Id.* at p. 4]. The FDA further noted that the "freedom from the need to have periodic blood test monitoring" was one of Pradaxa's principal advantages" over warfarin. [*Id.* at p. 3].

Additionally, in 2018, a "Think-Tank" meeting sponsored by the FDA and the Cardiac Safety Research Consortium ("CSRC") convened to discuss whether laboratory monitoring and dose adjustment to customize drug exposure would improve the safety and efficacy of novel oral anticoagulants (such as Pradaxa) in patients with atrial fibrillation. [Doc. 75-48]. Following this meeting, four senior FDA scientists co-authored an article along with several other scientists summarizing their findings. [Id.] In this article, the scientists acknowledged that the consensus position is that "[r]outine PK-PD measurements to guide NOAC [novel oral anticoagulant] dosing cannot currently be recommended." [*Id.* at p. 9].

(a) Effects of Age

The record shows that Defendant submitted detailed information regarding the impact of increasing age on Pradaxa plasma concentrations and bleeding rates to the FDA prior to approval. [*See, e.g.*, Doc. 75-11 at p. 27 (discussing age effects on Pradaxa plasma concentrations), and at p. 71 (discussing the increased rate of major bleeding as age increases). The FDA also conducted its own pre-approval review of the impact of age on Pradaxa plasma concentrations and patient outcomes. [Doc. 75-12 at p. 25 (recognizing increase in Pradaxa plasma concentrations with increasing age); Doc. 75-28 at p. 127 (discussing perceived increased bleeding risk in older patients and finding that there is no reason to adjust dose in the elderly).

After the FDA's approval of Pradaxa, Defendant continued to provide the FDA with additional information regarding the medicine's safety—including more recent exposure-response and dose-titration analyses. [*See* Doc. 75-42; Doc. 75-43; Doc. 75-45; Doc. 75-26]. At the time Ms. Underwood was

prescribed the medicine, the label warned about increased bleeding risk with age. [Doc. 75-31 at p. 8].

(b) Effects of Renal Impairment

Before approval, BI and the FDA also repeatedly analyzed the clinical data as it relates to renal function, including the impact of mild to moderate renal impairment on plasma concentrations and bleeding risk. [*See, e.g.*, Doc. 75-11 at pp. 51, 73-74] (presenting bleed and stroke data for Pradaxa 150 mg versus warfarin, a similar drug, in patients with mild and moderate renal impairment, and concluding that "[d]ecreasing renal function is associated with decreasing advantages of dabigatran over warfarin in the rate of major bleeding"); Doc. 75-12 at pp. 11-12, 26-27 (analyzing increase in exposure to dabigatran in patients with mild and moderate renal impairment).

After the FDA's approval of Pradaxa, Defendant continued to provide the FDA with additional information regarding the medicine's safety—including more recent exposure-response and dose-titration analyses. [*See* Doc. 75-42; Doc. 75-43; Doc. 75-45; Doc. 75-26]. At the time Ms. Underwood was prescribed Pradaxa, the label warned about the impact of renal impairment on exposure to Pradaxa and the importance of assessing renal impairment. [Doc. 75-31 at p. 13].

(c) Drug interaction between Pradaxa and P-gp inhibitors

**\*5** Simvastatin is a medication that is prescribed to treat patients with high cholesterol. It is one of many medications known as a P-gp inhibitor because it inhibits the transport of P-glycoproteins. [Doc. 75-11 at 29, 53]. Prior to the approval of Pradaxa, Defendant informed the FDA that "eight studies assessed potential interactions with various P-gp inhibitors, substrates or inducers." [Doc. 75-30 at pp. 46-50]. Defendant shared with the FDA its conclusions that concomitant use of P-gp inhibitors can increase Pradaxa plasma concentrations and, therefore, increase the risk of bleeding. [*Id.* at p. 156 ("Several Phase I studies demonstrated that there was an interaction with increased exposure to dabigatran [with] various P-gp inhibitors" and the "risk for increased bleeding due to an increased dabigatran exposure with administration of P-gp inhibitors cannot be ruled out") and at p. 49 (table showing the percentage of increased risk of major bleeding with P-gp inhibitor co-medication) ].

2020 WL 5835125

The FDA analyzed Pradaxa's potential interaction with P-gp inhibitor medications, ultimately concluding that there is "an interaction liability of dabigatran and ... P-gp inhibitors." [Doc. 75-12 at p. 33]. At the time Ms. Underwood was prescribed Pradaxa, the label warned that "P-gp inhibition and impaired renal function are the major independent factors that result in increased exposure to dabigatran." [Doc. 75-31 at pp. 7, 13]. In 2012, Defendant twice sought to provide additional warnings that P-gp inhibitor co-medication increases the risk of bleeding, but the FDA rejected Defendant's proposals, stating that P-gp inhibition is an "independent risk factor[ ] for bleeding" that "do[es] not need to be called specifically in the label." [Doc. 75-34 at p. 2].

Thus, the record is clear that, after Pradaxa's approval, Defendant continued to provide the FDA with additional information regarding the medicine's safety—including the very exposure-response and dose-titration analyses that Plaintiff claims constituted "newly acquired information." Having had this information in its possession for years, the FDA has taken no action to update Pradaxa's labeling to require plasma monitoring or dose-titration—as would be the FDA's responsibility if it was concerned about patient safety—reflecting a rejection of the substance of Plaintiff's proposed warnings. See 21 U.S.C. § 355(o)(4) (requiring the FDA, if it "becomes aware of new safety information" that it "determines should be included in the labeling," either from a manufacturer's submission or through its own monitoring of adverse event reports, to notify the manufacturer and initiate a process to institute a labeling change, even over the manufacturer's objection).

### B. Ms. Underwood's Use of Pradaxa

Ms. Underwood began taking Pradaxa on January 25, 2016. At that time, she was 75 years old and was already taking the P-gp inhibitor Simvastatin. [Doc. 75-4 at pp. 3-4 - Interrogatory Responses Nos. 2-3; Doc. 75-50 at p. 15, transcript page no. 53; Doc. 75-8 at p. 4]. The prescribing physician, cardiologist Kuchela Reddy, M.D., testified that he knew and understood the risks and warnings associated with Pradaxa when he prescribed the drug for Ms. Underwood. [Doc. 75-50 at pp. 13-14, transcript page nos. 43-47 (dosing guided by renal function); id. at pp. 15-16, transcript page nos. 50-53 (risk of bleeding and potentially fatal bleeding event, renal impairment could increase bleeding risk, concomitant use of certain other drugs could increase bleeding risk, bleeding risk increased with age) ]. Knowing all of this, Dr.

Reddy also understood Pradaxa does not require monitoring of blood plasma levels. [Id. at p. 14, transcript page no. 48].

After an assessment of Ms. Underwood's renal function indicated that she had a normal creatinine clearance, Dr. Reddy prescribed Pradaxa in the 150 mg dose according to the recommended Pradaxa dosing instructions. [Doc. 75-50 at pp. 13-14, transcript page nos. 42-47; id. at p. 15, transcript page no. 51; id. at pp. 24-25, transcript page nos. 89-90; id. at p. 56, transcript page nos. 215-217].[2]

**\*6** On March 17, 2016, Ms. Underwood was admitted into Intensive Care Unit of the Piedmont Henry Hospital, where she was diagnosed as having a cardiac tamponade. [Doc. 75-5 at p. 5, transcript page nos. 10-12]. A cardiac tamponade occurs when the presence of fluid in the pericardial sac around the heart (a pericardial effusion) reaches a level of pressure that acutely interferes with the heart's ability to pump blood throughout the body. [Doc. 75-6 at p. 13, transcript page nos. 42-44]. She was evaluated by Dr. Gregory Erdelyan, who later performed a pericardial window procedure and "removed between six and 700 CC's of ... bloody pericardial fluid." [Doc. 75-7 at p. 5, transcript page no. 10; id. at p. 14, transcript page no. 49]. Following the procedure, Ms. Underwood received two doses of Praxbind, the product-specific reversal agent for Pradaxa. [Doc. 75-5 at pp. 14-15, transcript page nos. 49-50]. A few days later, Ms. Underwood improved and was transferred out of ICU. [Doc. 75-6 at p. 40, transcript page no. 153]. However, subsequent testing indicated that she was still "over-anticoagulated." [Doc. 75-8 at p. 5]. On March 26, 2016, Ms. Underwood died. [Doc. 75-5 at p. 5, transcript page nos. 11-13]. Ms. Underwood's death certificate indicates that the immediate cause of death was "multisystem organ failure due to, or as a consequence of, cardiac tamponade." [Doc. 75-9].

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A defendant who moves for summary judgment must support its motion with evidence that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the defendant discharges its burden of showing an absence of evidence to support the plaintiff's case, the burden then shifts to the nonmoving party to "respond with evidence sufficient to withstand a directed verdict motion at trial." Id. In determining whether

PAS-L-002011-20    10/16/2020 3:16:53 PM    Pg 72 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC    Document 1-1    Filed 01/29/21    Page 130 of 248 PageID: 139
Lyons v. Boehringer Ingelheim Pharmaceuticals, Inc., --- F.Supp.3d ---- (2020)

2020 WL 5835125

a genuine dispute of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is relevant or necessary to the outcome of the suit. *Id.*

## III. <u>ANALYSIS</u>

Plaintiff brings various causes of action premised around the allegation that Defendant failed to adequately warn of certain risks of its anticoagulant drug Pradaxa. Plaintiff's claim is that Defendant failed to adequately warn physicians that the blood plasma concentrations of Pradaxa should be monitored. Plaintiff also alleges that Defendant failed to adequately warn about the impact of various patient characteristics—such as age, renal impairment, and concomitant Simvastatin use—on Pradaxa plasma concentrations and bleed risk. [*See* Doc. 1].

Having considered the parties' arguments on motion for summary judgment, the Court concludes that Plaintiff's failure to warn, negligence, negligent misrepresentation/fraud, and fraudulent concealment claims are preempted by federal law, for two independent reasons. First, Plaintiff has not met her burden of showing "newly acquired information" supporting her warning criticisms. This is information that was "not previously submitted to the [FDA]" and that "reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). Second, the FDA's repeated rejection of the need for plasma monitoring and dose adjustment based on plasma levels constitutes "clear evidence" that the FDA would have rejected Plaintiff's proposed warnings. Indeed, three separate courts in four different cases have concluded that claims similar to the ones at issue in this case are preempted. *See Roberto v. Boehringer Ingelheim Pharm., Inc.*, No. CPL-HHD-CV-16-6068484-S, 2019 WL 5068452 at *21 (Conn. Super. Ct. Sept. 11, 2019); *Pradaxa Cases (Lawson)*, No. CJC-16-004863, 2019 WL 6043513, at *3-4 (Cal. Super. Ct. Nov. 8, 2019); *Adkins v. Boehringer Ingelheim Pharm., Inc.*, No. HHD-CV-16-6065131-S, slip opinion at 16–21, 23–25, 2020 WL 1890681 (Conn. Super. Ct. Mar. 13, 2020) ("*Adkins* Order"), ECF No. 98-1; *Ridings v. Maurice*, 444 F.Supp.3d 973, 997–99 (W.D. Mo. 2020). This Court agrees with the general reasoning of the above cases in holding that Plaintiff's warning claims are preempted here.

**\*7** The Court also concludes that Defendant is entitled to summary judgment on Plaintiff's design defect claim because she has no evidence of defective design or design defect causation.

Finally, as a result of these rulings, Defendant is entitled to summary on Plaintiff's claims for wrongful death, damages for pre-death pain and suffering, and punitive damages.

### A. Preemption

The doctrine of federal preemption has origins stemming from the Supremacy Clause of the United States Constitution. U.S. CONST. art. VI, cl. 2. This doctrine generally means that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623–24, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). Accordingly, state-law failure-to-warn claims are preempted if FDA approval is needed to add the warning that a plaintiff alleges state law requires. See *Wyeth v. Levine*, 555 U.S. 555, 568, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); *Mensing*, 564 U.S. at 623–24, 131 S.Ct. 2567. "Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application." *Levine*, 555 U.S. at 568, 129 S.Ct. 1187. However, manufacturers can unilaterally add a warning under the "changes being effected" (CBE) regulation. 21 C.F.R. § 314.70(c)(6)(iii). This regulation "allows drug manufacturers to change [a label] without the FDA's preapproval if the changes.. 'reflect newly acquired information.' " *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) (quoting 21 C.F.R. § 314.70(c)(6)(iii)).

The FDA nonetheless "retains authority to reject labeling changes" made through the CBE process. *Levine*, 555 U.S. at 571, 129 S.Ct. 1187. Accordingly, even if newly acquired information exists, a manufacturer can still establish impossibility preemption through "clear evidence that the FDA would not have approved a change" to the label. *Id.*

The Court's preemption analysis proceeds in two steps. "First, the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without FDA approval." *See Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644; *see also Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S. Ct. 1668, 1679, 203 L.Ed.2d 822 (2019) (recognizing that a drug manufacturer can change a drug's label through the CBE process if there is "newly

2020 WL 5835125

acquired information" to justify the label change) (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)). However, "newly acquired information" is not only new data, but can also mean "new analyses of previously submitted data". 73 Fed. Reg. 49604; Levine, 555 U.S. at 569, 129 S.Ct. 1187 (stating that "if the sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.' "). Absent such a showing, Plaintiff's claims are preempted.

Second, "a manufacturer may still—even after the plaintiff has identified 'newly acquired information'—establish impossibility preemption through 'clear evidence that the FDA would not have approved a change' to the label." See Utts, 251 F. Supp.3d at 661 (quoting Wyeth, 555 U.S. at 571, 129 S.Ct. 1187); see also Albrecht, 139 S. Ct. at 1672.

*8 Plaintiff argues that while the Judge must decide the factual question of whether the FDA would not have approved a change under Albrecht, the newly acquired information is an issue of fact for the jury. Id. However, this Court finds that in order to answer the former question, the latter must also be answered by the Judge. Like all other court's that have addressed this question post-Albrecht, this Court finds that both the "newly acquired information" and "FDA action" questions are for a Judge to decide, not a jury. See Roberto, 2019 WL 5068452, at *21; Pradaxa Cases, 2019 WL 6043513, at *3-4; Adkins Order at 16-21, 23-25 [Doc. 98-1]; Ridings, 444 F.Supp.3d at 997–99. Because "a judge, not the jury, must decide the pre-emption question," the Court " 'may have to resolve subsidiary factual disputes' that are part and parcel of the broader legal question." See Albrecht, 139 S. Ct. at 1676; see also id. at 1680 (explaining that factual issues do not "warrant submission alone or together with the larger pre-emption question to a jury" because "these factual questions [are] subsumed within an already tightly circumscribed legal analysis").

### 1. No Newly Acquired Information

Plaintiff has not met her burden of showing that Defendant possessed newly acquired information that would have enabled it unilaterally to change Pradaxa's labeling after the FDA's October 2010 approval and before Ms. Underwood's alleged March 2016 injury. "Newly acquired information is data, analyses, or other information not previously submitted

to the Agency" that "reveal[s] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). Newly acquired information "cannot be rooted in conjecture or hypothesis. Rather, it must conclusively establish, by scientifically valid measurable and statistically significant data, that the different or increased risks are actual and real." Pradaxa Cases, 2019 WL 6043513, at *3. Additionally, Plaintiff must show that BI acquired the new information before Ms. Underwood's alleged injury. See id. at *4; Roberto, 2019 WL 4806271, at *14, 19 n.36.

### (a) The Reilly Exposure-Response Paper and Schumacher Analysis

Plaintiff claims the Reilly paper constitutes newly acquired information, but every court to address this argument post-Albrecht has rejected it. See Ridings, 444 F.Supp.3d at 985–87, 995–98; Adkins Order at 24, ECF No. 98-1; Pradaxa Cases, 2019 WL 6043513, at *3 n.6; Roberto, 2019 WL 5068452, at *15–17. For similar reasons, this Court concludes that the Reilly paper is not newly acquired information.

First, the FDA was already "well aware" of the "correlation between plasma levels and bleed risk" reported in the Reilly paper. [Doc. 75-12 at 18-19, 33]. The paper did not reveal any "risks of a different type or greater severity or frequency." Roberto, 2019 WL 5068452, at *17; see also Ridings, 444 F.Supp.3d at 1000 n.34 ("[T]he FDA was aware of this correlation dating back to the original Boehringer submissions for Pradaxa in 2010."). The FDA also understood the relationship between plasma concentrations and stroke risk prior to approval. Adkins Order at 23-25 ("[T]o the extent that the plaintiff correctly interprets the Reilly article as finding no significant stroke prevention benefit at higher doses, that finding does not differ from the FDA's information, which found only a 'gradual' or 'minimal' stroke reduction benefit at higher concentrations without finding statistical significance. Thus, the Reilly study does not 'reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.' ") (citation omitted).

Second, the Reilly paper's conclusion that "[t]here is no single plasma concentration range that provides optimal benefit-risk for all patients" is squarely in line with the FDA's pre-approval conclusion that plasma monitoring is not necessary.

*See Ridings*, 444 F.Supp.3d at 997 (quoting Reilly paper [Doc. 75-25 at 328] ).

**\*9** Third, Defendant published the paper and submitted it to the FDA nearly two years before Plaintiff's alleged injury in March 2016. [Doc. 95-17 at 48-51]; *see also Ridings*, 444 F.Supp.3d at 986. As a result, it cannot be newly acquired information because it was "previously submitted to the [FDA]." 21 C.F.R. § 314.3(b).

Nor do the early drafts or emails reflecting preliminary discussions about the Reilly paper and the underlying analyses cited by Plaintiff constitute newly acquired information. [*See* Doc. 87 at 27-29]. These documents simply reflect an ongoing scientific dialogue regarding proposed revisions to drafts of the paper and, at best, preliminary conclusions about the meaning of the data and analysis. They do not constitute new data or analyses substantiating a different or greater risk with unmonitored Pradaxa. *See Roberto*, 2019 WL 5068452, at \*16 ("These preliminary discussions do not provide reliable evidence of new risks. They are essentially uncorroborated trial balloons.... [U]ltimately, a preliminary opinion or dissenting voice is just that—it is not a final opinion").

Finally, the email from Defendant's scientist Dr. Helmut Schumacher referenced by the Plaintiff [Doc. 87, Ex. 610] does not qualify as newly acquired information. That email reflects early "exploratory analyses" of what would become the Reilly paper. *Id.* Additionally, this email was written before the modeling analysis was completed. [Doc. 95-7 (the modeling continued into 2012) ]. The email reflects one scientist's interpretation based on an incomplete analysis of substantially similar data that was submitted to the FDA previously.

(b) Patent Application

The simulations conducted by Defendant in 2012, and subsequently explained to the FDA, reflect preliminary efforts to "explore whether exposure measurement ... might further improve" Pradaxa's "positive benefit-risk balance." [Doc. 75-44]; [Doc. 75-1]. Based on these preliminary efforts, Defendant filed a patent application regarding the general idea of adjusting doses based on plasma levels. But after further analysis, Defendant concluded that the preliminary computer simulations were statistically unreliable and that the data could not support the theory. [Doc.

95-9 at 529-531; Doc. 95-10 at 1092-1093; Doc. 75-43]. Defendant ultimately withdrew its application patent due to the unreliable data. Thus, this Court finds that the patent application was not newly acquired information, but just a failed opinion. [*See* Doc. 75-44; *see also Ridings*, 444 F.Supp.3d at 996 (explaining that "Boehringer's computer simulation testing was a bad idea that simply did not pan out. It does not constitute newly acquired evidence under the CBE regulation").

(c) European Label

Plaintiff argues that the European warning label for Pradaxa is significantly different from the one approved by the FDA. Due to this, Plaintiff argues that this constitutes newly acquired information that should have prompted Defendant to unilaterally change the label the U.S. label of Pradaxa. While evidence may exist that supports the European label's differences, substantially similar evidence was presented to the FDA and it decided not to give the same warning. Accordingly, Defendant is still entitled to rely upon the defense of federal preemption. "[I]nformation previously submitted to the FDA is preempted because the CBE regulation cannot be used to make a label change based on such information." *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 185 F.Supp.3d 761, 769 (D.S.C. 2016); *see also Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018) (newly acquired information claim "fails because the undisputed evidence shows that the FDA was aware of the nature of the data it received"); 21 C.F.R. § 314.3 ("Newly acquired information is data, analyses, or other information not previously submitted to the Agency").

**\*10** This Court concludes that warnings approved for a foreign label are not newly acquired evidence when they are based on substantially similar evidence. Furthermore, foreign drug labels are based on different regulatory standards. "The mere existence of a differently structured and written European label does not establish that the U.S. label is insufficient, misleading, or legally inadequate." *McDowell v. Eli Lilly & Co.*, 2015 WL 845720, op. at \*5 (S.D.N.Y. Feb. 26, 2015); *see also Meridia Prod. Liability Litigation v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006) (the fact that "the warning label for [the drug's] European equivalent contained more detailed instructions for the treating physician" was not enough for the U.S. label to be declared inadequate).

(d) Medical Literature

Plaintiff cites various articles in medical literature, but none of these articles constitutes newly acquired information. Plaintiff's response brief references seven articles, [Doc. 87 at 38], but Plaintiff fails to explain how any of these articles "reveal a risk of a different type or greater severity or frequency than previously included in submissions to FDA" under 21 C.F.R. § 314.3(b).

The Chin paper, published in 2014, "proposed a 'potential dosing algorithm' in which '[a]nticoagulant tests can be used to check for excessive effect' in certain patient subgroups after dosing based on certain patient characteristics like renal function." Ridings, 444 F.Supp.3d at 987 (quoting Paul K.L. Chin, et al., A Proposal for Dose-Adjustment of Dabigatran Etexilate in Atrial Fibrillation Guided by Thrombin Time, 78(3) Brit. J. Clin. Pharm. 599-609 (2014). However, this is a proposal based upon substantially similar data that was previously available to the FDA, for which it found a "gradual" or "minimal" stroke reduction benefit at higher concentrations and still concluded monitoring was not necessary. Adkins Order at 23-25 (citation omitted). Differing conclusions of the Chin paper and the FDA scientists based upon substantially similar data does not constitute newly acquired information.

The Reiffel article discusses a potential "sweet spot" based on the same data regarding the relationship between plasma concentration and bleed risk that was known to the FDA prior to Pradaxa's approval. See Roberto, 2019 WL 5068452, at *25 n.12. Moreover, the Reiffel article recognized that whether such monitoring "should be used to guide NOAC dosing remained unresolved or at least without consensus," pending "further discuss[ion] in a follow-up CSRC think tank meeting." James A. Reiffel et al., NOAC Monitoring, Reversal Agents, and Post-Approval Safety & Effectiveness Evaluation: A Cardiac Safety Research Consortium Think Tank, 177 Am. Heart J. 74, 82 (2016). Due to the inconclusive nature of this article and data already known to the FDA, it cannot be used as newly acquired information. Overall, a close comparison of the documents relied upon by Plaintiff, including but not limited to the two articles above, with the information that Defendant submitted to the FDA prior to approval and before Ms. Underwood's alleged injury, reveals no newly acquired information that would have allowed Defendant to change its warnings to require plasma monitoring without FDA approval.

This conclusion is reaffirmed by the 2018 Chan paper, the FDA's most recent statement on plasma monitoring. In the Chan paper, which post-dates Defendant's Reilly paper, the internal discussions leading up to the Reilly paper, the company's dose titration modeling and patent application/withdrawal, and the European label, the FDA concluded that "[r]outine PK-PD measurements to guide NOAC dosing cannot currently be recommended" due to "lack of clinical evidence of benefit" and "lack of data to guide appropriate dosing." [Doc. 75-48 at 66]. This reflects the FDA's judgment that no newly acquired information exists to recommend plasma monitoring. See Roberto, 2019 WL 5068452, at *19 (considering the Chan paper, "the court cannot conclude that there is any newly acquired information concerning blood monitoring").

2. Evidence FDA Would Not Have Approved Change in Warning

  *11  This Court concludes, using the analysis set forth above, that Defendant has established through "clear evidence that the FDA would not have approved a change." Wyeth, 555 U.S. at 571, 129 S.Ct. 1187. Additionally, based on the same data and analyses that Plaintiff uses as a basis for their warning label criticisms, the FDA has twice rejected Defendant's proposal to warn that the risk of bleeding is increased in elderly patients who are also taking P-gp inhibitors. The FDA rejected Defendant's proposal and by stating that "all independent risk factors for bleeding ... do not need to be called specifically in the label" because "we do not want [the label] to become too long to be useful." [Doc. 75-34 at p. 2]. The FDA's repeated refusal to allow Defendant to warn that P-gp inhibitor co-medication is a risk factor for bleeding constitutes clear evidence that the FDA would have rejected the warning the Plaintiff seeks. [See Doc. 75-32; Doc. 75-33; Doc. 75-34].

Finally, using the aforementioned Chan paper [Doc. 75-48], the FDA has further indicated as recently as 2018 that there is a "lack of clinical evidence of benefit" and "lack of data to guide appropriate dosing" with regards to plasma monitoring. [Doc. 75-48 at 66]. While this study was published after the Plaintiff's injury, it further shows the FDA's consistency in its intial conclusions with regard to plasma monitoring and shows the FDA would have rejected the warning the Plaintiff seeks.

PAS-L-002011-20   10/16/2020 3:16:53 PM  Pg 76 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 134 of 248 PageID: 143
Lyons v. Boehringer Ingelheim Pharmaceuticals, Inc., --- F.Supp.3d ---- (2020)

2020 WL 5835125

3. Patient-Specific Failure to Warn Claims

Plaintiff alleges that Defendant failed to warn that Ms. Underwood's specific patient characteristics—increased age, renal impairment, and concomitant simvastatin use—increased her risk of bleeding because they made her more likely to have high plasma concentrations. *See, e.g.,* [Doc. 77-2; Doc 77-3].

The Court concludes that Plaintiff's patient-specific warning claims are also preempted. Plaintiff has presented no data or analyses regarding the use of Pradaxa in these groups that demonstrates a different or greater risk than the risks the FDA was already aware of based on Defendant's previous submissions upon which the FDA based their approval decision. *See* 21 C.F.R. § 314.3(b).

Furthermore, these patient characteristics are only relevant insofar as they impact plasma concentration levels, so these claims are preempted for the same reasons as the overall plasma concentration labeling theory. *See Pradaxa Cases, 2019 WL 6043513, at \*4* (ruling that plaintiff's "additional patient-specific risk factors ... are covered by [p]laintiff's plasma concentration theory" and preempted for the same reasons).

**B. Plaintiff's Design Defect Claims**

Under Georgia law, Plaintiff must show, through expert testimony, that the product was defective and that the defect was the proximate cause of the alleged injury. *Silverstein v. Procter & Gamble Mfg. Co.,* 700 F. Supp. 2d 1312, 1316 (S.D. Ga. 2009); *see also* Ga. Code Ann. § 51-1-11(b)(1) (manufacturer may be liable where the product's "condition when sold is the proximate cause of the injury sustained"). Georgia courts have adopted the risk-utility analysis to determine whether a manufacturer should be liable for an allegedly defectively designed product. *Banks v. ICI Americas, Inc.,* 264 Ga. 732, 450 S.E.2d 671, 675 (1994). A "non-exhaustive list of general factors" is usually considered by court's when conducting this analysis:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured;

> the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

**\*12** *Id.* at 675, n.6.

Defendant argues that Plaintiff has no proof of any defect in the design of Pradaxa, cannot show that a defect in Pradaxa's design caused her alleged injuries, and that the basis of her claim is failure-to-warn, not a defect in the actual design of Pradaxa.

In response, Plaintiff argues that Georgia law permits warning defects to be considered as part of the risk-utility analysis and that her claim should therefore survive summary judgment. However, Plaintiff's argument shows that the basis of her claims actually involves the adequacy of Pradaxa's warning label, not any defect or deficiency in the chemical composition or formulation of the drug itself. Additionally, the Plaintiff has not put forward a "safer alternative design" to Pradaxa, something the Supreme Court of Georgia has described as the "heart of [proving] a design defect case" under Georgia law. *See Jones v. NordicTrack, Inc.,* 274 Ga. 115, 550 S.E.2d 101, 118-19 (2001). As Plaintiff has failed to support allegations of some design defect in Pradaxa with any evidence, and these claims are dismissed.

**C. Claims for Wrongful Death, Damages for Pain and Suffering, and Punitive Damages**

Plaintiff's claims for wrongful death, damages for pre-death pain and suffering, and punitive damages are premised on and a derivative of her underlying claims. As summary judgment is granted in favor of Defendant as to the underlying claims based on the analysis set forth above, the derivative claims are also dismissed. *See Anderson v. Dunbar Armored, Inc.,* 678 F. Supp. 2d 1280, 1335 (N.D. Ga. 2009); *see also United Health Servs. of Ga., Inc. v. Norton,* 300 Ga. 736, 797 S.E.2d 825, 827 (2017) (holding that it is "longstanding precedent that a wrongful death action is wholly derivative of a decedent's right of action"); *Mowell v. Marks,* 269 Ga.App. 147, 603 S.E.2d 702, 704 (2004) ("A survivor cannot recover for the decedent's wrongful death if the decedent could not have recovered in his or her own right").

**D. Defendant's Motions to Exclude Testimony**

The Court has concluded that Defendant is entitled to summary judgment based on the analysis set forth above. As the testimony that Defendant seeks to exclude has no bearing

PAS-L-002011-20   10/16/2020 3:16:53 PM  Pg 77 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC  Document 1-1  Filed 01/29/21  Page 135 of 248 PageID: 144
Lyons v. Boehringer Ingelheim Pharmaceuticals, Inc., --- F.Supp.3d ---- (2020)

2020 WL 5835125

on that analysis, Defendant's various motions to exclude that testimony are DENIED as moot.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment [Doc. 75] is **GRANTED**. It is further ORDERED that the Defendant's Motion to Exclude Certain Opinions of Laura Plunkett [Doc. 76], Defendant's Motion to Exclude the Testimony of Winston H. Gandy, M.D. [Doc. 77], Defendant's Motion to Exclude Certain Opinions of Robert Gosselin [Doc. 78], and Defendant's Motion to Exclude Certain Opinions of Glenn Chertow, M.D. [Doc. 79] are **DENIED AS MOOT**.

IT IS SO ORDERED, this 29th day of September, 2020.

### All Citations

--- F.Supp.3d ----, 2020 WL 5835125

---

Footnotes

1    For the purposes of this Order, all references to page numbers in documents refer to the ECF (or .pdf) page number, not the page number of the original document.

2    Even though Dr. Reddy had knowledge of Ms. Armstrong's alleged bleeding event at the time of his deposition, Dr. Reddy testified that he still stood by his decision in 2016 to prescribe Pradaxa to Ms. Underwood, even after he was questioned by Plaintiff's counsel about the need for additional warnings. [Doc. 75-50 at p. 34, transcript page no. 128; *id.* at p. 63, transcript page no. 244].

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit I

 Positive
As of: October 12, 2020 9:52 PM Z

# *Patton v. Forest Labs., Inc.*

United States District Court for the Central District of California

September 19, 2018, Decided; September 19, 2018, Filed

Case No. EDCV 17-922-MWF (DTBx)

**Reporter**
2018 U.S. Dist. LEXIS 160368 *

Stephanie Patton, et al. v. Forest Laboratories, Inc., et al.

**Subsequent History:** Dismissed by, in part, Motion granted by *Patton v. Forest Labs., Inc., 2020 U.S. App. LEXIS 740 (9th Cir. Cal., Jan. 9, 2020)*

Affirmed by *Patton v. Forest Labs., Inc., 2020 U.S. App. LEXIS 4520 (9th Cir. Cal., Feb. 11, 2020)*

**Prior History:** *Patton v. Forest Labs., LLC, 2017 U.S. Dist. LEXIS 115284 (C.D. Cal., July 24, 2017)*

**Counsel: [*1]** For Stephanie Patton, Kendrick Knighten, The Estate of Kennadi Knighten, Plaintiffs: Michael S Traylor, LEAD ATTORNEY, Michael Traylor Law Offices, Northridge, CA.

For Forrest Labratories, Inc., Defendant: Jennifer Snyder Heis, John R Ipsaro, PRO HAC VICE, Ulmer and Berne LLP, Cincinnati, OH; Kevin W Alexander, Gordon Rees Sccully Mansukhani LLP, Los Angeles, CA; Thomas Robert Watson, Gordon and Rees LLP, Los Angeles, CA.

For Allergan, Inc., Defendant: Kevin W Alexander, Gordon Rees Sccully Mansukhani LLP, Los Angeles, CA; Thomas Robert Watson, Gordon and Rees LLP, Los Angeles, CA.

For Allergan Sales, LLC, Defendant: Kevin W Alexander, Gordon Rees Sccully Mansukhani LLP, Los Angeles, CA; Thomas Robert Watson, Gordon Rees Scully Mansukhani LLP, Los Angeles, CA.

**Judges:** Honorable MICHAEL W. FITZGERALD, United States District Judge.

**Opinion by:** MICHAEL W. FITZGERALD

# Opinion

CIVIL MINUTES—GENERAL

**Proceedings (In Chambers)**: ORDER RE: ALLERGAN SALES, LLC AND ALLERGAN, INC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES [129]

Before the Court is the Motion to Dismiss Plaintiffs' Second Amended Complaint for Damages ("SAC") filed by Defendants Allergan Sales, LLC, and Allergan, Inc. (together, "Allergan" **[*2]** or "Defendants") on August 13, 2018. (Docket No. 129). On August 21, 2018, Plaintiffs filed an Opposition. (Docket No. 130). Defendants filed their Reply on August 31, 2018. (Docket No. 133).

The Court has reviewed and considered the papers submitted and held a hearing on September 17, 2018. At the hearing, the parties submitted on the Court's tentative order.

For the reasons set forth below, Defendants' Motion is

2018 U.S. Dist. LEXIS 160368, *2

**GRANTED** *without leave to amend* with respect to Plaintiffs' remaining claims. Plaintiffs' SAC is barely distinguishable from the First Amended Complaint ("FAC"), which the Court already found deficient as to all claims. The SAC therefore fails for many of the same reasons that caused the FAC to fail. Plaintiffs were warned that any future successful motions to dismiss would be granted without leave to amend, yet they have failed to address adequately the deficiencies the Court identified in the FAC. Further amendment would be futile.

## I. BACKGROUND

### A. Procedural History

On April 4, 2017, Plaintiffs commenced an action in the Riverside County Superior Court against Allergan and other pharmaceutical companies that have since been dismissed from this action (or, in the case of Forest **[*3]** Laboratories, LLC ("Forest"), merged into Allergan). (Notice of Removal ¶ 1 (Docket No. 1)). The genesis of the lawsuit is the suicide of Plaintiffs' teenage daughter, Kennadi, which Plaintiffs contend was the result of Kennadi's taking the anti-depressant branded Lexapro (manufactured by Allergan) and/or its generic equivalent, escitalopram (manufactured by other pharmaceutical companies). (*Id.* ¶ 7).

(Typically, the Court refers to a minor by his or her initials, here "K.K." Plaintiffs referred to Kennadi as K.K. in their original Complaint, and the Court did the same in its prior orders. But the SAC and Opposition briefs refer to the minor by her first name. Following the apparent wishes of Plaintiffs, to whom the Court again extends its condolences, the minor's first name, Kennadi, is used in this Order.)

On May 11, 2017, a day after it filed an Answer in Superior Court, Forest properly removed the action to this Court. (*Id.* at 1).

Plaintiffs' original Complaint asserted seven claims for relief: (1) strict products liability; (2) fraud and deceit; (3) breach of warranty; (4) violation of *California's Consumer Legal Remedies Act ("CLRA")*, *Cal. Civ. Code. § 1770*; (5) violation of *California's Unfair Competition Law* **[*4]** ("UCL"), *Cal. Bus. & Prof. Code § 17200*; (6) negligence; and (7) wrongful death. (*Id.* ¶ 1).

On January 29, 2018, following Plaintiffs' voluntary

dismissal of two pharmaceutical companies and the Court's dismissal, with leave to amend, of Plaintiffs' claims against two other pharmaceutical companies, Plaintiffs filed their FAC. (Docket No. 85).

Plaintiffs' FAC asserted nine claims for relief: (1) violation of the *Racketeer Influenced and Corrupt Organizations Act ("RICO")*, *18 U.S.C. § 1962*, against Allergan and the remaining pharmaceutical companies; (2) breach of contract under a third party beneficiary theory, against Forest (*i.e.*, Allergan, as a result of the merger); (3) strict products liability, against all Defendants; (4) fraud, concealment and deceit, against all Defendants; (5) negligence and negligence per se, against all Defendants; (6) violation of the CLRA, against all Defendants; (7) violation of the UCL, against all Defendants; (8) breach of warranty, against all Defendants; and (9) wrongful death, against all Defendants. (*Id.* ¶¶ 51-134).

Allergan moved to strike or dismiss Plaintiffs' claims pursuant to *Rule 12(b)(6)*. (Docket No. 89). On May 10, 2018, the Court granted Allergan's motions, striking Plaintiffs' RICO and breach of **[*5]** contract claims and dismissing all seven remaining claims. (Docket No. 115). The Court noted that it "has serious doubts about Plaintiffs' capacity to state any viable claim against Allergan," but nevertheless permitted Plaintiffs one more chance to amend their allegations with respect to their strict products liability, fraud, negligence, UCL, breach of warranty, and wrongful death claims. (*Id.* at 1-2). The Court did not permit Plaintiffs to amend their allegations with respect to their CLRA claim, as Plaintiffs did not provide statutorily required pre-suit notice. (*Id.* at 2).

On July 9, 2018, Plaintiffs filed their SAC, asserting four claims for relief: (1) negligence based upon the "Pre-Allergen Lawsuits Conduct"; (2) negligence based upon the "Post[-]Allergen Lawsuits Conduct and the CIA [Corporate Integrity Agreement]"; (3) violation of the UCL; and (4) wrongful death. (SAC ¶¶ 55-116). Plaintiffs named as Defendants only Allergan; Forest, now a subsidiary of Allergan; and Forest Pharmaceuticals, Inc., a subsidiary of Forest. (*Id.* ¶ 5).

Allergan has now again moved to dismiss each of Plaintiffs' claims pursuant to *Rule 12(b)(6)*.

### B. Relevant Regulatory Framework

2018 U.S. Dist. LEXIS 160368, *5

## 1. New Drugs

***The approval process***. The *Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq.* **[\*6]** , requires manufacturers of new, brand-name drugs to secure the approval of the United States Food and Drug Administration ("FDA") prior to marketing that new drug by submitting a "new drug application" ("NDA") demonstrating that the new drug is safe, effective, and appropriately labeled. *See 21 U.S.C. § 355(b), (d); 21 C.F.R. § 314.50; Mutual Pharmaceutical Co., Inc. v. Bartlett, 570 U.S. 472, 475-76, 133 S. Ct. 2466, 186 L. Ed. 2d 607 (2013)*. This process "is both onerous and lengthy." *Bartlett, 570 U.S. at 476*.

***Labeling requirements***. FDA regulations govern the content and format of prescription drug labeling. *See 21 C.F.R. §§ 201.56* (general requirements), 201.57 (specific requirements). These regulations apply to a broad range of written content relating to prescription drugs. The FDCA defines "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." *21 U.S.C. § 321(m)*. Relevant FDA regulations define "label" as "any display of written, printed, or graphic matter on the immediate container of any article, or any such matter affixed to any consumer commodity or affixed to or appearing upon a package containing any consumer commodity." *21 C.F.R. § 1.3(b)*.

Since 2006, the FDA has required that prescription drug labeling contain both a more streamlined "Highlights" section **[\*7]** and a more detailed "Full Prescribing Information" section. *See 21 C.F.R. §§ 201.56(d), 201.57(a)*.

The "Highlights" section of a drug's label must include the drug's name, a "boxed warning," and information about recent major changes, indications and usage, dosage and administration, dosage form and strengths, contraindications, warnings and precautions, adverse reactions, drug interactions, and use in specific populations. *21 C.F.R. §§ 201.56(d)(1), 201.57(a)(1)-(13)*.

The "Full Prescribing Information" section of a prescription drug label must contain the same categories of information required in the "Highlights" section, including a "boxed warning," but in greater detail. *See 21 C.F.R. §§ 201.56(d)(1), 201.57(b)-(c)*. The Full Prescribing Information section must also contain categories of information not included in the

Highlights section, such as pregnancy, pediatric use, geriatric use, abuse, dependence, overdosage, storage and handling, etc. *See 21 C.F.R. §§ 201.56(d)(1), 201.57(c)*.

The FDCA does not permit a drug manufacturer to change an approved drug's labeling without prior approval from the FDA. *See 21 U.S.C. § 301 et seq.* However, pursuant to its regulations, the FDA permits holders of approved NDAs to make preapproval "[c]hanges in the labeling to reflect newly acquired information..." *21 C.F.R. § 314.70(c)(6)(iii); Supplemental New Drug Applications, 30 Fed. Reg. 993, 993-94 (Jan. 30, 1965)*. Specifically, the FDA allows NDA holders to (based **[\*8]** upon "newly acquired information") independently: (A) "add or strengthen a contraindication, warning, precaution, or adverse reaction"; (B) "add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage"; (C) "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product"; or (D) "delete false, misleading, or unsupported indications for use or claims for effectiveness." *21 C.F.R. § 314.70(c)(6)(iii)(A)-(D)*.

As noted above, any unilateral changes to a drug's labeling by a NDA holder must be based upon "newly acquired information." Such changes are made pursuant to the FDA's "changes being effected" ("CBE") procedure. *See 21 C.F.R. § 314.70(c)(6)(iii)(A)*. The FDA may accept, modify, or reject a CBE supplement, and "may order the manufacturer to cease distribution of the drug product(s) made with the [labeling] change." *21 C.F.R. § 314.70(c)(7)*.

Outside of the specified CBE circumstances, NDA holders must obtain prior approval from the FDA for any labeling or other changes through the "prior approval supplement" ("PAS") process. *21 C.F.R. § 314.70*.

NDA holders may not make any changes to the Highlights section of a drug's labeling without prior FDA approval. *21 C.F.R. § 314.70(b)(2)(v)(C)*.

## 2. Generic Drugs

In 1984, Congress passed **[\*9]** the Drug Price Competition and Patent Term Restoration Act, commonly referred to as the "*Hatch-Waxman Act*," streamlining the FDA approval process for "generic" drugs - *i.e.*, those that replicate their brand-name

2018 U.S. Dist. LEXIS 160368, *9

predecessors. *See Bartlett, 570 U.S. at 476*. Under Hatch-Waxman, prior to marketing a generic drug, a manufacturer must submit an "abbreviated new drug application" ("ANDA") demonstrating that "the generic drug is identical to the already-approved brand-name drug in several key respects," including chemical composition, rate and extent of absorption, and labeling. *See 21 U.S.C. § 355(j)(2); 21 C.F.R. § 314.94; Bartlett, 570 U.S. at 476-77*.

Once the FDA approves a drug, whether brand-name or generic, the manufacturer may not make "any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" *Bartlett, 570 U.S. at 477* (quoting *21 C.F.R. § 314.70(b)(2)(i)*). "Generic manufacturers are also prohibited from making any unilateral changes to a drug's label." *Id.* (citing *21 C.F.R. §§ 314.94(a)(8)(iii), 314.150(b)(10)*). "[T]he warning labels of a brand-name drug and its generic copy must always be the same - thus, generic drug manufacturers have an ongoing federal duty of 'sameness.'" *PLIVA, Inc. v. Mensing, 564 U.S. 604, 613, 131 S. Ct. 2567, 180 L. Ed. 2d 580 (2011)*.

### C. Lexapro and its Generic Counterparts

Escitalopram oxalate is described **[*10]** as a selective serotonin reuptake inhibitor indicated for acute and maintenance treatment of major depressive disorder in adults and adolescents aged 12-17 and acute treatment of generalized anxiety disorder in adults. (SAC ¶ 14). In August 2002, the FDA approved Forest's (which has merged into Allergan) NDA to market escitalopram under the brand name Lexapro. (*Id.* ¶ 18). In March 2009, the FDA approved Lexapro for the treatment of depression in adolescents as young as 12. (*Id.* ¶ 24).

Subsequently, the FDA approved the ANDAs of numerous other pharmaceutical companies to manufacture and market generic escitalopram, including those of Teva and Lupin. (*See id.* ¶ 30).

Between October 2014 and January 2017 (*i.e.*, the time period relevant to this action), Lexapro's (and hence its generic counterparts') labeling contained suicide-related warnings. (Mot. at 7). The Highlights section of the Lexapro package insert contained the following "boxed warning":

**WARNING: Suicidality and Antidepressant Drugs** *See full prescribing information for* **complete boxed warning. Increased risk of suicidal thinking and behavior in children, adolescents and young adults taking antidepressants for major depressive disorder [*11] (MDD) and other psychiatric disorders. Lexapro is not approved for use in pediatric patients less than 12 years of age (5.1).**

(*Id.*). The "Warnings and Precautions" subsection of the Highlights section provided, *inter alia*: "Clinical Worsening/Suicide Risk: Monitor for clinical worsening, suicidality, and unusual change in behavior, especially during the initial few months of therapy or at times of dose changes (5.1)." (*Id.* at 8).

The Full Prescribing Information section also contained the following, lengthier boxed warning:

### WARNINGS: SUICIDALITY AND ANTIDEPRESSANT DRUGS

**Antidepressants increased the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short term studies of major depressive disorder (MDD) and other psychiatric disorders. Anyone considering the use of Lexapro or any other antidepressant in a child, adolescent, or young adult must balance this risk with the clinical need. Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 and older. Depression [*12] and certain other psychiatric disorders are themselves associated with increases in the risk of suicide. Patients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber. Lexapro is not approved for use in pediatric patients less than 12 years of age. [See Warnings and Precautions: Clinical Worsening and Suicide Risk (5.1), Patient Counseling Information: Information for Patients (17.1), and Use in Specific Populations: Pediatric Use (8.4)].**

(*Id.*).

## D. **Plaintiffs' Second Amended Complaint**

As it must, the Court assumes the truth of all facts alleged by Plaintiffs. The Court's Order on May 10, 2018, granting Defendants' Motion to Dismiss First Amended Complaint contained a detailed explanation of the relevant facts. The following section is substantially similar but has been updated to reflect relevant additional allegations and citations to the SAC as the operative complaint.

Plaintiffs are the parents of Kennadi K., who committed suicide in May 2016 at the **[\*13]** age of 15. (SAC ¶¶ 1-2). Kennadi, who "had a history of depression," received a single dose of Lexapro for the first time on March 22, 2016 from a physician at the Riverside County Regional Medical Center ("RCRMC"). (*Id.* ¶¶ 3, 48). Prior to that, she "had been treated with medications which did not include Lexapro or Escitalopram." (*Id.*). Plaintiffs and Kennadi did not receive "any of the labeling or other information required by the FDA" from any RCRMC staff with this initial single dose. (*Id.* ¶ 51).

Kennadi received two additional prescriptions for Lexapro. On March 23, 2016, the same RCRMC doctor issued Kennadi a prescription for Lexapro, which she began taking at home. (*Id.*). On April 24, 2016, a "second physician" issued Kennadi "another prescription." (*Id.* ¶ 52). Plaintiffs do not allege that they did not receive FDA-mandated labeling with either prescription.

On May 22, 2016, Kennadi committed suicide. (*Id.* ¶ 53). Plaintiffs allege that "harmful chemicals and/or compounds which the Defendants utilized in their effort to distinguish Lexapro and Escitalopram from other anti-depressants ... altered Kennadi's emotional state, awareness, mental faculties and ability to reason, differentiate **[\*14]** and evaluate circumstances to the point where an overwhelming desire to commit suicide came over Kennadi to the extent that she was unable to control." (*Id.* ¶ 54). "Prior to taking Lexapro and/or Escitalopram, Kennadi was taking a competing anti-depressant which did not have the effect of causing her to attempt at suicide." (*Id.*). "Had Kennadi not taken the Lexapro and/or Escitalopram; this sequence of events leading to her death would not have occurred and Kennadi would not have committed suicide." (*Id.*).

Plaintiffs allege that Defendants (including Forest, which has merged into Allergan) misled the FDA, doctors, pharmacists, and the public - through what Plaintiffs call the Lexapro Marketing Scheme - about the suicide-related risks associated with Lexapro and/or escitalopram. For example, among many other allegations of this type, Plaintiffs allege:

• "The Forest Defendants ... spent hundreds of millions of dollars running a successful scheme to deceive the medical profession and the general public about Lexapro... They presented Lexapro as the go-to drug for children, adolescents and adults suffering from nearly any type of depression without establishing the severity of the risks **[\*15]** of suicide among those children ..." (*Id.* ¶ 32).

• "While carefully navigating their way through the FDA regulations for NDAs, the Defendants had, maintained and concealed this information [regarding suicide risk] while defrauding the FDA, physicians and the general public. The Defendants never informed the FDA, physicians or the general public of these serious, known risks and continue to falsely represent (to this day) that Lexapro is safe for use by children and adolescents." (*Id.* ¶ 31).

• "[T]he Defendants ... intentionally misrepresented that Lexapro did not have the harmful side effects referenced hereinabove; including, without limitation, the likelihood of causing teenagers to make serious attempts at committing suicide." (*Id.* ¶ 36).

• "[T]he Defendants knew that Lexapro and Escitalopram were not very effective in treating teenagers (and younger patients) for the purposes of reducing depression." (*Id.* ¶ 37).

• "[T]he Defendants concealed and misrepresented ... the harmful risks and side effects (including their knowledge that use of the drugs would cause teenagers to make serious attempts at committing suicide) because they knew that dissemination and distribution of any negative **[\*16]** publicity, warnings and/or other information would materially reduce their earnings." (*Id.* ¶ 40).

• "The Defendants have never fully and/or properly informed doctors, pharmacists or other health care providers of these serious risks, even though third-party research shows the association between Lexapro/Escitalopram and the likelihood of increased teenage suicide. Defendants continued to represent that Lexapro was safe for teenagers and continued to mislead both consumers and physicians by failing to include a proper warning(s) on the Lexapro/Escitalopram label and/or inserts or in the materials distributed by them to physicians

and pharmacists..." (*Id.* ¶ 43).

Plaintiffs allege that each of the doctors who prescribed Lexapro to Kennadi "had received information about Lexapro through the Lexapro Marketing Scheme, but was not aware of (nor had ... been made aware by Defendants of) the significant increases in suicidality by children and adolescents using Lexapro/Escitalopram which was well-known to, but had not been disclosed by, the Defendants." (*Id.* ¶ 48).

Plaintiffs seemingly acknowledge the suicide warnings on the Lexapro and escitalopram packaging during the relevant period. (*Id.* ¶ [*17] 44). Plaintiffs' core allegation, though, is that "prior to Kennadi's suicide, the Defendants had the knowledge, the means and the duty to provide the medical community (including the physicians and pharmacists treating Kennadi) and the consuming public (including Kennadi and [Plaintiffs]) with **a stronger warning** regarding the association between Lexapro and Escitalopram [and teenage/adolescent suicide] through reasonable means, including but not limited to labeling, continuing education, symposiums, posters, sales calls to doctors, advertisements and promotional materials, etc." (*Id.*) (emphasis added).

## II. LEGAL STANDARDS

"Dismissal under *Rule 12(b)(6)* is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013)*. "*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . .'" *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*)."

In ruling on the Motion under *Rule 12(b)(6)*, the Court follows *Twombly, Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, and their Ninth Circuit progeny. "To survive a motion to dismiss, a complaint must contain sufficient factual matter [*18] . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 570*). The Court must disregard allegations that are legal conclusions, even when disguised as facts. *See id. at 681* ("It is the conclusory nature of respondent's

allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 996 (9th Cir. 2014)*. "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'" *Eclectic Properties, 751 F.3d at 995* (quoting *Twombly, 550 U.S. at 556-57*) (internal citations omitted).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief. *See Iqbal, 556 U.S. at 679*; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1054 (9th Cir. 2011)*. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc., 838 F.3d 958, 963 (9th Cir. 2016)* (quoting *Iqbal, 556 U.S. at 679*). Where the facts as pleaded in the complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs [*19] cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Eclectic Properties, 751 F.3d at 996-97*; *see also Somers, 729 F.3d at 960*.

## III. DISCUSSION

Defendants argue that (1) Plaintiffs' SAC does not allege facts sufficient to state any claim for relief plausible on its face; (2) Plaintiffs' UCL claim does not satisfy the pleading requirements of *Rule 9(b)*; and (3) to the extent any of Plaintiffs' claims can be interpreted as failure-to-warn claims directed at pharmaceutical products, they are preempted by federal law.

### A. Failure to State a Claim for Relief

Defendants first argue that Plaintiffs' allegations and four claims - two for negligence, violation of UCL, and wrongful death - can be boiled down to an insufficiently alleged failure-to-warn claim, and regardless, Plaintiffs fail to establish causation as to any claim. (Mot. at 11-13). Each of Plaintiffs' claims is insufficiently pled,

independently of whether they collectively boil down to a failure-to-warn claim, and therefore the Court addresses them **[*20]** individually.

## 1. Negligence

Plaintiffs assert two claims for negligence, one based on the "Pre-Allergan Lawsuits Conduct" and another based on "Post[-]Allergan Lawsuits Conduct and the CIA". (SAC ¶¶ 55-99). Plaintiffs, however, neither define "Pre-Allergan Lawsuits Conduct" nor "Post[-]Allergan Lawsuits Conduct".

As far as the Court can tell, Plaintiffs' first negligence claim based on "Pre-Allergan Lawsuits Conduct" appears to be premised upon Defendants engaging in the Lexapro Marketing Scheme and involvement in various lawsuits and investigations occurring in the late 1990s and early 2000s, nearly twenty years before Kennadi was prescribed or took the first dose of Lexapro on March 22, 2016. (*See, e.g., id.* ¶ 60 ("Prior to the Lexapro Lawsuits ... [Allergan] violated applicable law and ... [engaged in] illegal conduct (as was determined by the results and judgment in the Lexapro Lawsuits and which is referenced herein as the 'Illegal Conduct')..."); 66 ("Despite such knowledge of the facts and risks as alleged hereinabove, Defendants continued in their Lexapro Marketing Scheme and their Illegal Conduct up to and beyond the times in 2016 when Kennadi was prescribed and took Lexapro.")). **[*21]** "Pre-Allergan Lawsuits Conduct" is never defined and "Illegal Conduct" is amorphously defined based on the results and judgment in other actions. Therefore, this negligence claim is insufficiently pled.

Plaintiffs' second negligence claim based on "Post[-]Allergan Lawsuits Conduct and the CIA" appears to be premised upon Defendants engaging in the Lexapro Marketing Scheme and failing to provide proper labeling with their Lexapro/escitalopram. (*See, e.g., id.* ¶¶ 76 ("[Allergan] agreed to, submitted to and established with the federal government a higher standard of care specifically as it related to *distributing* accurate information about Lexapro in relation to the risks and dangers..."); 77 ("Similarly, [Allergan] intentionally *excluded* such information from the materials which they continued to distribute as part of the Lexapro Marketing Scheme."); 78 ("[Allergan] continued to *understate and conceal* such information about Lexapro's impact and effects on teenagers and adolescents.") (emphasis added).). Indeed, Plaintiffs allege that Defendants failed to "remedy", "dispel",

"change", or "correct" alleged misinformation or labeling related to the risk of suicides Lexapro poses to teenagers **[*22]** and adolescents. (*See id.*).

Again, the initial boxed warning at the very top of the Lexapro package insert reads:

> **WARNING: Suicidality and Antidepressant Drugs *See full prescribing information for complete boxed warning.* Increased risk of suicidal thinking and behavior in children, adolescents and young adults taking antidepressants for major depressive disorder (MDD) and other psychiatric disorders. Lexapro is not approved for use in pediatric patients less than 12 years of age (5.1).**

This warning, standing on its own (*i.e.*, without accounting for the other suicide warnings elsewhere on the Lexapro package insert), "directly warns in plain and explicit terms of the specific risk that caused injury" to Kennadi and Plaintiffs, and is thus adequate. *See Utts v. Bristol-Myers Squibb Co., 251 F. Supp. 3d 644, 673-74 (S.D.N.Y. 2017)* (citing *Kearl v. Lederle Labs., 172 Cal. App. 3d 812, 834-35, 218 Cal. Rptr. 453 (1985)*; *see also Shah v. Forest Laboratories, Inc., No. 10 C 8163, 2015 U.S. Dist. LEXIS 67554, 2015 WL 3396813, at *7-8 (N.D. Ill. May 26, 2015)* (package insert provided with Lexapro prescriptions filled in 2008 provided adequate suicide warnings).

Moreover, Plaintiffs' reliance on the CIA is misplaced, as the CIA was an agreement between Defendants and the FDA that began in 2010 and expired in 2015, more than a year before Kennadi was ever prescribed or took the first dose of Lexapro. (Mot. at 6). Plaintiffs' second negligence claim, premised on Defendants' engaging **[*23]** in the Lexapro Marketing Scheme and failing to provide proper labeling, is also insufficiently pled.

Accordingly, Defendants' Motion is **GRANTED *without leave to amend*** with respect to Plaintiffs' negligence claims.

## 2. UCL Claim

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." *Cal. Bus. & Prof. Code § 17200.* "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v.*

*HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012)*. The UCL "does not proscribe specific activities," but rather, "borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." *Puentes v. Wells Fargo Home Mortgage., Inc., 160 Cal. App. 4th 638, 643-44, 72 Cal. Rptr. 3d 903 (2008)* (internal quotation marks and citations omitted).

Plaintiffs are proceeding under the "fraudulent" prong of the UCL. *See* SAC ¶ 101) ("Defendants directly and indirectly engaged in *fraudulent* activity described hereinabove in the foregoing causes of action...") (emphasis added).

Conduct is "fraudulent" under the UCL if the conduct is "likely to deceive." *Morgan v. AT & T Wireless Servs., Inc., 177 Cal. App. 4th 1235, 1254, 99 Cal. Rptr. 3d 768 (2009)*. The particularity requirement of *Rule 9(b)* applies to claims under the fraudulent prong of the UCL. *See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009); Sosa v. Bank of New York Mellon Trust, No. 12-cv-144-LB, 2012 U.S. Dist. LEXIS 92291, 2012 WL 2568188, at *4 (N.D. Cal. July 2, 2012)* [*24] ; *Briosos v. Wells Fargo Bank, 737 F. Supp. 2d 1018, 1033 (N.D. Cal. 2010)*. *Rule 9(b)* requires the plaintiff to allege "the who, what, when, where, and how" of the alleged fraudulent conduct, *Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003)*, and "set forth an explanation as to why [a] statement or omission complained of was false and misleading," *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994)* (en banc) (superseded by statute on other grounds).

Here, Plaintiffs' UCL claim is either based on (1) allegations of a lack of proper labeling, and are thus preempted or undermined by Lexapro labeling, *see infra*; or (2) empty assertions of "fraudulent" representations made by Defendants to unspecified audiences at unspecified times.

For example, in connection with their UCL claim, Plaintiffs allege, without any factual support, the following:

• "[Defendants] disseminat[ed] or caus[ed] to be disseminated before the public in this state [California], in newspapers and other publications, any advertising device, and by public outcry or proclamation, and in any other manner or means whatever, including over the Internet, the false statements." (SAC ¶ 101).

• "Defendants had actual, inquiry and constructive knowledge that the Lexapro Marketing Scheme and

their Illegal Conduct would not only breach the [unclarified] duties set forth hereinabove; but would actually result in [*25] an unacceptable, unreasonable and continuously-increasing risk of teenagers and adolescents taking Lexapro and becoming suicidal." (¶ 104).

• "As a result of the foregoing breaches [of unclarified duties], a steady flow of unreliable, false, misleading and inaccurate information was provided to Kennadi, Plaintiffs, Kennadi's healthcare providers and/or other patients by the Defendants as it relates to Lexapro." (¶ 110).

Among other fatal deficiencies, Plaintiffs fail to define precisely what constitutes the "Illegal Conduct", offer no information about which of the Defendants (Allergan Sales, LLC; Allergan, Inc.; or Forest prior to the merger) made purportedly fraudulent statements in connection with either the Lexapro Marketing Scheme or Illegal Conduct, offer no specific content of such statements, allege when or how such statements were made, allege specifically who heard or saw the statements, or offer an acceptable reason why the statements were fraudulent. Indeed, Plaintiffs appear to believe that their UCL claim is sufficiently alleged because "the allegations in the SAC are very similar[] ... to the ongoing rendition of conduct which subjected [Defendants] to criminal charges" [*26] in the late 1990s and early 2000s. (Opp. at 8). This belief and the allegations contained in the SAC, however, fall far short of what is required to state a viable UCL claim.

Because Plaintiffs have failed to plead Defendants' alleged fraudulent conduct with sufficient particularity, their attempt to plead a UCL claim under the fraudulent prong also fails. *See Chase v. Hobby Lobby Stores, Inc., No. 17-cv-881-GPC (BLMx), 2017 U.S. Dist. LEXIS 162909, 2017 WL 4358146, at *8 (S.D. Cal. Oct. 2, 2017)* (dismissing UCL claim under the fraudulent prong even when the "complaint provides sufficient detail as to the 'who, what, when and where' of the alleged misconduct ... [but] has not adequately alleged the 'how').

Accordingly, Defendants' Motion is **GRANTED** *without leave to amend* with respect to Plaintiffs' UCL claim.

## 3. Wrongful Death

In connection with their wrongful death claim, Plaintiffs allege that "[t]he conduct alleged in each of the foregoing causes of action, contributed to the death of

2018 U.S. Dist. LEXIS 160368, *26

Kennadi," and that "[b]ut for the conduct ..., reliable healthcare which would not have resulted in Kennadi's death would have occurred." (SAC ¶¶ 114-115).

"Under California Code of Civil Procedure *section 377.60(a)*, a wrongful death action may be pursued by a decedent's personal representative, surviving spouse or **[*27]** children, or if there are no surviving issue, by a person entitled to inherit from decedent by intestate succession." *Harmon v. City of Fresno, No. 08-cv-1311-LJO (GSAx), 2008 U.S. Dist. LEXIS 88311, 2008 WL 4690897, at *14 (E.D. Cal. Oct. 21, 2008)*. The elements of a wrongful death claim are "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s] (3) the 'death of [another] person.'" *Id.* (quoting *Cal. Code Civ. Proc. § 377.60*) (alterations in original).

Since the SAC fails to allege any actionable wrongdoing on the part of Defendants, *supra*, Plaintiffs' wrongful death claim must be dismissed. *See id.* (dismissing wrongful death claim where complaint "alleges no wrongdoing on the part of the ... defendants to cause decedent's death ...").

Accordingly, because Plaintiffs do not have leave to amend any of their underlying claims, Defendants' Motion is **GRANTED** *without leave to amend* with respect to Plaintiffs' wrongful death claim.

### B. UCL Claim Fails to Satisfy *Rule 9(b)*

Defendants next argue that Plaintiff's UCL claim must also be independently dismissed because it does not satisfy the pleading requirements of *Rule 9(b)*. (Mot. at 13-14). As already discussed above, Plaintiffs' UCL claim based on the fraudulent prong falls far short of *Rule 9(b)*'s pleading requirements, because the SAC does not contain even the barest **[*28]** allegations of a misrepresentation or omission that could constitute fraud, much less the required "who, what, when, where and how". *See Vess, 317 F.3d at 1106*.

Accordingly, in addition to granting Defendants' Motion for failing to state a claim for relief, Defendants' Motion is also **GRANTED** *without leave to amend* as to Plaintiffs' UCL claim for failing to meet *Rule 9(b)*'s pleading requirements.

### C. Failure-to-Warn Claim Preempted by Federal Law

Defendants correctly argue that to the extent Plaintiffs'

allegations and other claims can be interpreted as failure-to-warn claim directed at pharmaceutical products, that claim is preempted by a federal law. (Mot. at 14-15). The Court addresses whether a failure-to-warn claim is preempted to give Plaintiffs the benefit of the doubt, even though the SAC does not label any claim as such and the Court has not determined whether Plaintiffs' allegations would even amount to such a claim. Therefore, even if Plaintiffs' allegations amount to a failure-to-warn claim, it is preempted.

### 1. Overview of Relevant Preemption Law

State law is preempted "to the extent of any conflict with a federal statute," regardless of whether the conflict is express or implied. *Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)*. Courts must "find preemption **[*29]** where it is impossible for a private party to comply with both state and federal law ..., and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id. at 372-73* (internal quotation marks, citations, and alterations omitted).

The leading cases on preemption in this area are *Wyeth v. Levine, 555 U.S. 555, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009)*, *PLIVA, Inc. v. Mensing, 564 U.S. at 609-10*, and *Bartlett, 570 U.S. at 472*.

In *Levine*, the Court rejected the preemption arguments of a name brand drug manufacturer (a NDA holder) and held that the manufacturer could have complied with both federal and state law in giving a stronger warning about the risks of gangrene associated with the name brand drug, "absent clear evidence that the FDA would not have approved a change to [the drug's] label." *555 U.S. at 571*.

In *Mensing*, a case in which the plaintiff challenged the sufficiency of a generic drug's labeling, the Court agreed with the generic manufacturer defendants that "changes unilaterally made to strengthen a generic drug's warning label would violate the statutes and regulations requiring a generic drug's label to match its brand-name counterpart's." *564 U.S. at 614*. "Thus, it was impossible for the Manufacturers to comply with both their **[*30]** state-law duty to change the label [to provide stronger warnings] and their federal law duty to keep the label the same [as the brand-name label]." *Id. at 618*. The plaintiffs' state law tort claims against the generic

2018 U.S. Dist. LEXIS 160368, *30

manufacturers were thus preempted. *Id. at 624*.

In *Bartlett*, a case involving a design defect claim against a generic drug manufacturer, the Court expanded upon its holding in *Mensing*. The Court held that because "federal law prevents generic drug manufacturers from changing their labels," federal law also "prohibited [the generic manufacturer defendant] from taking the remedial action required to avoid liability under [state products liability] law." *570 U.S. at 486*. Therefore, the plaintiff's state design defect claim was preempted. *Id. at 486-87*. In so holding, the Court rejected the First Circuit's reasoning that the generic manufacturer could have met its federal and state law obligations by "choos[ing] not to make [the generic drug] at all": "Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id. at 488*.

### 2. Plaintiffs' Failure-to-Warn Claim Preempted

Defendants raise two main points as to why Plaintiffs' [*31] failure-to-warn claim is preempted by relevant federal law.

***First***, Defendants argue that Plaintiffs ignore the fact that Defendants "could not unilaterally or independently change the Lexapro [Highlights section] label ... [and] all changes to that section require FDA's pre-approval." (Mot. at 15-16) (citing *21 C.F.R. § 314.70(b)(2)(v)(C)*). In opposition, Plaintiffs do not dispute Defendants' argument and instead argue that their claims are premised upon "voluntary, affirmative conduct of the Defendants to undermine the warning ... and defraud the medical professionals who prescribe Lexapro." (Opp. at 16). Plaintiffs then proceed to conclude causes of action for "breach of warranty, intentional fraud and misrepresentation ...., and conspiracy," purportedly upon which Plaintiffs' allegations are premised, are "not included within the preemptive reach of federal [law]." (*Id.*).

Plaintiffs' response, however, is confusing as Plaintiffs have not alleged a claim for breach of warranty, intentional fraud and misrepresentation (not arising under the "fraudulent" prong of the UCL), or conspiracy in their SAC. Moreover, the Court has already previously dismissed Plaintiffs' breach of warranty and fraud claims alleged in their FAC ( [*32] *see* Docket No. 115 at 33-36, 39-40), and the allegations in the SAC do not change any aspect of the Court's previous analysis.

***Second***, Defendants argue that Plaintiffs "fail[] to identify any 'newly acquired information' that would have supported a submission of a CBE to change the Lexapro label." (Mot. at 17). Plaintiffs, in opposition, argue that Defendants were required "to take action with the FDA ... and change its drug label based on safety information that becomes available after a drug's initial approval." (Opp. at 16-17). While it is obvious that the FDA, in approving the relevant Lexapro initial labeling and not yet requiring Defendants to change their label, disagreed with Plaintiffs, even if the FDA were wrong, only the government (*i.e.*, not Plaintiffs) may bring a lawsuit to enforce the FDCA and the FDA's regulations requiring Defendants to change their label. *See 21 U.S.C. § 337(a)* ("all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States"); *Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 352, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)* (citing *21 U.S.C. § 337(a)* as "clear evidence that Congress intended that the [Medical Device Amendment to the FDCA] be enforced exclusively by the Federal Government").

Accordingly, to extent Plaintiffs' allegations can be interpreted as failure-to-warn [*33] claim, it is preempted by federal law. Defendants' Motion is therefore **GRANTED** *without leave to amend* with respect to any failure-to-warn claim.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion is **GRANTED** *without leave to amend*. The action is therefore **DISMISSED**. Judgement as to all claims and Defendants shall be entered accordingly.

IT IS SO ORDERED.

### FINAL JUDGMENT AS TO ALL CLAIMS AND PARTIES

This action was timely removed to this Court on May 11, 2017. All claims have now been resolved against all parties, as follows:

Plaintiffs' original Complaint asserted claims against Defendants Allergan, plc; Allergan, Inc.; Forest Laboratories, Inc.; Actavis, plc ("Actavis"); Lupin Pharmaceuticals, Inc. ("Lupin"); Cipla Ltd. and Cipla USA, Inc. (collectively, the "Cipla Defendants"); Teva Pharmaceuticals USA, Inc. ("Teva"); CVS Pharmacy,

2018 U.S. Dist. LEXIS 160368, *33

Inc.; Target Corporation ("Target"); and the Riverside County Regional Medical Center ("RCRMC").

On July 6, 2017, Defendants Actavis and Allergan, plc, and all claims against them, were dismissed pursuant to the parties' Stipulation of Voluntary Dismissal of Foreign Corporate Defendants. (Docket No. 18).

On January 29, 2018, Plaintiffs filed their **[*34]** First Amended Complaint, asserting claims against Defendants Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc. (together "Forest"); Allergan, Inc.; Lupin; the Cipla Defendants; Teva; CVS Health Corporation and CVS Pharmacy, Inc. (together "CVS"); Target; the County of Riverside (the "County"); and RCRMC. (Docket No. 85).

On February 2, 2018, the Cipla Defendants, and all claims against them, were dismissed by the Court's Order re Stipulation of Dismissal with Prejudice of Defendants Cipla Ltd. and Cipla USA, Inc. (Docket Nos. 86-87). On May 10, 2018, Defendants Lupin, Teva, the County, RCRMC, CVS, and Target, and all claims against them, were dismissed as follows:

• Lupin, Teva, the County, and RCRMC by the Court's Order re Joint Motion of Defendants Lupin Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. to Strike and Dismiss Plaintiffs' Amended Complaint; and

• CVS and Target by the Court's Order re CVS Pharmacy, Inc. and Target Corporation's Motion to Dismiss All Claims Against CVS Pharmacy, Inc. and Target Corporation.

(Docket No. 115).

On July 9, 2018, Plaintiffs filed their Second Amended Complaint, asserting claims against only Defendants Forest; Allergan, Inc.; and **[*35]** Allergan Sales, LLC (collectively, the "Allergan Defendants"). (Docket No. 124). Defendant Forest merged into Allergan Sales, LLC, which took over the defense of Forest.

On September 19, 2018, the Allergan Defendants, and all claims against them, were dismissed by the Court's Order re Allergan Sales, LLC, and Allergan, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint for Damages. (Docket No. 136).

Now, therefore, pursuant to *Rules 54* and *58 of the Federal Rules of Civil Procedure*, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that judgment be entered as follows:

1. Judgment on all claims is entered in favor of all Defendants and Plaintiffs shall take nothing by their

Second Amended Complaint.

2. Defendants are awarded their costs as provided by law.

Dated: September 19, 2018

/s/ Michael W. Fitzgerald

MICHAEL W. FITZGERALD

United States District Judge

---

**End of Document**

# Exhibit J

2019 WL 1062387

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Holley v. Gilead Sciences, Inc., N.D.Cal., May 10, 2019

2019 WL 1062387
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.

Reagan MAZE, Plaintiff,

v.

BAYER HEALTHCARE
PHARMACEUTICALS INC., Defendant.

No.:4:18-CV-21-TAV-CHS
|
Filed 03/06/2019

**Attorneys and Law Firms**

Buddy D. Perry, Pro Hac Vice, Buddy D. Perry Law Office, Winchester, TN, Thomas D. Graham, Pro Hac Vice, Thomas B. Scolaro, Pro Hac Vice, Leesfield Scolaro, P.A., Miami, FL, for Plaintiff.

Kaspar J. Stoffelmayr, Pro Hac Vice, Katharine A. Roin, Pro Hac Vice, Katherine M. Swift, Pro Hac Vice, Bartlit Beck LLP, Chicago, IL, Lindsey M. Collins, Matthew J. Evans, Paine Bickers LLP, Knoxville, TN, for Defendant.

## MEMORANDUM OPINION

Thomas A. Varlan, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Reagan Maze claims that the name-brand birth-control pill Yaz, manufactured by defendant Bayer Healthcare Pharmaceuticals, Inc., caused her stroke and failed to adequately warn her of that potential outcome on its label. But because the FDA-approved Yaz warning label contained several warnings about the risk of a stroke, and because Maze has pointed to no new information—or a new interpretation of old information—suggesting that the included warning was inadequate, Maze's failure-to-warn claims are preempted by federal law. In the absence of any non-preempted claim, Bayer's motion to dismiss the complaint must be granted.

## I. Background

Yaz is a birth-control pill produced, marketed, and sold by defendant Bayer [Doc. 19, at ¶ 15]. It is a combination oral contraceptive (COC), the use of which, in addition to preventing pregnancy, treats acne and the symptoms of premenstrual dysphoric disorder [Doc. 19-1, at 3]. The Food and Drug Administration first approved Yaz for marketing and sales in 2006 [Doc. 19, at ¶ 19].

On July 1, 2015, Maze, who was then a sixteen-year-old girl, suffered a massive ischemic stroke after taking Yaz as prescribed [Doc. 19, at ¶¶ 9–10, 41–42]. The effects were debilitating [Doc. 19, at ¶¶ 43–51]. In her complaint Maze alleges that her stroke was caused when, "[a]s a direct and proximate result of ingesting Yaz ... a thrombus came to block the middle cerebral artery of [her] brain" [Doc. 19, at ¶¶ 41–42].

At the time of Maze's stroke, the warning label and prescribing information for Yaz (exhibit 1 to the amended complaint),[1] which as of that time had not been updated since 2012, provided the following warnings of stroke:

(1) "Use of COCs also increases the risk of arterial thromboses such as strokes" [Doc. 19-1, at 8];

(2) "COCs have been shown to increase both the relative and attributable risks of cerebrovascular events (thrombotic and hemorrhagic strokes)" [Doc. 19-1, at 8];

(3) "COCs also increase the risk for stroke in women with other underlying risk factors" [Doc. 19-1, at 8];

(4) Lists "Serious cardiovascular events and stroke" as one of three "serious adverse reactions" from the use of COCs [Doc. 19-1, at 10];

(5) Places vascular disorders, including "stroke," at the top of a list of adverse reactions that are "ordered by frequency" [Doc. 19-1, at 12];

(6) Includes the risk of stroke in a prominent boxed warning for women who smoke and also use oral contraceptives [Doc. 19-1, at 22];

(7) Warns that women who have ever had a stroke "should not take Yaz" [Doc. 19-1, at 28];

(8) States that it "is possible to die or be permanently disabled from a problem caused by a blood clot, such as a heart attack or a stroke" [Doc. 19-1, at 30].

In her complaint Maze admits that "Bayer devoted substantial ... space in its Yaz prescribing information ... to warning of the risk of venous thromboembolism associated with the medication," but maintains that those warnings were "still inadequate" [Doc. 19, at ¶ 21].

**\*2** Bayer has moved to dismiss Maze's claims, arguing that she has asserted no claim that is not preempted by federal law [Docs. 21, 22]. Maze responded [Doc. 24], and Bayer replied [Doc. 25]. For the reasons that follow, the motion will be granted and Maze's complaint will be dismissed.

## II. Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the [opposing party] fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). In ruling on a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Id.* at 555, 570. Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Id.*

In short, the Court's task is to determine whether the amended complaint here contains "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted). A complaint must contain enough factual allegations to state a plausible claim, or else it cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009).

As one district court explained, "It is well-established that preemption may be analyzed and decided at the motion to dismiss stage." *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 672 (S.D.N.Y. 2017) (citations omitted). Thus, when a complaint does not plausibly allege any non-preempted claim, it must be dismissed under Rule 12(b)(6). *See, e.g.*, *Mitchell v. Boehringer Ingelheim Pharms., Inc.*, 2017 WL 5617473, at \*1 (W.D. Tenn. Nov. 22, 2017) (granting in part defendants' motion to dismiss Tennessee product liability claims on preemption grounds); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 42-43 (1st Cir. 2015) (affirming dismissal for failure to state a claim on preemption grounds).

## III. Analysis

Maze's two Tennessee state-law tort claims, one based on negligence and one based on strict liability, are preempted because they conflict with federal law. Conflict preemption is based on the Supremacy Clause, which states that federal law "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. It exists where (1) "it is impossible for a private party to comply with both state and federal law," and (2) the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). Here, Maze's tort claims seek to hold Bayer liable because the FDA-approved label for Yaz failed to warn strongly enough about the risk of stroke. To avoid the state-law liability that Maze's complaint seeks to impose, then, Bayer would need to change Yaz's label. Unsurprisingly, federal law has something to say about that.

*Wyeth v. Levine*, 555 U.S. 555 (2009), is the leading Supreme Court case addressing the intersection between federal name-brand labelling requirements and state products-liability lawsuits. The holding of *Wyeth* was that the plaintiff's state-law failure-to-warn claim, which was based on an inadequate brand-name drug label, was not preempted merely because the FDA had approved that label. *See id.* at 569–72. Rather, so the Court held, state law can still hold a manufacturer liable for failing to update the drug's label based on "newly acquired information" or even a "new analyses of previously submitted data." *Id.* at 571. Such updates are authorized by the so-called Changes Being Effected regulation (CBE), 21 C.F.R. § 314.70(c)(6)(iii), which allows brand-name drug manufacturers to make changes without prior FDA approval if those changes "reflect newly acquired information," *id.; see also id.* § 314.3(b) (defining "newly acquired information"), and, as relevant here, "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling," *id.* Changes not based on new information—and thus necessarily based on the same information already considered by the FDA—require prior FDA approval. 21 C.F.R. § 314.70(b)(2)(v)(A).

**\*3** *Wyeth* thus draws a line that balances the regulatory expertise of the FDA with a state's general police power. As the First Circuit explained, "the line so drawn lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing,

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 93 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 151 of 248 PageID: 160

Maze v. Bayer Healthcare Pharmaceuticals Inc., Slip Copy (2019)

2019 WL 1062387

while allowing the states to reach contrary conclusions when new information not considered by the FDA develops." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41 (1st Cir. 2015). Similarly, the Sixth Circuit has framed the *Wyeth* rule in this way: "As a general matter, plaintiffs injured by brand-name prescription drugs retain state-law tort remedies against the manufacturer of those drugs, provided it is not impossible for the drug manufacturer to comply with both state and federal law." *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 294 (6th Cir. 2015) (citing *Wyeth*, 555 U.S. 555).

It follows from the above that any claim asserted by Maze and based on information known to the FDA as of April 2012—when the label at issue here was approved —is plainly preempted by federal law. Maze's complaint states, "In 2012 ... pharmaceutical research indicated the risk of stroke in individuals taking Yaz was 500% greater than the risk of stroke in individuals not taking birth control medication" [Doc. 19, at ¶ 31]. Assuming this is true, which is disputed by Bayer and unclear on the record, to impose state-law tort liability based on information known to the FDA at the time of approval is strictly prohibited under the Supremacy Clause and *Wyeth*.

What is more, Maze's complaint cannot plausibly be read to contain any "newly acquired information," or even a "new analyses of previously submitted data," on the basis of which Bayer could have changed the Yaz label using the CBE process, at sometime between 2012 and Maze's stroke in 2015. Maze submits that "in the years following the April 2012 Yaz label change there emerged more medical evidence in support of the contention that birth control pills containing drospirenone (DRSP) are associated with higher rates of side effects caused by blood clots" [Doc. 24, at 5]. No such evidence is included in the complaint, and no further detail is provided about this asserted new medical consensus. Maze also states, "A search of the FDA Adverse Event Reporting System indicates numerous adverse incidents suffered by Yaz users that postdate the FDA approval of the 2012 label change." This reference is once again neither cited nor explained. These blanket statements are merely conclusory allegations and do not count as a sufficient "showing" that the plaintiff is entitled to relief.[2] *See McElroy v. Amylin Pharms., Inc.*, 2013 WL 12099073, at *4 (E.D. Tenn. Aug. 5, 2013).

Finally, and what seals the deal here, is that the label in effect during the entire relevant time repeatedly warned about the risk of stroke. *Supra* at 2–3. Thus, even assuming the science marshaled by Maze is newly acquired and says anything at all about the risk of stroke (as stated above, it is not and does not), nothing indicates that the risk is any higher than what is reflected in the Yaz label that the FDA approved in 2012. This crucial point distinguishes the facts here from those in *Wyeth*, where the plaintiff argued that a drug's warning label was inadequate for not telling healthcare providers to use a low-risk method of administering the drug, rather than the high-risk method that injured the plaintiff.[3] *See* 555 U.S. at 559–60. That "warning" was necessarily inadequate, because it did not exist. Thus, the main question from *Wyeth*—whether a nonexistent warning should be included on a label at all —is different from the one presented here: the adequacy of the FDA-approved, repeated stroke warning that the Yaz label has included all along. The former is heads-or-tails, the latter involves matter-of-degree questioning with respect to something that was clearly known and considered by the FDA in 2012. Without some indication that the science available now is somehow different, the Court will not second guess the adequacy of Yaz's warning label with state tort law.

**\*4** Based on the allegations in Maze's complaint, federal law (specifically the CBE procedure) would not have allowed Bayer to modify the Yaz label, which had already been approved by the FDA, in the way that plaintiffs suggest is necessary to make its stroke warning adequate. And because Bayer could not unilaterally change the label, it could not have complied with that construction of Tennessee law without violating federal law in the form of the FDA regulations cited above. Thus, even if plaintiffs have any claim under Tennessee law—a matter the Court does not reach—it is preempted. Maze's complaint therefore must be dismissed.

**IV. Conclusion**

For the reasons explained above, Bayer's motion to dismiss will be **GRANTED**, and the complaint will be dismissed. A separate order will be entered as a judgment.

**All Citations**

Slip Copy, 2019 WL 1062387

Footnotes

**Maze v. Bayer Healthcare Pharmaceuticals Inc., Slip Copy (2019)**

2019 WL 1062387

1   Although at the motion-to-dismiss stage "review is typically limited to the complaint's allegations," the Court "may look outside the four corners of the complaint and consider materials attached to a motion to dismiss if they are referred to in the complaint and central to the claim." *Berry v. United States Dep't of Labor*, 832 F.3d 627, 637 (6th Cir. 2016). Because the Yaz warning label was attached as an exhibit to both the complaint and Bayer's motion to dismiss [Docs. 19-1, 22-1], and because it is essential to Maze's claims, considering it is proper.

2   Maze points to another study, conducted in 2015 by Yana Vinogradova. But not only does this study address venous thromboembolism (a different vascular condition) rather than stroke, the study is not included or referred to in her amended complaint or any attached exhibit. Considering materials beyond the complaint is sometimes permissible, but only "so long as they are referred to in the complaint." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011). Because this study was not, whatever it might say about strokes does not apply here.

3   *Wyeth* is further distinguishable by its procedural posture, as defendant rightly points out. That case was an appeal after a jury verdict. 555 U.S. at 558. The Court thus did not confront or even mention the question presented here: whether the plaintiff's pleadings were adequate to state a non-preempted claim. Moreover, the Court noted that "[t]he record is limited concerning what newly acquired information Wyeth had or should have had about the risks of IV-push administration of Phenergan because Wyeth did not argue before the trial court that such information was required for a CBE labeling change." *Id.* at 569. From that statement it appears that Wyeth forfeited the very defense raised by Bayer here: that newly acquired information about the risk of stroke is required to avoid preemption and lacking from the amended complaint.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit K

PAS-L-002011-20  10/16/2020 3:16:53 PM  Pg 96 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC  Document 1-1  Filed 01/29/21  Page 154 of 248 PageID: 163
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

2016 WL 3943335
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Kathleen ROSSITTO,
Plaintiff–Respondent,

v.

HOFFMAN–LA ROCHE INC. and Roche
Laboratories Inc., Defendants–Appellants.
Riley Dean Wilkinson,
Plaintiff–Respondent,

v.

Hoffman–La Roche Inc. and Roche
Laboratories Inc., Defendants–Appellants.

A-1237-13T1, A-1236-13T1
|
Argued Feb. 8, 2016.
|
Decided July 22, 2016.

On appeal from the Superior Court of New Jersey, Law
Division, Atlantic County, Docket Nos. L–7481–10 and L–
1311–08.

**Attorneys and Law Firms**

Paul W. Schmidt (Covington & Burling, LLP) of the
Washington, D.C. bar, admitted pro hac vice, argued the cause
for appellants in A–1236–13 and A–1237–13 (Gibbons P.C.
and Mr. Schmidt, attorneys; Michelle M. Bufano, on the
briefs; Michael X. Imbroscio (Covington & Burling, LLP)
of the Washington, D.C. bar, admitted pro hac vice, and Mr.
Schmidt, of counsel and on the briefs.).

David R. Buchanan argued the cause for respondents in
A–1236–13 and A–1237–13 (Seeger Weiss, LLP, attorneys;
Mary Jane Bass (Beggs & Lane) of the Florida bar, admitted
pro hac vice, Peter Samberg (Weitz & Luxenberg, P.C.) of the
New York bar, admitted pro hac vice, Troy Rafferty (Levin
Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.) of

the Florida bar, admitted pro hac vice, and Mr. Buchanan, on
the brief).

Before Judges SABATINO, ACCURSO and SUTER.

**Opinion**

PER CURIAM.

**\*1** This is another appeal involving the prescription
acne drug Accutane, the brand name for isotretinoin.
Plaintiffs Kathleen Rossitto, Riley Dean Wilkinson, Rebecca
Ree Wilkins Reynolds, and Jason Young brought product
liability actions against defendants, Hoffman–La Roche Inc.
and Roche Laboratories Inc. (collectively "Roche"), the
manufacturers of Accutane.

Plaintiffs alleged that the drug caused them to sustain
ulcerative colitis, an inflammatory bowel disease ("IBD").
They claimed that the labeling of Accutane that existed at
the time failed to sufficiently warn them and their prescribing
physicians of the risk of IBD from using the drug. The
four cases, which were part of the Accutane multicounty
litigation[1], were tried together in 2012.

The jury returned a verdict awarding $9 million each
in compensatory damages to Rossitto and Wilkinson, but
returned a verdict in Roche's favor as to Reynolds and
Young.[2] Roche moved for judgment notwithstanding the
verdict and a new trial as to the Rossitto and Wilkinson
verdicts, which the court denied.

Roche now appeals, arguing that (1) the court made several
prejudicial evidentiary rulings, including the admission of
a revision to the Accutane label in 2000 constituting a
subsequent remedial measure inadmissible under N.J.R.E.
407 and arbitrarily restricting the number of testifying experts
on critical subjects; (2) the Accutane product warnings in use
when Rossitto and Wilkinson were prescribed the drug were
adequate as a matter of New Jersey law; (3) plaintiffs failed to
establish proximate cause; and (4) plaintiffs' claims are time-
barred under New Jersey law. Rossitto and Wilkinson have
not cross-appealed any of the trial court's determinations.

For the reasons that follow, we vacate the final judgment and
remand for a new trial.

I.

The basic circumstances involving the characteristics and labeling of Accutane, as well as the reported instances of IBD in patients who used the drug, have already been canvassed at length in the Supreme Court's opinion in *Kendall v. Hoffman– La Roche, Inc.,* 209 N.J. 173, 180–83 (2012),[3] and several unpublished opinions of this court. We will not repeat that entire background except to amplify certain matters that are particularly germane to the present appeal, such as Roche's interactions with the Food and Drug Administration ("FDA") on labeling issues and the course of revisions to the warnings on the Accutane label. We also mention certain evidence that emerged at the current trial to the extent it was not covered in prior Accutane trials or discussed in our previous Accutane opinions.

*Accutane*

Accutane was originally studied for use in treating cancer. In 1992, the FDA approved a New Drug Application ("NDA"), submitted by Roche under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A . §§ 301–99 ("FDCA"), to market Accutane to treat recalcitrant nodular acne. The acne condition is "marked by an accumulation of sebum under the skin, which ultimately ruptures the follicle wall and forms an inflamed nodule." *Kendall, supra,* 209 N.J. at 180.

**\*2** Accutane is a retinoid, derived from vitamin A. *Ibid.* "Although much remains unknown about how Accutane treats acne, the drug appears to reduce the production of oil and waxy material in the sebaceous glands." *Ibid.* It is well established that Accutane "has a number of known side effects, including dry lips, skin and eyes; conjunctivitis; decreased night vision; muscle and joint aches; elevated triglycerides; and a high risk of birth defects if a woman ingests the drug while pregnant." *Ibid.*

There is scientific evidence, which the parties sharply dispute in certain respects, that Accutane has an adverse effect on the gastrointestinal tract. Studies prior to the drug's approval by the FDA revealed instances of dose-related gastrointestinal bleeding in dogs treated with the drug.[4] Similarly, in an Accutane clinical study conducted by Roche on 523 patients, 21.6% of them (i.e., 113 patients) suffered gastrointestinal side effects, primarily effects on mucous membranes, including effects such as increased thirst and appetite, nausea, and anorexia, as well as more serious gastrointestinal bleeding. Five patients left the study because of undisclosed gastrointestinal effects, but there were no reported cases of IBD. Gastrointestinal symptoms, but not

IBD, were also reported in 34% of the clinical trial patients taking a chemically similar drug (Vesanoid, the brand name for tretinoin), manufactured by Roche to treat leukemia.

*Inflammatory Bowel Disease*

As in *Kendall* and several other Accutane appeals we have considered, this case concerns "the effect of Accutane on the digestive tract and, in particular, the alleged propensity of the drug to cause inflammatory bowel disease (IBD)." *Kendall, supra,* 209 N.J. at 180–81. IBD refers to "several chronic incurable diseases characterized by inflammation of the intestine." *Id.* at 181. The disease occurs when a trigger sets off an abnormal or exaggerated immune reaction, that is, an ongoing inflammatory reaction.

IBD primarily manifests as one of two diseases: ulcerative colitis and Crohn's disease. *Ibid.* Ulcerative colitis, the disease plaintiffs were diagnosed with, is "a chronic condition characterized by ulceration of the colon and rectum." *Ibid.* Crohn's disease is similar to ulcerative colitis in that it causes inflammation and ulcers, but it can occur in any part of the digestive tract from the mouth to the anus. Individuals suffering from IBD generally experience abdominal pain, and frequent—and often bloody—bowel movements, resulting in fatigue, dehydration, anemia, fever, cramping and bloating. *Ibid.* The symptoms often wax and wane, but the condition is permanent and there is no known cure. *Ibid.*

The etiology or cause of IBD still remains largely unknown; however, several factors are associated with a statistically increased rate of IBD, including family history, infections, frequent use of some antibiotics, smoking, and possibly the use of oral contraceptives and nonsteroidal anti-inflammatory drugs ("NSAID"). *Ibid.* The peak onset of IBD occurs during adolescence, which is the same period in which patients with acne were likely to have been prescribed Accutane. *See ibid.*

**\*3** There have been no post-marketing clinical trials to study whether Accutane use causes IBD. Such a study is considered the "gold standard" in assessing causation, but would require a very large clinical trial.[5]

*Accutane Labels and Warnings*

*The 1982 "Launch" Label*
The FDA did not require a warning about IBD to appear on the 1982 Accutane "launch label," even though Roche, as the sponsoring pharmaceutical company, had included

2016 WL 3943335

information in its NDA indicating that the drug had an effect on the gastrointestinal tract. *Kendall, supra,* 209 *N.J.* at 181; *see also* 21 *U.S.C.A* . § 355(b)(1)(A) (requiring NDAs to include reports of investigation into the safety and effectiveness of the drug); 21 *C .F.R.* § 314.50 (same). Nor did Roche, which was required to submit proposed labeling[6] as part of the NDA, propose such a warning. *See* 21 *C.F.R.* § 201.56(a); 21 *C.F.R.* § 314.50(c)(2)(i). Instead, the approved launch label, in accordance with FDA regulations, contained information about other adverse effects under sections headed "Contraindications," "Warnings," "Precautions," and "Adverse Reactions." *See* 21 *C.F.R.* § 201.80(d)-(g); 21 *C.F.R.* § 201.56.

Shortly after obtaining FDA approval for Accutane, Roche began to receive reports of IBD arising in patients who took the drug. As a result, in August 1983, Roche amended the "Adverse Reactions" section of the label to provide that IBD and mild gastrointestinal bleeding had been reported in "less than 1% of patients and may bear no relationship to therapy[.]"

The following month, Public Citizen, a nonprofit consumer advocacy group, petitioned the FDA for enhanced warnings on Accutane about a variety of serious adverse reactions, including IBD. Public Citizen expressed concern that the "potential toxicity" of Accutane had been "seriously under-emphasized" because the drug had been approved on limited data, had received "fast track" approval, and had been over-prescribed by physicians. The group cited to reports of patients developing IBD. It asserted that the number of reported cases underestimates the actual occurrence of IBD due to known rates of underreporting and recommended that Roche include a warning about the risk of developing the disease.

*The 1984 Accutane Label and Its Warnings*

In 1984, Roche amended the "Warnings" section of the Accutane package insert provided to physicians (the warning in effect when plaintiffs here took the drug),[7] as follows:

> Inflammatory Bowel Disease: Accutane has been *temporally associated* with inflammatory bowel disease (including regional ileitis) in patients without a prior history of intestinal disorders. Patients experiencing abdominal pain, rectal bleeding or severe diarrhea should *discontinue* Accutane immediately.

> [ (Emphasis added.]

The 1984 labeling change, which was reviewed and approved by the FDA and reprinted in the Physician's Desk Reference ("PDR"), remained in effect until 2000, throughout the time that the plaintiffs took the drug. *See* 21 *C.F.R.* § 314.70(c) (regulation governing changes to an approved application).

**\*4** In March 1984, Roche issued a "Dear Doctor" letter to prescribing physicians, which explained that:

> Ten Accutane patients have experienced gastrointestinal disorders characteristic of inflammatory bowel disease (including 4 ileitis and 6 colitis). While these disorders have been *temporally* associated with Accutane administration, i.e., they occurred while patients were taking the drug, a precise cause and effect relationship has not been shown. [Roche is] *continuing to monitor adverse experiences* in an effort to determine the relationship between Accutane ... and these disorders.

> [ (Second emphasis added.]

At that time, Roche's "Sales Desk Reference," a manual used by sales personnel in answering questions, provided that some patients had experienced symptoms characteristic of IBD, and that "[t]hese disorders have been temporally associated with Accutane administration, that is to say, the symptoms occurred while the patients were receiving the drug. A precise cause and effect relationship has not been shown."

*"Temporally Associated "*

The key term "temporally associated" in the 1984 labeling, which is at the core of the labeling adequacy issues here, was subject to differing and somewhat inconsistent definitions in testimony by Roche's company officials. For example, Eileen Leach, Roche's Medical Director of Dermatology, said that the term "temporal" meant that "during the time that the patient was taking Accutane, [he or she] developed symptoms, or [he or she] reported symptoms." On the other hand, Dr. Martin Huber, an oncologist and Roche's former Director of Drug Safety, differed with the definition of "temporal" contained in the sales manual, and said it meant a condition that occurs within a "reasonable proximity," and did not have to have occurred at the exact time that a patient was taking the drug. Dr. Alan Bess, Roche's Director of Drug Safety, said that the term "association" was susceptible to different meanings within a label.

PAS-L-002011-20  10/16/2020 3:16:53 PM  Pg 99 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC  Document 1-1  Filed 01/29/21  Page 157 of 248 PageID: 166
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

In June 1994, Roche issued an FDA-approved patient brochure which Wilkinson's mother received but could not recall having read. Rossitto's mother similarly could not recall having received or read the brochure. The patient brochure did not specifically refer to IBD, but warned that "ACCUTANE MAY CAUSE SOME LESS COMMON, BUT MORE SERIOUS, SIDE EFFECTS" and that patients should "BE ALERT FOR ... SEVERE STOMACH PAIN, DIARRHEA, [and] RECTAL BLEEDING." Patients who experienced any of those symptoms were advised to "discontinue" Accutane and consult with a doctor. The brochure also warned that those symptoms "MAY BE THE EARLY SIGNS OF MORE SERIOUS SIDE EFFECTS WHICH, IF LEFT UNTREATED, COULD POSSIBLY RESULT IN PERMANENT EFFECTS." The same FDA-approved warnings were printed on the blister packaging, containing the individual Accutane pills.

Roche's "general data" report concerning the drug stated that it is reasonable to conclude based on available literature that colitis "is a possible side effect of ROACCUTANE [8] in very rare cases, possibly in patients predisposed to inflammatory gastro-intestinal diseases."

### The Post–Marketing Period

**\*5** After receiving FDA approval for Accutane, Roche had a continuing obligation to monitor the drug's safety. This duty included reporting to the FDA any adverse drug experiences and any new information that might affect the "safety, effectiveness or labeling of the drug product," reviewing the scientific literature, and reviewing the data for evidence of potential safety issues that should be included on the product label. *See* 21 C.F.R. §§ 314.80–81.

As part of the monitoring process, Roche collected data on adverse drug experiences ("ADE") or events through its call center and through MedWatch, the FDA's voluntary reporting system. As required by 21 C.F.R. § 314.80(f), Roche recorded the reports on an FDA form, listing among other information, a description of the event and whether it abated after the patient stopped using Accutane and returned after resuming the drug (referred to as "challenge"/"dechallenge"/"rechallenge").

From 1992 to 1998, Roche recorded several positive rechallenge reports of IBD. Dr. Bess admitted that, in some instances, a single positive rechallenge can be significant enough to warrant inclusion of the event on the label.

However, Dr. Huber stated it was "very difficult to interpret" positive rechallenge data for IBD because it is a permanent disease in which the symptoms wax and wane.

In any event, in accordance with 21 C.F.R. § 314.80(b), Roche's medical reviewers examined the completed forms and then contacted the patient, doctor, or reporter to supply any missing information. Roche was required under 21 C.F.R. § 314.80(c)(1)(i) to report to the FDA "each adverse drug experience that is both serious and unexpected, whether foreign or domestic, as soon as possible but in no case later than" fifteen calendar days after receipt. Also, in compliance with 21 C.F.R. § 314.80(c)(2), Roche submitted annual and periodic ADE reports to the FDA, containing an analysis of the reports and a determination of whether a labeling change was warranted.

### The Two FDA Warning Letters, Internal Roche Reports, and Other Developments

In January 1998, while Rossitto and Reynolds were still taking Accutane, Roche received a warning letter from the FDA for deviating from the reporting requirements of 21 C.F.R. § 314.80(c)(1) by failing to submit a number of ADE reports generated by their facilities in various countries for Accutane and other drugs "within 15 working days." Although Roche had "initiated corrective actions" to insure efficient processing, according to the FDA, Roche continued to submit "late reports (with some going back to 1989)." The FDA directed Roche to take "prompt action to correct these deviations," and cautioned that failure to do so "may result in regulatory action," including "seizure and/or injunction."

Roche also entered the data from the ADE reports into its internal ADVENT database. The ADVENT database contained a field which reflected the drug company's assessment of "relatedness or causality." Periodically, Roche prepared internal causality reports, which were not required to be submitted to the FDA, evaluating the ADE reports as entered into their database. In one such internal causality assessment, Roche indicated that, from 1982 to 1994, 104 cases of IBD and related syndromes had been reported in Accutane users, of which thirty-three were given a causality rating of " 'possibly' or 'probably' related to the administration of the drug."

**\*6** Based on this information, Dr. Henry Lefrancq, a physician with Roche, stated in an internal memo dated February 24, 1994, "[i]t is reasonable to conclude from this data that, in rare cases, ROACCUTANE may induce or

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 100 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 158 of 248 PageID: 167
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)
2016 WL 3943335

aggravate a preexisting colitis." Dr. Lefrancq explained it was reasonable to assume that Accutane has the "same effect on the intestinal mucosa as [has been observed] on the other mucosae in the body such as the oral or nasal mucosae." He added, "As these reactions have always been reversible, the colitis which may develop in a relatively limited number of patients can as well be regarded as reversible."

In another internal report from May 2003, Roche stated that there had been 159 reports of adverse events from exposure to Accutane received from worldwide sources. Sixty-four of those patients had Crohn's disease, of which Roche assessed causality as "related" in twenty-seven cases. The remainder were designated either as unrelated or unknown, and twenty-nine had IBD (not otherwise specified), of which it assessed causality as related in thirteen cases, and as unknown in the remaining sixteen cases.

Roche also prepared periodic safety update reports ("PSUR") for European regulators. In a PSUR dated August 17, 1988, Dr. Peter Schifferdecker, a physician and Roche product specialist, reviewed the reports received from patients using Accutane from January 1 to June 30, 1988, and concluded that "[s]ince introduction, ROCHE Drug Safety received 38 case reports of colitis [IBD] and proctitis in association with ROACCUTAN treatment." Twenty-two patients "recovered" after discontinuation of Accutane, but nine patients had persisting colitis or proctitis, and one patient underwent a "total colectomy." In another report dated November 16, 2000, Roche stated that "[i]sotretinoin has been found to be causally associated with inflammatory bowel disease, including colitis." Later, in a January 2003 report, Dr. Daniel Reshef, Roche's Director of Drug Safety, stated that there was "an average event latency after the start of the drug" to when symptoms of IBD manifested "ranging from 23 to 1,219 days."

According to Dr. Bess, in December 1997, while sales of Accutane were escalating sharply, there were differences of opinion between Roche's drug safety and marketing departments about adopting a label change to warn about depression, a different alleged side effect of Accutane. Dr. Bess testified that Frank Condella, Roche's vice president of marketing, "felt very strongly that any label change would hurt U.S. sales." The marketing department's "philosophy was to protect the franchise" and "build the product," and thus Condella, during a "very loud disagreement," "made it very clear that he wouldn't tolerate any action that would hurt the product." Mike Carter, who reported to Dr. Bess, agreed that "[m]arketing was calling the shots."

Dr. Russell Ellison, Roche's former chief medical officer, who was called as a witness at this trial by both sides, acknowledged that there were some "disagreements" between Roche's marketing and drug safety departments. Dr. Ellison asserted, however, that marketing never "called the shots," and that its concerns did not prevail because in February 1998 the Accutane label was changed to include a stronger warning about depression. However, he also stated that Roche had made a significant investment in marketing Accutane, and that its investment strategy was to "[f]eed the goose that lays the golden eggs." Dr. Ellison further noted that before he started working for Roche in 1997, the company had a "negative" image with the FDA (but not specifically regarding Accutane and IBD), which he claimed he had repaired.

**\*7**  On March 5, 1998, Roche received a second warning letter from the FDA in which the agency concluded that Roche's advertising and promotional materials for Accutane were "false or misleading" and promoted "Accutane for an unapproved use." The FDA found that Roche had failed to disclose "that depression may be associated with the use of Accutane," and had "misleadingly" suggested "that Accutane therapy will minimize or improve the patient's psychosocial status, including depression," even though Roche had "not systematically studied" the ability of Accutane to modify or prevent depression.[9] According to the FDA, Roche's claim was "particularly troublesome in light of information recently presented in a Dear Doctor letter, that Accutane may cause depression[.]" The FDA required Roche to cease this promotional activity and to instruct its sales personnel to stop disseminating the materials.

*The 2000 Label Revision*

In May 2000, after all of the plaintiffs in this trial had completed their treatment, Roche amended the Accutane warnings section. It removed the term "temporally," and added language about persistent IBD symptoms as follows:

Inflammatory Bowel Disease: Accutane has been *associated with* inflammatory bowel disease ... in patients without a prior history of intestinal disorders. *In some instances, symptoms have been reported to persist after Accutane treatment has been stopped.* Patients experiencing abdominal pain, rectal bleeding or severe

PAS-L-002011-20  10/16/2020 3:16:53 PM  Pg 101 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC  Document 1-1  Filed 01/29/21  Page 159 of 248 PageID: 168
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

diarrhea should discontinue Accutane immediately (see ADVERSE REACTIONS: Gastrointestinal).[10]

[ (Emphasis added.)]

Despite the label's acknowledgement of an association, Roche's position at trial was that Accutane does not cause IBD.

*Plaintiffs' Use of Accutane and Their IBD*

*Rossitto*

Rossitto is a New Jersey resident. In 1992, when she was twelve years old, Rossitto began seeing Dr. James Watt, a dermatologist, for treatment of her acne. Dr. Watt initially prescribed a series of antibiotics and topical creams which did not cause her any gastrointestinal upset, but did not resolve her acne.

In 1997, Dr. Watt recommended that Rossitto, who was then sixteen years old, begin taking Accutane. Dr. Watt, who had read the Accutane label, discussed certain side effects with Rossitto and her mother, including dry skin and lips, effects on the liver, and the risk of birth defects if she became pregnant while taking the drug. The mother testified that Dr. Watt did not discuss the risk of developing IBD, asserting that, if he had, she would not have allowed her daughter to take the drug. The mother also understood from reading the patient brochure, that when you stopped taking the drug, "the side effect would also stop."

Dr. Watt discarded all of his medical records when he retired in 2001. At his de bene esse deposition, he could not specifically recall having treated Rossitto. However, he testified that it was his customary practice in 1997 to only warn patients about the more serious and more common side effects of the drug, including dry skin and lips, and birth defects. Dr. Watt testified that the information provided in the 1984 label did not warn him that Accutane can cause permanent IBD, asserting that if it had, he would have relayed that information to his patients.

**\*8** In December 1997, Rossitto began taking Accutane with her mother's consent. She completed her treatment in April 1998. During this approximately six-month treatment period, Rossitto experienced dry skin and lips, but no gastrointestinal effects.

In July 1999, about fourteen months after she stopped taking Accutane, Rossitto saw Dr. Richard Eichel, a

gastroenterologist, complaining of blood in her stool, diarrhea, and severe abdominal pain. Dr. Eichel diagnosed her as suffering from ulcerative colitis.

Over the next eleven years, Rossitto's IBD symptoms flared and remitted. She underwent numerous colonoscopies, was hospitalized several times, and was treated with a variety of medications, including long-term steroid use. On bad days, she had twenty-five bloody bowel movements a day, and suffered from cramping, fever, and abdominal pain. In June 2011, her colon was surgically removed and her small intestine was brought through a hole in her abdominal wall to drain into an ileostomy bag. In October 2011, she underwent a second surgery to reverse the ileostomy.

None of Rossitto's treating physicians told her that Accutane was the cause of her IBD. Rossitto testified that she instead first learned of the connection between Accutane and IBD in November 2010, when her friend told her about a television commercial that mentioned the disease.

*Wilkinson*

Wilkinson is a resident of Utah. In January 1993, when he was fifteen years old, Wilkinson began seeing Dr. Robert Orme, a dermatologist, for an acne condition. Like Rossitto, Wilkinson was prescribed a series of antibiotics and creams which proved ineffective but did not cause him any gastrointestinal upset. In October 1993, Dr. Orme gave Wilkinson and his mother a copy of the Accutane patient brochure. In July 1994, Dr. Orme "strongly" recommended that Wilkinson begin taking Accutane, but Wilkinson's mother decided to defer possible Accutane treatment to a later time for various reasons.

In May 1995, Dr. Orme gave Wilkinson and his mother another copy of the patient brochure. Dr. Orme, who had read the 1984 label, discussed with them various side effects of taking Accutane, including dry eyes and skin, photosensitivity, joint pain, headaches, depression, birth defects, and dry mucous membranes, but not IBD. He testified that "[i]n all likelihood," if the label had warned that Accutane had been "possibly or probably associated" with IBD he would still have prescribed the drug for Wilkinson and would not have changed the content of the warnings he gave to Wilkinson. However, Dr. Orme also testified that if Roche had warned that taking Accutane presented a risk of developing IBD, he "[d]efinitely" would have warned them about IBD. Wilkinson's mother confirmed that Dr. Orme had not discussed the risk of developing IBD, stating that, if he

PAS-L-002011-20 10/16/2020 3:16:53 PM Pg 102 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC Document 1-1 Filed 01/29/21 Page 160 of 248 PageID: 169
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

had, she would not have allowed her son to take the drug even if Dr. Orme had "highly recommended it."

In May 1995, Wilkinson, then seventeen years old, began taking Accutane with his mother's consent. He completed that course of treatment in October the same year. While taking Accutane he suffered from dry lips and a few nosebleeds, but no gastrointestinal problems.

**\*9** In May 1996, approximately seven months after he stopped taking Accutane, Wilkinson began experiencing bouts of worsening abdominal pain and bloody diarrhea. The symptoms persisted. In June 1997, approximately twenty months after he stopped taking Accutane, Wilkinson was diagnosed with ulcerative colitis.

Over the next several years, Wilkinson was treated with a variety of medications, including steroids. In May 2001, his colon was surgically removed and he was fitted with an ileostomy bag. He later underwent a second surgery to reverse the ileostomy and replace his colon with a surgically created J-pouch. He subsequently developed bouts of pouchitis caused by J-pouch infections.

None of Wilkinson's treating physicians had ever told him that Accutane was the cause of his IBD. Wilkinson testified that he first learned of the connection between Accutane and IBD in December 2006, when he saw a television commercial on the subject.

*Expert and Related Testimony*

The parties presented at trial numerous competing liability experts addressing the critical issues of causation and labeling.

*Plaintiffs' Experts*

Plaintiffs' presented Dr. David Sachar as their causation expert, who linked generally the use of Accutane with IBD and addressed specific causation with respect to plaintiffs' own medical conditions.[11] Dr. Sachar is a board-certified gastroenterologist and internist. He has been a professor at Harvard and Mount Sinai Schools of Medicine. He was also the past chairman of the FDA Gastrointestinal Drugs Advisory Committee, and has authored or co-authored approximately a hundred articles on IBD in peer-reviewed publications.

Relying on a variety of sources, Dr. Sachar opined that Accutane in prescribed doses can cause, trigger or exacerbate ulcerative colitis in humans, and was in fact the cause of plaintiffs' ulcerative colitis in this case. He explained that although Accutane has a half-life of only about ten-to-twenty hours, it acts as a trigger, setting in motion an inflammatory effect that results in the latent development of Accutane-induced IBD.

As to specific causation, Dr. Sachar found that Wilkinson's Accutane use in 1995 had caused his ulcerative colitis. Dr. Sachar noted that Wilkinson had received a high dose for a relatively long period (five months), and had become symptomatic approximately six to twelve months after he had stopped taking the drug, which was well within the latency period. Further, Dr. Sachar ruled out other potential triggers, including family history, prior infections, and NSAID and antibiotic use.

Similarly, Dr. Sachar found that Rossitto's use of Accutane from December 1997 to April 1998 had caused her ulcerative colitis. He explained that Rossitto had received an "escalated" dose for four months, and was diagnosed with ulcerative colitis approximately fourteen months after she stopped taking Accutane, which was also well within the drug's latency period. Dr. Sachar likewise ruled out other causes of Rossitto's IBD.

**\*10** Dr. Cheryl Blume, a pharmacologist and consultant, testified as plaintiffs' expert in regulatory affairs, "pharmacovigilance," and drug labeling. Dr. Blume opined, as she had in *Kendall* and in other prior Accutane cases, that the 1984 Accutane label or warning in effect when the present plaintiffs took the drug did not accurately reflect the knowledge that Roche actually had at that time about IBD. Dr. Blume conceded that when the 1984 FDA-approved label for Accutane was first adopted, it appropriately warned about IBD, based on the information Roche had at that time. However, Dr. Blume opined that by the late 1980s the label was no longer accurate because Roche had received, through its post-marketing surveillance, numerous reports of patients who had developed IBD months after taking Accutane. Many of those reports contained positive rechallenge events. According to Dr. Blume, given generally accepted FDA rates of under-reporting, those reports may constitute only one-to-ten percent of the actual incidences of IBD in Accutane patients.

2016 WL 3943335

Based on the post-marketing ADE reports and the company's own internal conclusions, Dr. Blume concluded that Roche had deviated from the applicable standard of care on labeling. She testified that the 1984 label, which had remained unchanged for sixteen years, should have contained stronger, more specific language to clearly communicate the risk that taking Accutane can cause IBD. She criticized the label's use of the phrase "temporally associated" as deficient because Roche had received reports of a latency effect, signifying that a patient could develop IBD long after he or she had stopped taking the drug.

Further, Dr. Blume opined that Roche should have recommended in the "Precautions section" that patients who are susceptible to IBD should be given a lower dose of Accutane or not prescribed the drug at all. According to Dr. Blume, Roche should also have referred to the "very important" multiple positive rechallenge events, because there are instances where even a single positive rechallenge is included in a warning label. Dr. Blume also found significant that Roche had received two warning letters from the FDA about the shortcomings of its advertising and promotional materials for Accutane about depression, albeit not about IBD.

### Roche's Experts

Roche's experts proffered countering opinions on causation and labeling adequacy. On the subject of general causation, Roche presented Dr. Maria Oliva–Hemker, an expert in pediatric gastroenterology who focused on Rossitto's case. She opined that Accutane in prescribed doses cannot cause or substantially contribute to IBD in humans, and was not the cause of Rossitto's ulcerative colitis. Dr. Oliva–Hemker stated that, although the cause of ulcerative colitis remains unknown, studies have shown that genetics and exposure to certain triggers—but not Accutane—play a role in developing the disease. Dr. Oliva–Hemker stressed that the incidence rate of ulcerative colitis, which has been diagnosed in patients since 1875, had not risen after Accutane came on the market in 1982. As to specific causation, she opined that the most likely trigger of Rossitto's ulcerative colitis was her "extensive exposure to antibiotics" in the five years before taking Accutane.

*11  Similarly, Dr. Brian Dieckgraefe, Roche's expert in gastroenterology and IBD who focused on Wilkinson's case, opined that the available evidence does not support a causal connection between Accutane and IBD. He asserted that "[g]enetics cause" IBD, and that a number of triggers

had been reported in the scientific literature and accepted as "exacerbat[ing]" ulcerative colitis, including antibiotics, NSAIDs, and oral contraceptives, but not Accutane. Dr. Dieckgraefe opined that Accutane was not the trigger for Wilkinson's ulcerative colitis because his exposure to the drug was "not proximate" to its developing the disease. The expert could not, however, detect any identifiable known risk or trigger for the onset of Wilkinson's ulcerative colitis. He thus characterized the condition as "idiopathic."

Countering plaintiffs' labeling expert Dr. Blume, Dr. David Feigal testified for Roche that the 1984 Accutane label, in fact, was appropriate. Dr. Feigal is an epidemiologist specializing in drug regulatory affairs, labeling, and pharmacovigilance. He recognized that in 1983 Roche had received nine or ten case reports of patients who developed IBD while taking Accutane and asserted that Roche responded to those reports "rather promptly," noting that during an FDA advisory committee meeting in October 1983, Roche proposed certain labeling language to "convey that information to physicians[.]" The FDA presented counterproposals, and ultimately approved the language contained in the amended 1984 label.

Dr. Feigal testified that the 1984 label, which is at issue here, contained a "very strong and very effective warning" about IBD. He submitted that the term "temporally associated" used on the label indicates a "strong association," and communicates that IBD is a possible side effect of taking Accutane. Dr. Feigal added that the patient brochure given to plaintiffs was another tool by which a physician could communicate information about Accutane to a patient. Although IBD was not specifically referenced in the patient brochure, the symptoms of the disease were. The brochure instructed a patient to discontinue taking the drug and to check with his doctor if he or she experienced any of those symptoms.

Dr. Feigal agreed that a label should be changed if there is reasonable evidence of an association of a serious hazard with a drug. However, he found no evidence in the ADE reports or the scientific literature of a change in the frequency or severity of IBD, or of a latency effect, sufficient to warrant such a change.

In this regard, Dr. Feigal noted that from 1992 to 1993, Roche received only nine reports of IBD from among the approximately 300,000 Accutane users. From 1992 to 1998, there were about 190 reports of IBD from the approximately

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 104 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 162 of 248 PageID: 171
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

eight million Accutane users in the United States. After adjusting for the increased number of patients taking the drug, Dr. Feigal found no change in the frequency of reported cases of IBD, and found only five cases, out of eight million, where the patient experienced a latency effect. Dr. Feigal further stated that the causality reports and epidemiological studies showed only an association, not causation.

**\*12** On the whole, Dr. Feigal opined that Roche had acted in accordance with FDA standards by conducting post-marketing surveillance, and in complying with reporting and warning letter requirements. Although Dr. Feigal acknowledged that Roche had received a warning letter in 1998 about its failure to timely submit ADE reports to the FDA, he testified that such a failure was not indicative of a "system deficiency," because the late reports had been generated in France and not in the United States.

### Dr. Ellison's Testimony

Dr. Feigal's expert opinions on labeling dove-tailed substantially with the factual testimony of Dr. Ellison, who was responsible at Roche for the contents of the Accutane label between 1997 and 2002.

Dr. Ellison maintained that the 1984 label, which provided that Accutane "has been temporally associated" with IBD, was medically accurate and "was the strongest representation" of the risks based on the data that Roche then possessed. He asserted that the term "associated" was a "very accurate way of saying may cause," and that the term "has been" in the label was "very strong" language intended to convey that the potential risk "has been observed."

Dr. Ellison further contended the warning was consistent with the scientific literature, in which authors frequently had used the terms "has been associated" and "temporal relationship" in discussing Accutane and IBD.

According to Dr. Ellison, the 2000 revision to the Accutane label did not alter the "fundamental purpose" of the warning, that is, to warn physicians that there was a risk of developing IBD from taking Accutane. To that end, Dr. Ellison asserted that even if the warning had not been changed, it would still have been medically accurate, appropriately written, and complete. Moreover, he noted that the FDA had not asked Roche to amend the warning to include the information plaintiffs' expert Dr. Blume claimed should have been listed, including positive rechallenges, causality assessments, and a latency effect.

Dr. Ellison acknowledged that, after the Accutane label was amended in 2000, there were discussions about whether the FDA would refer an evaluation of the label to an advisory committee on a variety of side effects, including IBD.[12] An internal Roche "briefing document," dated April 6, 2000, addressed to Kevin Rigby, Roche's vice president of business policy and governmental affairs, noted that Roche had entered into negotiations with the FDA over the label. However, the briefing document further indicated that the discussions had "degenerated," and that the company's responses to the FDA's concerns had "almost uniformly been rejected [by the FDA] as insufficient." The internal document concluded that Roche had three options: (1) pressure the FDA to prevent an advisory committee; (2) work toward and prepare for a narrowed advisory committee hearing; or (3) prepare for a fairly open advisory committee hearing. Regardless of whether the potential hearing was "narrow" or "open," the document cautioned that "any review of adverse events could lead to questions by committee members on any listed adverse event or members of the public could raise those issues in a *manner likely to prove extremely harmful to Roche.*" (Emphasis in original).

### The Verdict and the Present Appeals

**\*13** After its deliberations, the jury issued a verdict finding that: (1) Roche failed to provide an adequate warning to the prescribing physicians of Rossitto, Wilkinson, Reynolds and Young; (2) Roche's failure to warn was a substantial factor in the decisions of Rossitto and Wilkinson, but not of Reynolds and Young, to take Accutane; and (3) Accutane was a substantial factor in Rossitto and Wilkinson developing IBD. As we have already noted, the jury awarded an identical $9 million in compensatory damages to both Rossitto and Wilkinson. This appeal by Roche ensued.[13]

## II.

We begin with a short overview of the governing substantive law. Plaintiffs hinge their claims in this case upon the New Jersey Product Liability Act ("PLA"), *N.J.S.A.* 2A:58C–1 to –11. Although Wilkinson is a citizen of Utah (unlike Rossitto who is a citizen of this state), all parties agree that the PLA and the substantive laws of New Jersey, where Roche is headquartered, govern the liability issues in this case. The product liability laws of Utah and New Jersey, although not identical, are sufficiently similar to justify that choice of law

designation. *See P.V. ex rel. T.V. v. Camp Jaycee,* 197 *N.J.* 132, 143 (2008) (applying a "most significant relationship test" to determine the governing choice of law on legal issues); *Rowe v. Hoffmann–La Roche, Inc.,* 189 *N.J.* 615, 621 (2007) (instructing, in the context of an Accutane products liability case, that choice-of-law determinations should be made on an issue-by-issue basis).[14]

The PLA was enacted by our Legislature in 1987 "as a remedial measure to limit the liability of manufacturers by establishing 'clear rules with respect to certain matters relating to actions for damages for harm caused by products,' " and in particular, to "reduce the burden on manufacturers of FDA-approved products resulting from products liability litigation." *Kendall, supra,* 209 *N.J.* at 194. In accordance with common-law principles, the PLA provides that a manufacturer shall be liable for harm caused by a product that was "not reasonably fit, suitable or safe for its intended purpose" because it "failed to contain adequate warnings." *N.J.S.A.* 2A:58C–2. A manufacturer "shall not be liable for harm caused by a failure to warn if the product contains an adequate warning," which is defined as

> one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account ... in the case of prescription drugs ... the characteristics of, and the ordinary knowledge common to, the prescribing physician.
>
> [*N.J.S.A.* 2A:58C–4.]

Following FDA approval, a manufacturer has a continuing duty to warn of all known adverse effects of a drug as soon as reasonably feasible based upon actual or constructive knowledge of a danger. *Feldman v. Lerderle Labs.,* 97 *N.J.* 429, 456–57 (1984). In this regard, FDA regulations require that "the labeling accompanying a prescription drug 'describe serious adverse reactions and potential safety hazards' and that the labeling 'be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug.' " *Rowe, supra,* 189 *N.J.* at 625 (quoting 21 *C.F.R.* § 201.80(e)).

**\*14** The process of changing an FDA-approved drug label is governed by federal regulation. For example, proposed changes in labeling are generally first submitted to the FDA for approval. However, when a new safety issue emerges, a company may add to the product's labeling on a temporary basis prior to FDA approval by the use of what is known as a "changes being effected" ("CBE") supplement. *See* 21 *C.F.R.* § 314.70(a)-(d). A supplement "is appropriate to amend the labeling for an approved product only to reflect newly acquired information ... to add or strengthen a contraindication, warning, precaution, or adverse reaction only if there is sufficient evidence of a causal association." *Bailey v. Wyeth, Inc.,* 424 *N.J.Super.* 278, 292 (Law Div.2008) (quoting 73 *Fed.Reg.* 2848 (Jan. 16, 2008)). The FDA defines " 'newly acquired' as 'data, analyses, or other information not previously submitted to the agency.' " *Ibid.* (quoting 73 *Fed.Reg.* at 2850). Ultimately, as it did with respect to Accutane, the FDA reviews all "modified labeling to ensure compliance with FDA regulations." *Id.* at 291–92.

In failure-to-warn claims involving pharmaceuticals, the New Jersey Legislature "recognized the preeminent role of federal regulation of drugs," *Cornett v. Johnson & Johnson,* 211 *N.J.* 362, 387 (2012), by including the following section in the PLA:

> If the warning or instruction given in connection with a drug or device or food or food additive has been approved or prescribed by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," ... *a rebuttable presumption shall arise that the warning or instruction is adequate.*
>
> [*N.J.S.A.* 2A:58C–4 (emphasis added).]

"Compliance with FDA regulations provides compelling, although not absolute, evidence that a manufacturer satisfied its duty to warn about the dangers of its product." *Kendall, supra,* 209 *N.J.* at 195. This "virtually dispositive" statutory "super-presumption" under the PLA is difficult to overcome. *Id.* at 195–197; Dreier, Keefe & Katz, *Current N.J. Products Liability & Toxic Torts Law* § 15:4 at 464–65 (2016). It is "stronger and of greater evidentiary weight than the customary presumption referenced in *N.J.R.E.* 301." *Bailey, supra,* 424 *N.J.Super.* at 314.

To overcome the PLA's "super-presumption," a plaintiff must show either: (1) "deliberate concealment or nondisclosure of after-acquired knowledge of harmful effects," *Perez, supra,* 161 *N.J.* at 25; *Rowe, supra,* 189 *N.J.* at 626; or (2) substantial evidence of economically-driven manipulation of the post-market regulatory process, *McDarby v. Merck & Co.,* 401 *N.J.Super.* 10, 63, 66 (App.Div.2008), *certif. dismissed as improvidently granted,* 200 *N.J.* 267 (2009). Compensatory damages are reserved for those "rare cases

PAS-L-002011-20 10/16/2020 3:16:53 PM Pg 106 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC Document 1-1 Filed 01/29/21 Page 164 of 248 PageID: 173

Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)
2016 WL 3943335

when the presumption is overcome." *Perez, supra,* 161 *N.J.* at 25.

III.

**\*15** Roche argues that it was seriously prejudiced in defending this case by several erroneous evidentiary rulings of the trial court. Those challenged rulings included, among other things, (1) allowing plaintiffs' counsel to reveal, when examining Dr. Ellison, that the Accutane label's warning was changed in 2000 after plaintiffs had ceased using the drug, despite the court having previously ruled that the subsequent labeling change would be excluded at trial under *N.J.R.E.* 407; (2) arbitrarily restricting the number of expert witnesses who could testify on a particular subject; and (3) not permitting Roche to introduce into evidence a scientific study that it contends undercuts plaintiffs' causation theories.

We agree with Roche that the trial court misapplied its discretion with respect to the first two of these challenged rulings, which had the cumulative impact of skewing the jurors' fair consideration of this case.

A.

*N.J.R.E.* 407 directs that "[e]vidence of remedial measures taken after an event is not admissible to prove that the event was caused by negligence or culpable conduct. However, proof of such subsequent remedial conduct may be admitted as to other issues." *Rule* 407 codifies our state's "strong public policy encouraging prompt remedial measures[.]" *Szalontai v. Yazbo's Sports Cafe,* 183 *N.J.* 386, 402 (2005). The Rule recognizes those remedial objectives can be thwarted if a defendant's post-accident corrective actions are admitted as liability proofs in product liability cases. *See In re Petition of S.D.,* 399 *N.J.Super.* 107, 124 (App.Div.2008) (noting that New Jersey has a longstanding public policy favoring the immunization of remedial measures from negative inferences).

Subject to considerations of unfair prejudice and other countervailing factors under *N.J.R.E.* 403, evidence of remedial conduct at times may be admitted under *N.J.R.E.* 407 as to other issues, including efforts to impeach the credibility of a witness. *See Kane v. Hartz Mountain Indus., Inc.,* 278 *N.J.Super.* 129, 148 (App.Div.1994), *aff'd o.b.,* 143

*N.J.* 141 (1996); *Lavin v. Fauci,* 170 *N.J.Super.* 403, 407 (App.Div.1979).

Initially, as it had in other Accutane trials, the trial court barred admission of the 2000 revised label (which, as we have noted, removed the term "temporally" and added language about persistent symptoms) as a subsequent remedial measure disallowed by *Rule* 407. As we will discuss, *infra,* the court reversed course on that ruling later in the case.

A threshold question under *Rule* 407 is whether the 2000 label change qualifies as a subsequent remedial measure. Consistent with the public policy underlying *Rule* 407, the Rule has been "held not to bar evidence of subsequent remedial conduct which was taken under governmental mandate rather than voluntarily." Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 407 (2016). For example, in *Harris v. Peridot Chemical (N.J.), Inc.,* 313 *N.J.Super.* 257, 292 (App.Div.1998), we held *Rule* 407's evidentiary prohibition was inapplicable because the safety measures taken by the defendant in that case were not remedial, but rather were mandated by the Department of Environmental Protection. Hence, "admission of the evidence would not violate the policy underlying the Rule." *Ibid.; see also Cepeda v. Cumberland Eng'g Co., Inc.,* 76 *N.J.* 152, 193 n. 11 (1978) (noting that proof of a defendant's installation of a safety device was not barred from evidence as a subsequent remedial measure because it was installed as the result of an official demand, not a voluntary action), *overruled on other grounds, Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150 (1979).

**\*16** We therefore must consider whether the FDA "mandated" the label change in 2000.[15] Dr. Ellison testified that the Accutane label was amended in 2000, in accordance with the FDA's suggestion to take out the word "temporally" and to add language about persistent symptoms. He explained that Roche "effectively agreed" with that suggestion because it did not "dispute it."

If, in fact, the FDA's "suggestion" is deemed to be a mandated label change, then the court's admission of the 2000 label would not violate the policy underlying *Rule* 407 and would not be barred as a subsequent remedial measure. On the other hand, if the label change is deemed voluntary, evidence of that remedial conduct still might be admissible under *Rule* 407 for purposes other than proving culpable conduct or causation. *Kane, supra,* 278 *N.J.Super.* at 148. Nonetheless, "[e]ven

*Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)*

2016 WL 3943335

where subsequent remedial conduct evidence has relevance to some fact in issue other than negligence, it may be excluded if the prejudicial effect outweighs the probative value." *Ibid.*

Having originally considered the 2000 label change as a non-mandated subsequent remedial measure, the trial court altered its course later in this trial. On the twenty-ninth day of trial, Dr. Ellison testified that the 1984 label was medically accurate and was the strongest representation of the risks based on the data that Roche had at that time. He contended the "temporally associated" warning conveyed causation, and that removing the word "temporally," might "weaken the association in the minds of the doctor," because a doctor might wonder how Roche had determined there was an association. He concluded that "[t]o a degree," inclusion of the term "temporally" made the warning stronger and "was a good thing."

At that point, the court, over Roche's objection, granted plaintiffs' application to admit the 2000 label into evidence under *Rule* 407, for the stated purpose of impeaching Dr. Ellison's credibility. The court subsequently denied Roche's motion for a mistrial on this issue. It instructed the jury that the label change was "admissible only for the purpose of attacking the credibility of the statements of the witness," and was not proof "that the label was inadequate."

In later denying Roche's post-trial motion for JNOV, the trial court found that Dr. Ellison had "opened the door" to justify the admission of the 2000 label. As part of the court's reasoning, it concluded, on reflection, that Roche's assent to the FDA's suggested change to the label in 2000 did not amount to a voluntary "remedial measure" within the ambit of *Rule* 407.

As an appellate court we must afford due deference to the trial court's authority over evidential rulings. *Hisenaj v. Kuehner,* 194 *N.J.* 6, 16 (2008). Nonetheless, we conclude that the court seriously erred in allowing plaintiffs' counsel to divulge to the jury that the Accutane label was altered in 2000 after plaintiffs had already stopped ingesting the drug. The court originally—and correctly—recognized before this trial began the substantial prejudice to Roche in allowing the subsequent post-ingestion labeling change to be considered by the jury. It should not have strayed from that correct determination.

**\*17** We are not persuaded that the 2000 labeling revision was a "mandated" change. As we have already noted, *supra* note 15, the FDA did not acquire the express regulatory

authority to mandate such changes until 2007. We disagree with the trial court's ultimate finding that the FDA's role in proposing the labeling change in 2000 rendered the drug company's adoption of that proposal involuntary. Hence, both the terms and the underlying public policies of *Rule* 407 do pertain here.

Although Dr. Ellison would not concede the point, it is manifestly clear that the 2000 warning did strengthen the label's warning relating to IBD and gastrointestinal disorders by removing the "temporally associated" phrasing that had preceded it. The revelation of the 2000 label change could easily have been viewed by the jurors as "smoking gun" evidence, signifying that the Accutane label that had preceded the 2000 version was deficient.

We disagree with the trial court's assessment that plaintiffs' disclosure of the 2000 label change was justified by *Rule* 407's exception for "other issues" such as witness impeachment. To be sure, Dr. Ellison did maintain that the previous 1984–vintage label was more than adequate, and that inclusion of the word "temporally" was beneficial to patients and their doctors. But such a retrospective defensive posture is a natural aspect of a classic *Rule* 407 factual paradigm, in which defendants and their witnesses are tasked with justifying the sufficiency of past conduct or the benign quality of past conditions that preceded a subsequent remedial change.

In any event, even if we agreed the disclosure of the 2000 label change to the jury fell within an exception to *Rule* 407, the probative value of that impeachment was substantially overcome by the strong prejudice to the defense and by the important public policies underlying the Rule. The court failed to afford sufficient consideration to the offsetting reasons for exclusion under *N.J.R.E.* 403. *See Green v. N.J. Mfrs. Ins. Co.,* 160 *N.J.* 480, 495–501 (1999).

The impact of this error was compounded by plaintiffs' summation. A substantial portion of the summation focused upon attacking Roche's conduct that post-dated plaintiffs' ingestion of Accutane, including an explicit argument that the "stronger" 2000 label change proved the inadequacy of the earlier warning. As part of his closing, plaintiffs' counsel told the jury:

> *Roche failed to provide an adequate warning.* Dr. Blume told you so. I think you know so. *You have seen the information. And this is what you got last week from Dr. Ellison,* his interpretation of the label.

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 108 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 166 of 248 PageID: 175

Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

He said, first of all, very important fact, [w]e never made the label weaker. I established that. That was the first point I established with him.

*And then you learned about five minutes later that,* in fact, what they did, after claiming that temporally associated was a stronger warning to patients [and] that [it] conveyed more than association ... was that *in 2000, they took it out of the label. It was removed. And Dr. Ellison, this is the 2000 label change, something you learned about just last week,* removed, and Dr. Ellison told you what it meant, when "temporally" was taken out of the label, *it conveyed to prescribers that this event could develop after somebody stopped taking the drug. Latency. Latency. Not in time for these folks, notwithstanding the company had information on latency years before. Not in time for their doctors.*

**\*18** [ (Emphasis added.)]
This robust and pointed argument shows that, notwithstanding the court's limiting instruction, the 2000 label change was used within plaintiffs' advocacy for its substantive evidential power. Despite the court's instruction, the evidence was obviously not deployed solely as mere impeachment proof to undermine Dr. Ellison. Instead, it was advocated as direct proof of the prior warning's deficiencies, accentuated by counsel's dramatic point that the remedial measure came "too late" for these plaintiffs.

The clear potential for unfair prejudice to Roche was further illuminated by the question the jurors posed as their very first request during deliberations. The jury asked, "Can we see all the evidence or only for 1998 back[?] In reference to the last Accutane brochure showed [sic] in court with the new language." While counsel were discussing with the judge in chambers how to deal with this request, the jury then indicated that "they didn't need an answer, that they found what they were looking for." Roche's counsel argued that the posing of the request suggested that the jury was "talking about the 2000 label change," and that the jury presumably intended to improperly "use the evidence prior to 1998, and then [compare it substantively to] the 2000 label[.]" The judge responded that the court could not interfere with the jury's deliberation, or speculate as to the reason for the jury's request. We do not share the trial court's confidence that the request was inconsequential, even if it is not totally certain what motivated the inquiry. Instead, it provides further indicia that the improvident admission of the 2000 revised label had the capacity to cause a miscarriage of justice. *R.* 2:10–2.

In sum, the trial court's ill-advised departure from its original ruling to exclude the 2000 label change under *Rule 407* constituted reversible error. The error was of such a magnitude, particularly coupled with the expert-limitation issue we now address, to warrant relief.

**B.**

The trial court also misapplied its discretion, albeit without having the benefit of more recent published case law, by curtailing the number of expert witnesses that Roche could present in its behalf on particular subjects.

In *McLean v. Liberty Health System,* 430 *N.J.Super.* 156, 160 (App.Div.2013), an opinion we issued after the verdict in this case, we held that a trial court erred in prohibiting a plaintiff "from presenting the testimony of a second expert witness on the subject of medical malpractice because his testimony would be duplicative." Our opinion explained that:

[T]he trial court erred in limiting expert witnesses to only one per side for each relevant field of medicine, in particular, on the crucial issue of deviation from accepted standards of medical care. *The court's pretrial ruling was a mistaken exercise of its discretionary authority to control the presentation of evidence at the trial. See N.J.R.E.* 611(a) ("court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence"). Nothing in our rules of evidence, or other laws or rules, gives a trial court authority to balance the number of witnesses presented by each side at the trial. Nor is the trial court authorized by *N.J.R.E.* 403 or any other rule or law to bar crucial evidence merely on the ground that it duplicates another witness's testimony.

**\*19** *A trial court would likely abuse its discretion if it imposed a limitation of only one witness for each side to testify on a factual matter that is vital to the resolution of a disputed issue. ...*

Here, the testimony that plaintiff wished to present went to the heart of her case: whether defendant deviated from accepted standards of care for an emergency department physician. Although a second expert would have taken more time at the trial, it might have been time well-spent. In the field of medicine, second opinions are often sought to test the accuracy of a diagnosis or the benefits and risks of proposed treatment. *Surely it cannot be said that additional expert testimony in a case that involved complicated*

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 109 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 167 of 248 PageID: 176
Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

*issues of emergency and diagnostic medicine had such low probative value as to be substantially outweighed by its partially repetitive nature.*

[*Id.* at 165–68 (emphasis added).]

We further explained:

We note that *Rule* 403 does not refer to "duplicative evidence" but to "needless ... cumulative evidence" that might cause undue delay in the trial and a waste of time. *By our holding today, we do not preclude a trial judge from excluding expert evidence when its cumulative nature substantially outweighs its probative value. We hold, however, that two expert witnesses on the central issue of liability in a medical malpractice case do not per se reach the level of needless cumulative evidence that substantially outweighs its probative value.* The trial court mistakenly exercised its discretion in granting defendant's pretrial motion to limit expert witnesses to one on each side on a central disputed issue in the case.

[*Ibid.* (Emphasis added).]

Here, the trial court erred in refusing to allow all four of Roche's experts to testify, as it desired, on the critical subject of general causation. As Roche asserts, it was forced to limit Dr. Dieckgraefe to "a simple net opinion that [p]laintiffs then attacked before the jury by falsely portraying his knowledge on the general cause question," while plaintiffs, on the other hand, were permitted to present general causation evidence through both Dr. Sachar and from another scientist who had commented on a published article addressing the subject. Because of the trial court's announced prohibition on repetitive expert testimony, Roche did not call another expert it had lined up, Dr. Bruce Thiers, a medical school professor who has prescribed Accutane to over a thousand patients, and had been prepared to address causation issues as well.

To be sure, we are mindful of the practical realities confronting the trial court in presiding over this complicated, lengthy, and hard-fought case. We are equally mindful that the judge did not have at the time the benefit of the guidance we subsequently provided in *McLean.* Nevertheless, in a matter of this complexity on "a central issue of liability," *McLean, supra,* 430 *N.J.Super.* at 168, the court should have allowed the defense freer rein to have overlap in the key causation opinions of its testifying experts. The impact of this error, although it alone might not have required a new trial, adds to the prejudice concerns we have already mentioned.

**\*20** Although we do not do so lightly, we therefore set aside the verdict because of these two critical and cumulative errors and remand for a new trial. *See Pellicer ex rel. Pellicer v. St. Barnabas Hosp.,* 200 *N.J.* 22, 52–57 (2009) (applying the cumulative error doctrine); *Barber v. ShopRite of Englewood & Assocs.,* 406 *N.J.Super.* 32, 52–53 (App.Div.) (same), *certif. denied,* 200 *N.J.* 210 (2009).

**C.**

We reject the remainder of Roche's evidentiary arguments. However, one of them is worthy of discussion, as it could bear upon the retrial.

Roche argues that the trial court erred in excluding from evidence the "latest science," which at the time of this trial included a pre-publication abstract of an epidemiological study, later published at Antoine Racine et al., *Isotretinoin Use and Risk of Inflammatory Bowel Disease: A French Nationwide Study, supra,* 109 *Am. J. Gastroenterology* 563 (2014) ("Racine study"). For procedural reasons, the court excluded the study, which largely supports Roche's position of a lack of IBD causation.

The Racine study was published in abstract form in February 2012. During depositions conducted that same month, Dr. Oliva–Hemker testified that she had not relied on the study in forming her opinion because it had not yet been published or presented at a conference. The Racine study was presented at a conference later that spring. A few months later, the court initially ruled that the abstract of the study, which contained only limited information, was admissible, and ordered prompt discovery of the contents.

During this additional discovery, plaintiffs were provided with a series of email conversations between Colleen Hennessey, a defense attorney; one of the Racine authors; and a defense expert who was not called as a witness in this trial. The emails appeared to have been redacted, but were not stamped as such. Pursuant to court order, defense counsel provided plaintiffs with unredacted copies of the emails, which then included a reference to an attachment that was not supplied to plaintiffs. Roche represented that the attachment had been deleted from the email chain and was not available.

PAS-L-002011-20  10/16/2020 3:16:53 PM  Pg 110 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC  Document 1-1  Filed 01/29/21  Page 168 of 248 PageID: 177

Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)
2016 WL 3943335

Upon questioning by the trial judge during a pretrial hearing on this issue, Hennessey testified under oath that she had not received the attachment because it had been deleted from the email chain by the defense expert, but she represented that the expert had told her the attachment was a copy of the abstract of the Racine study that had already been provided to plaintiffs. A few hours later, however, at the court's direction, defense counsel located the attachment. The attachment was, in fact, a different version of the abstract that had been provided to plaintiffs, in that the abstract listed a different: (1) number of years (2009–2010 vs. 2008–2009); (2) number of IBD cases in the general population (7593 vs. 4402); (3) number of IBD cases among people who had taken Accutane (26 vs. 17); and (4) "odds ratio" (0.59 vs. 0.68).

**\*21** Presented with two conflicting abstracts of the same Racine study, the court ruled that neither abstract was sufficiently reliable to be admissible at that trial, but noted the abstract might be admissible at a future trial once it was determined which version was correct. In later denying Roche's motion for a new trial, raising this issue again, the court further explained that the abstract of the Racine study would have been admitted, but for the conduct of the defense expert, which made it impossible to determine if there were two abstracts, two studies, or whether the abstracts were drafts or redrafts.

As a general proposition, learned treatises may be admissible in evidence under *N.J.R.E.* 803(c)(18), an exception to the hearsay rule, if "established as a reliable authority by testimony or by judicial notice." However, "[m]ere publication does not automatically render a text a reliable authority." *Jacober v. St. Peter's Med. Ctr.,* 128 N.J. 475, 491 (1992).

We concur with the trial court's exclusion of the Racine abstract under these circumstances. The defense, on the verge of trial, had cast doubt on the reliability of the abstract and its actual contents. The court did not abuse its discretion in excluding this evidence, given the procedural setting. *Bd. of Educ. of Clifton,* 409 N.J.Super. 389, 430 (App.Div.2009). However, we agree the study may be introduced, subject to any appropriate objections or competing evidence, at a retrial.

### IV.

Having set aside the verdict on the grounds we have already discussed, we nonetheless address Roche's additional

arguments seeking reversal for sake of completeness and because of their potentially dispositive character.

### A.

Roche contends that the 1984 version of the Accutane label was adequate as a matter of law under the PLA. It maintains that plaintiffs failed to present sufficient evidence to overcome the statutory rebuttable presumption of adequacy that flows from FDA approval under *N.J.S.A.* 2A:58C–4.

We previously rejected Roche's categorical argument on this issue in both *McCarrell I, supra,* slip op. at 108 (finding the trial proofs were ample to reasonably support the jury's finding that the 1984 label was inadequate), and in *Kendall, supra,* slip op. at 87.[16]

As in *McCarrell I* and *Kendall,* here there was evidence that the 1984 warning, as it existed when plaintiffs took the drug from 1992 to 1998, was inadequate even though it specifically referred to IBD, because it did not accurately reflect the knowledge the company allegedly had. As we have noted, Dr. Blume testified that during the sixteen years that the label had remained unchanged (from 1984 to 2000), Roche had received information through ADE reports that indicate both a causal relationship between Accutane and IBD and a latency effect, which she asserted was critically important information for a physician to have in making a risk/benefit analysis. Dr. Blume also criticized Roche's use of the term "temporally associated," which was subject to differing definitions by the company's own employees, and which she said meant while a patient was taking the drug. The labeling expert opined that the use of the term "temporally" falsely suggested that the disease was reversible, and that there was no latent effect.

**\*22** We recognize that the FDA approved the 1984 version of the label. Nevertheless, plaintiffs marshalled sufficient competing evidence upon which a jury reasonably could rely to overcome the rebuttable statutory presumption of adequacy. At a minimum, viewing the record from this trial, as we must, in a light most favorable to the respondents, *see Dolson v. Anastasia,* 55 N.J. 2, 5 (1969), there was potentially credible proof of the company's "deliberate concealment *or* nondisclosure of after-acquired knowledge of [Accutane's] harmful effects[.]" *Perez, supra,* 161 N.J. at 25 (emphasis added); *see also Rowe, supra,* 189 N.J. at 626. On a retrial, the parties are free to continue to litigate the general causation

PAS-L-002011-20   10/16/2020 3:16:53 PM   Pg 111 of 114 Trans ID: LCV20201846220
Case 2:21-cv-01418-KM-JBC   Document 1-1   Filed 01/29/21   Page 169 of 248 PageID: 178

Rossitto v. Hoffman-La Roche Inc., Not Reported in A.3d (2016)

2016 WL 3943335

issues bearing upon Accutane's actual "harmful effects" and the adequacy of the 1984 label, with the opportunity to expand the proofs to include more recent scientific studies further addressing those questions.

We need not reach whether the alternative basis for overcoming the presumption, i.e., "economically-driven manipulation of the post-market regulatory process," McDarby, supra, 401 N.J.Super. at 63, was reasonably shown here. However, if that second prong is placed in issue on a retrial, the company's interactions with the FDA respecting Accutane's effects of depression, as distinct from IBD, would be of some, but only limited, relevance to this case. See N.J.R.E. 401 (providing that evidence is relevant if it has a mere "tendency" to prove or disprove a fact of consequence to the case). The depression-related evidence, including Roche's internal briefing document on the subject, would not, in and of itself, be sufficient evidence to surmount that second prong. Instead, if plaintiffs choose to litigate the second prong again, they must present adequate evidence of alleged market manipulation concerning IBD side effects, and not solely of depression; otherwise the depression-related proofs should be excluded.

B.

Roche further argues that plaintiffs failed to present sufficient evidence of proximate causation. It contends that the claims of Rossitto and Wilkinson must be dismissed because their respective physicians would have prescribed Accutane for them anyway, even if the 1984 label had contained a stronger warning. See Strumph v. Schering Corp., 256 N.J.Super. 309, 323–28 (App.Div.1992) (Skillman, J., dissenting), rev'd on dissent, 133 N.J. 33 (1993).

We do not view the evidence in such a conclusive or absolute manner. Viewing the record in a light most favorable to plaintiffs, their prescribing physicians both expressed significant reservations about whether the label sufficiently alerted them to the risks of patient IBD. The evidence is by no means so one-sided that a stronger warning would have had no effect on the doctors' interactions with plaintiffs and their parents, or upon whether the patients would have necessarily agreed to take the drug in spite of a stronger IBD warning.

*23 Under New Jersey law, the inadequacy of a warning cannot be the proximate cause of an injury where there is an intervening cause, that is, that the physician either did

not read the warning, or had independent knowledge of the risks. Perez, supra, 161 N.J. at 28. In order for dismissal of the lawsuit to be warranted on this basis, the evidence must be clear and unequivocal. "Where the plaintiffs' prescribing physicians unequivocally testify that they had full knowledge of the dangers associated with a drug and that neither that knowledge nor anything in the enhanced post-injury warnings supplied by the manufacturer would have altered their decision to prescribe it, the plaintiff has failed to show that inadequate warnings are a proximate cause of injury and there must be a verdict for defendant." See Dreier, Keefe & Katz, supra, § 8:3–2 at 200 (emphasis added). "Where such a statement is not unequivocal the matter is properly for the jury." Ibid.; see also Strumph, supra, 256 N.J.Super. at 328 (Skillman, J., dissenting) (concluding that "a defendant drug manufacturer may not be held liable for an alleged inadequate warning where the only evidence on the issue of causation is the prescribing doctor's unequivocal testimony that his or her decision to prescribe the drug was not affected by the warning") (emphasis added).

As to Rossitto, her dermatologist Dr. Watt testified that he understood from reading the warnings, which had remained unchanged for thirteen years, that Accutane was only temporally associated with IBD, meaning to him that the symptoms only occurred while the patient was taking the drug. The 1984 label did not warn that Accutane can cause permanent IBD, or of a latency effect. If it had, Dr. Watt testified that he would have considered that information in conducting a risk/benefit analysis and would have relayed that information to Rossitto. The proofs were sufficient to support a reasonable inference that, if properly warned, Dr. Watt would have communicated the risk of developing IBD to her, and her mother would not have allowed her to take the drug.

Nor, as argued by Roche, was the chain of causation necessarily broken by Dr. Watt's alleged failure to read the warning. Dr. Watt testified that although he could not recall if he had read the Accutane label prior to prescribing the drug for Rossitto, he had, in making a risk/benefit analysis, relied on multiple sources. Those sources included Roche's "Dear Doctor" letter; the PDR, which he kept in his office; drug company representatives, who had been instructed to say that the IBD symptoms occurred while the patient was taking the drug, and that a precise cause and effect relationship had not been established; and his medical training and continuing education classes. There is ample evidence that Dr. Watt read the warning (because it was repeated in the "Dear

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3943335

Doctor" letter) and there was no evidence that he had any independent knowledge that Accutane could cause IBD or that the symptoms would be permanent, not temporary.

 **\*24**  We reach the same conclusion as to Wilkinson, although the proofs as to his own prescribing physician, Dr. Orme, are weaker. As we previously noted, Dr. Orme did acknowledge at one point in his testimony that "[i]n all likelihood," if the label had warned that Accutane had been "possibly or probably associated" with IBD, instead of "temporally associated," he "would have still prescribed it to ... Wilkinson with the same communication that [he] did in fact give to [Wilkinson's] parents." However, this evidence is contradicted, at least in part, by other testimony by Dr. Orme stating that if Roche had warned that taking Accutane presented a risk of developing IBD, he "[d]efinitely" would have warned Wilkinson and his mother about the disease. Unlike the circumstances in *Strumph,* this is not a case in which the prescribing doctor's testimony on this key issue is "unequivocal." *Id.* at 328.

In addition, it is significant that Dr. Orme had multiple discussions with Wilkinson and his mother of the risks and benefits of Accutane over a span of more than a year before the decision to prescribe it was made. There is more than ample evidence to infer that the label's alleged failure to sufficiently discuss the risks of IBD could have affected the prescribing decision and the patient's willingness to take the drug. With a stronger warning passed on by Dr. Orme, the medical decision would then have fallen to Wilkinson's mother, who could have then appropriately considered the IBD risk. As we have noted, the mother testified that if Dr. Orme had warned that Accutane caused IBD, she would not have let her son take the drug, even if Dr. Orme had highly recommended it. Her reluctance in this regard is consistent with her conduct. Dr. Orme raised Accutane as a treatment option in October 1993, and again in 1994, but Wilkinson's mother did not allow her son to take the drug until May 1995.

Viewing this evidence in a light most favorable to Wilkinson, there was sufficient evidence of proximate causation to present to a jury. The "prescribing decision"—insofar as it logically entails both a physician's recommendation and a patient's assent to follow that recommendation after being apprised of the pertinent risks—could have been affected by the absence of a stronger warning. Although a physician can

function as a "learned intermediary," *Niemiera v. Schneider,* 114 N.J. 550, 559 (1989), it should not be assumed that a doctor will issue a prescription to an informed patient who is unwilling to risk a drug's side effects. The evidence was sufficiently debatable to have the causation issue resolved by the jurors as the fact-finders.

C.

Lastly, Roche argues that the trial court should have ruled that Rossitto's and Wilkinson's claims were time-barred, under the two-year statute of limitations, *N.J.S.A.* 2A:14–2,[17] and should not have permitted their cases to proceed under principles of equitable tolling.

 **\*25**  The trial court concluded that both Rossitto, who filed suit in December 2010, and Wilkinson, who filed suit in April 2008, brought their claims within two years of learning of a connection between their use of Accutane and their IBD symptoms. The trial court reached these conclusions after conducting appropriate pretrial evidentiary hearings on the timeliness issues pursuant to *Lopez v. Swyer,* 62 N.J. 267, 275–76 (1973), and making associated credibility findings. Having reviewed the proofs developed at those hearings, we are satisfied that there is ample reasonable support for the trial court's findings of timeliness, and that they are consistent with the principles expressed by the Supreme Court in *Kendall, supra,* 209 N.J. at 197–98, including the application of the public policies underlying the PLA statute. We affirm those determinations, substantially for the reasons expressed by the trial court.

V.

For the foregoing reasons, we vacate the judgments entered in favor of Rossitto and Wilkinson and remand for a new trial consistent with this opinion.

Affirmed in part, vacated in part, and remanded in part.

**All Citations**

Not Reported in A.3d, 2016 WL 3943335

Footnotes

2016 WL 3943335

1    As of July 9, 2016, there were 3925 cases listed on New Jersey's Accutane mass tort case list. *See Accutane, N.J. Judiciary,* http://www.judiciary.state.nj.us/mass-tort/accutane (last visited on July 11, 2016). Prior to the verdict in this case, decisions were issued in: *McCarrell v. Hoffman–La Roche, Inc. (McCarrell I),* No. A–3280–07 (App.Div. Mar. 12, 2009), *certif. denied,* 199 N.J. 518 (2009); *Kendall v. Hoffman–La Roche, Inc.,* No. A–2633–08 (App.Div. Aug. 5, 2010), *aff'd,* 209 N.J. 173 (2012); and *Sager v. Hoffman–La Roche, Inc.,* No. A–3427–09 (App.Div. Aug. 7, 2012), *certif. denied,* 213 N.J. 568 (2013). After the verdict, decisions were issued in *Gaghan v. Hoffman–La Roche, Inc.,* No. A–2717–11, A–3211–11, A–3217–11 (App.Div. Aug. 4, 2014) and *McCarrell v. Hoffman–La Roche, Inc. (McCarrell II),* A–4481–12 (App.Div. Aug. 11, 2015), *certif. granted,* 223 N.J. 555 (2015).

2    Reynolds, a resident of California, and Young, a resident of New Jersey, did not appeal.

3    Roche's appeal (A–301–14) of a separate $1.578 million jury verdict in favor of Kendall on a retrial of her case was argued back-to-back with the present appeals. That appeal has since been dismissed, as the result of a recent settlement with that individual plaintiff.

4    In an internal document from 1978, Roche noted a call from Dr. Manfred Hein, a pharmacologist with the FDA, in which he expressed concern about the gastrointestinal bleeding observed in the dog studies.

5    Recent epidemiological studies have yielded mixed results regarding the disputed link between Accutane and IBD. For instance, in an article published in 2009, Charles N. Bernstein et al., *Isotretinoin Is Not Associated with Inflammatory Bowel Disease: A Population–Based Case–Control Study,* 104 *Am. J. Gastroenterology* 2774 (2009) (the "Bernstein article"), the authors concluded that "isotretinoin is not likely to cause chronic IBD." Additionally, in an article published in 2010, Seth D. Crockett et al., *Isotretinoin Use and the Risk of Inflammatory Bowel Disease: A Case–Control Study,* 105 *Am. J. Gastroenterology* 1986 (2010) (the "Crockett article"), the authors found that ulcerative colitis, but not Crohn's disease, is associated with Accutane, but cautioned that a causal association with IBD "remains unproven."

6    "Labeling" is a term of art within the arena of drug regulation. The term refers to "all labels and other written, printed or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C.A. § 321(m).

7    Plaintiffs Rossitto and Wilkinson took Accutane on various dates from May 1995 to April 1998. When the other two plaintiffs from this trial, Reynolds and Young, are included, the relevant time span of usage expands from November 1992 to November 1998.

8    RoAccutane, also spelled RoAccutan, is the brand name for Accutane in Europe.

9    We discuss, *infra,* the disputed relevance of these depression-related communications to the issues before us that concern IBD.

10    In 2003, the warnings were further strengthened, *Kendall, supra,* 209 N.J. at 183, although those 2003 changes were not admitted into evidence at this trial. In 2009, defendants withdrew Accutane from the market, but generic makers continue to manufacture it. *Id.* at 180 n. 3.

11    This court has upheld the admissibility of Dr. Sachar's expert opinions in some of the previous Accutane appeals. Roche has not challenged, in its present appeal, the admission of Dr. Sachar's opinions at the trial of Rossitto and Wilkinson, although the drug company asserts that more recent scientific studies have conflicted with Dr. Sachar's theories of causation.

12    "Advisory committees provide independent advice and recommendations to the FDA on scientific and technical matters related to products ... regulated by the Agency." *New Drug Application (NDA), Food & Drug Admin.,* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ HowDrugsareDevelopedandAppro ved/ApprovalApplications/ NewDrugApplicationNDA (last updated Mar. 29, 2016).

13    Roche has not argued on appeal that the damages the jury awarded to the two prevailing plaintiffs were excessive.

14    There are some differences between New Jersey and Utah law on product liability issues in the prescription drug context, although the parties do not argue that these differences affect the issues now before us on appeal. We do note that Utah, unlike New Jersey, adopted the reasoning of *Restatement (Second) of Torts* § 402A cmt. k (1965), and classifies all prescription drugs "as unavoidably dangerous in design[.]" *Schaerrer v. Stewart's Plaza Pharm., Inc.,* 79 P.3d 922, 928 (Utah 2003); *Perez v. Wyeth Labs.,* 161 N.J. 1, 10 (1999) (declining to hold as a matter of law that all prescription drugs are unavoidably unsafe). As a result, under Utah law "prescription drugs cannot, as a matter of law, be defective if approved by the United States Food and Drug Administration (FDA) and 'properly prepared, compounded, packaged, and distributed.' " *Schaerrer, supra,* 79 P.3d at 928 (quoting *Grundberg v. Upjohn Co.,* 813 P.2d 89 (Utah 1991)). However, in Utah, as in New Jersey, manufacturers are not shielded from strict liability claims based on inadequate warnings, which are at issue here. *Ibid.* We should also note that the statutory rebuttable presumptions concerning the effect of FDA approval for a drug differ, in that New Jersey's presumption is stronger and of greater evidentiary weight than a

2016 WL 3943335

customary presumption, *Kendall, supra,* 209 *N.J.* at 195, while in Utah, "a preponderance of the evidence is sufficient to rebut it." *Egbert v. Nissan N. Am., Inc.,* 167 *P.3d* 1058, 1063 (Utah 2007).

15 The FDA did not acquire the ability to mandate a labeling change until the passage of the Food and Drug Administration Amendments Act of 2007 (FDAA), Pub. Law 110–85, 121 *Stat.* 823. The FDA can now mandate a labeling change based on new information about an approved label. 21 *U.S.C.A.* § 355(o)(4).

16 We cite these unpublished opinions involving the same defendant and the same drug for non-precedential purposes, because they are related cases. *See R.* 1:36–3. In doing so, we need not address whether any principles of issue preclusion or collateral estoppel are applicable, which plaintiffs have not asserted in any event.

17 The parties agree that New Jersey law governs the statute-of-limitations issues, and thus the choice-of-law questions currently before the Supreme Court in *McCarrell II* are not of concern here.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

|  |  |
|---|---|
| ANTHONY GAETANO,<br><br>                    Plaintiff,<br><br>          v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: PASSAIC COUNTY<br>CASE NO. PAS-L-002011-20<br><br>**CIVIL ACTION** |

---

### BRIEF OF GILEAD SCIENCES, INC. IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

---

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500

SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

*Attorneys for Defendant*
*Gilead Sciences, Inc.*

BETH S. ROSE, ESQ.
Of Counsel and On the Brief

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................3

      A.    Gilead's HIV Medications ...................................................................3

      B.    Plaintiff's Allegations and Causes of Action ...................................4

LEGAL STANDARD..........................................................................................................5

ARGUMENT .......................................................................................................................6

  I.    PLAINTIFF'S CLAIM AGAINST GILEAD IS PREEMPTED BY FEDERAL
      LAW. ..........................................................................................................6

      A.    Principles of Federal Preemption...........................................................6

      B.    *Mutual Pharmaceuticals Co., Inc. v. Bartlett* ...............................7

      C.    Federal Regulations Regarding Drug Design and Labeling Changes .........8

      D.    Federal Law Preempts Plaintiff's Design Defect Theory of Liability.......10

      E.    Federal Law Preempts Plaintiff's Failure To Warn Theory. ....................16

  II.    THE TRUVADA® LABELING IS ADEQUATE AS A MATTER OF LAW....19

CONCLUSION....................................................................................................................22

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re: Accutane Litig.*,
    235 N.J. 229 (2018) ...........................................................................19, 20

*Adams v. Synthes Spine Co., LP*,
    298 F.3d 1114 (9th Cir. 2002) .......................................................21

*Aston v. Johnson & Johnson*,
    248 F. Supp. 3d 43 (D.D.C. 2017) ..................................................14

*Bailey v. Wyeth, Inc.*,
    424 N.J. Super. 278 (App. Div. 2008) ........................................ *passim*

*Banner v. Hoffman-La Roche Inc.*,
    383 N.J. Super. 364 (App. Div. 2006) ..........................................19, 21

*Boone v. Boehringer Ingelheim Pharms., Inc.*,
    SC 20200, 2020 WL 2121063, -- A.3d -- (Conn. May 4, 2020)......................14, 15

*In re Celexa & Lexapro Mktg. & Sales Prods. Liab. Litig.*,
    779 F.3d 34 (1st Cir. 2015)..........................................................9, 18

*DeBenedetto v. Denny's, Inc.*,
    421 N.J. Super. 312 (App. Div. 2010) .............................................5

*Desai v. Sorin CRM USA, Inc.*,
    No. 12-2995, 2013 WL 163298 (D.N.J. Jan. 15, 2013)..........................5

*Drescher v. Bracco Diagnostics Inc.*,
    No. CV-19-00096, 2020 WL 1466296 (D. Ariz. Mar. 26, 2020).....................14, 17

*Epstein v. Gilead Sciences, Inc.*,
    No. 19-81474, 2020 WL 4333011 (S.D. Fla. July 27, 2020)......................... *passim*

*Evans v. Gilead Sciences, Inc.*,
    No. 20-cv-00123, 2020 WL 5189995 (D. Haw. Aug. 31, 2020) ................13, 15, 16

*Farina v. Nokia Inc.*,
    625 F.3d 97 (3rd Cir. 2010) .........................................................6

*Fleming v. Janssen Pharm., Inc.*
    186 F. Supp. 3d 826 (W.D. Tenn. 2016)...........................................13

ii

*Gibbons v. Bristol-Myers Squibb Co.*,
 919 F.3d 699 (2d Cir. 2019) ............................................................8, 16

*Gustavsen v. Alcon Labs.*, *Inc.*,
 903 F.3d 1 (1st Cir. 2018) ..................................................................13

*Holley v. v. Gilead Sciences, Inc.*,
 379 F. Supp. 3d 809 (N.D. Cal. 2019) ...............................15, 16, 17, 19

*Lyons v. Boehringer Ingelheim Pharms., Inc.*,
 No. 1:18-cv-04624, -- F.Supp. 3d --, 2020 WL 5835125 (N.D. Ga. Sept. 29,
 2020) ...............................................................................................17

*Maze v. Bayer Healthcare Pharms., Inc.*,
 No. 4:18-cv-21, 2019 WL 1062387 (E.D. Tenn. Mar. 6, 2019) ..............19

*McGee v. Boehringer Ingelheim Pharms., Inc.*,
 No. 4:16-cv-2082, 2018 WL 1399237 (N.D. Ala. Mar. 20, 2018) ...........8, 9, 18

*Mutual Pharms. Co., Inc. v. Bartlett*
 570 U.S. 472 (2013) ................................................................ *passim*

*Patton v. Forest Labs., Inc.*,
 No. 17-cv-922, 2018 U.S. Dist. LEXIS 160368 (C.D. Cal. Sept. 19, 2018) ..........18

*PLIVA, Inc. v. Mensing*,
 564 U.S. 604 (2011) ................................................................ *passim*

*Robinson v. Eli Lilly & Co.*,
 5:17-cv-338, 2018 WL 4039703 (E.D. Ky. Aug. 23, 2018) ...................14

*Rollins v. Wackenhut Servs., Inc.*,
 703 F.3d 122 (D.C. Cir. 2012) .........................................................21

*Rossito v. Hoffman-La Roche Inc.*,
 A-1237-13T1, 2016 WL 3943335 (App. Div. July 22, 2016) .................19

*Teamster Local 97 v. State*,
 434 N.J. Super. 393 (App. Div. 2014) ............................................5, 6

*Trejo v. Johnson & Johnson*,
 13 Cal. App. 5th 110 (2017), *petition for review denied*, No. S243672 (Oct.
 11, 2017) ......................................................................................14, 15

*Utts v. Bristol-Myers Squibb Co.*,
 226 F. Supp. 3d 166 (S.D.N.Y. 2016)........................................... *passim*

iii

*Utts v. Bristol-Myers Squibb Co.*,
   251 F. Supp. 3d 644 (S.D.N.Y. 2017) ............................................................. *passim*

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ............................................................................................10

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
   808 F.3d 281 (6th Cir. 2015) ........................................................................12, 15

*Zardo v. Merck & Co. Inc.*,
   168 F.3d 504 (9th Cir. 1999) ..............................................................................21

**Other Authorities**

21 C.F.R. § 314.3 ...............................................................................................10, 16

21 C.F.R. § 314.70 ............................................................................................. *passim*

21 U.S.C. § 355 .............................................................................................2, 8, 15

Federal Food, Drug, and Cosmetic Act of 1938 ......................................................8

*N.J.S.A.* 2A:58C ................................................................................................ *passim*

N.J. Rule 1:36-3 .......................................................................................................6

N.J. Rule 4:6-2(e) .....................................................................................................5

iv

# INTRODUCTION

Gilead Sciences, Inc. ("Gilead") develops and markets life-saving medications, including Truvada®—an HIV medication containing tenofovir disoproxil fumarate ("TDF"). Plaintiff Anthony Gaetano does not, and could not, allege that Truvada® was ineffective for use in treating his HIV. Truvada® is approved by the U.S. Food and Drug Administration ("FDA") for the treatment of HIV infection; TDF-containing medications, including Truvada®, are core components of the U.S. Department of Health and Human Services' recommended regimens for HIV treatment[1]; and TDF is listed as an "essential" medicine by the World Health Organization.[2]

Instead, Plaintiff alleges that he experienced "pain related to musculoskeletal disorders" after taking Truvada®. *See* Complaint, Dated July 8, 2020 ("Compl.") at ⁋ 11. Plaintiff asserts a Negligence claim (Count I) against his treating physician and against a medical service provider where he was treated for HIV, and asserts a Strict Products Liability claim (Count II), subject to the New Jersey Product Liability Act ("PLA"), against Gilead, based on two theories: (1) Truvada® was defectively designed because, by 2009, a "safer, alternative design [*i.e.,* a medication containing a different drug, tenofovir alafenamide ("TAF"), instead of TDF] existed that would have reduced or prevented the harm caused to the Plaintiff," and (2) although "Truvada's labelling *included* a warning to monitor patients," *like Plaintiff*, "who were at risk for adverse kidney events," it failed to adequately warn of the need to similarly monitor *other* patients who, unlike Plaintiff, were *not* at such risk. *See* Compl. ⁋⁋ 11, 20-22, 40-42, 70, 73. Plaintiff's claim against Gilead should be dismissed with prejudice for two reasons.

---

[1] *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents Living with HIV,* Dep't of Health and Hum. Serv., at G-4, G-19, G-25 (Dec. 18, 2019), https://clinicalinfo.hiv.gov/sites/default/files/guidelines/documents/AdultandAdolescentGL.pdf.

[2] *WHO Model List of Essential Medicines,* World Health Org., at 19-21 (2019), https://apps.who.int/iris/bitstream/handle/10665/325771/WHO-MVP-EMP-IAU-2019.06-eng.pdf?ua=1.

*First*, Plaintiff's Strict Products Liability claim (Count II) against Gilead, premised on design defect and failure to warn theories, is preempted by federal law.  Specifically, Plaintiff's design defect theory that Gilead should have replaced TDF with TAF is preempted, because Gilead could not have marketed or sold medications containing TAF without first seeking and obtaining FDA approval.  *See* 21 U.S.C. § 355(a) (requiring FDA approval of a new drug application to market a drug); 21 C.F.R. § 314.70(b)(2)(i) (defining "changes in the qualitative or quantitative formulation of the drug product" as "major changes" that "requir[e] supplement submission and approval prior to distribution of the product").  Where, as here, state-law design defect claims seek to require manufacturers to render a drug safer by altering its composition, and thereby conflict with federal laws that *prohibit* manufacturers from unilaterally altering drug composition without FDA approval, they are preempted by federal law.  Plaintiff's design-defect theory also fundamentally conflicts with FDA's decisions to approve Truvada® for use in the treatment of HIV and never to revoke that approval in the more than 16 years since Truvada® was approved.  For these reasons, other courts have recently dismissed, as preempted, similar design defect claims brought against Gilead regarding Truvada® and other TDF medications.

Likewise, Plaintiff's allegations that Gilead failed to sufficiently warn of the need to monitor patients for bone and kidney risks associated with Truvada® are preempted, because (a) state law claims challenging, as inadequate, warnings contained in a drug's FDA-approved *original* labeling are preempted by federal law, and (b) Plaintiff fails to allege any "newly acquired information" that would have allowed Gilead to strengthen warnings in the Truvada® labeling without prior FDA approval.

Because Plaintiff's sole claim against Gilead is based entirely on these design defect and failure to warn theories, it is preempted and should be dismissed with prejudice.

2

*Second*, the FDA-approved Truvada® labeling is sufficient as a matter of law, and Plaintiff thus has not pled a cognizable failure to warn theory for that independent reason. Pursuant to the PLA, New Jersey recognizes a "'*virtually dispositive' statutory 'super-presumption'*" that warnings or instructions on FDA-approved drug labels are adequate as a matter of law.  *See N.J.S.A.*  2A:58C-4.  Not only does Plaintiff fail to plead any facts to rebut that presumption, he *concedes* that, "[a]t times relevant herein, Truvada's labelling included a warning to monitor patients who were at risk for adverse kidney events as clinically appropriate."  Compl. ⁋ 20; *see also id*. ⁋ 22 (same).  Although Plaintiff alleges that the label did not adequately warn of the need to monitor *other* patients who were *not* at risk, *see id*. ⁋⁋ 40-42, Plaintiff concedes that his diagnoses prior to taking Truvada® "*made him at risk for adverse kidney events*."  *Id*. ⁋⁋ 21(a), 23(a) (emphasis added).  Because the Truvada® labeling indisputably warned of the need to monitor patients, like Plaintiff, who were "at risk for adverse kidney events," Plaintiff cannot state a viable failure to warn claim.

## STATEMENT OF FACTS

### A.     Gilead's HIV Medications

Gilead manufactures and sells medications for the treatment of HIV, Compl. ⁋ 2, including Truvada®, a "fixed-dose combination tablet[] containing emtricitabine and [TDF]."[3]  In August 2004, FDA approved Truvada® for use in treatment of HIV.  Compl. ⁋ 31.

On November 5, 2015, after Plaintiff was no longer taking Truvada®, FDA approved Genvoya®, the first FDA-approved HIV medication containing TAF.  *Id*. ⁋⁋ 18, 70.

---

[3] Center for Drug Evaluation and Research ("CDER"), Truvada® Approved Labeling, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021752s000_Truvada_Prntlbl.pdf.

### B.    Plaintiff's Allegations and Causes of Action

Plaintiff alleges that he was prescribed and ingested Truvada® for the treatment of HIV between 2005 and 2014.  *Id.* ¶¶ 17-18.  Prior to ever taking Truvada®, Plaintiff allegedly was diagnosed with chronic kidney disease, Type 2 diabetes mellitus, renal insufficiency, anemia of chronic diseases, and dyselectrolytemia.  *Id.* ¶¶ 15-16, 21, 23.  As a result, Plaintiff admits that, prior to taking Truvada®, he was "at risk for adverse kidney events."  *Id.* ¶¶ 21(a), 23(a).

Plaintiff does *not* allege that Truvada® was ineffective for treating his HIV.  Instead, he alleges that, three years after he stopped taking Truvada®, he suffered "chronic pain related to musculoskeletal disorders."  *Id.* ¶ 11.  Plaintiff further alleges that (i) Truvada® was defectively designed, because its "risks outweighed its utility," or "a practical, feasible, safer, alternative design," *i.e.*, TAF, "existed that would have reduced or prevented the harm caused to the Plaintiff," and (ii) the Truvada® label failed to adequately warn of the need to monitor patients for adverse kidney and bone risks associated with Truvada®.  *Id.* ¶¶ 40-42, 73.  Plaintiff asserts one cause of action against Gilead for Strict Products Liability (Count II).[4]

Notwithstanding his design defect theory (*i.e.,* that TAF was a safer, alternative design), Plaintiff concedes that no medication containing TAF could have been approved until at least 2009, four years *after* Plaintiff was prescribed and began ingesting Truvada®.  *Id.* ¶ 70 (alleging that Genvoya® "could have been conceivably approved in 2009").

And notwithstanding his failure to warn theory (*i.e.,* that Gilead failed to warn of the need to monitor patients for kidney and bone risks), Plaintiff does not dispute that "[a]t all times

---

[4] Plaintiff also asserts a separate cause of action for Negligence (Count I) against St. Joseph's Health, Inc., a medical service provider where Plaintiff was treated for HIV, and Dr. Michael Lange, Plaintiff's treating physician.

4

relevant herein, Truvada's labelling *included* a warning to monitor patients who," *like Plaintiff*, "were at risk for adverse kidney events as clinically appropriate." *Id*. ¶¶ 20-23 (emphasis added). Indeed, since its FDA-approval, and since Plaintiff was first prescribed Truvada®, the Truvada® labeling has warned, among other things, that "[p]atients at risk for, or with a history of, renal dysfunction . . . should be carefully monitored for changes in serum creatinine and phosphorous."[5] *See also* Compl. ¶ 46 (alleging that Gilead "should have warned doctors to check for serum phosphorous and/or urine glucose, more effective markers of kidney damage").

## LEGAL STANDARD

"[A] complaint may be dismissed for failure to state a claim if it fails to articulate a legal basis entitling plaintiff to relief." *DeBenedetto v. Denny's, Inc.*, 421 N.J. Super. 312, 318 (App. Div. 2010) (internal quotations omitted); *see also* N.J. Rule 4:6-2(e). "[I]f the complaint states no basis for relief and discovery would not provide one, dismissal is the appropriate remedy. . . . [A] motion to dismiss may not be denied based on the possibility that discovery may establish the requisite claim; rather, the legal requisites for plaintiff's claim must be apparent from the complaint itself." *DeBenedetto*, 421 N.J. Super. at 318 (internal quotations omitted).

"In evaluating motions to dismiss, courts consider allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Teamster Local 97 v. State*, 434 N.J. Super. 393, 412 (App. Div. 2014) (internal quotations omitted).[6]

---

[5] CDER, Truvada® Approved Labeling at 16,
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021752s000_Truvada_Prntlbl.pdf.

[6] Because the FDA-approved Truvada® labeling cited herein (i) is a matter of public record available on FDA's official website, and (ii) forms the basis for Plaintiff's failure to warn claim, the Court may consider the content of the labeling in deciding Gilead's Motion to Dismiss without converting the motion to one for summary judgment. *Teamster Local 97*, 434 N.J. Super. at 412; *see also, e.g., Desai v. Sorin CRM USA, Inc.*, No. 12-2995, 2013 WL 163298, at

5

# ARGUMENT

I.   **PLAINTIFF'S CLAIM AGAINST GILEAD IS PREEMPTED BY FEDERAL LAW.**

Plaintiff's Strict Products Liability claim is based on two theories: (1) Gilead should have changed the design of Truvada® to contain TAF instead of TDF; and (2) Gilead failed to adequately warn of the need to monitor patients taking Truvada® for bone and kidney risks. Because federal law preempts both of these theories, Plaintiff's claim should be dismissed.[7]

## A.   Principles of Federal Preemption

"The Supremacy Clause establishes that federal law 'shall be the supreme Law of the Land . . . [,] any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (quoting U.S. Const., Art. VI, cl. 2).

Pursuant to the Supremacy Clause, "[f]ederal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3rd Cir. 2010). "*Express* preemption applies where Congress . . . declares its intent to displace state law. *Field* preemption applies where 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' *Conflict* preemption nullifies state law inasumuch as it conflicts with federal law," including "where compliance with both laws is impossible . . . ." *Id.* (emphasis added).

---

*4 (D.N.J. Jan. 15, 2013) (taking "judicial notice of the FDA's website" in deciding motion to dismiss). Similarly, the court may consider content available on the U.S. Department of Health & Human Services and World Health Organization websites, *see supra* n.1, 2, both of which similarly constitute "matters of public record." *Teamster Local 97*, 434 N.J. Super. at 412.

[7] Pursuant to N.J. Rule 1:36-3, Gilead is attaching copies of unpublished opinions to the Certification of Beth S. Rose submitted herewith. Cases appear in the order in which they are cited in this Brief.

This case involves *conflict* preemption, because "it is 'impossible for [Gilead] to comply with both state and federal requirements.'"  *Mensing*, 564 U.S. at 618; *see also id*. (conflict preemption applied, because "[w]e find impossibility" where "[i]t was not lawful under federal law for the Manufacturers to do what state law required of them").

Set forth below is a description of the U.S. Supreme Court's application of conflict preemption under similar circumstances, and the relevant federal requirements, with which Plaintiff's state law claims conflict and to which they "must give way."  *Id*. at 617.

**B.      *Mutual Pharmaceuticals Co., Inc. v. Bartlett***

In *Mutual Pharms. Co., Inc. v. Bartlett*, the U.S. Supreme Court considered whether federal law preempted state law design defect claims, in which plaintiff alleged, as here, that a drug's design and/or labeling should have been changed to make it safer.  570 U.S. 472, 475 (2013).  The Court recognized that contrary to these purported *state* law duties, *federal* law is clear that "[o]nce a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or the specifications provided in the approved application.'"  *Id*. at 477 (quoting 21 C.F.R. § 314.70(b)(2)(i)).  Therefore, "state-law design-defect claims . . . that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling."  *Id*. at 490.  In other words, "[w]here state law imposes a duty to take such remedial measures, it actually conflicts with federal law by making it impossible for a private party to comply with both state and federal requirements."  *Id*. (internal quotations omitted).

7

As a result of this conflict and impossibility, plaintiff's state law claims were preempted by federal law.  *Id*. at 493.  Indeed, "it has long been settled that state laws that conflict with federal law are 'without effect,'" and that state law claims are thus "pre-empted where it is impossible for a private party to comply with both state and federal requirements."  *Id*. at 479-80.

### C.    Federal Regulations Regarding Drug Design and Labeling Changes

The manufacture, use, and sale of drugs are regulated by the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA").  *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 176 (S.D.N.Y. 2016) (citing *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 196 (2005)), *aff'd by Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019); *see also Bailey v. Wyeth, Inc.*, 424 N.J. Super. 278, 287-88 (App. Div. 2008).  Pursuant to the FDCA, a drug manufacturer must submit a new drug application ("NDA") to FDA and obtain its authorization before marketing or selling the drug.  *Bailey*, 424 N.J. Super. at 287-88; *see also* 21 U.S.C. § 355.  The NDA process "is both onerous and lengthy," *Bartlett*, 570 U.S. at 476, and to obtain FDA approval of an NDA, a manufacturer must show that its drug is safe and effective.  *Bailey*, 424 N.J. Super. at 287-88; *Utts*, 226 F. Supp. 3d at 177 (quoting 21 U.S.C. § 355(b)(1)); *see also, e.g., McGee v. Boehringer Ingelheim Pharms., Inc*., No. 4:16-cv-2082, 2018 WL 1399237, at *3 (N.D. Ala. Mar. 20, 2018) ("Before the FDA permits a manufacturer to sell a new drug, the manufacturer must submit a new drug application and demonstrate that its drug is safe and effective.").  Specifically, FDA requires a manufacturer to demonstrate that its drug is "'safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling,'" and the manufacturer must likewise "prove the drug's effectiveness by 'substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended or suggested in the proposed labeling.'"  *Utts*, 226 F. Supp. 3d at 177

(quoting 21 U.S.C. § 355(d)); *see also Bailey*, 424 N.J. Super. at 288-89 (quoting 21 U.S.C. § 355(d)).  As described above, upon approval, a manufacturer is prohibited "from making any major changes to the 'qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved NDA.'"  *Utts*, 226 F. Supp. 3d at 177 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

In addition to proving a new drug's safety and efficacy, manufacturers must submit proposed labeling for the drug, and "FDA's premarket approval of an NDA includes the approval of the exact text in the proposed label."  *Id*. (citing 21 U.S.C. § 355; 21 C.F.R. § 314.50(c)(2)(i), 314.105(b)); *McGee*, 2018 WL 1399237, at *3 ("The FDA must approve the label's exact text before the manufacturer can sell the new drug."); *Bailey*, 424 N.J. Super. at 290 ("Often several versions of the labeling are exchanged between the FDA and the pharmaceutical company before reaching the final approved labeling.").  Accordingly, FDA approval of drug labeling constitutes "a specific finding that [the drug's] label was not 'false or misleading in any particular.'"  *In re Celexa & Lexapro Mktg. & Sales Prods. Liab. Litig*., 779 F.3d 34, 36 (1st Cir. 2015) (quoting 21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6)).

Like prohibitions on changes to an approved drug's *formulation*, "a manufacturer may only change a drug *label* after the FDA approves a supplemental application."  *McGee*, 2018 WL 1399237, at *3 (emphasis added).  While a manufacturer may make certain changes to drug labeling without prior approval under the federal "Changes Being Effected" ("CBE") regulation—*i.e.*, "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under" federal regulations—such changes must be based on "newly acquired information."  21 C.F.R. § 314.70(c)(6)(iii)(A).; *see also Bailey*, 424 N.J. Super. at 292 (FDA

9

has "reaffirmed its longstanding position" that a CBE supplement "is appropriate to amend the labeling for an approved product only to reflect newly acquired information"). "Newly acquired information is data, analyses, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3; *see also Bailey*, 424 N.J. Super. at 292 ("The FDA explicitly defines 'newly acquired' as 'data, analyses, or other information not previously submitted to the agency'").

However, FDA still "retains authority to reject labeling changes made pursuant to the CBE regulations," *Wyeth v. Levine*, 555 U.S. 555, 571 (2009), and "[b]y expressly requiring that a CBE supplement only reflect newly acquired information and 'be based on sufficient evidence of a causal association,' the FDA ensures 'that scientifically accurate information appears in the approved labeling.'" *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 659-60 (S.D.N.Y. 2017) (citation omitted). FDA further recognizes that "'[e]xaggeration of risk, or inclusion of speculative or hypothetical risks [on drug labeling], could discourage appropriate use of a beneficial drug . . . or decrease the usefulness and accessibility of important information by diluting or obscuring it.'" *Id*. at 659 (citation omitted).

### D.    Federal Law Preempts Plaintiff's Design Defect Theory of Liability.

Plaintiff's theory that Gilead should have altered the design for Truvada® to contain TAF instead of TDF is preempted by federal law. In particular, Plaintiff's design defect theory is that a TAF medication "could have been conceivably approved in 2009," Compl. ¶ 70, and it constituted a "feasible, safer, alternative design" to TDF "that would have reduced or prevented

the harm caused to the Plaintiff." *Id*. ¶ 73.  In other words, Plaintiff's claim is premised on

assertions that, notwithstanding FDA's approval of Truvada®, Gilead should have stopped

selling it, and instead state law required it to manufacture and sell a different medication entirely,

*i.e.,* a medication containing TAF instead of TDF.  That theory, however, is preempted by

federal law, because it fundamentally conflicts with FDA's approval of Truvada®, and because

such a material change to Truvada® would have required FDA approval, making it impossible

for Gilead to comply simultaneously with both a purported state law duty to change an active

ingredient in Truvada® and federal regulations prohibiting Gilead from doing so unilaterally.

As the Supreme Court has explained, "[w]here state and federal law directly conflict,

state law must give way," and "state and federal law conflict where it is impossible for a private

party to comply with both state and federal requirements."  *Mensing*, 564 U.S. at 617-18

(internal citations omitted).  Moreover, "[t]he question for 'impossibility' is whether the private

party could *independently* do under federal law what state law requires of it."  *Id*. at 620

(emphasis added).  "[W]hen a party cannot satisfy its state duties without the Federal

Government's special permission and assistance, which is dependent on the exercise of judgment

by a federal agency, that party cannot independently satisfy those state duties for pre-emption

purposes."  *Id*. at 623-24.  Thus, "state-law design defect claims . . . that place a duty on

manufacturers to render a drug safer by . . . altering its composition" are preempted, because they

"conflict with federal laws that prohibit manufacturers from unilaterally altering drug

composition" without FDA approval.  *Bartlett*, 570 U.S. at 490; *see also id*. at 484 (design defect

claims are preempted where they would require an "NDA [for the allegedly alternative drug] to be marketed in interstate commerce").

The Sixth Circuit's decision in *Yates v. Ortho-McNeil-Janssen Pharm., Inc.* is directly on point. Plaintiff asserted a design defect claim, alleging that defendants should have altered the formulation of their Ortho Evra® patch, after FDA approval, by reducing the amount of estrogen in each patch. *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015). Applying the Supreme Court's *Wyeth*, *Bartlett*, and *Mensing* decisions, the court held that impossibility preemption barred plaintiff's ***post***-approval design defect theory—*i.e.*, that defendants could have altered the drug's formulation after FDA approval—because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product . . . .' Therefore, to the extent [plaintiff] argues that defendants should have altered the formulation of [the product] after the FDA had approved the patch, we find this claim clearly preempted." *Id.* at 298 (quoting 21 C.F.R. § 314.70(b)(2)(i)).[8]

Several courts have dismissed similar design defect claims, including those asserting, as here, that Gilead should have designed Truvada® or other TDF medications to contain TAF

---

[8] Likewise, plaintiff's theory that defendants should have designed "a different drug in the first instance"—plaintiff's ***pre***-approval design defect theory—also was preempted, because defendants could not independently introduce an alternatively designed medication without FDA approval. *Id.* at 299-300. "Even if [state] law requires defendants to produce and market a different design, the ultimate availability to [plaintiff] is contingent upon whether the FDA would approve the alternate design in the first place. . . . Defendants could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [the product], and certainly prior to [plaintiff's] use of the drug." *Id.* The court found that plaintiff's pre-approval design defect theory amounted to an untenable and preempted argument that "defendants should never have sold the FDA-approved formulation of [the drug] in the first place." *Id.* at 300 ("We reject this never-start selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale of the First Circuit.").

instead of TDF.  For example, in July, a Florida district court dismissed design defect claims premised on allegations that Gilead should have designed TDF medications to contain TAF instead of TDF as preempted by federal law, "because Gilead could not have marketed or sold medications containing this design change without first seeking and obtaining FDA approval," or, in other words, "FDA approved Gilead's formula and any changes would have required further approval."  *Epstein v. Gilead Sciences, Inc.,* No. 19-81474, 2020 WL 4333011, at *2 (S.D. Fla. July 27, 2020).  Similarly, in August, a Hawaii district court dismissed design defect claims premised on allegations that Gilead should have designed Truvada® to contain TAF instead of TDF as preempted by federal law, because "doing so would have required prior FDA approval," such that "it was impossible for Gilead to 'independently' distribute a TAF-containing drug," and once Truvada® was FDA-approved, Gilead was "prohibited from making any major changes" under federal law.  *Evans v. Gilead Sciences, Inc.,* No. 20-cv-00123, 2020 WL 5189995, at *9-10 (D. Haw. Aug. 31, 2020).  *See also, e.g., Gustavsen v. Alcon Labs., Inc*., 903 F.3d 1, 14 (1st Cir. 2018) ("changing the product bottle so as to dispense a different amount of prescription eye solution is a 'major change' under 21 C.F.R. § 314.70(b)," such that "plaintiffs' attempt to use state law to require such a change is preempted"); *Fleming v. Janssen Pharm., Inc.* 186 F. Supp. 3d 826, 832-33 (W.D. Tenn. 2016) (dismissing as preempted design defect claim "premised on the proposition that Defendants should have designed Invokana differently"); *Utts*, 226 F. Supp. 3d at 185-86 (dismissing as preempted plaintiffs' claims that "defendants had a pre-approval duty to submit a differently designed drug for FDA approval," and stating that "[i]nsofar as the plaintiffs' design defect claim suggests that the defendants

13

should never have sold the FDA-approved formulation of Eliquis, such claims have been explicitly repudiated by the Supreme Court").[9]

Here, Plaintiff asserts a *post*-approval design defect theory.  He alleges that Gilead should have substituted TAF for TDF in its formulation of Truvada®, *see* Compl. ¶¶ 58-70, and, more specifically, that such a "TAF medication . . . could have been conceivably approved in 2009," five years *after* Truvada® was FDA-approved and marketed, *id.* ¶ 31.  But any such post-approval substitution of TAF for TDF indisputably would have required Gilead to obtain prior FDA approval.  *See* 21 C.F.R. § 314.70(b)(2)(i) (providing that "changes in the qualitative or quantitative formulation of the drug product" require supplemental submission to, and approval from, FDA); *see also* 21 C.F.R. § 314.70(h) ("An applicant may not supplement a 505(b)(2) application to seek approval of a drug that is a different drug from the drug in the approved 505(b)(2) application.").  Thus, "to the extent [plaintiff] argues that [Gilead] should have altered the formulation of" Truvada®, or sold a different medication entirely, his claim is "clearly

---

[9] *See also, e.g., Robinson v. Eli Lilly & Co.*, 5:17-cv-338, 2018 WL 4039703, at *6 (E.D. Ky. Aug. 23, 2018) (pre- and post-approval design defect claims preempted because defendant "could not have independently made such fundamental changes to Prozac's formula"); *Drescher v. Bracco Diagnostics Inc.*, No. CV-19-00096, 2020 WL 1466296, at *5 (D. Ariz. Mar. 26, 2020) (dismissing design defect claim where "Plaintiff alleges that Defendants should have sold" a different drug formulation, because doing so "would require FDA approval," and "the Supreme Court expressly rejected Plaintiff's argument that Defendants should have simply replaced the linear GBCA products with macrocyclic GBCA products in *Bartlett*"); *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 54 (D.D.C. 2017) ("'state-law design defect claims . . . that place a duty on [pharmaceutical] manufacturers to render a drug safer by . . . altering its composition . . . are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling' and are therefore preempted") (quoting *Bartlett*, 570 U.S. at 490); *Boone v. Boehringer Ingelheim Pharms., Inc.*, SC 20200, 2020 WL 2121063, at *12, 15, -- A.3d -- (Conn. May 4, 2020) (design defect claim based on allegations that "defendants could have brought [another drug] to the market earlier" was preempted, because "defendants could not have satisfied their alleged state law duty to the decedent without marketing an unapproved drug in violation of federal law"); *Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110, 154 (2017) ("In light of the statutes and regulations regarding new drug applications and preventing changes to drugs already approved by the FDA, defendants could not have 'unilaterally changed the active ingredient of Motrin from ibuprofen to dexibuprofen to satisfy their state law duty' without violating federal law."), *petition for review denied*, No. S243672 (Oct. 11, 2017).

14

preempted." *Yates*, 808 F.3d at 298.  In other words, "[e]ven if [state] law require[d] [Gilead] to produce and market a different design" or a different medication, Gilead could not do so under federal law "without ultimately seeking the FDA's approval." *Id.* at 299-300.  Therefore, it "could not have satisfied [its] alleged state law duty . . . without marketing an unapproved drug in violation of federal law." *Boone*, 2020 WL 2121063, at *15.[10]

At bottom, Plaintiff's claim is that Gilead should have switched to a purportedly safer "alternative drug" containing TAF and should have stopped selling Truvada®, despite the fact that FDA specifically authorized Gilead to market and sell this medication.  Such design defect claims are "incompatible with . . . pre-emption jurisprudence," and should be dismissed.  *Bartlett*, 570 U.S. at 488; *Yates*, 808 F.3d at 300.[11]

---

[10] Given that Truvada® was FDA-approved in 2004, Compl. ¶ 31, and Plaintiff only alleges that a TAF alternative "could have been conceivably approved in 2009," *id.* ¶ 70, Plaintiff cannot assert a ***pre***-approval design defect theory, *i.e.,* that Gilead could have designed Truvada® to contain TAF ***before*** seeking FDA approval.  But in any event, any such pre-approval design defect theory would be preempted for the same reasons described above.  *See* 21 U.S.C. § 355(a) (providing NDA requirements); *Yates*, 808 F.3d at 299-300; *Utts*, 226 F. Supp. 3d at 185-86; *Epstein*, 2020 WL 4333011, at *2 (dismissing, as preempted, theory that Gilead "never should have sold" its TDF medications); *Evans*, 2020 WL 5189995, at *9 ("to the extent [plaintiff] asserts a pre-approval design defect claim—i.e., prior to Truvada receiving FDA approval, Gilead should have produced an HIV treatment . . . containing TAF, rather than TDF—this claim is preempted.").

[11] In *Holley v. v. Gilead Sciences, Inc.*, 379 F. Supp. 3d 809 (N.D. Cal. 2019), plaintiffs asserted similar design defect claims regarding Gilead's TDF medications.  The court noted that plaintiffs abandoned their ***post***-approval design defect claim in response to Gilead's preemption argument, but held that even though Gilead could not have independently sold or marketed TAF medications without FDA approval, plaintiffs' ***pre***-approval design defect claims were not preempted, because Gilead could have "develop[ed] and submit[ted] for FDA approval drugs that contained TAF rather than TDF . . . ." *Id.* at 821, 822 n.6, 824.  *Holley* is irrelevant here, because as set forth above, Plaintiff concedes that no TAF medication "could have been conceivably approved" until 2009, Compl. ¶ 70, and he thus cannot assert the ***pre***-approval design defect claim that survived dismissal in *Holley*.  Additionally, the *Holley* court incorrectly ignored that Gilead could not independently *market* any TAF medication "without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency . . . ." *Mensing*, 564 U.S. at 623-24; *see also Boone*, 2020 WL 2121063, at *15 (the mere feasibility of "*develop[ing]* [the drug] before the decedent's death is insufficient to

15

### E.    Federal Law Preempts Plaintiff's Failure To Warn Theory.

Plaintiff asserts, in support of his failure to warn theory, that the FDA-approved labeling for Truvada® did not adequately warn of the need to monitor patients for bone and kidney risks associated with the medication. *See* Compl. ¶¶ 40-49. Like his design defect theory of liability, these allegations are preempted by federal law, and should be dismissed.

Absent "newly acquired information" about safety, a manufacturer cannot change a drug's labeling without prior FDA approval. *See supra* § I.C; 21 C.F.R. § 314.70(b)(2)(v);[12] *see also Utts*, 226 F. Supp. 3d at 177. Thus, failure to warn claims based on a purported state law duty to change a drug's FDA-approved labeling, without an allegation of newly acquired safety information, are preempted. *Utts*, 251 F. Supp. 3d at 662-73 (dismissing failure to warn claims because plaintiffs failed to allege "newly acquired information" that would have allowed defendant unilaterally to change its labeling). In *Gibbons*, the Second Circuit affirmed the *Utts* court's dismissal of failure to warn claims as preempted, where plaintiffs did not adequately identify "newly acquired information." *Gibbons,* 919 F.3d at 707-08. Plaintiffs there alleged that "Defendants became aware of many reports of serious hemorrhaging" and that "numerous . . . studies published after [the drug's] approval in 2012 confirm the problematic bleeding events associated with [the drug]." *Id.* However, plaintiffs "provide[d] no basis upon which the court

---

preclude preemption," because "that fact is inapposite to the question of whether *marketing* [the drug] in 2014 would have required FDA's 'special permission and assistance'") (quoting *Mensing*, 564 U.S. at 623-24) (emphasis added)). Nor did the *Holley* court address the implications of plaintiffs' claim—*i.e.,* that Gilead should never have sold medications that FDA specifically approved for sale. A federal district court in Hawaii recently rejected *Holley's* reasoning as inconsistent with Supreme Court precedent. *Evans*, 2020 WL 5189995, at *9.

[12] Under certain circumstances, "newly acquired information" may allow a prescription drug manufacturer to change the labeling or strengthen a warning without prior FDA approval. 21 C.F.R. § 314.70(c)(6)(iii); *see also* 21 C.F.R. § 314.3 (defining "newly acquired information").

16

could conclude that the bleeding events covered by the alleged 'reports' and 'studies' presented a different type of risk than those the company had discussed with the FDA, or were more severe or more frequent than the bleeding events that the government already knew about," such that they did not constitute "newly acquired information" required for defendants to change the drug's labeling.  *Id.*; *see also, e.g. Epstein*, 2020 WL 4333011, at *2 (dismissing failure to warn claims regarding Gilead's TDF medications as preempted, because "it would have been impossible for Gilead to comply with both its state duties to change the products' labels and its federal duties not to make such changes without first obtaining FDA approval").[13]

Here, Plaintiff has not alleged any "newly acquired information" and, thus, cannot state a non-preempted claim based on a purported post-approval failure to issue sufficient warnings.  To the contrary, Plaintiff repeatedly alleges that *before* Truvada® was approved, Gilead was aware of the same risks associated with TDF about which Plaintiff now complains.  *See* Compl. ¶ 33 ("Before the introduction of TDF based antiretroviral medications into the market, Defendant's preclinical trials of TDF showed exposure to TDF caused bone toxicity . . . and reduced bone mineral density."); *id.* ¶ 34 ("By 2004 and the introduction of the Product into the market,

---

[13] *See also, e.g.*, *Holley*, 379 F. Supp. 3d at 828, 830 (dismissing failure to warn claims based on post-approval labeling as preempted, where "Plaintiffs allege that [Gilead] knew that TDF posed risks to patients' kidneys and bones before the first TDF drug was approved by the FDA," such that "the Court cannot conclude that Plaintiffs have plausibly alleged the existence of 'newly acquired information'—i.e., 'data, analyses, or other information not previously submitted to the FDA'") (quoting 21 C.F.R. § 241.3(b); emphasis omitted); *Drescher*, 2020 WL 1466296, at *3 (affirming magistrate judge finding that "Plaintiff's inadequate warning claim is preempted because it did not state a plausible claim that the Defendant manufacturers could have changed their labels under the [CBE] regulation"); *Lyons v. Boehringer Ingelheim Pharms., Inc.*, No. 1:18-cv-04624, -- F.Supp. 3d --, 2020 WL 5835125, at *6, 9 (N.D. Ga. Sept. 29, 2020) (failure to warn claims were preempted where plaintiff did not show "'newly acquired information' supporting her warning criticisms," despite evidence of, *inter alia*, a "European warning label" that was "significantly different from the one approved by the FDA").

17

Defendant had years' worth of evidence that TDF medications were causing liver and bone damage."); *id.* ¶ 35 ("By this time, medical literature identified multiple cases of renal dysfunction and failure even in those with no preexisting kidney issues."); *id.* ¶ 36 ("By this time, Defendant's long-term clinical data also showed that TDF was damaging bones").

Thus, any post-approval theory that Gilead should have revised its Truvada® labeling should be dismissed as preempted, and to the extent Plaintiff purports to maintain that the Truvada® labeling fails to warn about associated risks, his theory is necessarily that FDA incorrectly approved the *initial* Truvada® labeling.  But state law claims challenging, as inadequate, warnings contained in a drug's FDA-approved *original* labeling are preempted by federal law.  *See*, *e.g.*, *Utts*, 226 F. Supp. 3d at 184-85 (dismissing claims, because "[t]o the extent that the failure to warn claims are premised on the adequacy of the label as approved by the FDA when the drug was first marketed in the United States, they are preempted"); *McGee*, 2018 WL 1399237, at *4 ("To the extent [plaintiff] asserts that [defendant] should have alerted the FDA about [the drug's] DKA risk *before* [the drug's] approval, the claim is preempted because the claim is essentially one of failure to communicate with the FDA."); *Patton v. Forest Labs., Inc.*, No. 17-cv-922, 2018 U.S. Dist. LEXIS 160368, *32 (C.D. Cal. Sept. 19, 2018) (dismissing failure to warn claim as preempted by federal law); *Epstein*, 2020 WL 4333011, at *2 (dismissing pre-approval failure to warn claim against Gilead regarding TDF medication labeling, because "it would have been impossible for Gilead to comply with both its state duties to change the products' labels and its federal duties not to make such changes without first obtaining FDA approval").  Indeed, Plaintiff cannot use state law to "second guess . . . an FDA judgment," and FDA is "the exclusive judge of safety and efficacy based on information available at the commencement of marketing . . . ."  *In re Celexa & Lexapro Mktg. & Sales*

*Pracs. Litig.*, 779 F.3d at 41; *see also Maze v. Bayer Healthcare Pharms., Inc.*, No. 4:18-cv-21,

2019 WL 1062387, at \*3 (E.D. Tenn. Mar. 6, 2019) ("any claim asserted by Maze and based on

information known to the FDA as of April 2012—when the label at issue here was approved—is

plainly preempted by federal law").[14]

Thus, Plaintiff's claims based on allegedly inadequate warnings contained in the Truvada[®]

labeling are preempted, and should be dismissed.

## II.       THE TRUVADA® LABELING IS ADEQUATE AS A MATTER OF LAW.

Plaintiff also fails to plead a viable failure to warn claim because the FDA-approved

Truvada[®] labeling is adequate as a matter of law.[15]  Under the New Jersey PLA, warnings and

instructions contained on FDA-approved pharmaceutical labeling are subject to a "'virtually

dispositive' statutory 'super-presumption'" of adequacy as a matter of law.  *Rossito v. Hoffman-*

*La Roche Inc.*, A-1237-13T1, 2016 WL 3943335, at \*14 (App. Div. July 22, 2016) (quoting

*Kendall v. Hoffman La-Roche, Inc.*, 209 N.J. 173, 195-97 (N.J. 2012) (emphasis added)); *see*

*also In re: Accutane Litig.*, 235 N.J. 229, 276 (2018) (the presumption "gives pharmaceutical

companies the protection necessary to research and develop the drugs that will improve and

extend the lives of people around the world," and "protects manufacturers from unmeritorious

---

[14] The court's holding in *Holley*—that plaintiffs' pre-approval failure to warn claims were not preempted—is inconsistent with the above-referenced cases, which correctly and logically hold that failure to warn claims challenging the adequacy of an original label approved and deemed sufficient by FDA are preempted.  *See Holley*, 379 F. Supp. 3d at 825; *see also supra* § I.C (explaining that FDA's approval of drug labeling constitutes "a specific finding that [the drug's] label was not 'false or misleading in any particular'").

[15] New Jersey follows the learned intermediary doctrine, pursuant to which Gilead owed any duty to warn to Plaintiff's doctor, not to Plaintiff himself.  *N.J.S.A.* 2A:58C-2; *Banner v. Hoffman-La Roche Inc.*, 383 N.J. Super. 364, 375-76 (App. Div. 2006) ("Our statute incorporates the 'learned intermediary' doctrine under which a pharmaceutical manufacturer generally fulfills its duty to warn the ultimate user of its prescription drug . . . when it supplies physicians with adequate information about a drug's dangerous propensities.").

19

lawsuits"); *N.J.S.A.* 2A:58C-4 (codifying the presumption where "the warning or instruction given in connection with a drug . . . has been approved or prescribed by the federal Food and Drug Administration under the 'Federal Food, Drug, and Cosmetic Act'"). The Truvada® labeling, which was indisputably approved by the FDA, Compl. ⁋ 31, is thus presumptively adequate.

A plaintiff may only overcome the presumption by showing "[1] deliberate concealment or nondisclosure of after-acquired knowledge of harmful effects, . . . [2] economically-driven manipulation of the post-market regulatory process, . . . [or] [3] clear and convincing evidence that a manufacturer knew or should have known in the postmarketing phase that the drug warnings were inadequate based on the label warning updating requirements" under the federal regulations. *In re: Accutane Litig.,* 235 N.J. at 277. As set forth above, Plaintiff has not alleged any "newly acquired information" that would have allowed Gilead to update the Truvada® labeling under the federal regulations. *See supra* § I.E; *In re: Accutane Litig.,* 235 N.J. at 275 (analyzing applicability of the third exception to the presumption under this same "newly acquired information" standard for revising FDA-approved labeling). Nor has Plaintiff attempted to plead any facts supporting any other basis for overcoming the "virtually dispositive" presumption. *See, e.g., In re: Accutane Litig.,* 235 N.J. at 277-81 (rejecting failure to warn theory that drug labeling was inadequate, in light of lack of evidence rebutting the presumption that the FDA-approved warnings were adequate); *Bailey,* 424 N.J. Super. at 324 (rejecting failure to warn theory, because "the actions and/or inactions of defendants have to be viewed in light of plaintiffs' failure to warn claim and the presumption of adequacy established by our Legislature," and "[p]laintiffs have not presented compelling or substantial evidence of the type necessary to rebut the presumption of adequacy").

20

Not only does Plaintiff fail to plead any facts to rebut this presumption that the Truvada® labeling was adequate, he *concedes* that "[a]t all times relevant herein, Truvada's labelling included a warning to monitor patients who were at risk for adverse kidney events as clinically appropriate." Compl. ℙ 20; *see also id.* ℙ 22 (same).  Although Plaintiff alleges that the label did not adequately warn of the need to monitor *other* patients who were *not* at risk, *see id.* ℙℙ 40-42, he further concedes that *his* diagnoses prior to being prescribed Truvada® rendered him "*at risk for adverse kidney events.*" *Id.* ℙℙ 21(a), 23(a) (emphasis added).  In other words, despite Plaintiff basing his failure to warn claim on the theory that the Truvada® labeling did not adequately warn of the need to monitor patients for bone and kidney risks associated with the medication, *see id.* ℙℙ 40-49, the label undisputedly *did* contain a warning, at all relevant times, that patients like Plaintiff should be monitored for these risks.[16]

As a result, Plaintiff has not pled a viable claim that the Truvada® label inadequately warned of the need to monitor him for bone and kidney risks, and his failure to warn claim should be dismissed.  *See, e.g., Banner*, 383 N.J. Super. at 382 (dismissing failure to warn claim because "the warnings given . . . 'were accurate, clear, and unambiguous', and were, therefore, adequate as a matter of law").[17]

---

[16] To the extent Plaintiff maintains that the monitoring instruction on the Truvada® labeling was nevertheless inadequate because it "should have warned doctors to check for serum phosphorous and/or urine glucose, more effective markers of kidney damage," *id.* ℙ 46, he ignores that the Truvada® label did, at all times, warn that "[p]atients at risk for, or with a history of, renal dysfunction . . . should be carefully monitored for changes in serum creatinine and phosphorous."  CDER, Truvada® Approved Labeling at 16, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021752s000_Truvada_Prntlbl.pdf.

[17] *See also, e.g., Zardo v. Merck & Co. Inc.*, 168 F.3d 504, 504 (9th Cir. 1999) (warning was adequate as a matter of law, where it "clearly states a risk of" the complained-of side-effect); *Adams v. Synthes Spine Co., LP*, 298 F.3d 1114, 1118 (9th Cir. 2002) (label was adequate as a matter of law, where "[i]t plainly said that" complained-of adverse event could occur); *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012) (affirming dismissal where the "warning label warned of the precise risk of increased suicidal tendencies"); *Utts,* 251 F. Supp.

21

## CONCLUSION

For the foregoing reasons, Gilead's Motion to Dismiss should be granted, and Plaintiff's

Complaint should be dismissed with prejudice.


Dated: October 16, 2020                          Respectfully submitted,

                                                 /s/ *Beth S. Rose*

                                                 Beth S. Rose (NJ ID #028491987)
                                                 R. Michael Riecken (NJ ID #211402016)
                                                 SILLS CUMMIS & GROSS P.C.
                                                 One Riverfront Plaza
                                                 Newark, New Jersey 07102
                                                 Telephone: (973) 643-7000
                                                 Facsimile: (973) 643-6500
                                                 brose@sillscummis.com
                                                 rriecken@sillscummis.com

                                                 Joshua E. Anderson (*pro hac vice* pending)
                                                 Alycia A. Degen (*pro hac vice* pending)
                                                 SIDLEY AUSTIN LLP
                                                 555 West Fifth Street, Suite 4000
                                                 Los Angeles, CA 90013
                                                 Telephone:  (213) 896-6000
                                                 Facsimile:  (213) 896-6600
                                                 janderson@sidley.com
                                                 adegen@sidley.com

---

3d at 673 (dismissing warning claim "because the warnings given on the [] label were, as a
matter of law, sufficient to warn of" the alleged injury).

22

# FARKAS & DONOHUE, LLC

**-Counselors at Law-**
25A Hanover Road, Suite 320
Florham Park, New Jersey 07932
(973) 443-9400
(973) 443-4330 Fax
Email: Office@FarkasandDonohue.com
www.FarkasandDonohue.com

**EVELYN CADORIN FARKAS \***
**DAVID C. DONOHUE # \***
**ROBERT J. MORMILE \*\***
**BETH A. HARDY\***
**CHARLES E. MURRAY III +**
**NANCY CROSTA LANDALE\***
**EILEEN M. KAVANAGH + ◆**
**JENNIFER SALFI GIANETTI ◆**
**GUY M. MAGNUSSON ◆**
**CHRISTINE M. JONES +**
**SEAN D. MCMURTRY##**

**\* Certified By The Supreme**
**Court of New Jersey as a**
**Certified Civil Trial Attorney**
**\*\* Admitted in NJ & PA**
**+ Admitted in NJ & NY**
**# Admitted in NJ & AZ**
**◆ Of Counsel**

November 18, 2020

_Sent via Electronic Filing_
Honorable Joseph S. Conte, J.S.C.
New Court House
77 Hamilton Street, 6th Floor
Paterson, NJ 07505

>       Re:    **Gaetano v. St. Joseph's Health, Inc. et. al.**
>              **Docket No.:   PAS-L-2011-20**
>              **Our File No.: STJI-436**

Dear Judge Conte:

Our office represents defendants, St. Joseph's Health, Inc. and Dr. Michael Lange in the above-referenced matter. Please accept this letter in lieu of a more formal submission in partial opposition to co-defendant's motion to dismiss, presently returnable December 4, 2020.

These defendants do not take a formal position one way or the other on the motion's merits or the truth of any of the factual allegations _vis a vis_ dismissal of plaintiff's complaint as to co-defendant. This letter is submitted to confirm that dismissal of cross-claims is not warranted due to dismissal of the plaintiff's direct claims against defendant, Gilead Sciences, Inc.  Defendants are still entitled to an allocation of percentage of fault attributable to any dismissed defendants.

In <u>Burt v. West Jersey Health Systems</u>, 339 N.J. Super. 296 (App. Div. 2001), the Appellate Division held that co-defendants cross claims were to be preserved despite the dismissal of the direct claims for failure to provide an Affidavit of Merit.  <u>See</u>, <u>also</u>, <u>Brodsky v. Grinnell Haulers, Inc.</u>, 181 N.J. 102 (2004)(where the Supreme Court held that a jury should assess the fault of a driver where the defendant had been dismissed by virtue of being discharged in bankruptcy); <u>Malik v. Cooper Tire and Rubber Co.</u>, 2015 WL 3440856 (D.N.J. 2015) (where defendant was allowed to seek an allocation of fault against a driver who was not named as a defendant and the court found that sufficient notice was provided in supplemental answers to interrogatories); <u>Carter v. University of Medicine of Dentistry of New Jersey</u>, 854 F. Supp. 310 (D.N.J. 1994), (where the court granted the defendants permission to have a physician who settled in a separate suit appear on the verdict sheet for purposes of apportionment); <u>Young v. Latta</u>, 123 N.J. 584 (1991).

The court in <u>Burt</u> held that if the plaintiff fails to provide an affidavit of merit to a defendant against whom a cross-claim has been asserted, that defendant is not subject to liability either to the plaintiff or to a codefendant who has asserted a cross-claim.  Instead, plaintiff's recovery is diminished by the percentage of negligence the jury allocates to that defendant.  <u>Id</u>. at 306-10, 771.

The allocation of fault doctrine stems from both the Comparative Negligence Act and the Joint Tortfeasors Contribution Law.  <u>Town of Kearny v. Brandt</u>, 214 N.J. 76, 96 (2013).  There is a strong public policy preference that defendants should only pay their actual percentage of negligence.  Under the Comparative Negligence Act, in negligence and strict liability actions in which the question of liability is in dispute, the trier of fact makes the following findings: (1) the amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damage; (2) the extent, in the form of a percentage, of each party's negligence or fault.  The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all parties to the suit shall be 100%.  <u>N.J.S.A</u>. 15-5.2(a).

The Joint Tortfeasors Contribution Law plays a complementary role in the statutory scheme.  <u>N.J.S.A</u>. 2A:53A-3.  The statute "was enacted to promote the fair sharing of the burden of judgment by joint tortfeasors and prevent a plaintiff from arbitrarily selecting his or her

victim." <u>Halloway v. State</u>, 125 N.J. 386, 400-401 (1991).  As the New Jersey Supreme Court has noted "when applied together, the [Comparative Negligence Act and Joint Tortfeasors Contribution Law] implement New Jersey's approach to fair apportionment of damages among plaintiffs and defendant, and among joint defendants." <u>Erny v. Estate of Merola</u>, 171 N.J. 86, 99 (2002).  This is true even in circumstances where a negligent party is not listed as a defendant.

Based on the foregoing, it is respectfully requested that the defendants' cross-claims be preserved for purposes of allocation at the time of trial. Thank you for your time and attention to this matter. I look forward to hearing from Your Honor regarding the above.

Respectfully submitted,

*/s/ Charles E. Murray, III, Esq.*

Charles E. Murray, III, Esq.

cmurray@farkasanddonohue.com

CEM/hlv
cc: all counsel of record (via electronic filing)

# LANDEL, BERNSTEIN & KALOSIEH, LLP

## ATTORNEYS AT LAW

**Robert E. Landel, Esq.***
**Ari G. Bernstein, Esq. +**
**Joseph G. Kalosieh, Esq. #**

**Thomas S. Garlick, Esq. +**

*Of Counsel*
  Hon. Edward V. Torack, J.S.C. (Ret.) **

*Admitted in NJ
+Admitted in NJ, NY
# LL.M. in Taxation
  Admitted in NJ, NY & DC
**Court-Approved Mediator

**279 Franklin Avenue**
**Wyckoff, New Jersey 07481**

**Telephone: (201) 891-6955**
**Fax: (201) 891-7420**

New York Office
4180 Purchase Street
Purchase, NY 10577
Tel: (914) 524-7375

November 18, 2020

## VIA E-COURTS

Clerk, Law Division
Passaic County Superior Court
77 Hamilton Street
Paterson, New Jersey 07505-2017

> **Re:** **Anthony Gaetano v. Gilead Sciences, Inc., et al.**
> **Docket No.: PAS L-2011-20**
> **Motion to Dismiss Plaintiff's Complaint (Returnable: 12/4/2020)**

Dear Sir/Madam:

Please be advised that this office represents the Plaintiff, Anthony Gaetano, in connection with the above-referenced matter. A *Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim* filed by Defendant, Gilead Sciences, Inc., is presently returnable on December 4, 2020 before Judge Joseph S. Conte. In connection with same and in response/opposition thereto, I am submitting herewith, on behalf of my client, a ***Legal Brief*** for electronic filing with the Court.

By copy of this letter (with the enclosed Opposition Legal Brief) to Judge Conte, I am providing His Honor with a copy of same marked "COURTESY COPY".

Thank you for your assistance with this matter.

Very truly yours,

Ari G. Bernstein

AGB/an
Enclosure
cc:    Hon. Joseph S. Conte, J.S.C. (*w/encl.*) (*via first-class mail*)
       Client (*w/encl.*) (*via first-class mail*)
       Evelyn Farkas, Esq. (*w/encl.*) (*via e-mail*)
       Beth S. Rose, Esq. (*w/encl.*) (*via e-mail*)

Ari G. Bernstein, Esq.
Attorney I.D. No.: 024841992
**LANDEL, BERNSTEIN & KALOSIEH, LLP**
279 Franklin Avenue
Wyckoff, New Jersey 07481
(201) 891-6955
*Attorneys for Plaintiff Anthony Gaetano*

| | |
|---|---|
| ANTHONY GAETANO,<br><br>          Plaintiff,<br><br>     v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE, MD; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  PASSAIC COUNTY<br><br>Docket No.:  PAS-L-2011-20<br><br>**CIVIL ACTION** |

**PLAINTIFF'S BRIEF IN OPPOSITION TO GILEAD SCIENCES, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE CLAIM**

LANDEL, BERNSTEIN & KALOSIEH, L.L.P.
279 Franklin Avenue
Wyckoff, New Jersey 07481
(201) 891-6955
*Attorneys for the Plaintiff, Anthony Gaetano*

On the Brief:

ARI G. BERNSTEIN, ESQ.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii
COUNTER STATEMENT OF MATERIAL FACTS................................................ 1
LEGAL STANDARD............................................................................................... 3
LEGAL ARGUMENT .............................................................................................. 5

    I. DEFENDANT GILEAD'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT
    SHOULD BE DENIED BECAUSE GILEAD CANNOT SHOW THAT PLAINTIFF'S
    CLAIM IS PREEMPTED BY FEDERAL LAW. ...................................................... 5
        A.   Standards of Federal Conflict Preemption ......................................................... 5
        B.   The *Bartlett* Case: Irrelevant and Distinguishable ......................................... 7
        C.   Relevant Federal Regulations Regarding Drug Labeling Changes ............................. 10
        D.   Plaintiff's Design Defect Claim is not Preempted ......................................... 11
        E.   Plaintiff's Failure to Warn Claim is not Preempted ....................................... 12

    II. DEFENDANT GILEAD'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT
    SHOULD BE DENIED BECAUSE PLAINTIFF'S HAS PLED SUFFICIENT FACTS TO
    OVERCOME THE PRESUMPTION OF ADEQUACY OF TRUVADA'S LABELING...... 14
        A.   Plaintiff has pled facts to overcome pre-approval presumptions of adequacy in
        Truvada's labeling. ...................................................................................... 16
        B.   Plaintiff has pled facts sufficient to overcome post-approval presumptions of adequacy
        of Truvada's labeling ................................................................................... 17
        C.   Plaintiff's pleadings allege rare circumstances where the presumption of adequacy of
        Truvada's labeling is overcome. ................................................................... 18

    III. DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH
    PREJUDICE SHOULD BE DENIED AS PLAINTIFF IS ENTITLED TO LEAVE TO
    AMEND HIS PLEADINGS ................................................................................ 20

CONCLUSION...................................................................................................... 21

## TABLE OF AUTHORITIES

Cases

Banco Popular North America v. Gandi,
  184 N.J. 161 (2005) ................................................................ 4, 14
Buckman Company v. Plaintiffs' Legal Committee,
  531 U.S. 341 (2001)................................................................ 13
Cornett v. Johnson & Johnson,
  414 N.J. Super. 365 (App. Div. 2010) .................................... 5
Cornett v. Johnson,
  211 N.J. 362 (2012) ................................................................ 18
Di Cristofaro v. Laurel Grove Memorial Park,
  43 N.J.Super. 244 (App. Div. 1957) ................................... 3, 5
Feldman v. Lederle Labs.,
  125 N.J. 117 (1991) ............................................................ 8, 14
Guidry v. Janssen Pharms., Inc.,
  206 F. Supp. 3d 1187 (E.D. La. 2016)................................... 8
Hall v. Saint Joseph's Hosp.,
  343 N.J. Super. 88 (App. Div. 2001) ..................................... 5
Holley v. Gilead Scis., Inc.,
  379 F. Supp. 3d 809 ( N.D. Cal. 2019) ........................... passim
In re Accutane Litig.,
  235 N.J. 229 (2018) ................................... 9, 14, 15, 18
Kendall v. Hoffman-La Roche, Inc.,
  209 N.J. 173 (2012) ................................................................ 15
McDarby v. Merk & Co., Inc., ...................................................
401 N.J. Super. 10 (App. Div. 2008) ............................. 15, 18, 19
Mut. Pharm. Co. v. Bartlett,
  570 U.S. 472 (2013)............................................................ 6, 7
NCP Litigation Trust v. KPMG, L.L.P.,
  187 N.J. 353 (2006) ............................................................ 4, 5
Perez v. Wyeth Labs. Inc.,
  161 N.J. 1 (1999) ............................................................ 15, 16
PLIVA, Inc. v. Mensing,
  564 U.S. 604 (2011) ................................................................ 6
Printing Mart-Morristown v. Sharp Electronics Corp.,
  116 N.J. 739 (1989) ........................................................ 3, 4, 20
Roberts v. Rich Foods,
  139 N.J. 365 (1995) ................................................................ 5
Schulman v. Wolff & Samson, P.C.,
  401 N.J.Super. 467 (App. Div. 2008) ................................. 4, 14
Wyeth v. Levine,
  555 U.S. 555 (2009) ........................................................ passim
Yates v. Ortho-Mcneil-Janssen Pharms., Inc.,
  808 F.3d 281 (6th Cir. 2015) ................................................. 8

iii

**Other Authorities**

21 CFR §§314.70 ................................................................................................................ 11
73 Fed. Reg. 49609 ........................................................................................................... 14
*Pressler, Current N.J. Rules* (2016) .................................................................................. 3

iv

## COUNTER STATEMENT OF MATERIAL FACTS

1.    On or about September 8, 2005, Defendant, Anthony Gaetano (hereinafter, sometimes referred to as "Plaintiff" or "Anthony"), sought treatment at St. Joseph's Hospital in Paterson, New Jersey. See, Complaint dated July 28, 2020 ("Compl.") at ¶14.

2.    After being diagnosed with HIV and myriad of other diseases affecting his kidney health, Anthony was prescribed the antiretroviral Truvada, developed by Defendant, Gilead Sciences, Inc. (hereinafter, "Defendant Gilead"), on or about December 27, 2005. Id at ¶¶15-17.

3.    When Anthony was initially prescribed Truvada, Defendant Gilead's labeling warned to monitor only those patients at risk of adverse kidney events. Id at ¶¶42-46.

4.    However, in its warning to monitor those patients at risk of adverse kidney events, Defendant Gilead only recommended that patients be monitored for high creatinine clearance, a marker that would only indicate kidney damage once the damage was irreversible. Id at ¶46.

5.    Even in Defendant Gilead's warning to monitor those patients at risk of adverse kidney events, Defendant Gilead failed to instruct as to how often this biochemical marker should be checked, only stating that these markers should be checked "as clinically appropriate." Id at ¶48.

6.    In 2005, before Anthony began taking Truvada, Defendant Gilead's labels for Truvada in the European Union included warnings for the careful monitoring of renal function using serum creatinine and serum phosphate on a consistent four-week schedule in the first year and, thereafter, every three months. Id at ¶¶51-52.

1

7.    In 2001, three years before Truvada entered the market and four years before Anthony
      Gaetano was prescribed Truvada, Defendant Gilead discovered a safer composite of
      tenofovir known as *tenofovir alafenamide fumarate* ("TAF") that would allow for the
      same antiviral benefits of TDF at doses up to 10 times smaller. Id at ¶¶58-60.

8.    In 2004, despite consistent positive results from clinical trials, Defendant Gilead abruptly
      stopped its research and development of TAF medications. Id at ¶61.

9.    Defendant Gilead only renewed its development of TAF in 2010. Id at ¶64.

10.   In a statement to the Capital Markets Healthcare Conference on March 2, 2001,
      Defendant Gilead's President explicitly stated that Defendant Gilead stopped research
      into TAF to protect its market dominance. Id at ¶67.

11.   Anthony took Truvada regularly, as prescribed by his doctor until the introduction of
      Odesfey, a TAF drug manufactured by Gilead. Id at ¶18.

12.   Anthony was exposed to the harmful effects of Truvada for approximately a decade
      before he was switched to Odesfey, while TAF medications like Odesfey could have been
      available as early as 2009 absent Defendant Gilead's unconscionable conduct, which
      would have cut Anthony's exposure to Truvada's nephrotoxic side effects in half. Id at
      ¶¶18,70.

13.   Had Defendant Gilead provided proper warnings on their labeling of Truvada, Anthony
      would have been properly monitored by his healthcare providers as monitoring would
      have been universal among patients notwithstanding the presence of susceptibility to
      adverse kidney events. Id at ¶¶42-46, 78-79.

14. Had Defendant Gilead provided proper warnings on their labeling of Truvada, Anthony, upon reading the labeling, would have insisted he be monitored for kidney health despite his lack of knowledge regarding his kidney health issues. Id at ¶¶21-23,42-26,78-79.

15. Plaintiff filed a Complaint against Defendant Gilead alleging design defect and failure to warn claims on July 8, 2020.

16. In lieu of filing an Answer, Defendant Gilead filed a Motion to Dismiss the Plaintiff's Complaint pursuant to Rule 4:6-2(e) alleging that Plaintiff's claim is preempted by federal law and that their labeling is adequate as a matter of law. Mot. to Dismiss Plaintiff's Complaint, Dated October 16, 2020 ("Mot. to Dis.").

17. Plaintiff opposes said Motion.

## LEGAL STANDARD

As stated by the New Jersey Supreme Court in New Jersey in Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 772 (1989), trial courts should approach applications for dismissal for failure to state a cause of action upon which relief may be granted with great caution.  "We have sought to make clear that such motions, almost always brought at the very earliest stage of the litigation, should be granted in only the rarest of instances."  Id.

Moreover, as set forth in the New Jersey Court Rules, the court must search the complaint in depth and with liberality to ascertain whether the cause of action may be garnered even from an ambiguous statement of claim, opportunity being given to amend if necessary. Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252, (App. Div. 1957).  Every reasonable inference is accorded to the plaintiff and the motion is granted only in rare instances and ordinarily without prejudice. See Pressler, Current N.J. Rules, comment 4.1.1 on Rule 4:6-2(e) (2016).

3

The only question to be resolved on a motion to dismiss is whether <u>any viable cause of action</u> exists.  "[T]he test for determining the adequacy of a pleading [is] whether a cause of action is 'suggested' by the facts."  <u>Printing Mart</u>, 116 N.J at 746.  Further, "the court should assume that the non-movant's allegations are true and give that party the benefits of all reasonable inferences."  <u>NCP Litigation Trust v. KPMG, L.L.P.</u>, 187 N.J. 353, 365 (2006).  Further, a complaint should not be dismissed for failure to state a claim where a cause of action is *suggested* by the facts and a theory of actionability may be articulated by amendment of the complaint.  <u>Printing Mart</u>, 116 N.J.  at 746.

In order to defeat a motion to dismiss, the plaintiff does not have to prove the case but only needs to plead allegations which, if proven, would create a valid cause of action. <u>Schulman v. Wolff & Samson, P.C.</u>, 401 N.J. Super. 467, 473-74 (App. Div. 2008). This broad and liberal standard on motions to dismiss was further set forth by the Court in <u>Banco Popular North America v. Gandi</u>, 184 N.J. 161 (2005):

> At this preliminary stage of the litigation [a] [c]ourt [should not be] concerned with the ability of the plaintiffs to prove the allegation contained in the complaint… [P]laintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach. <u>Id</u>. at 165.

As will be shown below, Plaintiff has more than met this burden and for all of the reasons set forth below, Defendant Gilead's Motion to Dismiss Plaintiff's Complaint should be denied.

4

**LEGAL ARGUMENT**

**POINT I**

**DEFENDANT GILEAD'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT
SHOULD BE DENIED BECAUSE GILEAD CANNOT SHOW THAT PLAINTIFF'S
CLAIM IS PREEMPTED BY FEDERAL LAW.**

Anthony Gaetano's (hereinafter, sometimes referred to as "Plaintiff" or "Anthony") Strict
Products Liability Claim is based on the following theories: (1) Gilead should have designed and
submitted Truvada utilizing TAF rather than TDF **before its introduction into the market**; (2)
Gilead failed to adequately warn of the need to monitor all patients for adverse bone and kidney
events; and (3) Gilead failed to adequately warn of the need to monitor patients **at risk of
adverse kidney and bone events**.[1] Federal preemption, as an affirmative defense, places the
burden of proving the defense on Defendant Gilead. See generally, Hall v. Saint Joseph's Hosp.,
343 N.J. Super. 88, 108-109 (App. Div. 2001); Roberts v. Rich Foods, 139 N.J. 365, 378 (1995);
Cornett v. Johnson & Johnson, 414 N.J. Super. 365, 391 (App. Div. 2010). Thus, Defendant
Gilead has a **super burden** in arguing that their Motion to Dismiss should be granted based on
federal preemption grounds: Defendants are both responsible for affirmatively showing that that
they can comply with both federal and state law **and** that compliance would be impossible when
viewing the pleadings in the light most favorable to the Plaintiff with every reasonable inference
drawn to the benefit of Plaintiff therein. See, NCP Litigation Trust, 187 N.J. at 365; Di
Cristofaro, 43 N.J. Super. At 252; Roberts, 139 N.J. at 378.

**A. Standards of Federal Conflict Preemption**

Defendant Gilead argues that Plaintiff's state-law design defect and failure to warn
claims are preempted because it would be impossible for them to comply with both state and

federal duties. See, Mot. to Dis. at pgs6-7. What Defendant Gilead cites as *conflict preemption* is more commonly referred to as **impossibility preemption**, so named, because "'Impossibility preemption is a demanding defense,' and the burden for demonstrating impossibility rests with the party asserting preemption." Holley v. Gilead Scis., Inc., 379 F. Supp. 3d 809, 819 ( N.D. Cal. 2019) (quoting Wyeth v. Levine, 555 U.S. 555, 573 (2009).

In the pharmaceutical failure to warn and design defect context, the defining issue that determines whether impossibility preemption exists is whether manufacturers can "independently do under federal law what state law requires of it." PLIVA, Inc. v. Mensing, 564 U.S. 604, 620 (2011). While generic drug manufacturers are prevented in most contexts from undertaking unilateral acts to change the design or labeling of a product, brand-name manufacturers have greater ability to unilaterally change their labeling. See, Mensing, 564 U.S. at 620; Levine, 555 U.S. at 569-571. Defendant Gilead, in presenting the Supreme Court's opinion in Mutual Pharmaceuticals Co., Inc. v. Bartlett for the proposition that Plaintiff's claim is federally preempted, seeks to destroy carefully established distinctions between the liabilities of brand name versus generic drug manufacturers. See generally, Mut. Pharm. Co. v. Bartlett, 570 U.S. 472 (2013); Levine, 555 U.S. at 569-571. Defendant Gilead argues that decades of legal analysis of federal preemption as applied to drug manufacturers as outlined in Levine are effectively and definitively overruled a single line of dicta contained in the former. Id. Plaintiff, conversely, will demonstrate that Bartlett is inapplicable and, instead, this Court should adopt the well-reasoned analysis of Holley, the only published opinion that directly addresses the lack of federal preemption of Plaintiff's claims as well as the persuasive weight of the various

---

[1] Defendant Gilead's characterization of Plaintiff's claims should be given no weight considering that the pleadings, for the purpose of a summary judgment motion, must be read in the light most favorable to the plaintiff with every reasonable inference accorded to the plaintiff. See, *Pressler*, Supra.

6

unpublished court opinions denying motions to dismiss complaints regarding the harmful effects of TDF medications manufactured by Defendant Gilead.

### B.  The *Bartlett* Case: Irrelevant and Distinguishable

In <u>Bartlett</u>, a New Hampshire woman sued the manufacturer of a **generic** nonsteroidal anti-inflammatory drug sulindac, (hereinafter the "NSAID") for not properly warning of the risk that the NSAID would cause skin necrosis. <u>Bartlett</u>, 570 U.S. at 478-479. The woman sued under both design defect and failure to warn strict liability claims. <u>Id</u> at 475. The Court, reasoning that <u>Mensing</u> established that federal law prohibits generic drug manufacturers from changing their labels unilaterally, and that drug manufacturers should not be forced to exit a marketplace to comply with both state and federal law, ruled that "state-law **design defect claims that turn on the adequacy of a drug's warnings** are pre-empted by federal law under [<u>Mensing</u>]." <u>Bartlett</u>, 570 U.S. at 476 (emphasis added).

The particular phrasing of <u>Bartlett</u>'s holding is important in order to understand the narrow scope of its holding: <u>Bartlett</u> is unique in that the failure to warn claim was dismissed after the woman's doctor admitted he failed to read the warning labels on the NSAID. <u>Id</u> at 479. As <u>Bartlett</u> involved both a peculiar hybrid design-labeling defect claim of a generic drug manufacturer who is unable to unilaterally change their labeling and a design defect claim that demanded the manufacturer withdraw from the market, it is not applicable to Plaintiff's claims against Defendant Gilead in the present case as the Defendant is a brand-name drug manufacturer. Further, Defendant Gilead  knew of TDF's nephrotoxicity **before** the introduction of Truvada into the market and, thus, their duty was to present Truvada to the FDA with a TAF composition and, alternatively, continue independently with the introduction of TAF into the market instead of prioritizing market dominance over the health of its consumers.

7

Instead, this court should adopt the legal analysis and holdings found in <u>Holley</u>.[2] <u>Holley</u>, 379 F. Supp. 3d. In <u>Holley</u>, a group of 140 consumers of Defendant Gilead's TDF medications sued Defendant Gilead for various state failure to warn and design defect claims. <u>Id</u> at 814. In determining the applicability of <u>Bartlett</u> to claims **almost identical to Plaintiff's**, the court noted that:

> [T]he <u>Bartlett</u> court did not reach the sweeping conclusion that all design defect claims are preempted by federal law, but rather applied the impossibility preemption analysis to the plaintiff's design defect claim regarding a generic drug, and clarified that preemption cannot be avoided if the only way a manufacturer can comply with both federal and state law is to exit the market. <u>Holley</u>, F. Supp. 3d. at 822 (citing <u>Yates v. Ortho-Mcneil-Janssen Pharms., Inc.</u>, 808 F.3d 281, 296 (6th Cir. 2015).

The <u>Holley</u> court, in determining the applicability of federal preemption, applied the following two-part test: First, it determined whether a drug manufacturer may independently act in compliance with both state and federal law. <u>Id</u> at 821. Second, if this independent action is possible, the claims are preempted "only if there is clear evidence that the FDA would not grant their approval." <u>Holley</u>, 379 F. Supp. at 821.

Using this test, the court in <u>Holley</u> refused to dismiss design defect claims against Defendant Gilead, noting that "The Question is not whether a drug manufacturer can 'independently sell pharmaceutical drugs without FDA approval'; it is whether 'a drug manufacturer [can] independently design a reasonably safe drug in compliance with its state-law duties before seeking FDA approval.'" <u>Id</u> at 824 (citing <u>Guidry v. Janssen Pharms., Inc.</u>, 206 F. Supp. 3d 1187, 1208 (E.D. La. 2016). In concluding that "Gilead has not satisfied the 'demanding' defense of impossibility preemption," as to the group's design defect claims

---

[2] Defendant Gilead's claims that <u>Holley</u> should not be given weight where it is inconsistent with their cited unpublished opinions holds no basis in law. In fact, New Jersey published jurisprudence is consistent with <u>Holley</u>'s finding of no preemption. <u>See</u>, <u>Feldman v. Lederle Labs.</u>, 125 N.J. 117 (1991) (finding that state law failure to warn

because "Plaintiffs contend that, under state law, [Gilead] should have offered for FDA approval a drug formulation with fewer side effects, and that [Gilead] could have complied with both state and federal law by formulating a drug with TAF, a formulation that eventually was approved by the FDA." Id at 825.

In rejecting arguments that claims against Defendant Gilead for failure to warn were preempted with regard to pre-approval of their labeling, the court in Holley noted that Defendant Gilead **possessed the ability to implement stronger warning language into labelling and submit that labeling for FDA approval**. Holley, F. Supp. 3d.at 826. Thus, failure to warn claims "do not conflict with any state-law duties regarding adequacy of warnings, and it is therefore not impossible for a manufacturer to comply with both state and federal law prior to submitting a new drug application to the FDA for approval." Id at 826.

In rejecting the same arguments regarding changing of Defendant Gilead's labeling post-approval, the court in Holley noted that up until 2008, regulations allowed Defendant Gilead to change their labeling unilaterally via the Changes Being Effected ("CBE") regulations and thus did not apply to claims that Truvada should have changed their labeling before 2008. Id at 828. Thus, applying this analysis to Anthony Gaetano's claims, the allegations can properly be read to claim that, from Plaintiff's first use of Truvada in 2005 until 2008, Defendant Gilead should have utilized CBE regulations to unilaterally change their labeling to strengthen warnings regarding the nephrotoxicity and need to monitor markers of kidney health with definitive regularity.

Finally, Holley's analysis should control this Court's analysis of federal preemption because it contains therein fact-specific rejections of the many opinions, both published and

---

claims are not preempted by federal drug regulations); In re Accutane Litig., 235 N.J. 229 (2018) (cited Wyeth positively in finding that failure to warn claims against brand-name manufacturers were not preempted).

unpublished, cited and relied upon by Defendant Gilead in their Opposition. First, the court in Holley notes that nationally, courts not bound to the opinions of the sixth circuit have refused to apply the Yates court's rational in support of preemption for design defect claims. Id at 823. The court in Holley also notes, as discussed above, that design defect claims for TDF medications are a question of submitting safer designs or independently designing a safer drug, rather than whether Defendant Gilead can market the safer design without FDA approval. Id at 824. This means that all unpublished opinions cited by Defendant Gilead finding federal preemption because the formula of an already-manufactured drug cannot be changed should be disregarded as inapplicable to Plaintiff's claims. See, Motion at pg11 fn9. Additionally, as Plaintiff's claims cover Truvada's labeling from 2005 onward, and Defendant Gilead had the ability to unilaterally change their labeling from 2005-2008, any unpublished opinions regarding the preemption of post-2008 failure to warn claims should be disregarded in favor of Holley's pre-2008 failure to warn preemption analysis. Holley, 379 F. Supp. 3d. at 828.

### C.  Relevant Federal Regulations Regarding Drug Labeling Changes

As set forth in both Levine and Holley, a drug manufacturer is permitted to make certain changes to their labeling before receiving agency approval. Id at 819. The process regarding the ability to change drug labeling prior to FDA approval was described by the Levine court:

> There is, however, an FDA regulation that permits a manufacturer to make certain changes to its label before receiving FDA approval. Among other this, this "change being effects" (CBE) regulation provides that if a manufacturer is changing a label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," it may make the labeling change upon filing its supplemental application with

10

the FDA; it need not wait for FDA approval. <u>Levine</u>, 555 U.S. at 568 (citing
21 CFR §§314.70(c)(6)(iii)(A),(C).[3]

Thus, as established in <u>Levine</u> and subsequently followed by <u>Holley</u>, a drug manufacturer cannot
claim impossibility preemption if they have the ability to modify their labels by utilizing CBE
regulations absent clear and convincing evidence that the FDA would not ultimately grant
approval. <u>See</u>, <u>Levine</u>, 555 U.S. at 571; <u>Holley</u>, 379 F. Supp. 3d. at 821.

### D.  Plaintiff's Design Defect Claim is not Preempted

As stated above, Plaintiff argues that Defendant Gilead should have 1) introduced
Truvada with a TAF rather than TDF composition (Plaintiff's pre-approval design defect claim)
and 2) should have introduced TAF medication into the market in 2009 mitigating harms to
Plaintiff. <u>Holley</u>, in determining whether a pre-approval design defect claim against Defendant
Gilead for failing to design TDF medications with TAF, found that the weight of authority
dictated a finding against preemption. <u>Holley</u>, 379 F. Supp. 3d. at 824. In determining a lack of
preemption, the <u>Holley</u> court noted that Defendant Gilead failed to cite federal law that would
have prevented it from submitting drugs that contained TAF for approval rather than TDF. <u>Id</u>.
Additionally, the court noted that a pre-approval design defect theory does not implicate <u>Bartlett</u>
or <u>Yates</u> because a preapproval design theory does not demand that a drug manufacturer not act,
but rather act differently. <u>Id</u> at 825.

Just as Defendant Gilead failed to do in <u>Holley</u>, Defendant Gilead cites no federal law
that would have prevented it from submitting for approval Truvada with a composition including
TAF rather than TDF. This pre-approval claim would not prevent Defendant Gilead from
participating in the marketplace: by 2004 Defendant Gilead had already developed and was

---

[3] While Defendant Gilead asserts that under CBE regulations, they can only change their labels to reflect newly
acquired information, the regulations were amended include this requirement in 2008, **three years after** Plaintiff
began taking Truvada and **four years** after Defendant Gilead first introduced Truvada into the market.

11

marketing Viread, another TDF medication. Instead, Defendant Gilead could have easily met their duties under both state and federal law by submitting Truvada with TAF formulation.

### E.  Plaintiff's Failure to Warn Claim is not Preempted

Similarly, Plaintiff's pre-approval and post-approval failure to warn claims are not preempted.[4] As discussed by both the Levine and Holley courts, the test for whether Plaintiff's failure to warn claims are preempted is whether Defendant Gilead could have acted unilaterally by either initially presenting adequate labeling to the FDA or amending its labeling thereafter. Holley, 379 F. Supp. 3d. at 821; Levine, 555 U.S. at 571. If Defendant Gilead could have acted unilaterally to change its labeling prior to FDA approval, the burden shifts to Defendant Gilead to show clear evidence that such a labeling change would not be approved. Holley, 379 F. Supp. 3d. at 821; Levine, 555 U.S. at 571. Defendant Gilead does not argue that its changed labeling of Truvada would not have been approved by the FDA, nor could it considering Truvada's labeling has been subsequently amended and approved to reflect some of the stronger warnings that should have been included in its prior labeling. Thus, the issue is whether Defendant Gilead could have amended the labeling of their product unilaterally. Viewing the pleadings in a light most favorable to the Plaintiff, Defendant Gilead could have unilaterally acted to change their labeling and thus Plaintiff's failure to warn claims are not preempted.

While the FDA and drug manufacturers participate in an arduous approval process for initial drug labeling, Defendant Gilead cites **no statute or regulation** that would have prevented them from presenting an adequate label to FDA prior to drug approval. Holley, 379 F. Supp. 3d. at 826. When analyzing whether federal preemption applied to failure to warn claims regarding TDF medications including Truvada, the Holley court determined that the ability for Truvada to

present stronger labeling to the FDA for approval did not conflict was not restricted by federal law or regulations and thus  pre-approval failure to warn claims against Truvada were not preempted. Id. The case at bar presents the exact same situation: Defendant Gilead fails to show why they could not present adequate labeling to the FDA for initial approval.[5] Without such a restriction, Defendant Gilead cannot show it could not comply with both its federal and state law duties. Thus, Defendant Gilead fails to meet its demanding burden of proving federal preemption.

Defendant Gilead also fails to show why Plaintiff's post-approval failure to warn claims are preempted. After the introduction of Truvada into the market in 2004 until the amendment of CBE regulations in 2008, Defendant Gilead had the ability to unilaterally change their labeling to strengthen warnings and instruction about administration of Truvada in order increase safe use of Truvada. Levine, 555 U.S. at 568. While Defendant Gilead claims that Plaintiff has not pled that Defendant Gilead had "newly acquired information" that would permit it to unilaterally change its labeling prior to FDA approval, such does not  bar Plaintiff's claim that Defendant Gilead should have updated its labeling between 2004 and 2008. Even if Plaintiff's claim were subject to preemption pursuant to post-2008 CBE regulations, the Supreme Court in Levine noted that such "newly acquired information" is defined broadly by the FDA:

> As the FDA explained in its notice of the final rule, "'newly acquired information'" is not limited to new data, but also encompasses "new analyses of previously submitted data." The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent  developments: "[I]f the sponsor submits adverse event information to FDA, and then later conducts a new

---

[4] Defendant Gilead spuriously claims that Plaintiff only alleges a post-approval failure to warn claim. However, Plaintiff's allegations properly alleged that Defendant Gilead's labeling was inadequate from its inception and throughout the time Anthony Gaetano was prescribed Truvada. See, Compl. At ¶¶40-49.

[5] It is important to note that Plaintiff did not allege that Defendant Gilead engaged in any fraud upon the FDA. Thus, Plaintiff's claims do not rely on any "fraud on the agency" theories and instead rest on traditional state tort law issues preventing any blanket preemption of Plaintiff's failure to warn claims. See, Holley, 379 F. Supp. 3d. at 825 (citing Buckman Company v. Plaintiffs' Legal Committee, 531 U.S. 341, 353-353 (2001).

13

analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.' Levine, 555 U.S. at 569 (citing 73 Fed. Reg. 49609).

Reading Plaintiff's complaint with every reasonable inference drawn in his favor, Plaintiff has properly pled that Defendant Gilead had evidence that two of its similar antiretroviral medications caused significant kidney and bone damage. Compl. At ¶32; see also, Gandi, 184 N.J. at 165; Schulman, 401 N.J. Super. at 473-74. Additionally, Defendant Gilead's preclinical trial showed that exposure to TDF caused bone toxicity. Compl. at ¶33. By the time Defendant Gilead introduced Truvada into the market, it had **years' worth** of data that TDF medications caused kidney and bone damage. Compl. At ¶34. Defendant Gilead Sciences must have realized through subsequent analysis or other newly acquired information that Truvada's warnings remained inadequate as they provided stronger labeling warning of adverse kidney events and encouraged more consistent and universal monitoring for the European Union doctors and consumers. Compl. at ¶¶50-54. Thus, Anthony Gaetano's post-approval failure to warn claims are not preempted because, as pled, Defendant Gilead had, at all times after the approval of Truvada, the ability to unilaterally update their labeling pursuant to CBE regulations.

**POINT II**

**<u>DEFENDANT GILEAD'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT SHOULD BE DENIED BECAUSE PLAINTIFF'S HAS PLED SUFFICIENT FACTS TO OVERCOME THE PRESUMPTION OF ADEQUACY OF TRUVADA'S LABELING.</u>**

Defendant Gilead, in arguing its motion to dismiss, claims that its labeling is adequate as a matter of law. See, Motion pg19. While New Jersey presumes that labeling approved by the FDA is adequate, this presumption is rebuttable. See, Feldman v. Lederle Labs., 125 N.J. 117, 156-157 (1991); In re Accutane Litig., 235 N.J. 229, 270-272 (2018). Most recently in Accutane,

14

the New Jersey Supreme Court described how the strength of presumptive validity of drug labeling pursuant to the New Jersey Product Liability Act ("PLA") was dependent on the strength in oversight procedures by the FDA. In re Accutane, 235 N.J. at 270-273. The New Jersey Supreme Court, in initially evaluating the strength of the label adequacy presumption of the PLA, expressed that absent deliberate concealment or nondisclosure of after-acquired knowledge, presumptions should be virtually dispositive. Perez v. Wyeth Labs. Inc., 161 N.J. 1, 25 (1999). Subsequently, however, the New Jersey Supreme Court noted that such a high burden was only dictum whose persuasiveness has all but eroded:

> The "flaws in that post-marketing oversight process," the Appellate Division reasoned, "render[ed] the dictum of Perez less all-encompassing than it might then have appeared" and "provide[d] the foundation for [a] further exception to the presumption of adequacy" enunciated in McDarby . . . In Cornett, 211 N.J. at 388, 48 A.3d 1041, this Court recognized the McDarby exception. In re Accutane, 235 N.J. at 272-273 (citations omitted).

Still, New Jersey courts recognize that there are still unique circumstances where this presumption of labeling adequacy may be overcome. See, McDarby, 401 N.J. Super. at 63 (citing Perez, 161 N.J. at 25).

Thus, New Jersey currently recognizes two different standards for strength of presumption of adequacy of labeling: a strong pre-approval presumption and a weaker post-approval presumption. Id. However, the New Jersey Supreme Court has been reluctant to apply such a burdensome standard in preliminary hearings and filings:

> Rather, [the presumption of adequacy of labeling] should be treated, as would any presumption in the ordinary course, as capable of being overcome by evidence which "'tends to' disprove the presumed fact, thereby raising a debatable question regarding the existence of the presumed fact." If, in the face of the evidence, reasonable people would differ regarding the presumed fact, the presumption will be overcome. Kendall v. Hoffman-La Roche, Inc., 209 N.J. 173, 197-198 (2012) (citations omitted).

15

Whether a weaker or stronger presumption of validity is placed on Plaintiff's claim, Plaintiff has

pled facts sufficient to overcome both burdens. Additionally, Plaintiff's claims that Defendant

Gilead knew of their inadequate labeling through their actions to protect consumers in the

European Union demonstrate unique circumstances that overcome any presumption of labeling

adequacy.

### A. Plaintiff has pled facts to overcome pre-approval presumptions of adequacy in Truvada's labeling.

A general presumption can be overcome when evidence may disprove the presumed fact.

Id at 197. Viewing Plaintiff's pleadings in the light most favorable to them, and drawing all

reasonable inferences therein, Plaintiff has overcome this burden. Plaintiff, in his complaint,

notes that Truvada labeling should have warned all patients to be monitored for markers

indicating kidney damage. Compl. At ¶40-41. Further, Plaintiff indicates that Defendant Gilead

"knew universal monitoring should be done." Compl. At ¶44. In addition, Truvada's labeling

warning to monitor those for markers of kidney damage were inadequate in that they both failed

to warn doctors to check for effective indicators of kidney damage and failed to indicate with

what regularity at risk patients should be monitored. Compl. At ¶46-48. All of these allegations

are more than sufficient in tending to disprove the presumption of adequacy of Truvada's

labeling for purposes of Defendant Gilead's Motion to Dismiss.

Alternatively, Plaintiff can defeat any heightened presumption of validity. According to

the New Jersey Supreme Court in Perez, the presumption of the adequacy of a pharmaceutical

label is dispositive "absent deliberate concealment or nondisclosure of after-acquired

information." Perez, 161 N.J. at 25. Plaintiff, in his complaint, properly alleges that, during the

time Defendant Gilead introduced Truvada into US markets, Defendant Gilead provided stronger

recommendations and warnings to European Union doctors and patients. Compl. At ¶50.

16

Additionally, Plaintiff alleges that even before the introduction of Truvada into the market, Defendant Gilead told their sales representatives to downplay TDF's nephrotoxicity and downplay side effects experienced by patients. Id at ¶38. These allegations clearly indicate that Defendant Gilead was deliberately concealing and failing to disclose the harm of TDF medications to the FDA that would have affected the FDA's determination of the adequacy of their labeling.   Thus, Plaintiff has pled facts sufficient to overcome the presumption that Truvada's labeling was adequate.

**B.  Plaintiff has pled facts sufficient to overcome post-approval presumptions of adequacy of Truvada's labeling.**

Viewing the adequacy of Truvada's labeling as a general presumption, Plaintiff easily demonstrates that he has pled facts that tend to disprove this assumption with regard to the adequacy of Defendant Gilead's Truvada labeling after Truvada's introduction into the market. In addition to the allegations described regarding Defendant Gilead's initial labeling, Defendant Gilead provided for doctors in the EU after Truvada's introduction into the market recommendations of careful monitoring of renal function before taking Truvada, every four weeks during the first year, and every three months thereafter. Compl. at ¶52. Additionally, after the introduction of Truvada into the market, Defendant Gilead began using suspiciously convenient methodologies in their published studies with the purpose of concealing the seriousness of kidney damage associated with TDF medications. Id at ¶55. These allegations, when viewed in the light most favorable to Plaintiff, would properly rebut the presumption that Defendant Gilead's labelling of Truvada was adequate.

Even if Plaintiff is forced to face a stronger presumption of adequacy of Truvada's labeling, Plaintiff can still rebut this presumption. The New Jersey Supreme court recently noted that, in light of the FDA's lack of resources available to properly regulate drugs post-marketing,

claims of inadequate post-marketing labeling fell under an exception to the "virtually dispositive" super presumption articulated in Perez. In re Accutane, 235 N.J. at 272-274. Specifically, an accusation of post-market manipulation is sufficient to overcome adequacy presumption under the New Jersey law. McDarby v. Merk & Co., Inc., 401 N.J. Super. 10, 63-64 (App. Div. 2008). Further, Plaintiff's complaint should be read **indulgently** in the context of a motion to dismiss. Cornett v. Johnson, 211 N.J. 362, 388-389 (2012). As stated above, Defendant Gilead used suspiciously convenient methodologies in their studies of the adverse effects of their TDF medication after the introduction of Truvada into the market. Compl. At ¶55. Defendant Gilead also stated in its 10-K filings in 2002 through 2004 that the company would suffer if Viread (one of Defendant Gilead's TDF medications) did not maintain or increase its market acceptance. Compl. at ¶61. These two facts show that Defendant Gilead, in order to maintain its market dominance, manipulated information available to the medical community and thus Defendant Gilead cannot maintain that its labeling was adequate as a matter of law.

**C. Plaintiff's pleadings allege rare circumstances where the presumption of adequacy of Truvada's labeling is overcome.**

While the New Jersey Supreme Court has addressed specific circumstances where the presumption of labeling validity under the PLA may be overcome, the Court has recognized that the legislature provided no guidance with regard to what evidence may be sufficient to overcome this presumption. In re Accutane, 235 N.J. at 270. In determining the role of the PLA's adequacy presumption in light of the regulatory framework of the FDA, the Accutane court cites positively the Supreme Court's proposition in Levine that state-law failure to warn claims, "provide a 'complementary form of drug regulation.'" In re Accutane, 235 N.J. at 269 (quoting Levine, 555 U.S. at 578. Consequently, evidential requirements for rebutting the PLA's adequacy presumption has and continues to evolve as the court considers different claims against various

18

manufacturers. Id at 270-273. As a result, this court should consider whether Plaintiff properly alleges unique circumstances where the adequacy presumption of the PLA is overcome. McDarby, 401 N.J. Super. at 63 (citing Perez, 161 N.J. at 25).

Plaintiff properly alleges these unique circumstances against Defendant Gilead. While Defendant Gilead attempts to argue that their labeling was adequate as a matter of law, their actions in marketing TDF medications and purposefully delaying the introduction of TAF medications show that Defendant Gilead **knew** that its labeling was inadequate. Seemingly prioritizing the health and safety of their European consumers, Defendant Gilead provided stronger warnings of the harmful effects of Truvada and other TDF medications to doctors and patients in the EU. Compl. At ¶50. While only recommending for Truvada consumers the monitoring of a single ineffective indicator of kidney damage for those at risk of adverse kidney events for unspecific intervals until Defendant Gilead changed Truvada's labeling in 2008, Defendant Gilead, since 2005, recommended to **all consumers** that their kidney function be monitored using more sensitive markers of kidney damage for specified intervals. Id at ¶51-52. Additionally, Defendant Gilead recommended to EU patients and doctors that those at risk of adverse kidney events be monitored **more frequently**. Id at ¶52. In 2006, Defendant Gilead also released a "Dear Doctor" letter to physicians in the EU stressing the importance of frequent monitoring of kidney health. Id at ¶53.

In contrast, Defendant Gilead failed to warn that all patients should be monitored for kidney health while taking Truvada until 2008. Id at ¶45. Defendant Gilead also failed to advise for monitoring of other biochemical markers of kidney health while taking Truvada until 2018, despite similar recommendations to EU doctors and patients **over a decade earlier**.   Id at ¶46-47,52. Throughout the time Plaintiff was taking Truvada, Defendant Gilead's Truvada labeling

provided for monitoring of kidney health "as clinically appropriate" while providing EU doctors and patients with a specific monitoring schedule of "every four weeks during the first year, and then every three months." Id at ¶48,52.

As described above, Defendant Gilead **knew** that its labeling was inadequate and, instead of changing their labeling pursuant to CBE regulations, chose to prioritize the wellbeing of their European consumers over their American consumers. As a consequence, Plaintiff has overcome any presumption regarding the adequacy of Truvada's labeling.

**POINT III**

**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE SHOULD BE DENIED AS PLAINTIFF IS ENTITLED TO LEAVE TO AMEND HIS PLEADINGS**

As discussed above, the granting of a motion to dismiss, especially with prejudice, should only be done in the rarest of circumstances. Printing Mart, 116 N.J. at 772. Further, where there is a cause of action even suggested by the claim, courts should liberally grant leave to Plaintiffs to amend their complaints where an amendment may render a claim actionable. Id at 746. When considering Defendant Gilead's motion to dismiss a mass action against them in Holley, the court held that, where the consumers' claims were insufficient to escape dismissal, these consumers were granted leave to amend all of the dismissed complaints. Holley, 379 F. Supp. 3d at 834.

This Court should extend the same leave to Anthony Gaetano. In his Complaint, Plaintiff articulates very serious and actionable claims that suggest that Defendant Gilead failed to provide adequate warnings to monitor kidney and bone health on Truvada. Compl. At ¶¶40-49. Plaintiff also claims that while Defendant Gilead's labeling for Truvada in the United States remained inadequate, it provided stronger adequate labeling in the EU. Id at ¶¶50-54. Finally,

20

Plaintiff claims that Defendant Gilead purposefully ended development into TAF, a safer composite of TDF that would have eliminated the nephrotoxicity of Defendant Gilead's antiretroviral for purposes of maintaining market dominance and preventing Truvada from losing its market share. Id at 58-71. As demonstrated above, Anthony Gaetano has made sufficient claims against Defendant Gilead for violating its state law duties to design a safe drug and warn of its dangers where Defendant Gilead had the ability to comply in light of complimentary state and federal laws. Should this Court determine that the Pleadings are not sufficient in any manner, Anthony Gaetano should have the ability to amend his Pleadings as to not deny him his day in Court.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Defendant Gilead's Motion to Dismiss should be denied in its entirety.

LANDEL, BERNSTEIN & KALOSIEH, LLP
*Attorneys for Plaintiff Anthony Gaetano*

Dated:  November 18, 2020        By: _____
                                     Ari G. Bernstein, Esq.

21

| | |
|---|---|
| ANTHONY GAETANO,<br><br>           Plaintiff,<br><br>     v.<br><br>GILEAD SCIENCES, INC.; ST. JOSEPH'S HEALTH, INC.; MICHAEL LANGE; JOHN DOES 1-10 (fictitious names representing unknown individuals); and/or JANE DOES 1-10 (fictitious names representing unknown individuals),<br><br>         Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: PASSAIC COUNTY<br>CASE NO. PAS-L-002011-20<br><br>**CIVIL ACTION** |

## GILEAD SCIENCES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500

SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

*Attorneys for Defendant*
*Gilead Sciences, Inc.*

BETH S. ROSE, ESQ.
Of Counsel and On the Brief

# TABLE OF CONTENTS

INTRODUCTION ................................................................**Error! Bookmark not defined.**

I.    FEDERAL LAW PREEMPTS PLAINTIFF'S DESIGN DEFECT THEORY ................................................**Error! Bookmark not defined.**

II.    FEDERAL LAW PREEMPTS PLAINTIFF'S FAILURE TO WARN THEORY ................................................**Error! Bookmark not defined.**

A.    Federal Law Preempts Plaintiff's Pre-Approval Failure to Warn Theory......................................**Error! Bookmark not defined.**

B.    Federal Law Preempts Plaintiff's Post-Approval Failure to Warn Theory......................................**Error! Bookmark not defined.**

III.    THE TRUVADA® LABELING IS ADEQUATE AS A MATTER OF LAW ................................................**Error! Bookmark not defined.**

IV.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ................................................**Error! Bookmark not defined.**

CONCLUSION................................................................**Error! Bookmark not defined.**

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re: Accutane Litig.*,
    235 N.J. 229 (2018) ...........................................................................................10, 14

*Boone v. Boehringer Ingelheim Pharms., Inc.*,
    SC 20200, 2020 WL 2121063, -- A.3d -- (Conn. May 4, 2020)...........................5, 7

*Epstein v. Gilead Sciences, Inc.*,
    No. 19-81474, 2020 WL 4333011 (S.D. Fla. July 27, 2020)........................... *passim*

*Matter of Estate of Jensen*,
    No. A-2901-17, 2020 WL 479074 (App. Div. Jan. 30, 2020) ...............................15

*Evans v. Gilead Sciences, Inc.*,
    No. 20-cv-00123, 2020 WL 5189995 (D. Haw. Aug. 31, 2020) ....................*passim*

*Feldman v. Lederle Labs.*,
    125 N.J. 117 (1991) ...............................................................................................10

*Fleming v. Janssen Pharm., Inc.*
    186 F. Supp. 3d 826 (W.D. Tenn. 2016)..................................................................5

*Holley v Gilead Sciences, Inc.*,
    379 F. Supp. 3d 809 (N.D. Cal. 2019) ..........................................................*passim*

*Johnson v. Glassman*,
    401 N.J. Super. 222 (App Div. 2008) ....................................................................15

*Malin v. Union Carbide Corp.*,
    219 N.J. Super. 428 (App. Div. 1987) ..................................................................13

*Mut. Pharm Co., Inc. v. Bartlett*,
    570 U.S. 472 (2013)................................................................................................7

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)....................................................................................5, 7, 8, 10

*Port Auth. of New York & New Jersey v. Arcadian Corp.*,
    189 F.3d 305 (3rd Cir. 1999) ...............................................................................13

*Robinson v. Eli Lilly & Co.*,
    5:17-cv-338, 2018 WL 4039703 (E.D. Ky. Aug. 23, 2018)....................................5

ii

*Rossito v. Hoffman-La Roche Inc.*,
    A-1237-13T1, 2016 WL 3943335 (App. Div. July 22, 2016) ...............................12

*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016)...................................................................5, 9

*Wyeth v. Levine*,
    555 U.S. 555 (2009)...........................................................................................12

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ........................................................................ *passim*

**Statutes**

21 U.S.C. § 355(d)(7) ............................................................................................9

**Other Authorities**

21 C.F.R. § 314.125(b)(6).......................................................................................9

47 Fed. Reg. at 46,623 ..........................................................................................11

73 Fed. Reg. 2848 .................................................................................................11

iii

## INTRODUCTION

As set forth in Gilead Sciences, Inc.'s ("Gilead") Brief in Support of its Motion to Dismiss Plaintiff's Complaint ("Brief" or "Br."),  Plaintiff's design defect and failure to warn theories—the sole theories underlying his Strict Liability claim against Gilead—are preempted by federal law, and the FDA-approved Truvada® labeling is adequate as a matter of law under the New Jersey Product Liability Act's ("PLA") strong presumption of adequacy.  Plaintiff's Brief in Opposition ("Opposition" or "Opp.") misconstrues federal preemption law, ignores cases cited by Gilead dismissing as preempted materially identical claims against Gilead and other drug manufacturers, and ignores his own Complaint's allegations.  At bottom, Plaintiff's Opposition only confirms the conclusion that he has not stated a plausible Strict Liability cause of action against Gilead, and that his claim against Gilead should be dismissed with prejudice.

*First*, Plaintiff has not stated a plausible design defect theory of liability, *i.e.*, that Gilead should have replaced the TDF in Truvada® with TAF.  Br. at 10-15.  Plaintiff makes virtually no attempt to defend his *post*-approval design defect theory (*i.e.,* that Gilead could have replaced TDF with TAF *after* FDA approved Truvada®), and does not address *any* of the myriad cases dismissing as preempted post-approval design defect claims that similarly purport to require drug manufacturers to alter a drug's formulation.  *See Id*. at 12-14.  Instead, Plaintiff ignores his own *post*-approval allegations, *see* Compl. ⁋ 70 (alleging a TAF medication could not have been approved until five years *after* FDA's approval of Truvada®), and insists that he has asserted a *pre*-approval design defect theory (*i.e.,* that Gilead should have designed Truvada® to contain TAF instead of TDF *before* obtaining FDA approval).  *E.g.* Opp. at 5.  Not only does Plaintiff's argument ignore his own allegations, but federal law preempts his purported pre-approval design defect theory, because Gilead could not have marketed a TAF medication without prior FDA approval.  Br. at 12 n.8, 15 n.10; *Yates v. Ortho-McNeil-Janssen Pharm., Inc.,* 808 F.3d 281, 298

(6th Cir. 2015) (affirming dismissal of pre-approval design defect claim as preempted). Plaintiff also ignores recent decisions dismissing as preempted virtually the same pre-approval design defect theory regarding Truvada® that he asserts. *E.g., Evans v. Gilead Sciences, Inc.,* No. 20-cv-00123, 2020 WL 5189995, at *9 (D. Haw. Aug. 31, 2020); *Epstein v. Gilead Sciences, Inc.,* No. 19-81474, 2020 WL 4333011, at *2 (S.D. Fla. July 27, 2020).

*Second*, Plaintiff's failure to warn theory is likewise preempted. Br. at 16-19. Plaintiff makes no attempt to address extensive case law dismissing state law challenges to warnings contained in a drug's *original* labeling as preempted by federal law, *id.* at 18-19, and contrary to Plaintiff's argument, his Complaint fails to allege any "newly acquired information" that would have allowed Gilead to invoke the federal Changes Being Effected ("CBE") regulation or its predecessor regulation to modify the Truvada® labeling after FDA approval. *Id.* at 16-18. Instead, Plaintiff repeatedly points only to allegations that Gilead was aware of the risks associated with Truvada® *before*, not *after*, FDA approval. Opp. at 12 (citing Complaint); *see also* Br. at 17-18. As numerous courts have found, including as to claims materially identical to Plaintiff's, such allegations, as a matter of law, cannot constitute "newly acquired information."

*Third*, Plaintiff's failure to warn theory also fails because the Truvada® labeling is adequate as a matter of law. Br. at 19-21. Not only does Plaintiff fail to plead facts that could plausibly overcome the PLA's "'virtually dispositive' statutory 'super-presumption'" that warnings on FDA-approved drug labels are adequate as a matter of law, he also continues to ignore the indisputable fact that the Truvada® labeling has, at all times, *contained the warnings that he asserts should have been included*. Br. at 19-21.

Plaintiffs' Strict Liability claim against Gilead is based entirely on his design defect and failure to warn theories. Because those theories do not state a viable claim, and because Plaintiff

has not suggested any manner in which he could amend his pleading to cure its fatal deficiencies, his Strict Products Liability claim against Gilead should be dismissed with prejudice.

## I.   FEDERAL LAW PREEMPTS PLAINTIFF'S DESIGN DEFECT THEORY.

As Gilead has explained, Plaintiff's Complaint does not assert a *pre*-approval design defect claim, *i.e.,* that Gilead should have introduced a TAF medication *prior* to FDA's approval of Truvada® in 2004.  Br. at 10-11, 15 n.10.  Rather, he alleges that if Gilead had not stopped TAF research in 2004, a TAF medication "could have been conceivably approved *in 2009*," five years *after* the FDA approved Truvada® with TDF.  Compl. ¶¶ 63, 70 (emphasis added); Br. at 10-11.  Plaintiff repeats this assertion in his Opposition.  Opp. at 2 ¶ 12 ("TAF medications . . . could have been available as early as 2009"); *id*. at 11 (Gilead "should have introduced TAF medication into the market in 2009").  Accordingly, Plaintiff's Complaint can only be read as asserting a *post*-approval design defect theory—*i.e.*, that Gilead only could have "conceivably" replaced TDF with TAF "in 2009," Compl. ¶ 70, years after FDA approved Truvada® in 2004.

Plaintiff's post-approval design defect theory, however, is preempted by federal law, because Gilead indisputably could not independently alter the formulation of Truvada® after it received FDA approval, making it impossible for Gilead to comply simultaneously with its purported state law duty to change an active ingredient in Truvada® and federal regulations prohibiting Gilead from doing so unilaterally.  *See, e.g., Yates*, 808 F.3d at 298 (dismissing post-approval design defect claim as preempted by federal law, because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product. . . .'  Therefore, to the extent [plaintiff] argues that defendants should have altered the formulation of [the product] after the FDA had approved the [product], we find this claim clearly preempted") (quoting 21 C.F.R. § 314.70(b)(2)(i)); *Epstein*, 2020 WL 4333011, at *2

(dismissing post-approval design defect claim regarding medication containing TDF, because "FDA approved Gilead's formula and any changes would have required further approval."); *Evans*, 2020 WL 5189995, at *9-10 (dismissing post-approval design defect claim regarding Truvada®, because once Truvada® was FDA-approved, Gilead was "prohibited from making any major changes" under federal law); *see also* Br. at 12-13 (collecting cases).

In response, Plaintiff does not cite a single case holding that a post-approval design defect theory challenging the formulation of an FDA-approved medication can survive dismissal.[1]  Moreover, notwithstanding his allegation that Gilead "should have introduced TAF medication into the market in 2009," Opp. at 11, Plaintiff makes virtually no attempt to dispute that such a claim is "clearly preempted."  *Yates*, 808 F.3d at 298.  Instead, Plaintiff reverses course, ignores his own allegations (repeated in his Opposition) that Gilead only could have "conceivably" introduced a TAF medication five years *after* Truvada® was on the market, Compl. ⁋ 70, and now argues that he has actually asserted a *pre*-approval design defect theory, *i.e.,* that Gilead "should have [] introduced Truvada with a TAF rather than TDF composition" *before* obtaining FDA approval.  Opp. at 11.

Plaintiff does not, and cannot, square this theory with his explicit concession that a TAF medication could not "conceivably" have been introduced until 2009, Compl. ⁋ 70; Opp. at 2 ⁋ 12, five years after Truvada® was already on the market.  Compl. ⁋ 31 (acknowledging that Truvada® was approved by the FDA in 2004).  Accordingly, any pre-approval design defect theory is belied by Plaintiff's own pleading, and cannot form the basis of a plausible claim.

---

[1] In *Holley v Gilead Sciences, Inc.*, plaintiffs abandoned their post-approval design defect theory in response to Gilead's preemption argument.  379 F. Supp. 3d 809, 822 n.6 (N.D. Cal. 2019) ("Plaintiffs' opposition makes clear that they are not pursuing claims that Gilead should have pursued a different drug composition after approval.").

In any event, even if this pre-approval design defect theory was not patently inconsistent with Plaintiff's own allegations, it still would not support a viable cause of action, because it would also be preempted by federal law.  Indeed, "[t]he question for 'impossibility' [preemption] is whether the private party could independently do under federal law what state law requires of it," *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011), and Gilead could not have independently introduced an alternatively designed formulation of Truvada® without FDA approval, *i.e.,* "without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Id*. at 623-24.  Accordingly, numerous courts have dismissed similar pre-approval design defect claims as preempted by federal law.  *E.g., Yates,* 808 F.3d at 299 (pre-approval design defect claim was preempted, because "Defendants could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [the product], and certainly prior to [plaintiff's] use of the drug."); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185-86 (S.D.N.Y. 2016) ("dismissing as preempted plaintiffs' claims that "defendants had a pre-approval duty to submit a differently designed drug for FDA approval," and "[i]nsofar as the plaintiffs' design defect claim suggests that the defendants should never have sold the FDA-approved formulation of Eliquis, such claims have been explicitly repudiated by the Supreme Court").[2]

---

[2] *Fleming v. Janssen Pharm., Inc.* 186 F. Supp. 3d 826, 832-33 (W.D. Tenn. 2016) (dismissing as preempted design defect claim "premised on the proposition that Defendants should have designed Invokana differently"); *Robinson v. Eli Lilly & Co.*, 5:17-cv-338, 2018 WL 4039703, at *6 (E.D. Ky. Aug. 23, 2018) (pre-approval design defect claim preempted because defendant "could not have independently made such fundamental changes to Prozac's formula"); *Boone v. Boehringer Ingelheim Pharms., Inc.*, SC 20200, 2020 WL 2121063, at *12, 15, -- A.3d -- (Conn. May 4, 2020) ("design defect claim based on allegations that "defendants could have brought [another drug] to the market earlier" was preempted, because "defendants could not have satisfied their alleged state law duty to the decedent without marketing an unapproved drug in violation of federal law").

Plaintiff fails to address recent decisions rejecting and dismissing materially identical pre-approval design defect claims against Gilead. *Epstein*, 2020 WL 4333011, at *2 (dismissing, as preempted, theory that Gilead "never should have sold" its TDF medications); *Evans*, 2020 WL 5189995, at *9 ("to the extent [plaintiff] asserts a pre-approval design defect claim—i.e., prior to Truvada receiving FDA approval, Gilead should have produced an HIV treatment . . . containing TAF, rather than TDF—this claim is preempted."); Br. at 12-13, 15 n.10.

Furthermore, Plaintiff's reliance on *Holley*, 379 F. Supp. 3d 809, to argue that he can state a pre-approval design defect claim is misplaced. *See, e.g.,* Opp. at 8-11. *Holley* did not involve, as here, a concession that no TAF medication "could have been conceivably approved until 2009," Compl. ¶ 70, or any other allegations that are flatly inconsistent with Plaintiff's attempt to re-frame his design defect theory as challenging Gilead's pre-approval conduct. Additionally, *Holley* incorrectly ignored, as Plaintiff does here, that Gilead could not independently *market* any TAF medication without FDA approval, focusing instead on only whether Gilead could have merely *submitted* for FDA consideration a differently designed medication. *See Holley*, 379 F. Supp. 3d at 824; Opp. at 10 (arguing that pre-approval "design defect claims for TDF medications are a question of *submitting* safer designs or independently designing a safer drug, rather than whether Defendant can *market* the safer design without FDA approval") (emphasis added), 11 (arguing that "Gilead cites no federal law that would have prevented it from *submitting* for approval Truvada with a composition including TAF rather than TDF") (emphasis added). That analysis ignores the Supreme Court's holding that design defect claims are preempted where, as here, introducing a drug with different ingredients would create

6

"a new drug that would require its own NDA [new drug application] *to be marketed in interstate commerce*." *Mut. Pharm Co., Inc. v. Bartlett*, 570 U.S. 472, 484 (2013) (emphasis added).[3]

Multiple courts have thus recognized that the relevant question for preemption is whether a brand-name drug manufacturer could have independently *marketed or sold* a purportedly safer design under federal law, not simply "submit[ed]" it. For instance, the Sixth Circuit held that similar pre-approval design defect claims were preempted, and rejected this same argument that "there is no federal law that would have prohibited defendants from *designing* a different drug in the first instance." *Yates*, 808 F.3d at 299 (emphasis added). The court explained that "Defendants could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval *prior to marketing [the drug]*, and certainly prior to [plaintiff's] use of the drug." *Id.* at 300 (emphasis added). Likewise, the Connecticut Supreme Court concluded that the feasibility of "*develop[ing]* [the drug] before the decedent's death is insufficient to preclude preemption," because "that fact is inapposite to the question of whether *marketing* [the drug] in 2014 would have required FDA's 'special permission and assistance.'" *Boone*, 2020 WL 2121063, at *15 (quoting *Mensing*, 564 U.S. at 623-24) (emphasis added)).

For this reason, the court in *Evans* expressly rejected *Holley's* reasoning and dismissed the same pre-approval design defect claim regarding Truvada® that Plaintiff now asserts. *Evans*, 2020 WL 5189995, at *9. The court explained that under Supreme Court precedent, "[m]erely

---

[3] *Bartlett* is not inapplicable to "brand-name" medications, *see* Opp. at 7, as the Court itself recognized. *Id.* at 477 ("Once a drug—*whether generic or brand name*—is approved, the manufacturer is prohibited from making any major changes to the" drug.) (emphasis added); *see also, e.g., Yates*, F.3d at 293 (applying *Bartlett* to design defect claim regarding brand name drug); *Boone*, 2020 WL 2121063, at *15 ("The plaintiff claims that the test for preemption set forth in *Mensing* and *Bartlett* is inapplicable to [the] present case because those cases do not involve brand-name drugs. We disagree. . . . [T]he nature of the underling test remain[s] consistent: whether the defendant 'could *independently* do under federal law what state law requires'").

'requesting FDA assistance' or 'ask[ing] the FDA for help'" in complying with state law 'would have satisfied [Gilead's] federal duty, [but] it would not have satisfied [Gilead's] state tort-law duty' to *provide* an allegedly safer drug composition."  'The only action [Gilead] could independently take—asking for the FDA's help [by *submitting* a TAF-containing drug application]—is not a matter of state law concern.'"  *Id.* (quoting *Mensing*, 564 U.S. at 619, 624).[4]  Here too, Plaintiff's suggestion that Gilead could have "*submit[ted]* for [FDA] approval Truvada with a composition including TAF rather than TDF," Opp. at 11, does not address the fact that Gilead could not satisfy its purported state law duty to actually *market* such a medication without FDA's approval.  Indeed, Plaintiff himself characterizes Gilead's purported state law duty as a requirement to actually "*introduce* Truvada with a TAF rather than TDF composition," not just "submit" it to FDA.  Opp. at 11 (emphasis added).  But Gilead indisputably could not "introduce" to the market a differently designed version of Truvada® without FDA's "permission and assistance," and federal law thus preempts any such claim.

## II.    FEDERAL LAW PREEMPTS PLAINTIFF'S FAILURE TO WARN THEORY.

Plaintiff's failure to warn theory is also preempted by federal law, because (i) Plaintiff cannot challenge the adequacy of the *original* FDA-approved Truvada® labeling, and (ii) Plaintiff has not identified any "newly acquired information" that would have permitted Gilead to unilaterally change that labeling *after* FDA approval.  Br. at 16-19.

---

[4] The Court in *Mensing* explained that it is not enough to assert that "if the Manufacturers had asked the FDA for help . . . they might have eventually been able to accomplish under federal law what state law requires," because conflict preemption does not permit this sort of "Mouse Trap game that eventually" could have led to compliance with a purported state law duty.  *Mensing*, 564 U.S. at 619.

### A.    Federal Law Preempts Plaintiff's *Pre*-Approval Failure to Warn Theory.

Plaintiff argues that his pre-approval failure to warn theory is not preempted, relying almost exclusively on *Holley*.  *See* Opp. at 12.  He does not even attempt to address cases holding that "failure to warn claims [that] are premised on the adequacy of the label as approved by the FDA when the drug was first marketed in the United States" are preempted.  *Utts*, 226 F. Supp. 3d at 184-85; *see also Epstein*, 2020 WL 4333011, at *2 (dismissing pre-approval failure to warn claim against Gilead regarding TDF medication labeling, because "it would have been impossible for Gilead to comply with both its state duties to change the products' labels and its federal duties not to make such changes without first obtaining FDA approval"); Br. at 18-19. *Holley* conflicts with these cases, and with federal regulations providing that FDA's approval of drug labeling constitutes "a specific finding that [the drug's] label was not 'false or misleading in any particular,'" 21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6)); Br. at 9-10.

Plaintiff nevertheless argues that his pre-approval theory is not preempted because "Gilead cites no statute or regulation that would have prevented them [sic] from *presenting an adequate label to FDA* prior to drug approval."  Opp. at 12 (emphasis added).  This argument fails for similar reasons to Plaintiff's pre-approval design defect theory:  Plaintiff's failure to warn theory is not based on Gilead's failure to *present* a different label; it is based—as Plaintiff himself describes it—on Gilead's purported "*fail[ure] to adequately warn*" of the necessary patient monitoring accompanying Truvada®.  Opp. at 5 (emphasis added).  Regardless of whether Gilead could "*present[]*" different labeling to FDA, Gilead indisputably could not actually "*warn*" Plaintiff or his doctors with different labeling without prior FDA approval of such labeling, *i.e.*, "*without the Federal Government's special permission and assistance . . .*"

*Mensing*, 564 U.S. at 623-24 (emphasis added).[5]   Accordingly, Plaintiff's pre-approval failure to warn theory is preempted and should be dismissed.

### B.   Federal Law Preempts Plaintiff's *Post*-Approval Failure to Warn Theory.

As set forth in Gilead's Brief, Plaintiff has not sufficiently alleged that Gilead could have unilaterally changed the Truvada® labeling *after* FDA approval, because Plaintiff has not identified "newly acquired information" that would have permitted Gilead to do so under federal CBE regulations.  Motion at 13-15.  Plaintiff makes the conclusory assertion that "Gilead could have unilaterally acted to change their labeling and thus Plaintiff's failure to warn claims are not preempted," Opp. at 12, but he does not point to any allegations actually identifying "newly acquired information."  In fact, Plaintiff only cites to his Complaint's allegations that Gilead knew *before*, not after, FDA approved Truvada®, of the associated risks.  *See* Compl. ¶¶ 32-34 (citing in Opp. at 14) (addressing the time period "*[b]efore* the introduction of TDF based antiretroviral medications in 2001") (emphasis added).  Numerous cases, including *Holley*, have rejected far more robust allegations of "newly acquired information" as inadequate to support a non-preempted failure to warn claim.  *See* Br. at 16-17, n.13 (collecting cases).[6]

Plaintiff also points to purportedly "stronger labeling warning[s]" in the European Union as evidence that Gilead "must have realized through subsequent analysis or other newly acquired

---

[5] Indeed, the court in *Holley* "assume[d] . . . that the state laws invoked by Plaintiffs require Gilead to *use different labeling*," *Holley*, 379 F. Supp. 3d at 826 n.7 (emphasis added), but ignored that a manufacturer cannot "use" a different original label without FDA's approval.

[6] Contrary to Plaintiff's argument, *Feldman v. Lederle Labs*., 125 N.J. 117 (1991), and *In re: Accutane Litig*., 235 N.J. 229 (2018) (cited in Opp. at 8-9 n.2), do not support his argument that his failure to warn claims are not preempted.  *In re Accutane* did not address preemption at all, let alone hold that "failure to warn claims against brand-name manufacturers were not preempted."  Opp. at 8-9 n.2.  *Lederle* was analyzed under the regulations in place before *1965*, long before the regulations that prevent Gilead from revising its labeling without newly acquired information.  125 N.J. at 149-50.

information that Truvada's warnings remained inadequate," Opp. at 14, but this too does not suffice to state a non-preempted post-approval failure to warn claim. Indeed, Plaintiff does not allege that data provided to European regulatory agencies was different than what was already provided to FDA. Accordingly, in *Holley*, where these exact same allegations were raised, the court still dismissed Plaintiff's post-approval failure to warn claim for failure to allege newly acquired information. 379 F. Supp. 3d at 815, 830 (highlighting allegations that "Gilead 'provides stronger monitoring warnings to physicians and patients in the European Union than it does in the United States," but nevertheless holding that "the Court cannot conclude that Plaintiffs have plausibly alleged the existence of 'newly acquired information'—*i.e.*, 'data, analyses, or other information *not previously submitted to the [FDA]*'—such that it could have made post-2008 labeling changes under the CBE regulation") (quoting 21 C.F.R. § 341.3).[7]

Finally, Plaintiff argues that, after FDA approval of the Truvada® labeling, but before 2008 when the current CBE regulations were enacted, "Gilead had the ability to unilaterally change their [sic] labeling to strengthen warnings and instruction . . . ." Opp. at 13. But FDA has explained that, even before those CBE regulations were promulgated, the same standard applied, *i.e.*, in order to unilaterally modify product labeling without prior FDA approval a drug manufacturer was required to have evidence of "newly discovered risks." 47 Fed. Reg. at 46,623; *see also* 73 Fed. Reg. 2848 (explaining that the then-proposed CBE regulation would "reaffirm [FDA's] longstanding position that a supplemental application . . . is appropriate to amend the labeling for an approved product only to reflect newly acquired information").[8]

---

[7] Indeed, it is not possible to conceal from FDA the contents of European labeling, which is publicly available. *See* https://www.ema.europa.eu/en/medicines/human/EPAR/truvada.

[8] Brief for the United States as Amicus Curiae, *Wyeth v. Levine*, No. 06-1249, 2008 WL 2308908, at *4 (June 2, 2008) ("FDA interprets that [pre-CBE] regulation to permit changes without prior approval only to address 'newly discovered risks' for which there is sufficient

11

Because Plaintiff has not even attempted to identify any "newly discovered risks" during the period between FDA approval of Truvada® and 2008, he has not pled sufficient facts to show that Gilead could have unilaterally changed the FDA-approved Truvada® labeling.  Indeed, the same argument was presented in *Epstein*, where the court dismissed Plaintiff's post-approval failure to warn claim, *including* for the pre-2008 period.  *Epstein*, 2020 WL 4333011, at *2; *Epstein*, No. 9:19-cv-81474 (S.D. Fla. June 15, 2020), Pl.'s Mem. in Resp. to Motion to Dismiss [D.E. 35] at 13-15 (raising the same argument on opposition to Gilead's motion to dismiss).[9]

## III.    THE TRUVADA® LABELING IS ADEQUATE AS A MATTER OF LAW.

The Truvada® labeling is subject to a "'virtually dispositive' statutory 'super-presumption'" of adequacy, *Rossito v. Hoffman-La Roche Inc.,* A-1237-13T1, 2016 WL 3943335, at *14 (App. Div. July 22, 2016) (quoting *Kendall v. Hoffman La-Roche, Inc*., 209 N.J. 173, 195-97 (N.J. 2012) (emphasis added)), which Plaintiff has not overcome, particularly given that the label contained the warnings that he alleges should have been included.  Br. at 19-21.[10]

Specifically, Plaintiff argues that the Truvada® labeling was inadequate, because it "warned to monitor only those patients at risk of adverse kidney events."  Opp. at 1 ¶ 3; *see also*

---

evidence of causal association with the drug."); *id*. at *9, 22 (pre-CBE regulation "permits manufacturers to make changes to the labeling, subject to FDA's subsequent review and approval, based *only* on newly available information, not based on information that was previously submitted to FDA – let alone whenever the manufacturer believes a different label 'will make the product safer.' . . .  As FDA explained when it proposed [the pre-CBE] regulation in 1982, . . . substantive changes may be made without prior FDA approval only 'to correct concerns about *newly discovered* risks from the use of the drug.'") (quoting 47 Fed. Reg. at 46,623).  The Court in *Wyeth* recognized the United States' position that "the 2008 CBE regulation is consistent with the FDCA and the previous version of the regulation," but ultimately found that it "need not decide" that issue.  *Wyeth v. Levine*, 555 U.S. 555, 569 (2009).

[9] *Holley* (cited in Opp. at 9) did not address whether "newly discovered risks" were alleged for the post-approval, pre-2008 period.

[10] There is no "weaker post-approval presumption," Opp. at 15; cases Plaintiff cites merely articulate the bases on which the strong presumption may be rebutted.

*id.* at 2, 16 (arguing that "Truvada labeling should have warned all patients to be monitored for markers indicating kidney damage").  But Plaintiff concedes that *he* was at risk of a kidney event, and thus the Truvada® labeling *did* warn of the need to monitor Plaintiff.  *E.g.,* Opp. at 1 ¶ 2 ("After being diagnosed with HIV and myriad of other diseases affecting his kidney health, [Plaintiff] was prescribed the antiretroviral Truvada . . . ."); *see also* Br. at 21. Plaintiff also argues that the Truvada® labeling should have warned of the need to monitor for "serum phosphorous and/or urine glucose," Compl. ¶ 46, *see also* Pl. Opp. at 1 ¶ 4, 16, but ignores that the Truvada® labeling *did* warn that "[p]atients at risk for, or a history of, renal dysfunction"— *i.e.,* patients precisely like Plaintiff—"should be carefully monitored for changes in **serum creatinine and phosphorous**."  Br. at 21 n.16 (citing Truvada® labeling; emphasis added).[11]

In all events, despite basing his failure to warn theory on a purported lack of instructions to monitor patients for *kidney* risks, *Plaintiff does not allege that he suffered any kidney injury as a result of taking Truvada®*.  Instead, his claims are based on "pain related to musculoskeletal disorders."  Compl. ¶ 11.  As a result, Plaintiff cannot link the alleged failure to warn to his injuries.  *See, e.g., Port Auth. of New York & New Jersey v. Arcadian Corp.*, 189 F.3d 305, 320 (3rd Cir. 1999) (dismissing failure to warn claim, because "'[i]f the basis for recovery under strict liability is inadequacy of warnings or instruction about dangers, then plaintiff would be required to show that an adequate warning or instruction would have prevented the harm.'") (quoting *Malin v. Union Carbide Corp.*, 219 N.J. Super. 428, 439 (App. Div. 1987)).

---

[11] Plaintiff also argues that Gilead "failed to indicate with what regularity at risk patients should be monitored," Opp. at 16; *see also id.* at 1 ¶ 5, but he does not attempt to explain how, if at all, such a warning would have altered *his* monitoring, let alone how this allegation plausibly supports his claim that with allegedly proper warnings, Plaintiff's healthcare providers "would have elected not to use the Product to treat Plaintiff's HIV."  Compl. ¶ 80.

13

Notwithstanding the lack of any factual allegations plausibly showing a failure to warn, let alone a failure that caused his injuries, Plaintiff argues that he can rebut the presumption that the Truvada® labeling is adequate, because he alleges "deliberate concealment or nondisclosure of after-acquired information."  Opp. at 16.  But Plaintiff misconstrues this basis for overcoming the presumption, which is based on concealment of information "*from the FDA*."  *See, e.g., In re: Accutane Litig.*, 235 N.J. at 280 (finding the presumption was not rebutted where "there is no evidence that [defendant] deliberately concealed or withheld any material information *from the FDA*") (emphasis added).  Plaintiff does not allege that Gilead concealed any information *from the FDA*, and in fact specifically *disclaims* any allegations of fraud on the FDA.  Opp. at 13 n.5 ("Plaintiff did not allege that Defendant Gilead engaged in any fraud upon the FDA.").

Plaintiff also argues that he can rebut the presumption of adequacy based on purported "post-market manipulation."  Opp. at 18.  The problem, of course, is that Plaintiff does not allege any post-market manipulation regarding Truvada®.  Instead, Plaintiff points to two allegations in his Complaint that address *a different medication*.  Opp. at 18 (citing Compl. ⁋ 55 and ⁋ 61, which address Viread®, not Truvada®).  In any event, the allegations plainly do not show "economically-driven post-market manipulation," as is required to rebut the presumption of adequacy attached to FDA approval drug labeling, *In re Accutane*, 235 N.J. at 280.[12]

Finally, Plaintiff baselessly argues that this case includes "unique circumstances," such that even absent an established basis for overcoming the presumption of adequacy, the Court should nevertheless allow Plaintiff's claims to proceed.  Opp. at 19.  But Plaintiff merely repeats his same flawed design defect and failure to warn theories that cannot support a claim for the

---

[12] In *In re Accutane*, as here, the presumption of adequacy was *not* rebutted.  235 N.J. at 277 ("plaintiffs . . . failed to show any of those bases for overcoming the presumption of adequacy.")

reasons discussed in Gilead's Brief and herein, and Plaintiff does not cite any support for his conclusory assertion that his allegations suffice to overcome the presumption that the Truvada® labeling is adequate.  For instance, Plaintiff asserts, without citation to any facts, that Gilead "purposefully delay[ed] the introduction of TAF medications," and therefore "Gilead knew that its labeling was inadequate."  Opp. at 19.  Plaintiff offers no basis for the logical leap between a purported delay in introducing a different medication to the market and the conclusory assertion that this somehow means Gilead knew its labeling was inadequate, let alone that this is adequate to create a novel basis for overcoming the presumption that the Truvada® labeling is adequate.

## IV.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiff argues that if his claim against Gilead is dismissed, he should be granted leave to amend.  Opp. at 20-21.  But Plaintiff does not identify *any* allegations that he could or would include in an amended complaint that would save his fatally flawed theories of liability.  Indeed, Plaintiff does not even attempt to suggest how he could plead around the fact that his claims are preempted by federal law or that the Truvada® labeling is presumptively adequate, especially given that the FDA-approved Truvada® labeling contained the warnings Plaintiff contends were missing.  He plainly cannot do so, and his claims should be dismissed with prejudice.  *See, e.g., Matter of Estate of Jensen*, No. A-2901-17, 2020 WL 479074, at *6 (App. Div. Jan. 30, 2020) ("Dismissal with prejudice is appropriate . . . if provision of an opportunity to amend would be futile."); *Johnson v. Glassman*, 401 N.J. Super. 222, 246 (App Div. 2008) (affirming dismissal with prejudice where "plaintiffs have not offered either a certification or a proposed amended pleading that would suggest their ability to cure the defects that we have noted").

15

# CONCLUSION

For the foregoing reasons, and those set forth in Gilead's Brief, its Motion to Dismiss should be granted, and Plaintiff's Complaint should be dismissed with prejudice.

Dated: November 30, 2020                    Respectfully submitted,

/s/ *Beth S. Rose*

Beth S. Rose (NJ ID #028491987)
R. Michael Riecken (NJ ID #211402016)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
brose@sillscummis.com
rriecken@sillscummis.com

Joshua E. Anderson (*pro hac vice* pending)
Alycia A. Degen (*pro hac vice* pending)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
janderson@sidley.com
adegen@sidley.com

16